UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL J. MADIGAN
and MICHAEL F. MCCLAIN

No. 22 CR 115

Hon. John Robert Blakey

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' PRETRIAL MOTIONS**

MORRIS PASQUAL
Acting United States Attorney

AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH E. STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

ARGUMENT ...................................................................................................... 18

    I.     Madigan's Motion to Dismiss (R. 54) Should Be Denied ........................... 18

        A.     Overview ................................................................................... 18

        B.     Applicable Law .......................................................................... 20

        C.     The Indictment Properly Alleges RICO Conspiracy. ............................ 22

        D.     The ComEd Related Counts Should Not Be Dismissed ...................... 41

        E.     The AT&T Related Count Should Not Be Dismissed. ......................... 71

        F.     Madigan's Constitutional Arguments Regarding § 666 Are Meritless. ................................................................................. 72

    II.    McClain's Motion to Dismiss Counts Nineteen and Twenty (R. 69) Should Be Denied. ............................................................................ 77

        A.     The Indictment Properly Alleges Honest Services Fraud. .................. 78

        B.     The Indictment Properly Alleges Property Fraud. ............................. 80

    III.   Madigan's Motion to Strike (R. 59) Should Be Denied. ......................... 83

        A.     Applicable Law .......................................................................... 83

        B.     Analysis .................................................................................... 83

    IV.   Madigan's Motion for a Bill of Particulars (R. 60) Should Be Denied ....... 87

        A.     Applicable Law .......................................................................... 88

        B.     Madigan's Motion For A Bill of Particulars Should Be Denied ............. 89

V.    Madigan's Motion to Suppress Title III Interceptions (R. 58) Should
      Be Denied. ................................................................................................. 96

      A.    Background .............................................................................. 98

      B.    McClain Does Not Have Standing. ...................................... 110

      C.    The Attenuation Doctrine Forecloses Suppression. ........... 111

      D.    There Was Probable Cause Supporting Entry of the 2014 Order. ..... 118

      E.    The Request for a *Franks* Hearing Should Be Denied. ....................... 129

CONCLUSION ........................................................................................ 138

## TABLE OF AUTHORITIES

### Cases

*Bakes v. United States*, 478 F.2d 1405 (7th Cir. 1973)............................................. 109

*Bakes v. United States*, 350 F. Supp. 547 (N.D. Ill. 1972)........................................ 109

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) ........................................... 45

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ...................................................... 32, 73

*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015) .................... 31

*Boyle v. United States*, 556 U.S. 938 (2009)......................................................... 23, 24

*Brinegar v. United States*, 338 U.S. 160 (1949)................................................. 119, 122

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...................................................... 32, 37

*Brown v. Illinois*, 422 U.S. 590 (1975) ............................................................... 113, 114

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) .......................................... 33, 74

*Express Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014) ................... 87

*Expressions Hair Design v. Scheiderman*, 137 S. Ct. 1144 (2017)...................... 33, 40

*First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)................................... 33, 74

*Franks v. Delaware*, 438 U.S. 154 (1978).............................................................. 130

*Hamling v. United States*, 418 U.S. 87 (1974)......................................................... 20

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .................................... 33, 40

*Hudson v. Michigan*, 547 U.S. 586 (2006) .............................................. 98, 113, 130

*Illinois v. Gates*, 462 U.S. 213 (1983) ................................................................. 119

*Johnson v. United States*, 576 U.S. 591 (2015)......................................................... 76

*Jordan v. DeGeorge*, 341 U.S. 223 (1951) .............................................................. 32

*Kaupp v Texas*, 538 U.S. 626 (2003) ................................................................. 115

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ..................................................... 82, 83

*Kolender v. Lawson*, 461 U.S. 352 (1983) ........................................................ 32, 76

*McDonnell v. United States*, 579 U.S. 550 (2016) .............................................. *passim*

*Murray v. United States*, 487 U.S. 533 (1988) ........................................................ 113

*New York v. Ferber*, 458 U.S. 747 (1982) .................................................................. 32

*Ocasio v. United States*, 578 U.S. 282 (2016) ........................................................... 46

*People v. Brandstetter*, 430 N.E.2d 731 (Ill. App. 1982) ........................................... 35

*People v. Defore*, 150 N.E. 585 (1926) ................................................................... 113

*People v. Johnson*, 335 Ill. App. 3d 805, 780 N.E.2d 803 (2002) .............................. 38

*Percoco v. United States*, 143 S. Ct. 1130 (2023) ..................................................... 80

*Rao v. BP Prod. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009) ....................................... 28

*Rawlings v. Kentucky*, 448 U.S. 98 (1980) ....................................................... 114, 116

*Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012) ............................................ 59, 94

*Sabri v. United States*, 541 U.S. 600 (2004) ............................................................. 76

*Salinas v. United States*, 522 U.S. 52 (1997) ................................................ 45, 46, 56

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................... 36, 37, 38, 79

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) .......................................................... 31

*United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) ................................................ 47

*United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997) ................................. *passim*

*United States v. Alex*, 791 F. Supp. 723 (N.D. Ill. 1992) ...................................... 90, 92

*United States v. Alexander*, 741 F.2d 962 (7th Cir. 1984) ......................................... 79

*United States v. Anderson*, 280 F.3d 1121 (7th Cir. 2002) ........................................ 20

iv

*United States v. Applins*, 637 F.3d. 59 (2d Cir. 2011) .................................................. 23

*United States v. Bates*, 96 F.3d 964 (7th Cir. 1996) .................................................... 21

*United States v. Bates*, 522 U.S. 23 (1997) .................................................................. 21

*United States v. Black*, 469 F. Supp. 2d 513 (N.D. Ill. 2006) ..................................... 84

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) .................................... 123

*United States v. Blanchard*, 542 F.3d 1133 (7th Cir. 2008) ...................................... 89

*United States v. Boender*, 649 F.3d 650 (7th Cir. 2011) ..................................... *passim*

*United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) ............................................. 61

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) .................................................. 58

*United States v. Bryant*, 556 F.Supp.2d 378 (D.N.J. 2008) ........................................ 69

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ................................................. 70

*United States v. Burke*, No. 19-CR-322,
    2022 WL 1970189 (N.D. Ill. June 6, 2022) ....................................................... *passim*

*United States v. Busch*, No. 92 CR 20012,
    1992 WL 176485 (N.D. Ill. July 6, 1992) .................................................................. 90

*United States v. Carrillo*, 269 F.3d 761 (7th Cir. 2001) ........................................... 127

*United States v. Carter*, 573 F.3d 418 (7th Cir. 2009) ..................................... 115, 118

*United States v. Chaverra-Cardona*, 667 F. Supp. 609 (N.D. Ill. 1987) .................... 84

*United States v. Climatemp, Inc.*, 482 F. Supp. 376 (N.D. Ill. 1979) ........................ 84

*United States v. Conrad*, 673 F.3d 728 (7th Cir. 2012) ........................... 114, 115, 116

*United States v. Cook*, 970 F.3d 866 (7th Cir. 2020) .................................................. 32

*United States v. Cornier-Ortiz*, 361 F.3d 29 (1st Cir. 2004) ................................. 65, 70

*United States v. Cox*, 536 F.3d 723 (7th Cir. 2008) .................................................... 21

*United States v. Crowley*, 504 F.2d 992 (7th Cir. 1974) ............................................ 120

*United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993) ................................................. 77

*United States v. Davis*, 44 F.4th 685 (7th Cir. 2022) ............................... 114, 115, 116

*United States v. Domme*, 753 F.2d 950 (11th Cir. 1985) ........................................... 125

*United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021) .......... 54, 74, 75, 77

*United States v. Dwyer*, 238 Fed. App'x 631 (1st Cir. 2007) ..................................... 65

*United States v. Elliott*, 771 F.2d 1046 (7th Cir. 1985) .............................................. 96

*United States v. Farley*, No. 97 CR 0441,
    1997 WL 695680 (N.D. Ill. Oct. 31, 1997) ............................................................. 91

*United States v. Fassnacht*, 332 F.3d 440 (7th Cir. 2003).................................... 88, 89

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013).................................. 62, 63, 64

*United States v. Ferriero*, 866 F.3d 107 (3d Cir. 2017)......................................... 34, 41

*United States v. Figueroa*, 757 F.2d 466 (2d Cir. 1985) .......................................... 125

*United States v. Firtash*, 392 F. Supp. 3d 872 (N.D. Ill. 2019) ................................. 22

*United States v. Friedland*, 441 F.2d 855 (2d Cir 1971) .................................. 115, 118

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007)..................................... 54, 55, 62

*United States v. Garcia*, 528 F.3d 481 (7th Cir. 2008) ............................................ 128

*United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013) ............................................ 47

*United States v. Gatto*, 746 F. Supp. 432 (D.N.J. 1990) ........................................... 84

*United States v. Gatto*, 924 F.2d 491 (3d Cir. 1991)................................................. 84

*United States v. Gee*, 432 F.3d 713 (7th Cir. 2005) ................................. 46, 48, 49, 50

*United States v. Genova*, 167 F. Supp. 2d 1021 (N.D. Ill. 2001) .............................. 39

*United States v. Ginsburg*, 773 F.2d 798 (7th Cir. 1985) ......................................... 79

*United States v. Gladhart*, 68 F. App'x 784 (9th Cir. 2003) ...................................... 96

*United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991) ................................... 22, 88, 90

*United States v. Glover*, 755 F.3d 811 (7th Cir. 2014) .............................................. 136

*United States v. Griffin*, 827 F.2d 1108 (7th Cir. 1987) ................................... 119, 123

*United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) .................................... 62, 63

*United States v. Hancock*, 844 F.3d 702 (7th Cir. 2016) ................................. 131, 137

*United States v. Hardin*, 874 F.3d 672 (10th Cir. 2017) ............................................ 77

*United States v. Harris*, 464 F.3d 733 (7th Cir. 2006) ............................................ 131

*United States v. Harris*, 695 F.3d 1125 (10th Cir. 2012) ........................................... 23

*United States v. Hassanshahi*, 75 F. Supp. 3d 101 (D.D.C. 2014) ................. 114, 115

*United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015) .............................. 52, 55, 62

*United States v. Hernandez*, 330 F.3d 964 (7th Cir. 2003) ....................................... 89

*United States v. Hogan*, 886 F.2d 1497 (7th Cir. 1989) ............................................ 39

*United States v. Holzer*, 816 F.2d 304 (7th Cir. 1987) ............................................ 124

*United States v. Holzer*, 484 U.S. 807 (1987) .......................................................... 124

*United States v. Hosseini*, 679 F.3d 544 (7th Cir. 2012) ........................................... 30

*United States v. Jackson*, 688 F. App'x 685 (11th Cir. 2017) .............................. 62, 63

*United States v. Jenner*, 52 F.3d  (7th Cir. 1995) .................................... 120, 123, 124

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998) ................................... 55, 63

*United States v. Ji Chaoqun*, No. 18 CR 611,
 2020 WL 1689826 (N.D. Ill. Apr. 7, 2020) ............................................................. 96

*United States v. Johnson*, 874 F.3d 990 (7th Cir. 2017) ........................................... 62

*United States v. Jones*, 208 F.3d 603 (7th Cir. 2000) ...................................... 131, 136

*United States v. Jones*, 275 F.3d 648 (7th Cir. 2001) .................................................. 25

*United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981) ....................................... 88, 89

*United States v. Khan*, No. 15-CR-00286,
    2017 WL 2362572 (N.D. Ill. May 31, 2017) .............................................................. 89

*United States v. Khan*, 937 F.3d 1042 (7th Cir. 2019) .............................................. 89

*United States v. Kousisi*s, 66 F.4th 406 (3d Cir. 2023).............................................. 83

*United States v. Lavin*, 504 F. Supp. 1356 (N.D. Ill. 1981)...................................... 92

*United States v. Leisure*, 844 F.2d 1347 (8th Cir. 1988) ......................... 119, 122, 133

*United States v. Leon*, 468 U.S. 897 (1984)....................................................... *passim*

*United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022)........................................... 60

*United States v. Little*, No. 11-189-01, 2012 WL 489194 (W.D. La. Feb. 14, 2012) 126

*United States v. Lobue*, 751 F. Supp. 748 (N.D. Ill. 1990) ........................................ 91

*United States v. Loscalzo*, 18 F.3d 374 (7th Cir. 1994) ............................................. 81

*United States v. Lovett*, 811 F.2d 979 (7th Cir. 1987) .............................................. 79

*United States v. Lupton*, 2009 WL 679649 (E.D. Wisconsin 2009)........................... 66

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)................................... 65, 66, 71

*United States v. Maggio*, 862 F.3d 642 (8th Cir. 2017) ............................................. 61

*United States v. Malin*, 908 F.2d 163 (7th Cir. 1990) ..................................... 119, 122

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ....................................... 34

*United States v. Marcy*, 777 F. Supp. 1400 (N.D. Ill. 1991) .................................... 126

*United States v. Maro*, 272 F.3d 817 (7th Cir. 2001)...................... 130, 131, 132, 137

*United States v. Masters*, 924 F.2d 1362 (7th Cir. 1991) ..................................... 25, 26

*United States v. McAllister*, 18 F.3d 1412 (7th Cir. 1994) ...................................... 131

viii

*United States v. McClain*, No. 20 CR 812,
   2022 WL 488944 (N.D. Ill. Feb. 17, 2022) ...................................................... *passim*

*United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013) ............................. 130, 131

*United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010)......................................... 47

*United States v. McNeese*, 901 F.2d 585 (7th Cir. 1990) ......................................... 137

*United States v. Medley*, 913 F.2d 1248 (7th Cir. 1990)...................................... 51, 52

*United States v. Moore*, 563 F.3d 585 (7th Cir. 2009) .................................. 21, 29, 88

*United States v. Mullins*, 800 F.3d 866 (7th Cir. 2015).................................. 46, 48, 53

*United States v. Nelson*, 712 F.3d 498 (11th Cir. 2013) ........................................... 77

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019).......................... 60, 76, 78

*United States v. Norfleet*, No. 05 CR 117,
   2005 WL 8150055 (N.D. Ill. July 1, 2005) ............................................................ 91

*United States v. Olson*, 450 F.3d 655 (7th Cir. 2006) ................................................ 22

*United States v. Owens*, 2016 WL 7079609 (E.D. Wis. Dec. 5, 2016) ..................... 130

*United States v. Palma*, 58 F.4th 246 (6th Cir. 2023) ............................................... 83

*United States v. Pappas*, 592 F.3d 799 (7th Cir. 2010) ........................................... 128

*United States v. Perholtz*, 842 F.2d 343 (D.C. Cir. 1988) ......................................... 26

*United States v. Pless*, 982 F.2d 1118 (7th Cir. 1992) ..................................... 119, 123

*United States v. Plummer*, 581 F.3d 484 (7th Cir. 2009) .......................................... 32

*United States v. Porter*, 886 F.3d 562 (6th Cir. 2018) ........................................ 47, 60

*United States v. Redzic*, 627 F.3d 683 (8th Cir. 2010)............................................... 55

*United States v. Reed*, 443 F.3d 600 (7th Cir. 2006) ............................................... 127

*United States v. Reed*, 744 F.3d 519 (7th Cir. 2014) ............................................... 128

ix

*United States v. Renner*, 238 F.3d 810 (7th Cir. 2001)..............................................81

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ...............................................43

*United States v. Rich*, 14 F.4th 489 (6th Cir. 2021) ...................................................23

*United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988)...................................................70

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021) ...........................55, 59, 60

*United States v. Rose*, 590 F.2d 232 (7th Cir. 1978)...................................................46

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) ..................................................58

*United States v. Ryans*, 709 F. App'x 611 (11th Cir. 2017)........................................77

*United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978)...........................................91

*United States v. Schultz*, 586 F.3d 526 (7th Cir. 2009) .............................................131

*United States v. Searcy*, 664 F.3d 1119 (7th Cir. 2001) ...........................................119

*United States v. Shabani*, 513 U.S. 10 (199) ..............................................................46

*United States v. Shoemaker*, 746 F.3d 614 (5th Cir. 2014) .........................................86

*United States v. Shotts*, 145 F.3d 1289 (11th Cir. 1998).....................................35, 74

*United States v. Slizewski*, 809 F.3d 382 (7th Cir. 2016).........................................132

*United States v. Snyder*, --- F.4th ---,
   2023 WL 4011163 (7th Cir. June 15, 2023)..................................................*passim*

███████████    ████████████████████████████████████████████ 107

*United States v. Solomon*, 892 F.3d 273 (7th Cir. 2018) .............................................59

*United States v. Spann*, 409 F. Supp. 3d 619 (N.D. Ill. 2019)..........................129, 130

*United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999)..... *passim*

*United States v. Swanson*, 210 F.3d 788 (7th Cir. 2000) .........................................131

*United States v. Tamras-Martin*, Case No., 18 CR 267- ............................................53

*United States v. Tello*, 687 F.3d 785 (7th Cir. 2012) .................................................. 22

*United States v. Thomas*, 150 F.3d 743 (7th Cir. 1998) ............................................. 22

*United States v. Thompson*, 76 F.3d 442 (2d Cir. 1996)....................................... 35, 74

*United States v. Thompson*, 944 F.2d 1331 (7th Cir. 1991) .................................... 112

*United States v. Turkette*, 452 U.S. 576 (1981)........................................................ 23

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ............................ 34

*United States v. Vargas*, 116 F.3d 195 (7th Cir. 1997).................................... 112, 125

*United States v. Vastola*, 899 F.2d 211 (3d Cir. 1990)................................................ 85

*United States v. Vaughn*, 722 F.3d 918 (7th Cir. 2013) ......................... 20, 21, 44, 89

*United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014)........................... 26, 27, 29

*United States v. Warner*, No. 02 CR 506,
2004 WL 1794476 (N.D. Ill. Aug. 11, 2004) ......................................................... 25

*United States v. Watts*, 535 F.3d 650 (7th Cir. 2008) .............................................. 127

*United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001) ................................... 21

*United States v. White*, 610 F.3d 956 (7th Cir. 2010) .................................... 20, 21, 73

*United States v. Williams*, 507 F.3d 905 (5th Cir. 2007).................................... 65, 66

*United States v. Williams*, 553 U.S. 285 (2008)........................................................ 32

*United States v. Williams*, 718 F.3d 644 (7th Cir. 2013).......................................... 130

*United States v. Wilson*, 493 F. Supp. 2d 364 (E.D.N.Y. 2006)................................. 92

*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999)............................................... 21

*United States v. Zimmermann*, 509 F.3d 920 (8th Cir. 2007)................................... 62

*Utah v. Strieff*, 579 U.S. 232 (2016) ................................................................. *passim*

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ............................................................... 76, 77

*Williams v. United States*, 341 U.S. 97 (1951) ............................ 38

*Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) ............................ 45

*Wright v. City of Danville*, 675 N.E.2d 110 (Ill. 1996) ................ 37

## Statutes

18 U.S.C. § 2 ................................................................. 17, 18, 81

18 U.S.C. § 201(b) ............................................................ *passim*

18 U.S.C. § 215 ........................................................ 56, 57, 58, 63

18 U.S.C. § 371 ........................................................... 17, 46, 96

18 U.S.C. § 666 ............................................................... *passim*

18 U.S.C. § 1343 .............................................................. 17, 82

18 U.S.C. § 1346 .............................................................. *passim*

18 U.S.C. § 1512(b) ............................................................ 35, 74

18 U.S.C. § 1951 .............................................................. *passim*

18 U.S.C. § 1952(a)(3) ............................................................ 17

18 U.S.C. § 1961(4) ............................................................ 23, 39

18 U.S.C. § 1962(d) ............................................................ *passim*

18 U.S.C. § 2511(c) ............................................................. 109

18 U.S.C. § 2510(11) ............................................................ 112

31 U.S.C. § 5313 ................................................................ 70

720 ILCS § 5/33-1(d) ......................................................... 31, 33, 35

720 ILCS § 5/55-3(a)(4) ......................................................... 33, 35

Pub. L. No. 98-473 ................................................................. 57

Pub. L. No. 99-646 ................................................................. 56

## Rules

Fed. R. Crim. P. 7(c)(1) ................................................ 20, 43, 83

Fed. R. Crim. P. 7(d) ............................................................. 84

## Other Authorities

Comprehensive Crime Control Act of 1989, S. Rep. No. 98-225, 98th Cong., 1st Sess. 369-70 (1983), reprinted in 1984 U.S.C.C.A.N. 351................................................ 42

*Bank Bribery: Hearings on H.R. 2617, 2839, and 3511 Before the Subcomm. On Criminal Justice of the H. Comm. On the Judiciary, 99th Cong. 2 (July 11 and 17, 1985)* ................................................................................ 57

*Financial Bribery and Fraud Amendments Act of 1984: Hearing on H.R. 5405 Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 98th Cong. at 1 (Apr. 26, 1984)................................................................................ 57

H.R. Rep. 99-797, § 42, at 6153 n.9 (1986)................................................ 56

**INTRODUCTION**

Defendant Michael Madigan was the leader of a corrupt criminal enterprise, the tentacles of which extended from the Office of the Speaker of the Illinois House of Representatives in Springfield, to the Thirteenth Ward Democratic Organization on the south side of Chicago. For approximately eight years, through the operation of this criminal enterprise, Madigan exploited his position as a high-ranking public official to manipulate the levers of State and local government for the purpose of illegally enriching himself and his associates. Madigan, together with his loyal lieutenant Michael McClain—a self-described soldier and faithful agent for Madigan—arranged for a flood of corrupt payments and perks to be doled out to Madigan and his associates in exchange and as a reward for Madigan's abuse of his official powers.

Major corporations handed out more than one million dollars in bribes to Madigan's cronies to secure Madigan's assistance and favor with respect to the passage of legislation worth hundreds of millions to the companies. Madigan was sure to line his own pockets as well through the abuse of his official position. Without batting an eye, time and again Madigan stood prepared to take official action in his capacity as an Illinois Representative and Speaker of the Illinois House of Representatives, at times with the connivance and assistance of his confederate McClain, in exchange for legal work being steered to his private law firm. Indeed, Madigan was prepared to exploit the official positions of others, including Chicago Alderman A, in order to personally benefit himself.

1

For their roles in this wide-ranging criminal enterprise, Madigan and McClain were charged by a grand jury in a 23-count superseding indictment with a litany of offenses, including racketeering conspiracy, conspiring to commit an offense against the United States, honest services fraud, extortion, use of interstate facilities in aid of racketeering activity, and federal program bribery. The 117-page indictment returned by the grand jury exhaustively details the defendants' reign of corruption over the course of an eight-year period.

The defendants have now filed a series of pretrial motions seeking to prevent a jury from considering their conduct and holding them accountable for their gross abuses of power. As the defendants would have it, nearly every single criminal statute targeting corruption referenced in the superseding indictment, including decades-old corruption measures passed by both the United States Congress as well as the Illinois General Assembly—a body which Madigan himself helmed for nearly forty years no less—is either unconstitutional or incomprehensible. The defendants also offer up not-so-novel limiting constructions of these measures in an effort to limit their application to their criminal conduct; however, the Court of Appeals has rejected these efforts to improperly cabin the statutes again and again, most recently just several weeks ago. Not only that, but the defendants contend that the 117-page indictment returned by the grand jury lacks sufficient details for them to understand what they did wrong. This challenge is lodged despite the fact that McClain has just stood trial for some seven weeks in this very courthouse, before a jury that heard and

2

saw much of the evidence that will be introduced at trial in this case. And the defendants do not stop there; they also ask this Court to prevent the jury from hearing the truth captured on a series of damning wiretap and consensual recordings made over the course of several years—including the recordings admitted at the recently concluded trial—on the supposed ground that the Chief Judge of this district was incapable of correctly applying the time-tested probable cause standard applicable to wiretap applications.[1]

These pretrial motions and the others that have been filed are totally baseless. R. 53, 57, 59, 60, 61, 69, 71. For the reasons described in greater detail below, each and every one of these motions should be denied and the matter should proceed to trial as scheduled.

## BACKGROUND

### *Factual Background*

#### *Defendants*

As Speaker of the Illinois House of Representatives, Michael Madigan controlled which measures were called for a vote in the House of Representatives and exercised substantial influence over fellow lawmakers concerning legislation, including legislation affecting regulated entities like Commonwealth Edison ("ComEd") and AT&T Illinois ("AT&T"). R. 37 (Superseding Indictment ("SI")), Count

---

[1]     The government's response to this motion is filed partially under seal, because the wiretap affidavit and related filings are not public and include descriptions of uncharged individuals and allegations.

1, ¶¶ 1(c), 2, 6-7. Madigan was elected from a House district that was largely made up of two Chicago wards: the 13th Ward (for which he was Democratic Committeeman and Chairman) and the 23rd Ward. *Id.* ¶¶ 1(i), 6. Madigan was also Chairman of the Democratic Party of Illinois and a named partner in the property tax law firm, Madigan & Getzendanner. *Id.* ¶¶ 1(k), 6.

McClain served with Madigan in the House of Representatives for approximately 10 years beginning in 1972. McClain subsequently served as a lobbyist and/or consultant for entities, including for ComEd. *Id.* ¶ 8. McClain acted on Madigan's behalf, including by making demands for jobs and payments to third-parties. *Id.* ¶ 9.

As described below, Madigan and McClain worked together to use Madigan's as well as other public officials' positions (i) to receive unlawful personal financial advantage for Madigan and his law firm, Madigan and Getzendanner, and to (ii) arrange for private benefits for Madigan's political allies and associates. *E.g., id.* ¶ 13(a)-(b). Madigan used his position as Speaker of the House of Representatives to promote certain legislation and defeat other legislation and to appoint his allies and associates to public employment. *Id.* ¶ 13(c).

### ComEd Conduct

The superseding indictment alleges that Madigan engaged in bribery and conspired to do so by making requests, through McClain as his intermediary, for the Illinois energy company ComEd to hire individuals associated with Madigan, including as full-time employees, consultants, and contractors. SI, Count 2, ¶ 2. These

4

hires were made for the purpose of influencing and rewarding Madigan to take favorable action with regard to ComEd legislation. *E.g., id.* ¶ 3.

### Consultant Hiring

The indictment alleges that, from 2011 to 2019, ComEd hired Madigan associates as "subcontractors," even though these individuals did little or no work for ComEd and instead were paid as part of a corrupt effort to bribe Madigan in connection with ComEd legislation. *Id.* ¶ 3. The Madigan "subcontractors" included: a former Alderman for the 13th Ward and Treasurer of the 13th Ward Democratic Organization (Individual 13W-1), two precinct captains for the 13th Ward (Individual 13W-2 and Individual 13W-3), a former 23rd Ward Alderman (Individual 23W-1), and a former Democratic representative (Individual FR-1). *Id.* ¶¶4, 31(f), 31(g), 31(h), 31(t), 31(ii). These "subcontractors" were not paid directly by ComEd, but through various intermediary lobbyists, in order to conceal the payments. *Id.* ¶¶ 6, 28.

These hires were not premised on the "subcontractors'" lobbying or consulting acumen but rather their utility to Madigan. For example, Madigan told Individual 13W-3 not to worry that he did not do any work for ComEd, even though he was paid by the company, because he was doing campaign work for Madigan. *Id.* ¶ 31(kk). And McClain explained to a ComEd employee that ComEd subcontractors were valuable because of their connection to Madigan, not because of their work. *Id.* ¶ 31(ppp). And significantly, it was Madigan–not ComEd–who determined when payments to the "subcontractors" started and stopped. *Id.* ¶ 11.

.

The hiring of Individual 23W-1 is a perfect illustration of the corrupt scheme. In 2018, after ComEd had been paying other Madigan associates as "subcontractors" for years, Madigan requested that Individual 23W-1 be hired by ComEd. *Id.* ¶¶ 1(y), 31(ll), 31(qq), 31(rr). ComEd agreed to hire Individual 23W-1, and McClain informed Madigan that he could call Individual 23W-1 to let him know, which Madigan did. *Id.* ¶¶ 31(tt), 31(uu). Individual 23W-1 was paid $5,000 per month by ComEd, even though he did little or no work for ComEd. The payments were made by one of ComEd's existing lobbyists, Jay Doherty, in order to conceal that the payments were going directly to Individual 23W-1. *Id.* ¶ 31(xx).

Around the same time as communications concerning hiring Individual 23W-1, McClain informed ComEd's CEO (Anne Pramaggiore) and others that Madigan ("a friend of ours") had authorized McClain to "go ahead and kill" a piece of legislation that was adverse to ComEd's interests, House Bill 5626. *Id.* ¶ 31(vv). House Bill 5626 was ultimately not enacted into law. *Id.* ¶ 2(p).

Indeed, Madigan's coconspirators understood these appointments to be directly linked to Madigan's ability to help ComEd with its legislative agenda in Springfield. In a phone call on February 18, 2019, ComEd employee and cooperator Fidel Marquez told Pramaggiore that the Madigan subcontractors just "collect a check," yet Pramaggiore nevertheless advised Marquez not to change the contracts, because "we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off, and then

6

we get forced to give' em a five year contract because we're in the middle of needing to get something done in Springfield." *Id.* ¶ 31(mmm).

### *Law Firm A*

The superseding indictment further alleges that ComEd's retention of Law Firm A was intended to corruptly influence Madigan. In 2011, McClain and ComEd employee John Hooker advised a member of ComEd's legal department that it was important to retain Law Firm A, a law firm "valuable" to Madigan. SI, Count 2, ¶¶ 14, 31(l). After that, ComEd retained Law Firm A and guaranteed the firm approximately 850 hours of work each year. *Id*. In 2014, Pramaggiore instructed a member of ComEd's legal department that Law Firm A's contract had to be renewed, working through McClain to do so. *Id*. ¶ 15.

In 2016, after ComEd personnel sought to reduce the number of hours of legal work provided to Law Firm A, McClain interceded with Pramaggiore to cause Law Firm A's contract to be renewed on terms acceptable to Law Firm A. *Id.* ¶ 16. On January 20, 2016, McClain wrote to Pramaggiore and Hooker, "I am sure you know how valuable [Lawyer A] is to our Friend," and continued:

> I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through? For me, Hook and I am sure you I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend.

*Id.* ¶ 31(l). That same day, Pramaggiore responded: "Sorry. No one informed me. I am on this." *Id.* ¶ 31(m).

The retention of Law Firm A was linked to ComEd's legislative agenda in other ways. In 2016, a ComEd project manager who had no oversight over ComEd's legal department but was tasked with helping to obtain legislative approval for the Future Energy Jobs Act ("FEJA")— legislation beneficial to ComEd that passed in December 2016—began to monitor the renewal of Law Firm A's contract. *Id.* ¶¶ 17, 31(q)-(s). McClain, on Madigan's behalf, pressed for Law Firm A's continued retention on favorable terms, including by contacting the project manager for FEJA. *Id.* ¶¶ 31(q), 31(s).

On December 2, 2016, the day after ComEd's FEJA legislation passed, McClain emailed a member of ComEd's legal department about Law Firm A, and asked, "After you catch a couple of good nights [sic] sleep can we put this item to bed?" *Id.* ¶ 31(v).

ComEd ultimately renewed its contract with Law Firm A in 2016 on terms favorable to the law firm, as part of an effort to influence and reward Madigan in connection with ComEd legislation. *Id.* ¶ 18.

### Board Appointment for Individual BM-1

As alleged in the superseding indictment, Madigan also conspired to appoint Individual BM-1 to ComEd's Board of Directors, corruptly intending to be influenced and rewarded with regard to ComEd legislation.

Starting in November 2017, Madigan and McClain sought to have Individual BM-1 appointed to ComEd's Board of Directors. SI, Count 2, ¶¶ 23-24. In or around April 2018, Madigan called Individual BM-1 about the expected timing of his appointment to the ComEd board. *Id.* ¶ 31(mm). On May 2, 2018, McClain advised

8

Madigan that Pramaggiore was experiencing push-back on Individual BM-1's appointment and had proposed finding a job that would pay Individual BM-1 the same amount of money as a Board position. *Id.* ¶ 31(oo). On May 16, 2018, Madigan instructed McClain that ComEd should "go forward with" the appointment of Individual BM-1. *Id.* ¶ 31(qq). McClain did as instructed, and spoke to Pramaggiore that same day. Pramaggiore told McClain that she would, at Madigan's request, "keep pressing" for Individual BM-1's Board appointment. SI ¶ 31(rr).

On September 7, 2018, Madigan asked McClain to confirm that Individual BM-1 would, in fact, be appointed to ComEd's Board of Directors. *Id.* ¶ 31(bbb). McClain called Pramaggiore that same day, and Pramaggiore confirmed that she continued to advocate for Individual BM-1. During that call, Pramaggiore linked Individual BM-1's appointment to ComEd's success: "You take good care of me and so does our friend and I will do the best that I can to, to take care of you." *Id.* ¶ 31(ccc).

Individual BM-1 was appointed to ComEd's Board in April 2019. *Id.* ¶31(sss).

### *Other ComEd Hires*

The indictment alleges other hiring requests made for or on behalf of Madigan, which were intended to influence or reward Madigan with regard to ComEd legislation. SI, Count 2, ¶¶ 26-27. As one example, the conspirators caused positions in the ComEd Internship Program to be set aside for individuals associated with the Thirteenth Ward who were identified by McClain. Those interns received favorable treatment compared to other intern candidates because of their connection to Madigan. *Id.* ¶¶ 19-22.

9

### *Legislation Affecting ComEd*

While Madigan received this stream of benefits from ComEd, he repeatedly took official action that was favorable to the company. For example, in 2011, the Illinois General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"), which benefitted ComEd by allowing ComEd to more reliably determine consumer rates. Madigan voted in favor of EIMA and voted to override the Governor's veto of EIMA. SI, Count 2, ¶¶ 1(m), 31(a)-(b).

After EIMA's passage, the Illinois Commerce Commission ("ICC") interpreted EIMA in a manner adverse to ComEd. In 2013, the Illinois General Assembly passed legislation, known as Senate Bill 9, that effectively overruled the ICC's adverse interpretation of EIMA. *Id.* ¶ 1(n). Madigan voted in favor of Senate Bill 9, and voted to override the Governor's veto. *Id.* ¶ 31(c)-(d).

In 2016, FEJA was called for a vote in the House and ultimately passed. *Id.* ¶¶ 1(o), 31(u).

### *State Board Conduct*

As alleged in the superseding indictment, Madigan agreed to accept business steered by Alderman A to his private law firm, Madigan & Getzendanner, and in exchange, agreed to help Alderman A secure a lucrative state board position. SI, Count 8, ¶¶ 4, 5.

On July 11, 2018, Madigan caused information about State board positions to be delivered to Alderman A. *Id.* ¶ 6. On July 23, 2018, Alderman A contacted Individual A-1, who was employed by a New York real estate company, at Madigan's

request, and asked Individual A-1 to meet with Madigan so that Madigan could pitch his real estate tax business. *Id.* ¶¶ 2(a), 7. In a meeting on August 2, 2018, Madigan met with Alderman A, and during the meeting: (a) Alderman A explained that he was interested in a State board position that would pay him over $100,000 per year; (b) Madigan agreed to assist Alderman A with an appointment to a State board by going to the Governor-elect; (c) Alderman A assured Madigan that he would help Madigan obtain legal business for his law firm; and (d) in return, Madigan again assured Alderman A that he would help him secure a State board position. *Id.* ¶ 8.

Madigan followed up with Alderman A at least twice in early August 2018 to check on the meeting with the New York real estate firm. *Id.* ¶¶ 9, 10. On August 21, 2018, Madigan set up a meeting with a representative of the New York real estate company. *Id.* ¶ 11-12. Madigan later asked Alderman A for his help obtaining business related to a second property owned by the New York company. *Id.* ¶ 14. In a meeting on October 26, 2018, Alderman A advised Madigan that the New York company would give Madigan business, and Madigan again assured him that he would help secure Alderman A a lucrative state board position. *Id.* ¶ 16.

On November 23, 2018, Madigan once again met with Alderman A. Alderman A told Madigan that he would not run for reelection but would still help generate business for Madigan's law firm. Madigan thanked Alderman A and asked, "Do you wanna go forward now on one of those state appointments?" Madigan also asked for Alderman A's resume, "[b]ecause I wanna have a meeting with [the Governor-elect]" to tell him about the board appointment. They also discussed Madigan's assistance

11

in getting Alderman A's relative a state position. *Id.* ¶ 17. After that, Alderman A emailed a copy of his and his relative's resumes to Madigan's office. *Id.* ¶ 19. Madigan met with the Governor-elect on December 4, 2018. *Id.* ¶ 21.

### *Company C Conduct*

The indictment further alleges that Madigan sought to obtain legal fees for his law firm from Company C, an entity involved in developing an apartment building in Chicago, through extortion. SI, Count 15, ¶ 10.

On June 23, 2017, Alderman A told Madigan that Company C would meet with Madigan about legal work but would continue to deal with Alderman A regarding Chicago zoning issues, because, in Alderman A's words, "I think they understand how this works, you know, the *quid pro quo.*" *Id.* ¶ 4. Madigan confirmed that he understood by saying, "Okay. . . very good." *Id.* On July 18, 2017, Madigan confirmed that he knew exactly what Alderman A was talking about, when he advised Alderman A not to use the phrase "*quid pro quo*" with Company C representatives, but to instead falsely suggest that Alderman A was "just recommending . . . because if they don't get a good result on their real estate taxes, the whole project will be in trouble. . . . Which is not good for your ward. So you want high quality representation." *Id.* ¶ 6. This was false, because Madigan had asked Alderman A to introduce him to Company C's representative, and Alderman A had twice informed Madigan that approvals for Company C's real estate project were to be received in exchange for legal work provided to Madigan's law firm. *Id.* After that, on July 18, 2017, Madigan pitched his law firm's work to Company C's representative. *Id.* ¶ 7.

On September 7, 2017, Alderman A told Madigan that he was about to take official action on the Company C real estate project and asked whether Madigan's firm had been engaged by Company C. Madigan responded, "I'm almost positive the answer is yes," but asked Alderman A for an opportunity to "double check with my partner." *Id.* ¶ 8. A few days later, on September 11, 2017, Alderman A again asked Madigan whether Company C had engaged his law firm, and Madigan responded vaguely, in an effort to conceal the nature of the discussion: "you know, you should go ahead and process that. . . You were contemplating processing something. You should go ahead and process that." *Id.* ¶ 9.

### *Chinatown Conduct*

Madigan and McClain also devised and participated in a scheme to transfer a parcel of land in Chinatown from the State ownership to the City of Chicago through legislation, for the purpose of facilitating a sale to a private developer that would, in exchange, hire Madigan's law firm for real estate tax work. SI, Count 19, ¶ 4.

On July 18, 2017, Madigan discussed with Alderman A the transfer of the Chinatown parcel from the State to the City of Chicago via a land transfer bill, which would enable Group A to acquire the parcel for commercial development. *Id.* ¶ 5. Madigan told Alderman A that McClain would contact a representative of Group A to discuss the transfer, which McClain did. *Id.* ¶¶ 7-9.

After that, on December 18, 2017, Alderman A told McClain that he had previously steered work to Madigan's law firm and hoped "these guys," meaning Group A, would be able to do the same thing with the Chinatown parcel. *Id.* ¶ 11.

13

On March 26, 2018, Alderman A told Madigan that he could "be discreet," and that Group A would provide Madigan with property tax work. *Id.* ¶ 13. Madigan thanked Alderman A and said McClain would work on legislation to transfer the Chinatown parcel from State to City ownership. *Id.* On March 27, 2018, Alderman A told Madigan that if Madigan transferred the Chinatown parcel, Madigan would get tax work for his firm, and Madigan responded, "Okay, alright, very good." *Id.* ¶ 14.

After that, McClain worked to pass legislation that would transfer the Chinatown parcel to the City of Chicago on Madigan's behalf. For example, McClain: (a) worked to overcome opposition to the bill in the Senate (*id.* ¶ 15), (b) reported back to Madigan on the opposition to the bill and McClain's progress (*id.* ¶¶ 16, 18, 21); and (c) informed Madigan's staff that Madigan would vote "present" on the land transfer bill in order to conceal Madigan's interest in the bill (*id.* ¶ 19).

On July 31, 2018, McClain told Alderman A that he had talked to Madigan about the land transfer bill and did not anticipate problems with the legislation. *Id.* ¶ 26. On October 26, 2018, Madigan told Alderman A that he was willing to call the legislation for the land transfer bill in the veto session but needed to identify a sponsor for the bill. *Id.* ¶ 27. After that, Madigan asked McClain to work to find a sponsor for the bill, and McClain subsequently contacted Representative B and others to try to secure Representative B as a sponsor of the land transfer bill. *Id.* ¶¶ 29-33.

After that, on November 21, 2018, McClain told Alderman A that the Illinois Secretary of State had learned of opposition to the land transfer bill, which was a

"major hurdle." *Id.* ¶ 34. Madigan informed McClain that the bill would not go forward in that year's veto session. *Id.* ¶ 35-36.

### *AT&T Conduct*

As alleged in the superseding indictment, during the spring of 2017, AT&T, the telecommunications company, started making indirect payments to former Democratic representative and Madigan ally, Individual FR-1 (who was also paid by ComEd), at Madigan's and McClain's request. The purpose of those payments was to influence and reward Madigan with regard to AT&T's Carrier of Last Resort ("COLR") legislation. SI, Count 23, ¶ 4. Like with the ComEd "subcontractor" payments, the monthly $2,500 payments to Individual FR-1 were made indirectly through an intermediary, with a false justification, in an effort to conceal the corrupt nature of the payments. *Id.* ¶ 8.

McClain first asked AT&T to hire Individual FR-1 on or about February 14, 2017. *Id.* ¶ 18(a). Just two days later, McClain informed an AT&T representative that he was working on AT&T's major legislation as a "Special Project" for Madigan. *Id.* ¶ 18(b). On March 28, 2017, McClain again asked for a "small contract" for Individual FR-1 on Madigan's behalf. *Id.* ¶ 18(c). AT&T's president understood this to be a "GO order" for the company to hire Individual FR-1, and after that AT&T representatives pushed to hire Individual FR-1 and to ensure the company would "get credit" for the hire. *Id.* ¶¶ 18(d)-(g).

AT&T employees discussed that they would need to confirm with McClain their plan to hire Individual FR-1 through an intermediary and the amount of the

payments. *Id.* ¶¶ 18(h)-(j). On April 20, 2017, before any AT&T representative had contacted Individual FR-1, the company amended its contract with an existing lobbyist (Intermediary 4) so that AT&T could make indirect payments to Individual FR-1 through Intermediary 4. *Id.* ¶ 18(l). Six days after the contract amendment, AT&T representatives first met with Individual FR-1 to discuss paying Individual FR-1 $2,500 per month. *Id.* ¶ 18(o). Individual FR-1 rejected that amount and contacted McClain. After that, on April 28, 2017, McClain informed AT&T representatives that $2,500 per month was sufficient. *Id.* ¶ 18(n). AT&T then paid Individual FR-1 $2,500 per month for the last nine months of 2017, totaling $22,500. *Id.* ¶ 18(s).

Less than a month after McClain confirmed that $2,500 per month was sufficient, Madigan requested a complete roll call of AT&T's COLR legislation. *Id.* ¶ 18(o). He voted in favor of the COLR legislation on two occasions and voted to override the Governor's veto of the legislation. *Id.* ¶ 18(o)-(r).

### *The Indictment*

On March 3, 2022, a grand jury returned an indictment against Madigan and McClain. R. 1. On October 12, 2022, the grand jury returned a 23-count superseding indictment against Madigan and McClain. R. 37 ("SI"). The superseding indictment is premised on the above-described conduct. The following chart summarizes the counts and charges in the superseding indictment. *Id.*

| Count | Defendant(s) | Violation(s) | Description |
|-------|-------------|--------------|-------------|
| 1 | Madigan<br>McClain | 18 USC § 1962(d) | Racketeering conspiracy |
| 2 | Madigan | 18 USC § 371<br>18 USC § 2 | Conspiracy—ComEd |
| 3 | Madigan | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—ComEd Board seat |
| 4 | Madigan | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—ComEd payments to Individual 23W-1 in 2018 |
| 5 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—ComEd, June 29, 2018 |
| 6 | Madigan | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—ComEd Payments to Individuals 13W-1, 13W-2, 23W-1 in 2019 |
| 7 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—ComEd, July 10, 2018 |
| 8 | Madigan | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—State positions for Alderman A and relative |
| 9 | Madigan | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—State positions for Alderman A and relative |
| 10 | Madigan | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—State positions for Alderman A and relative |
| 11 | Madigan | 18 USC § 666(a)(1)(B) | Solicitation—State board position for Alderman A |
| 12 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— State board position, August 15, 2018 |
| 13 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— State board position, August 31, 2018 |
| 14 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— State board position, December 1, 2018 |
| 15 | Madigan | 18 USC § 1951(a)<br>18 USC § 2 | Attempted extortion involving Company C—December 1, 2018 |
| 16 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Company C, June 23, 2017 |
| 17 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Company C, July 12, 2017 |
| 18 | Madigan | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Company C, July 18, 2017 |
| 19 | Madigan<br>McClain | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—Chinatown parcel |
| 20 | Madigan<br>McClain | 18 USC § 1343<br>18 USC § 1346 | Wire fraud—Chinatown parcel |
| 21 | Madigan<br>McClain | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—Chinatown parcel |
| 22 | Madigan<br>McClain | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act— Chinatown parcel, November 2, 2018 |
| 23 | Madigan<br>McClain | 18 USC § 371<br>18 USC § 2 | Conspiracy—AT&T |

17

*The Pretrial Motions*

Madigan seeks through his pretrial motions: (1) to dismiss Counts One through Seven, Eleven through Fourteen, and Twenty-One through Twenty-Three (R. 53); (2) to strike certain allegations from the indictment (R. 59); (3) to require the government to file a bill of particulars (R. 60); and (4) to suppress the Title III interceptions and for a *Franks* hearing (R. 57). McClain has moved to join Madigan's pretrial motions. R. 61. McClain further argues that, should the motion to suppress be granted, the Court should exclude evidence obtained from "subsequent search warrants of Mr. McClain's phone [and] vehicle," as "fruits of the poisonous tree." *Id.* McClain also moves to dismiss Counts Nineteen and Twenty of the superseding indictment, and Madigan joins that motion. R. 69, 71.

## ARGUMENT

## I. Madigan's Motion to Dismiss (R. 54) Should Be Denied.

### A. Overview

Count One of the superseding indictment charges defendants with conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Contrary to Madigan's motion (R. 54, 55), the superseding indictment properly alleges an association-in-fact enterprise composed of Madigan and McClain, as well as several entities through which Madigan exercised his power. Count One alleges the purposes of this long-lasting enterprise and the types of illegal activities committed by the enterprise's members and associates. The enterprise unquestionably had a common purpose with common actors: Madigan

abused his official position (and that of others) to steer benefits to his associates and to his law firm, and often directed McClain to carry out this unlawful activity. The indictment also sufficiently alleges that Madigan and McClain acted in concert to pursue the enterprise's common interests, rather than solely in their own self-interest.

In addition, the Court should decline Madigan's invitation to be the first to invalidate any of the bribery statutes charged in the superseding indictment. The state bribery statutes that serve as the predicates for the RICO conspiracy charged in Count One are plainly constitutional. The Court should similarly decline to invalidate the federal programs bribery statute, 18 U.S.C. § 666, on constitutional grounds, consistent with the overwhelming weight of precedent upholding the statute.

Madigan also moves to dismiss the § 666 counts in the superseding indictment. Counts Two (in part), Three, Four, Six, Eleven, Twenty-One, and Twenty-Three of the indictment track the plain language of § 666, and detail the above-described corrupt schemes to solicit and accept valuable benefits for favorable action by Madigan. These counts are not defective for failure to allege a *quid pro quo*. The Seventh Circuit repeatedly has held that no *quid pro quo* agreement or understanding is required to establish a violation of § 666, consistent with the plain language of the statute.

Madigan also asks this Court to ignore recent Seventh Circuit precedent and conclude that the government may not pursue a gratuity theory under § 666. The Court should decline this invitation, and rule that § 666 criminalizes gratuities.

Finally, the Court should reject Madigan's argument that portions of the indictment must be dismissed in light of the "bona fide" exception in § 666(c). Although § 666 does not apply to bona fide salary or other compensation paid in the usual course of business, the question whether payments constitute such compensation is a jury question—that fact need not be specifically alleged in the indictment. Moreover, even if such an allegation were necessary, the detailed allegations in the indictment more than adequately establish that the jobs, contracts, and payments at issue were bribes, rather than "bona fide" arrangements made in the usual course of business that are exempted from the reach of § 666.

## B. Applicable Law

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment complies with Rule 7 and the Constitution if it (1) states the elements of the crimes charged; (2) adequately informs a defendant of the nature of the charges brought against him; and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013); *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010); *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). To successfully challenge the sufficiency of an

indictment based on the failure to allege a required element, a defendant must establish both that an essential element was omitted and that he suffered prejudice as a result. *Vaughn*, 722 F.3d at 925.

"Facial sufficiency is not a high hurdle"; there is no need for an indictment to "exhaustively describe the facts surrounding a crime's commission." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997); *United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001) (an indictment need not spell out each element so long as each element is present in context). An indictment that tracks the words of a statute to state the elements of the crime generally is acceptable, so long as the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *Vaughn*, 722 F.3d at 925.

When considering a motion to dismiss under Rule 12(b), a court assumes all facts in the indictment to be true and "view[s] all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009). The court evaluates the allegations "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quotation omitted). A motion to dismiss an indictment is not a summary-judgment motion and should not be used to "test[] the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Moore*, 563 F.3d at 586 (citation omitted); *see also White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can

21

ultimately prove its case"); *United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases." (citation omitted)); *United States v. Firtash*, 392 F. Supp. 3d 872, 885 (N.D. Ill. 2019) (Pallmeyer, C.J.) ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal.").

### C.    The Indictment Properly Alleges RICO Conspiracy.

To prove a RICO conspiracy in violation of 18 U.S.C. § 1962(d), "the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006). For an indictment to adequately set forth the elements of a racketeering conspiracy, it need only charge – after identifying a proper enterprise and the defendant's association with that enterprise – that the defendant knowingly joined a conspiracy, the objective of which was to operate that enterprise, that affected interstate commerce, through a pattern of racketeering activity. *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012), citing *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991) ("Neither overt acts nor specific predicate acts that the defendant agreed personally to commit need be alleged or proved for a section 1962(d) offense."). As discussed below, Count One properly alleges all the essential elements of RICO conspiracy.

### 1.    The Indictment Sufficiently Alleges an Enterprise.

Madigan argues that the indictment does not allege an "enterprise," but instead alleges two separate schemes without a common purpose. R. 55 at 10-14.

The superseding indictment properly alleges an association-in-fact enterprise, which is defined by statute as "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has held that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)).[2] The Supreme Court reads this definition of enterprise broadly. In *Boyle*, the Court held that an association-in-fact enterprise need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 944-46.

Consistent with *Turkette* and *Boyle*, the superseding indictment identifies the enterprise as an association-in-fact enterprise composed of Madigan and McClain, as well as several entities through which Madigan exercised his power. SI, Count 1, ¶ 2.

---

[2]  Several appellate courts have found the government is not required to prove the existence of an enterprise to prove the offense of racketeering conspiracy; rather, an agreement to create an enterprise suffices. *See United States v. Applins*, 637 F.3d 59, 71-75 (2d Cir. 2011); *United States v. Harris*, 695 F.3d 1125, 1133 (10th Cir. 2012); *United States v. Rich*, 14 F.4th 489, 493 (6th Cir. 2021). The government acknowledges that the Seventh Circuit has not expressly adopted this view, although it is contemplated in the 2022 Seventh Circuit Pattern Criminal Jury Instructions for 18 U.S.C. § 1962(d) (Racketeering Conspiracy Elements, requiring government to prove "that [name of enterprise] was/would be an enterprise").

These entities include the Office of the Speaker, the Thirteenth Ward Democratic Organization, and Madigan's law firm, Madigan & Getzendanner. *Id*. Count One alleges that the purposes of the enterprise included "(i) to exercise, to preserve, and to enhance MADIGAN's political power and financial well-being; (ii) to financially reward MADIGAN's political allies, political workers, and associates for their loyalty, association with, and work for MADIGAN; and (iii) to generate income for members and associates of the enterprise through illegal activities." *Id*. ¶ 3. The indictment outlines the types of illegal activities committed by the enterprise's members and associates, including soliciting and receiving bribes; using threats, intimidation and extortion to solicit benefits from private parties; using Madigan's official powers as Speaker (including his ability to control the passage of bills in the House and the resources of the Office of the Speaker) to cause third parties to financially reward Madigan and his associates; and (using facilities of interstate commerce to coordinate, plan and further the enterprise's goals. *Id*. ¶¶ 4, 11. As to longevity, the enterprise is alleged to have continued from no later than 2011 through 2019 (*Id*. ¶ 10). Count One describes how the defendants jointly engaged in criminal activity to accomplish the enterprise's goals (*Id*. ¶ 13), which is sufficient to establish an association that "remain[ed] in existence long enough to pursue a course of conduct." *Boyle*, 556 U.S. at 948. The indictment properly alleges an enterprise.

Defendants contend that Count One improperly alleges "two distinct enterprise conspiracies motivated by separate goals and carried out by different actors." R. 55 at 12. Not so. The superseding indictment alleges one enterprise with

24

a common purpose: Madigan unlawfully used his official position for his own personal gain. SI, Count 1, ¶¶ 3, 4, 7, 9. This common purpose underlies Madigan's efforts to secure lucrative payments from utilities such as ComEd and AT&T for his political allies and his efforts to secure lucrative payments for his law firm. In both contexts Madigan directed the affairs of the enterprise using his right-hand man, Michael McClain, to conduct the affairs of the enterprise. SI Count 1, ¶ 9; *e.g., id.* Count 2, ¶¶ 4-29 (ComEd), Count 19, ¶¶ 5-27 (Chinatown Parcel); Count 23, ¶¶ 4-17 (AT&T). While the defendants are free to challenge the existence of the alleged enterprise at trial, it is not grounds for dismissal at this stage of the proceedings.

Contrary to Madigan's contention that the indictment improperly alleges separate schemes to enhance Madigan's political and financial wellbeing (R. 55 at 12-13), a criminal enterprise may have diverse players and purposes. "So long as the evidence demonstrates that the co-conspirators embraced a common criminal objective, a single conspiracy exists, even if the parties do not know one or another and do not participate in every aspect of the scheme." *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001); *see also United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, at *18 (N.D. Ill. Aug. 11, 2004) (indictment properly alleged a single conspiracy that encompassed George Ryan's actions while in the Secretary of State's Office and the Governor's Office). For example, in *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991), a lawyer named Masters, a Cook County Sheriff's lieutenant, and a local police chief were charged with RICO conspiracy. The enterprise consisted of the defendants, a law firm, and two police departments that

25

Masters corrupted by paying kickbacks for the purpose of steering work to his law firm. The criminal enterprise did not just engage in bribery, however; the Sheriff's lieutenant also arranged for the murder of Masters' wife. *Id.* at 1365. The Seventh Circuit observed that although the enterprise's "main purpose" was the bribery of local police agencies for legal work, Masters "did not make a rigid division between his business and his personal affairs." The murder-for-hire was properly part of the criminal enterprise, because:

> A criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities. Versatility, flexibility, and diversity are not inconsistent with pattern. The systematic corruption of law enforcement in the west Chicago suburbs brought about by the Masters enterprise could be used for a variety of purposes without destroying the integrity, the rationale, of the enterprise. The acts of a criminal enterprise within the scope of the enterprise's evolving objectives form pattern enough to satisfy the requirements of the RICO statute.

*Id.* at 1367.

Just as Masters' bribery-murder scheme was criminal enterprise, so too was the Madigan Enterprise was made up of efforts to benefit Madigan both financially and politically. The Madigan Enterprise involved the "systematic corruption" of the legislative process for Madigan's personal and political gain. *Id.* at 1367. And the Enterprise's purpose, shared by Madigan and McClain, was to benefit Michael Madigan. *See United States v. Volpendesto*, 746 F.3d 273, 296 (7th Cir. 2014) ("A person who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise

26

through illegal means."); *United States v. Perholtz*, 842 F.2d 343, 354-55 (D.C. Cir. 1988) (jury could find a criminal enterprise existed involving separate procurement fraud schemes, "despite some changes in personnel between schemes, and despite the fact that every participant did not play an identical role in each scheme," because "[t]he interlocking nature of the schemes and the overlapping nature of the wrongdoing provides sufficient evidence for the jury to conclude that this was a single enterprise").

It does not matter that McClain was not involved in every act described in the indictment. It is well established that a defendant need not participate in all aspects of a conspiracy. As the Seventh Circuit has explained, "we have never suggested that a defendant is guilty of racketeering conspiracy only if he participates in every aspect of the enterprise's affairs. To the contrary, '[s]ection 1962(d) [is] broad enough to encompass those persons who, while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate crimes.'" *Volpendesto*, 746 F.3d at 284-85 (citations omitted). In *Volpendesto*, for example, defendants complained that they were not involved in particular predicate acts, but the court of appeals rejected these arguments. Here too, the government does not need to show participation in each of the enterprise's activities, only that McClain was aware of the "essential nature and scope of the enterprise and intended to participate in it." *Id.* at 285 (citations omitted). The indictment amply alleges that McClain embraced the nature and scope of the enterprise, given his role in helping Madigan secure lucrative contracts and

27

payments for his political allies *and* his work to help steer work to Madigan's law firm.

The case relied upon by defendants shares nothing in common with this case. In *Rao v. BP Prod. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009), a gas station franchisee sued a franchisor, former employees of the franchisor, and the husband of one of the employees. The Seventh Circuit affirmed dismissal of the franchisee's civil RICO claims. Significantly, each event alleged as part of the enterprise involved completely different actors, and the complaint did not allege "how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct." *Id.* at 400. In this case, by contrast, Madigan was at the center of each of the incidents alleged in the indictment, and McClain acted on Madigan's behalf in most of them. The indictment alleges in detail the relationship between these two men, and the types of unlawful conduct they engaged in as part of the Madigan Enterprise.

### 2. The Indictment Properly Alleges that Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise.

Contrary to Madigan's argument (R. 55 at 14-16), the indictment sufficiently alleges that Madigan and McClain acted in concert to pursue the enterprise's common interests, rather than solely in their own self-interest.

Defendants claim that "McClain interacted with Madigan to further the interests of *his* client, ComEd, and to build *his* credentials as a Springfield lobbyist." R. 55 at 16. This is a frivolous argument. Questions of fact are the province of a

properly instructed jury, not an issue this Court can resolve on a motion to dismiss. *Moore*, 563 F.3d at 586.

Moreover, the indictment alleges that McClain "served the enterprise" by, among other things, "conveying MADIGAN's instructions and messages to public officials, lobbyists, and business executives . . . ; (iv) providing strategic advice to MADIGAN on sensitive political matters; (v) briefing MADIGAN on his activities on behalf of the enterprise; [and] (vi) otherwise acting as MADIGAN's agent for the purposes of conveying MADIGAN's instructions, requests, and messages to third parties." SI ¶ 9. These allegations clearly allege that McClain acted in concert with Madigan.

Finally, even if McClain was furthering his own self-interest, the Seventh Circuit has recognized that a defendant can act in his own self-interest while furthering a criminal enterprise. *See, e.g., Volpendesto*, 746 F.3d at 296 ("A person who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise through illegal means. He cannot escape liability just because, at the end of the day, he prizes his own self-interest above the group's."). Consistent with this principal, the jury will be instructed that, to be "associated with an enterprise,"

> a person must be involved with the enterprise in a way that is related to its affairs or common purpose, although the person need not have a stake in the goals of the enterprise and may even act in a way that subverts those goals. . .

29

Seventh Circuit Pattern Jury Instruction at 830 (2022 ed.) ("Pattern Instructions"). The fact that McClain was a lobbyist with his own clients does not defeat the Count One conspiracy.

In *United States v. Hosseini*, 679 F.3d 544 (7th Cir. 2012), the defendants made an argument similar to Madigan's after they were convicted at trial. The defendants operated three automobile dealerships and sold luxury cars to drug dealers in the Chicago area. They challenged their RICO conspiracy conviction by claiming that the evidence at trial was insufficient to establish an enterprise because they engaged in parallel rather than concerted conduct. *Id.* at 558. The Seventh Circuit held that the defendants' conduct was neither independent nor lacking in coordination. The appellants operated three car dealerships and shared bank accounts, employees, and health insurance. They transferred money, referred customers to each other, and sold cars in the same manner. Thus, a jury could reasonably conclude that the enterprise "had a purpose (profiting through unreported cash auto sales to drug dealers), relationships (Hosseini and Obaei's own close personal relationship, as well as the dealerships' interlocking relationship), and longevity (the scheme lasted at least a decade.)" *Id.* As in *Hosseini*, the superseding indictment alleges a long-term relationship between Madigan and McClain that encompassed the various entities alleged as part of the enterprise, and their common efforts to unlawfully benefit Madigan politically and professionally. That is all that is required.

Madigan cites civil cases involving separate business entities with independent interests, but those cases have no application in this case, as Madigan

30

and McClain were long-time friends and confidants who worked together to further the enterprise. *E.g., Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) ("Our cases have distinguished between two situations: a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest."); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (complaint did not adequately allege that two companies acted on behalf of enterprise as opposed to in each company's self-interest).

In short, the indictment amply alleges that Madigan and McClain agreed to conduct or participate in the affairs of an enterprise.

### 3.  The Illinois Bribery and Official Misconduct Statutes Are Constitutional.

Contrary to Madigan's argument (R. 55 at 19-34), none of the state law bribery predicates—720 ILCS 5/33-1(d)-(e), or 720 ILCS 5/55-3(a)(4)—is constitutionally overbroad or void for vagueness. Judge Robert Dow recently rejected a nearly identical challenge to these statutes, concluding that the statutes do not reach substantial amounts of protected speech, provide sufficient notice to individuals regarding criminal conduct, and do not invite arbitrary enforcement. *See United States v. Burke*, No. 19-CR-322, 2022 WL 1970189, at *39 (N.D. Ill. June 6, 2022) (Dow, J.). This Court should apply the same analysis.

31

### a. Applicable Law

Where First Amendment rights are potentially implicated, a defendant may make a facial challenge to a statute but must prove that the statute "substantially" criminalizes or suppresses protected speech in comparison to its plainly legitimate sweep. *Bell v. Keating*, 697 F.3d 445, 452-53 (7th Cir. 2012) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)); *United States v. Williams*, 553 U.S. 285, 292-93 (2008)). In its analysis, the Court should take into account whether the scope of the statute has been limited by case law. *Id.* at 456.

Outside of the First Amendment context, void-for-vagueness challenges are governed by the due process clause in the Fifth Amendment, which requires that a penal statute define a criminal defense so that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). This does not require perfect clarity and precise guidance but does require a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. *Jordan v. DeGeorge*, 341 U.S. 223, 231 (1951) (citations omitted). While Madigan's First Amendment challenge is properly viewed as a facial challenge to the statute, his more general due process challenge should be analyzed as an as-applied challenge. *United States v. Plummer*, 581 F.3d 484, 488 (7th Cir. 2009); *see also United States v. Cook*, 970 F.3d 866, 876 (7th Cir. 2020). In other words, while a statute may not be clear in every application, so long as the statutory terms are clear

in their application to the party before the court, a "vagueness challenge must fail." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21-23 (2010) (rejecting vagueness challenge because although "material-support statute potentially implicates speech, the statutory terms are not vague as applied to plaintiffs") (citations omitted). *Accord Expressions Hair Design v. Scheiderman*, 137 S. Ct. 1144, 1151 (2017).

### b. Analysis

#### i. The State Statutes Are Not Overbroad.

None of the challenged state law bribery predicates—720 ILCS 5/33-1(d)-(e), and 720 ILCS 5/55-3(a)(4)—are constitutionally overbroad in violation of the First Amendment. Each one of these state statutes legitimately criminalizes bribery. Preventing corruption and preserving citizens' confidence in government are "interests of the highest importance," *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788-89 (1978) (citations omitted), and measures calculated to prevent bribery plainly accomplish this goal. Here, each of the statutes is designed to target corruption by criminalizing efforts to provide things of value as a means of obtaining improper and unlawful influence over individuals in positions of trust.

None of the challenged statutes has the effect of substantially criminalizing protected speech. Acts of bribery—like other crimes that might be accomplished through speech—are not protected speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); *United States v. Ferriero*, 866 F.3d 107, 125

(3d Cir. 2017) (state bribery statute that punishes corrupt agreements does not criminalize legitimate First Amendment activity); *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972) ("Threats and bribes are not protected simply because they are written and spoken; extortion is a crime although it is verbal."). Madigan claims that the rights of citizens "to petition elected representatives" and for politicians to respond to those concerns is somehow chilled by these state statutes. R. 55 at 19. But giving money and other benefits to elected officials outside the context of campaign contributions has nothing to do with the right to petition elected representatives.

Madigan claims that the state bribery statutes are overbroad because the "any act" language in those statutes threatens to criminalize innocent conduct like routine lobbying or small gifts given to government officials. R. 55 at 19-24. This argument fails to account for the statute's scienter requirement.

By their plain text, the statutes in question clearly distinguish between criminal conduct (which is not protected speech) and permissible conduct (which can include protected speech). For example, § 33-1(e) requires that the property or personal advantage provided be given to "improperly influence" the performance of a public officer. Use of the term "improperly" to describe the nature of the influence is synonymous with wrongful influence, requiring that an intention of wrongdoing accompany the tender of property, thus providing fair notice. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 445 (1978) (to meet the statute's *mens rea*

requirement, a defendant must consciously behave in a way the law prohibits, "and such conduct is a fitting object of criminal punishment").

As Judge Dow recognized in the *Burke* case, "[t]he plain language of the statute imposes a scienter requirement such that the statute only proscribes the receipt of gifts intended to 'improperly influence' specific conduct." *Burke*, 2022 WL 1970189, at *39. The court further noted that "Illinois courts have applied the intent element to rein in the statute in practice." *Id.* at *39 n.26 (citation omitted).

Addressing analogous federal statutes, courts have held that this type of scienter requirement protects against impermissible infringement of protected speech. *See, e.g., United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) (obstruction of justice statute that punished "corruptly persuad[ing] another person . . . with intent to influence . . . the testimony of any person in an official proceeding," 18 U.S.C. § 1512(b), was not overbroad based on corrupt intent requirement); *accord United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998).

In addition, 720 ILCS § 5/33-1(d) and 720 ILCS § 5/33-3(a)(4) apply only to property that a public official "is not authorized by law" to accept, and thus limits any potential overbreadth. *See People v. Brandstetter*, 430 N.E.2d 731, 736 (Ill. App. 1982) (rejecting claim that section (a) of same statute was overbroad in part on ground that "it is also clear that other public officials are 'authorized by law' to receive campaign contributions from those who might seek to influence the candidate's performance as long as no promise for or performance of a specific official act is given in exchange"). As Judge Dow observed, the "not authorized by law" language is a "limitation that

plainly excludes legitimate campaign contributions," *Burke*, 2022 WL 1970189, at *41.

Despite all this, Madigan maintains that the Supreme Court's decision in *McDonnell v. United States*, 579 U.S. 550 (2016) effected a seismic change in the law that has rendered Illinois bribery statutes unconstitutional. Madigan exaggerates the significance of *McDonnell*. To begin with, he does not identify a single case, state or federal, where a state bribery statute has been found unconstitutional based on *McDonnell*—on either First Amendment or vagueness grounds. *See Burke*, 2022 WL 1970189, at *45 ("Although he directs this Court to *McDonnell* as a watershed case for bribery law, Ald. Burke does not identify a single case, state or federal, where a state bribery statute has been found unconstitutional based under McDonnell's holding or reasoning—either on First Amendment or vagueness grounds."). In addition, *McDonnell* was confined to deciding what constituted an "official act" for purposes of the honest services fraud statute. Of course, "official act" is not a phrase found anywhere in the relevant state statutes, nor is it found in 18 U.S.C. § 666. In short, *McDonnell* did not purport to call into question wide swathes of state law and, in fact, specifically declined to revisit its holding in *Skilling v. United States*, 561 U.S. 358 (2010), upholding the honest services fraud statute against a vagueness

challenge. *McDonnell,* 579 U.S. 550, 580 (2016). Against this background, Madigan's arguments about the changes wrought by *McDonnell* fall apart.[3]

### ii. The State Statutes Are Not Unconstitutionally Vague, Facially or As Applied to Madigan and McClain.

The state statutes also are not unconstitutionally vague in violation of the due process clause. Each of the state statutes plainly defines the criminalized conduct, as discussed above, and provided fair notice to defendants.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court addressed whether the honest services fraud statute, 18 U.S.C. § 1346, was unconstitutionally vague, and held that it was not, including because it was "plain as a pikestaff" that the provision, at its core, prohibited bribery and kickbacks. *Id.* at 412. The Supreme Court emphasized that, even if the outermost boundaries of a statute are imprecise, it will survive scrutiny if a defendant's conduct falls squarely within the "hard core" of the statute. *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973)); *see also McDonnell,* 579 U.S. at 580 (citing *Skilling*, 561 U.S. at 403 (seeking "to construe, not condemn, Congress' enactments")).

Consistent with the Supreme Court's interpretation of § 1346 in *Skilling*, the Illinois bribery statutes provided fair notice to defendants of the conduct prohibited. *See Burke*, 2022 WL 1970189, at *44. As in *Skilling*, at their core, the pertinent state statutes target the crime of bribery and, much like § 666, which has withstood

---

[3]     Madigan also cites to *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), but that case did not involve an overbreadth or vagueness challenge and is therefore inapposite.

repeated vagueness challenges, they speak in terms of an improper or unlawful effort to influence the actions of a public official by means of a solicitation or offer of property, benefit, fee or reward. *See, e.g, Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996) ("the essence of a violation of the [official misconduct] statute 'is that a public official has attempted to personally enrich himself or another by an act exceeding his 'lawful authority' as a public servant" (citation omitted)).

Because it is "plain as a pikestaff" that illegal bribery is the central focus of these statutes, there is no question that defendants were on fair notice of what the statutes proscribed. *Skilling*, 561 U.S. at 412 (quoting *Williams v. United States*, 341 U.S. 97, 101 (1951)). Illinois courts have similarly held that the Illinois bribery provides fair notice. *E.g., People v. Johnson*, 335 Ill. App. 3d 805, 806, 780 N.E.2d 803, 805 (2002) (720 ILCS 5/33–1(a) was not unconstitutionally vague as applied to defendant).[4]

Madigan nevertheless argues that Count One does not make clear what acts were intended to be influenced. But Count One alleges that Madigan accepted bribes and used his ability to affect the progress of legislation to cause third parties to financially reward him, including businesses with legislation pending in the Illinois

---

[4]  Far from showing that the Illinois bribery statute is vague, as Madigan claims (R. 55 at 28), this decision underscores that the statute's prohibitions are clear: "The statute plainly prohibits the tender of property to *any* public employee who is not authorized to accept it, with intent to influence the performance of *any* act related to his or her employment or function, regardless of the amount of discretion vested in the employee." *Id.* at 807.

General Assembly. SI, Count 1, ¶¶ 4, 7. Further, the indictment alleges that Madigan used the Office of the Speaker to take official action, including:

> (1) the promotion, support, and furtherance of legislation favorable to, and obstruction of legislation unfavorable to, companies that would and did provide private benefits to MADIGAN and MADIGAN's political allies, political workers, and associates; and (2) the appointment of MADIGAN's political allies, political workers, and associates to public employment, including but not limited to appointments made in exchange and as a reward for private benefits provided to MADIGAN, including but not limited to private work for MADIGAN's law firm, Madigan & Getzendanner.

*Id.* ¶ 13(c). The indictment also provides numerous examples of action Madigan took with regard to ComEd-related legislation, and AT&T-related legislation. The indictment's 117 pages make it clear that acts sought to be rewarded related to Madigan's ability to influence state legislation and make high-level public appointments. There is no notice concern as applied to Madigan and McClain.

Nor do the statutes pose a risk of arbitrary enforcement. Opinions of state and federal courts define with specificity the conduct prohibited by the state statutes. *See, e.g., United States v. Hogan*, 886 F.2d 1497, 1502-04 (7th Cir. 1989) (construing Illinois bribery statute); *United States v. Genova*, 167 F. Supp. 2d 1021, 1039-40 (N.D. Ill. 2001) (discussing scope of official misconduct statute). Moreover, the Illinois bribery statute was first enacted in 1961, and the amendment to section (e) became effective in 1985. In the intervening 38 years, there has been no indication that the statute has been arbitrarily enforced. The same holds true of the official misconduct statute. There is simply no suggestion of arbitrary enforcement, as Judge Dow

39

recognized. *See Burke*, 2022 WL 1970189, at *44 ("As the Government points out, there is no support for any suggestion that the statute has been arbitrarily enforced in the thirty-six years since it was last amended.").

Madigan points to other politicians who made job recommendations but were not criminally prosecuted. R. 55 at 32. Of course, the superseding indictment in this case does not allege mere job recommendations but corrupt solicitations and bribes paid to benefit Madigan and influence legislation. The superseding indictment outlines numerous emails and intercepted communications that demonstrate that Madigan's hiring demands were corruptly linked to his ability to affect legislation. In this regard, Madigan's comparison to another politician's apparent job recommendation for someone who could help to "[u]nderstand the new personalities" in the governor's office (*id*. at 33) is apples to oranges. The demands Madigan made were not premised on the candidates' lobbying or consulting acumen but rather their utility to Madigan. *E.g.,* SI, Count 2, ¶¶ 31(kk) (Madigan told Individual 13W-3 not to worry that he did not do any work for ComEd, despite receiving payments from the company, because he was doing campaign work for Madigan); 31(ss) (McClain explaining that subcontractors were paid by ComEd because of their utility to Madigan).

Finally, an examination of the state statutes as applied to Madigan and McClain makes clear that they have no legitimate vagueness claim. *Humanitarian Law Project*, 561 U.S. at 21-23; *Scheiderman*, 137 S. Ct. at 1151. The allegations in this case do not involve the petitioning of state officials, but rather a politician's

40

efforts to make monetary demands on entities with business in the state and local legislatures. Whatever the outer contours of the Illinois bribery statutes may be, it is plain that Madigan's efforts to solicit, obtain, and receive private benefits in exchange for his action on these matters as alleged in the superseding indictment constituted bribery and official misconduct.

Consistent with principles of federalism (a key factor motivating the Supreme Court's decision in *McDonnell*), the State of Illinois has the "prerogative to regulate the permissible scope of interactions between state officials and their constituents," *McDonnell*, 579 U.S. at 576, and can determine the scope of its own laws. It need not track identically the language later used by the Supreme Court. Here, in fact, the Illinois state bribery statute is more specific than the honest services fraud statute considered in *McDonnell*, including because it requires a defendant to seek to improperly influence a public official, a phrase synonymous with corrupt or unlawful influence. *Ferriero*, 866 F.3d at 125 (state bribery statute that punishes corrupt agreements is not unconstitutionally vague). No further limitations are necessary to resolve Madigan's overbreadth and vagueness claims.[5]

**D. The ComEd Related Counts Should Not Be Dismissed.**

The Court should deny Madigan's motion to dismiss Counts Two, Three, Four, and Six related to ComEd. R. 55 at 34-49.

---

[5]     Because the Illinois bribery and legislative misconduct statutes are not facially overbroad or vague, there is no basis to dismiss Counts Five and Seven related to ComEd. R. 55 at 57.

1. **The ComEd Counts Track the Statutory Language and Place Madigan on Fair Notice of the Charges.**

Section 666 of Title 18 criminalizes theft and bribery concerning government entities that receive federal benefits of $10,000 or more. 18 U.S.C. § 666. Congress passed § 666 in 1983 to "augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." Comprehensive Crime Control Act of 1989, S. Rep. No. 98-225, 98th Cong., 1st Sess. 369-70 (1983), reprinted in 1984 U.S.C.C.A.N. 351.

As pertinent here, § 666(a)(1)(B) of Title 18 makes it a crime for an agent of state government to corruptly solicit or demand, for the benefit of any person, or to accept or agree to accept, anything of value, intending to be influenced or rewarded "in connection with any business, transaction, or series of transactions" of that government involving anything of value over $5,000. 18 U.S.C. § 666(a)(1)(B). Based on the statute's plain language, the following elements must be proven to establish an offense under § 666(a)(1)(B):

1. That the defendant was an agent of a state government;

2. The defendant solicited, demanded, accepted, or agreed to accept something of value from another person;

3. The defendant did so corruptly, that is, with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties;

4. The defendant acted with the intent to be influenced or rewarded in connection with some business, transaction or series of transactions of the government;

42

5. This business, transaction, or series of transactions involved a thing of a value of $5,000 or more; and

6. The government in a one year period, received benefits of more than $10,000 under any Federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other assistance.

Pattern Criminal Jury Instructions of the Seventh Circuit (2022 updates) at 6-7 ("Pattern Instructions").

In addition, § 666(a)(2) makes it a crime for an individual to corruptly give, offer, or agree to give anything of value to any person, intending to influence or reward an agent of state government "in connection with any business, transaction, or series of transactions" of such government involving anything of value over $5,000. 18 U.S.C. § 666(a)(2).[6]

As Madigan concedes (R. 55 at 43[7]), the indictment tracks the plain language of § 666: Counts Three, Four and Six, which allege substantive violations of § 666,

---

[6]    Section 666(a)(2) is cited as an object of the Count Two conspiracy.

[7]    Madigan relies on *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007), to argue that a § 666 indictment must allege more than the elements in § 666. R. 55 at 8, 43. Although the Court in *Resendiz-Ponce* observed that "there are crimes that must be charged with greater specificity," the Court nevertheless held that the attempted illegal reentry statute at issue did *not* need to be pleaded with greater specificity because guilt did not depend on such specific factual allegations. 549 U.S. at 110. In so holding, the Court emphasized that the promulgation of Federal Rule of Criminal Procedure 7(c)(1) was designed to eliminate such technicalities in criminal pleadings, by allowing an indictment to simply provide a "'plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* (quoting Fed. R. Cr. P. 7(c)(1)). *Resendiz-Ponce* made no mention of § 666, and there is no basis for concluding that § 666 requires greater specificity. In any event, the allegations in the superseding indictment, in addition to alleging the elements of the offenses charged, place Madigan on fair notice of the crimes he committed, including by detailing at length the corrupt arrangements, the precise benefits offered and received, and communications that reflect his corrupt intent.

charge Madigan with corruptly soliciting and demanding things of value from ComEd, intending to be influenced and rewarded in connection with state business. SI, Counts 3, 4, & 6. The Count Two conspiracy is similarly premised on an agreement to violate § 666, and tracks the language of the statute. SI, Count 2.

The indictment also contains detailed factual allegations that put Madigan on notice of the specific nature of the charges. Over a period of 8 years, Madigan received unlawful benefits that included ComEd: (1) hiring Madigan's associates as ComEd "subcontractors," who in fact did little or no work for ComEd (*id.* Count 2, ¶¶ 4-12); (2) hiring Law Firm A and renewing Law Firm A's contract (*id.* ¶¶ 13-18); (3) appointing Individual BM-1 to ComEd's board of directors at Madigan's request (*id.* ¶¶ 23-25); and (4) setting aside summer internship positions and giving preferential treatment for those internships to individuals associated with the 13th Ward identified by McClain (*id.* ¶¶ 19-22). Madigan accepted these benefits intending to be influenced and rewarded in connection with ComEd legislation in Springfield. *Id.* ¶ 3.

In view of the indictment's detailed allegations, the § 666 counts satisfy all legal and constitutional requirements. The counts are more than sufficient to notify Madigan of the charged offenses, protect him from double jeopardy, and enable him to prepare a defense; thus, they are facially valid. *See*, *e.g.*, *Vaughn*, 722 F.3d at 927 (indictment is adequate if it sets forth the elements of the offense, identifies the date and time of the alleged criminal conduct, and provides citations to applicable statutes).

44

### 2. The Indictment Is Not Defective for Failing to Allege a "*Quid Pro Quo*" or Specific Act.

#### a. A *Quid Pro Quo* Is Not an Element of § 666.

Madigan argues that the § 666 charges are deficient for failing to specifically allege a *quid pro quo*. R. 55 at 36-45. However, the plain text of § 666, and the Seventh Circuit's case law, reflects no such requirement, whether the case is charged under the intent to influence (bribery) or the intent to reward (gratuity) provision of § 666. As the Seventh Circuit recently reiterated, and as discussed in detail below, the Seventh Circuit has "refused to import an additional, specific *quid pro quo* requirement into the elements of § 666." *United States v. Snyder*, ---F.4th---, No. 21-2986, 2023 WL 4011163, at *16 (7th Cir. June 15, 2023).[8]

A statute must be interpreted consistent with its plain meaning. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 56 (1997) (interpreting § 666 based on its plain text, and recognizing "[t]he enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered"); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (noting that the "preeminent canon of statutory interpretation" is that Congress "says . . . what it means and means . . . what it says" (citation omitted)); *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (court is obliged to interpret "words consistent with their 'ordinary meaning at

---

[8] The distinction between a bribe and a gratuity has been described as follows: "If the payer's intent is to influence or affect future actions, then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity." *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997).

the time Congress enacted the statute'" (quotation marks omitted)).

By its plain text, § 666(a)(1)(B) makes it a crime for an agent of state government to demand, solicit, accept, or agree to accept a thing of value from another person, where the official acts "corruptly," "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the government agency by which he is employed. 18 U.S.C. § 666(a)(1)(B). Section 666(a)(2) makes it a crime to offer, give, and agree to give, things of value to another person, where the giver acts "corruptly, with the intent to influence or reward" an agent of a State or local government agency in connection with some business, transaction, or series of transactions of the government agency. 18 U.S.C. § 666(a)(2).[9]

Relying on the statute's plain language and structure, the Seventh Circuit repeatedly and unequivocally has held that no *quid pro quo* agreement or understanding is required to establish a violation of § 666.[10] *See*, *e.g.*, *United States*

---

[9] Because the plain text of the statute, and the case law interpreting the statute, is clear, the rule of lenity has no place here. *See Salinas*, 522 U.S. at 66 ("The rule [of lenity] does not apply when a statute is unambiguous . . . ."); *United States v. Shabani*, 513 U.S. 10, 17 (1994) ("The rule of lenity [ ] applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.").

[10] Because Count Two alleges a conspiracy to violate § 666, the government need not allege or prove a completed § 666 violation for that count—and certainly need not allege or prove that any defendant engaged in a *quid pro quo*. *See Ocasio v. United States*, 578 U.S. 282, 289 (2016) ("Not only is it unnecessary for each member of a conspiracy to agree to commit each element of the substantive offense, but also a conspirator may be convicted 'even though he was incapable of committing the substantive offense' himself." (citation omitted)); *United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978) ("Whether the substantive crime itself is, or is likely to be, committed is irrelevant [for a § 371 conspiracy].").

46

*v. Mullins*, 800 F.3d 866, 871 (7th Cir. 2015) (holding that evidence of *quid pro quo* is not necessary to establish a violation of § 666(a)(1)(B)); *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011) (noting that "it is clear that our circuit, like most others, does not require a specific *quid pro quo*" in cases involving charged violations of § 666(a)(2)); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (holding that a *quid pro quo* is sufficient but not necessary to violate § 666(a)(1)(B)); *United States v. Agostino*, 132 F.3d 1183, 1190-91 (7th Cir. 1997) (§ 666(a)(2), "by its statutory language, requires that the defendant act '*corruptly . . . with intent to influence or reward,*'" and on that basis "declin[ing] to import an additional, specific *quid pro quo* requirement into the elements of § 666(a)(2)"). The Seventh Circuit recently reaffirmed its past precedents, recognizing that "we have refused to 'import an additional, specific *quid pro quo* requirement into the elements' of § 666." *Snyder*, 2023 WL 4011163, at *16 (quoting *Agostino*, 132 F.3d at 1190).[11]

Madigan argues that the Supreme Court's statement in *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), identifying a *quid pro quo* as an element of bribery under 18 U.S.C. § 201(b), indicates that § 666, which also includes

---

[11]    Other circuits have similarly held that § 666 does not require a *quid pro quo. See, e.g.*, *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) ("[T]he text of § 666(a)(1)(B) says nothing of a *quid pro quo* requirement to sustain a conviction, express or otherwise." (quotation marks and citation omitted)); *United States v. Garrido*, 713 F.3d 985, 996 (9th Cir. 2013) ("§ 666 does not require a jury to find a specific *quid pro quo.*"); *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010) ("[T]here is no requirement in § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo.*"); *United States v. Abbey*, 560 F.3d 513, 521 (6th Cir. 2009) ("*Sun-Diamond*'s heightened *quid pro quo* standard is inapplicable to . . . 18 U.S.C. § 666.").

the phrase "intent to influence," must also include that element. R. 55 at 36-37. *Sun-Diamond* in no way suggests that a bribery offense charged under § 666 requires a *quid pro quo*. In that case, the Court distinguished between the scienter requirements of § 201(b) (bribery) and § 201(c) (illegal gratuities) to illustrate the distinct scienter requirement applicable to illegal gratuity offenses under § 201(c) at issue in that case: proof of "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." 526 U.S. at 404-06, 413. *Sun-Diamond* did not address § 666, which differs from § 201 in that neither the bribery nor the gratuity provisions of § 666 includes an "official act" requirement.

In the years since *Sun-Diamond*, the Seventh Circuit repeatedly has reaffirmed its conclusion that a specific *quid pro quo* is not required to establish a violation of § 666. *See Snyder,* 2023 WL 4011163, at \*16; *Gee*, 432 F.3d at 714; *Boender*, 649 F.3d at 654; *Mullins*, 800 F.3d at 871. More specifically, in *Gee*, the Seventh Circuit held that a "*quid pro quo* of money for a specific legislative act" was sufficient, but not necessary, to establish a violation of § 666(a)(1)(B). 432 F.3d at 714. At issue in *Gee* was a conspiracy to exchange payments to a Wisconsin senator to influence the awarding of contracts to Opportunities Industrialization Center of Greater Milwaukee. In addressing the defendant's challenge to the sufficiency of the evidence, the court rejected the argument that the charged conspiracy had not been proven because the evidence failed to establish any specific act taken by the senator in response to any specific payment, and held that "[a] *quid pro quo* of money for a specific legislative act is *sufficient* to violate the statute, but it is not *necessary*." *Id.*

(emphasis in original). The court explained:

> It is enough if someone "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B).

432 F.3d at 714-15. The court held that a jury could reasonably conclude that the senator had the requisite corrupt intent, and therefore conspired to violate § 666. *Id.* Thus, the court made clear its rejection of the proposition that a *quid pro quo* is required to establish a bribery offense under § 666; the decision also indicates that an "exchange" of money for influence may be inferred from the acceptance of a bribe with corrupt intent.

In *Boender*, the Seventh Circuit addressed whether a specific *quid pro quo* was required to establish a violation § 666(a)(2), in the context of a challenge to the instructions presented to the jury. 649 F.3d 650. Boender was convicted based on evidence showing that, intending to influence a Chicago alderman in connection with the rezoning of certain industrial property, he paid $38,000 for repairs to the alderman's home and convinced business associates to contribute, to the Congressional campaign of the alderman's aunt.

On direct review, Boender challenged the court's failure to instruct the jury that a specific *quid pro quo* was necessary to sustain a conviction, and the government's failure to prove such a *quid pro quo*. The Seventh Circuit held, consistent with its precedent, that proof of a *quid pro quo* was not necessary to

49

establish a violation of § 666(a)(2) and, therefore, a jury instruction requiring one would have been incorrect as a matter of law. 649 F.3d at 654. In reaching this conclusion, the court specifically rejected Boender's argument that, pursuant to *Sun-Diamond*, § 666 should be construed consistently with 18 U.S.C. § 201(b) (proscribing bribery of federal officials), noting the differences in the structure and language of the two statutes:

> Boender's premise is false: while parallel in some respects, the two statutes differ in the provisions central to Boender's argument. Whereas § 201(b) makes it a crime to "corruptly give[ ], offer [ ] or promise[ ] anything of value to any public official . . . with intent to influence any official act," § 666(a)(2) criminalizes corrupt giving "with intent to influence *or reward*" a state or local official. Further, § 201(b) is complemented by § 201(c), which trades a broader reach—criminalizing *any* gift given "for or because of any official act performed or to be performed," § 201(c)(1)(A)— for a less severe statutory maximum of two, rather than fifteen, years' imprisonment. Section 666(a)(2) has and needs no such parallel: by its plain text, it already covers both bribes and rewards.

> Moreover, Boender's parallel is undermined by *Sun-Diamond* itself. There, the Supreme Court distinguished between bribes, rewards, and other gratuities. The bribery provision, § 201(b), covers only bribery and requires a specific *quid pro quo*. *Sun-Diamond*, 526 U.S. at 404, 119 S.Ct. 1402. The "illegal gratuity" provision, § 201(c), on the other hand, requires only the identification of a specific official act "for or because of which" a gift was given. *Id*. at 406, 119 S.Ct. 1402. Tellingly, the example of an illegal gratuity that the Court cited was "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id*. at 405, 119 S.Ct. 1402. Section § 666(a)(2), however, criminalizes both bribes and rewards in the same section. If the Supreme Court's construction of § 201 in *Sun-Diamond* tells us anything about § 666(a)(2), it is what

> we said in *Gee*: "A *quid pro quo* of money for a specific
> legislative act is sufficient to violate [§ 666], but it is not
> necessary."432 F.3d at 714.

649 F.3d at 655 (emphasis in original). As the *Boender* court recognized, the

significant differences in the language and structure of § 666 and § 201 mean that no

*quid pro quo* is required for § 666 offenses.

Consistent with this case law, two courts in this district have recently held that

no *quid pro quo* exchange is required under § 666. In the case against McClain and

other individuals involved in the ComEd conspiracy, District Judge Leinenweber

ruled that a *quid pro quo* is not an element of a § 666 violation. *United States v.

McClain*, No. 20 CR 812, 2022 WL 488944, at *4 (N.D. Ill. Feb. 17, 2022). District

Judge Dow similarly held that "decades of Seventh Circuit jurisprudence hold that

§ 666 does not require a *quid pro quo*." *Burke*, 2022 WL 1970189, at *13.

Madigan's reliance on the Seventh Circuit's statement in *United States v.

Medley*, 913 F.2d 1248 (7th Cir. 1990), that "[t]he essential element of a section 666

violation is '*quid pro quo*'; that is, whether the payment was accepted to influence

and reward an official for an improper act" (R. 55 at 41; 913 F.2d at 1260), is

misplaced. The court in *Medley* made that statement in the context of a challenge to

the omission of an instruction defining the term "corruptly." The court held that,

where a defendant is charged with accepting or agreeing to accept payment intending

to be influenced or rewarded in the performance of his official duties, the term

"corruptly" was "self-defining" and the failure to separately address it in the jury

instructions was not plain error. 913 F.2d at 1261. Thus, the focus of the court's

statement was the statute's requirement of corrupt intent; it was not presented with the question of whether a *quid pro quo* must be specifically identified in the indictment, and did not opine on that issue.

The Seventh Circuit later made the limitations of its decision in *Medley* clear in *Agostino*, explaining that the question of "whether an indictment must contain specific allegations of a *quid pro quo* was not before the *Medley* court and it did not rule on this issue." *Agostino*, 132 F.3d at 1190 (further explaining that "the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666," that is, the corrupt intent of the defendant in question). That question *was*, however, directly before the court in *Agostino*, and the Seventh Circuit held that the indictment before it—which tracked the words of the statute—was not facially deficient for failing to include allegations of a specific *quid pro quo*. *Id.* The court explained that an indictment must allege only the intent elements "set forth in the statutory language," "and not any specific *quid pro quo*." *Id.*

Madigan relies on *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015), to support his contention that a *quid pro quo* is required under the "intent-to-influence prong of Section 666." R. 55 at 40-41. Far from requiring a *quid pro quo*, *Hawkins* held that a public official need not agree or even intend to perform an official act to be convicted under § 666.

In *Hawkins*, the defendants, Cook County employees who had accepted money from a police officer trying to reduce the penalties for his own crimes, challenged their

convictions for violating § 666(a)(1)(B), and argued that the government had to show that they took the money intending to perform an official act. 777 F.3d at 881. The *Hawkins* court disagreed. It held that the defendants could properly be convicted under a reward theory, even if they did not intend to be influenced. The court also affirmed the jury instruction that defined "corruptly" to require that the defendants took money "with the understanding" that the money was "offered or given to reward or influence [them] in connection with [their] official duties." *Id.* at 882. The court explained that this definition properly placed the focus of the corrupt-intent inquiry on the defendants, who act "corruptly if they *know* that the payor is trying to get them to do the acts forbidden by the statute, and they take the money anyway." *Id.* In other words, a government employee need not actually perform any acts after receiving a payment, or even intend to do so, so long as he knew the payor wanted to influence or reward him and took the payment anyway.

Madigan also relies on District Judge Edmond Chang's unpublished memorandum opinion in *United States v. Tamras-Martin*, Case No. 18 CR 267-2, Dkt. 63 (N.D. Ill. Feb. 17, 2019). R. 55 at 38. In *Tamras-Martin*, the government pursued a bribery theory only (unlike in this case), and Judge Chang instructed the jury that a *quid pro quo*—or "the intent that the agent perform an official act in exchange for something of value"—was required. *Id.* at 6. In examining the Seventh Circuit's decisions in *Boender*, *Gee*, and *Mullins*, Judge Chang focused on the distinctions made in those cases between the way bribery and illegal gratuities are treated in the federal bribery statute (§ 201) and the federal program bribery statute (§ 666)—particularly,

the fact that § 666, unlike § 201, addresses both bribery and illegal gratuities in the same statutory provision—and concluded that, where a "reward" or gratuity theory is not presented, the jury should be provided with instructions that mirror those applicable to § 201(b) bribery cases, which include a *quid pro quo* requirement. *Id.* at 4-6.

The government respectfully disagrees with Judge Chang's analysis, which was written in connection with proposed jury instructions rather than a motion to dismiss. As noted above, in this case the government is not proceeding on a bribery theory only, so its holding is inapplicable in any event. The indictment alleges that defendants acted with intent to both influence *and* reward. Moreover, like Judge Dow and Judge Leinenweber (discussed above), Judge Lee also recently rejected Judge Chang's analysis and held that an indictment need not allege a *quid pro quo* where the government charges an intent to influence violation of § 666(a)(2). *See United States v. Donagher*, 520 F. Supp. 3d 1034, 1046 (N.D. Ill. 2021) (Lee, J.). The Seventh Circuit has, on numerous occasions, cited the textual differences between § 666 and § 201 in concluding that § 666 requires no proof of a *quid pro quo*. It reached that conclusion before *Sun-Diamond*, and it has reaffirmed the conclusion numerous times since *Sun-Diamond*. Had the court wanted to limit its holdings in the manner suggested by Judge Chang, it would have done so in plain terms.[12]

---

[12]     Contrary to defendants' suggestion (R. 55 at 42 & n.13), the Second Circuit did not conclude in *United States v. Ganim,* 510 F.3d 134 (2d Cir. 2007), that a *quid pro quo* is required under § 666. The court focused primarily on the *quid pro quo* requirement applicable to honest services fraud, in violation of 18 U.S.C. § 1346, and a violation of the Hobbs Act, 18

While the Fourth and Eighth Circuits have held that a *quid pro quo* is required for bribery in violation of § 666 (*United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998); *United States v. Redzic*, 627 F.3d 683, 692 (8th Cir. 2010)), those decisions are inconsistent with the law in this circuit.[13]

Madigan contends that a *quid pro quo* is required, because otherwise large swathes of legal conduct would be criminalized. R. 55 at 35. Defendants ignore the "corrupt" intent requirement of § 666, which distinguishes criminal conduct (like the defendants') from lawful exercise of First Amendment rights. The government will have to show that Madigan acted "with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties" and he intended "to be influenced or rewarded in connection with some business, transaction or series of transactions of the government." Pattern Instructions at 6-7. That instruction, which parallels the instruction approved by the Seventh Circuit in

U.S.C. § 1951, holding in those contexts that a *quid pro quo* requires a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as opportunities arise. 510 F.3d at 148-49.

    With respect to § 666, the *Ganim* court did not opine on whether the statute contained a *quid pro quo* requirement—an issue that was not, in that case, disputed by the parties. Instead, for purposes of the appeal, the court "presume[d] that the same standard for proving a *quid pro quo* exists under both 18 U.S.C. § 666 and § 201(b)(1), as neither party has argued that there is, or should be, any difference of which we should be cognizant." 510 F.3d at 148 n.7 (although expressing skepticism that the standards should be the same for § 666 and § 201, noting "salient" differences between the two provisions, and also observing that there was "good reason to limit *Sun–Diamond*'s holding to the statute at issue in that case").

[13]    Madigan incorrectly cites *United States v. Roberson,* 998 F.3d 1237, 1251 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1109 (2022), for the proposition that § 666 requires a *quid pro quo* (R. 55 at 43), but the court held the opposite: that § 666 does not have an express *quid pro quo* requirement in cases that do not involve campaign contributions as alleged bribes.

*Hawkins*, suffices to "safeguard against criminalizing innocent acts." *Hawkins*, 777 F.3d at 882. A *quid pro quo* agreement or understanding is not necessary to avoid impinging on First Amendment freedoms. As described below, the indictment amply alleges that the regular, substantial, and surreptitious stream of benefits that Madigan received, indirectly, for more than eight years, were made with corrupt intent and were not mundane political goodwill gestures.

Finally, defendants' references to the legislative history of § 666 are similarly unavailing. Legislative intent has no relevance where, as here, the plain text of the statute is unambiguous. *See Salinas*, 522 U.S. at 57-58 (stating, in the context of § 666, that "[c]ourts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language" (quotations and citations omitted)). The legislative record does not support Madigan's position that a *quid pro quo* requirement was "inherent" in 201(b) and therefore § 666 (R 55 at 39).

In fact, the legislative history shows that Congress did *not* intend to limit the reach of § 666 to *quid pro quo* bribery. Congress amended § 666 in 1986 to add a corrupt intent requirement, Pub. L. No. 99-646, § 59, 100 Stat. 3592, 3613 (1986), and that amendment was designed to "parallel[] the bank bribery provision (18 U.S.C. § 215)," which had been amended earlier that year. H.R. Rep. 99-797, § 42, at 6153 n.9 (1986) (citing legislative history for § 215). Given that Congress modeled § 666 after § 215, the legislative history of § 215—not § 201(b)—is instructive as to § 666.

In 1984, Congress removed the *quid pro quo* requirement from the existing version of the bank bribery statute (§ 215) and made bank bribery a felony, among other changes. Pub. L. No. 98-473, § 1106, 98 Stat. 1837, 2145-46 (1984); see also 1 Villa, John. K., *Banking Crimes: Fraud, Money Laundering and Embezzlement* § 5:3 (2022). Congress amended § 215 to add a corrupt intent requirement in 1986 (just months before doing the same for § 666). Significantly, Congress did not reinstate the *quid pro quo* requirement for § 215 or § 666. The legislative history thus demonstrates that Congress did not intend § 215 or § 666 to be limited to *quid pro quo* bribes. In addition, defendants' cabined interpretation of § 666 would contravene Congress's intent, which was to "augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." S. Rep. No. 98-225 at 369-70.[14]

_____

[14]    The legislative history also makes clear that § 215 and § 666 were intended to prohibit gratuities as well as bribes, consistent with the Seventh Circuit's recent decision in *Snyder*. For example, Representative Rick Boucher stated that § 215 "prohibits giving or accepting two types of payments . . . : Those intended to influence a discretionary decision or induce a violation of a legal or fiduciary duty and those given as a *reward* for making a particular discretionary decision or for violating a legal or fiduciary duty." *Bank Bribery: Hearings on H.R. 2617, 2839, and 3511 Before the Subcomm. On Criminal Justice of the H. Comm. On the Judiciary,* 99th Cong. 2 (July 11 and 17, 1985) (emphasis added); *see also, e.g., Financial Bribery and Fraud Amendments Act of 1984: Hearing on H.R. 5405 Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary,* 98th Cong. at 1 (Apr. 26, 1984) (statement of Rep. Conyers) (discussing "rewards" for violating a duty).

Representative Conyers also stated that, in drafting the § 215 amendment, "the committee sought to effectuate the purpose of section 215 as identified by the Justice Department." 131 Cong. Rec. 29324 (Oct. 29, 1985). Department of Justice representatives had emphasized the importance of criminalizing bribes and gratuities in the same manner, because "[b]ank bribery is usually not the simple, unsophisticated *quid pro quo* of someone saying, 'Hey, if you give me that loan I'll give you $5,000.' Criminality among bank officers

In short, a *quid pro quo* is not an element of § 666.[15]

### b. The § 666 Counts Are Not Defective for Failing to Allege a Connection to a Specific Act.

Madigan is also incorrect that the § 666 counts are defective because they do not identify a "specific act for or because of which Madigan purportedly intended to be rewarded." R. 55 at 47.

The indictment sufficiently alleges that Madigan received a stream of benefits from ComEd, knowing those benefits were intended to secure favorable treatment for ComEd legislation. The Seventh Circuit endorsed this theory in connection with the prosecution of former Illinois Governor George Ryan:

> [T]his is not a case in which a public official had a specific price for each official act that he did, like a menu in a

---

often evolves from a cozy relationship which builds and grows between a bank officer and the interested party." Bank Bribery Hearing, 99th Cong. 3 (July 11 and 17, 1985) (testimony of Deputy Attorney General Victoria Toensing). Another Department of Justice representative similarly testified that "the seriousness of graft is just as serious as the *quid pro quo* loan. . . ." *Id.* at 8 (testimony of Stephen Learned). The legislative history thus demonstrates that Congress did not intend § 215 to be limited to *quid pro quo* bribes, but rather, it intended the statute to criminalize gratuities as well. Because § 666 was modeled after § 215, it is similarly clear that Congress intended to criminalize gratuities in amending § 666.

[15]   Even if the Court were to find that § 666 requires a *quid pro quo* (which it does not), the indictment sets forth ample allegations from which a *quid pro quo* could be inferred. Because Seventh Circuit law is clear that no *quid pro quo* is required, the government does not address this alternative argument in detail, and instead incorporates by reference the government's filing in *United States v. McClain*, No. 20 CR 812 (N.D. Ill.) at Dkt. 54 at 34-38. As a summary, the Court can infer Madigan's intent from the benefits themselves—they were regular, spanned a lengthy period of time, and were of high value. SI ¶ 31(e)-(h). *See United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013). The Court also can infer Madigan's intent to engage in a *quid pro quo* from the allegation that he knew that certain benefits were provided in return for little or no legitimate work, SI ¶¶ 4, 31(kk), and from the acts taken to conceal the true nature of the benefits, including use of Doherty as an intermediary and falsifying records, SI ¶¶ 6, 9, 10, 28, 31(x), (ee). *See United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011). In addition, the indictment alleges a connection between Madigan's actions with regard to ComEd legislation and the bribes he received. SI ¶¶ 31(a)-(d), 31(oo), 31(l)-(o), 31(qq), 31(rr), 31(tt) 31(ccc), 31(mmm).

> restaurant where you pick an item and it has a particular price. . . . The corruption here was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals.

*Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012); *see also United States v. Solomon*, 892 F.3d 273, 276 (7th Cir. 2018) (honest services fraud statute "reaches schemes that involve a stream of benefits over time, not just singly negotiated deals"); *United States v. Roberson*, 998 F.3d 1237, 1251-52 (11th Cir. 2021) (approving of "'retainer' theory of liability" in a § 666 case).

The holding in *McDonnell v. United States*, 579 U.S. 550 (2016), does not apply here. In *McDonnell*, the governor of Virginia and his wife were charged with honest services fraud, in violation of 18 U.S.C. § 1346, and Hobbs Act extortion, in violation of 18 U.S.C. § 1951, based on their acceptance of luxury goods, vacations, and personal loans from a Virginia businessman seeking to influence the funding decisions of state medical schools. *Id.* at 556-62. McDonnell was convicted after trial, and his conviction was affirmed by the court of appeals. *Id.* at 564-66. The Supreme Court reversed, holding that the jury instructions' definition of "official act," as pertinent to the charged statutes, was flawed. The Court held that the district court instead should have instructed the jury that (1) an official act is limited to a "question, matter, cause, suit, proceeding or controversy involving the formal exercise of government power," *id.* at 578 (quotations omitted); (2) the pertinent "'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the

59

question whether to initiate the research studies," *id.* at 579 (quotations omitted); and (3) "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.*

Unlike the statutes at issue in *McDonnell,* and unlike § 201, which the Court addressed in *Sun-Diamond*, § 666 does not use the term "official act" or "official right" and does not require that the defendant contemplate an exchange for a discrete official act, so long as he intended to influence in connection with governmental business more generally. This is one of many textual and structural differences between § 666 and § 201. Section 201—unlike § 666(a)—uses the term "official act," expressly requiring a defendant act with intent to influence or be influenced in the performance of "any official act." 18 U.S.C. § 201(b)(1), (b)(2)(A); *see also id.* § (c)(1)(A), (c)(1)(B) (gratuity provisions).

While the Seventh Circuit has not addressed the issue of applying the *McDonnell* standard to § 666, every circuit court that has done so has declined to import *McDonnell*'s holding into prosecutions under § 666 for the above reasons. *See United States v. Lindberg*, 39 F.4th 151, 166-68 (4th Cir. 2022); *Roberson,* 998 F.3d at 1247, 1251 (holding, "[c]onsistent with the views of our sister Circuits," that *McDonnell*'s "official act" requirement does not apply to § 666 and that a bribery conviction also does not require a "specific act"); *United States v. Ng Lap Seng*, 934 F.3d 110, 131-33 (2d Cir. 2019) (holding that § 666 is "more expansive" than § 201, so "the *McDonnell* standard" does not apply); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) (finding defendant's "reliance on *McDonnell* is misplaced," because

60

"[i]n *McDonnell*, the Supreme Court limited the interpretation of the term "official act" as it appears in § 201, an entirely different statute than [§ 666]"); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (same); *United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) ("*McDonnell* had nothing to do with § 666."). Thus, *McDonnell* and *Sun-Dimaond* do not provide any basis for finding that the superseding indictment is deficient for failure to allege a specific act that Madigan performed.

Finally, contrary to Madigan's claim, the illegal conduct alleged in the superseding indictment did not consist merely of lobbying or job recommendations absent any connection to legislation. *E.g.*, R. 55 at 34. As the superseding indictment alleges, Madigan approved of the plan, starting in 2011, for ComEd to make indirect payments to his associates through third-party intermediaries. SI ¶¶ 7, 31(jjj). McClain regularly "reported to MADIGAN concerning the status of payments made to MADIGAN's associates." *Id.* Further, it was Madigan, not ComEd executives or employees, who "determined when payments made by ComEd through third party intermediaries to certain of his associates might be terminated." *Id.* ¶ 11. Based on *Madigan's* instructions, McClain ended payments. *Id.*; *see also id.* ¶ 31(fff). The fact that Madigan controlled when the payments started and stopped and was aware of the indirect nature of the payment, demonstrates that these were not merely lobbying contracts, but bribes designed to look like lobbying contracts.

### c. Section 666 Criminalizes the Payment of Gratuities

Madigan asks the Court to follow the First and Fifth Circuit's decisions in

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013), and *United States v. Hamilton*, 46 F.4th 389, 394-98 (5th Cir. 2022), and conclude that gratuities are not criminalized under § 666. R. 55 at 45-47. The Court should decline defendants' invitation to disregard circuit precedent, which the Seventh Circuit once again reaffirmed in *United States v. Snyder*, --- F.4th ---, No. 21-2986, 2023 WL 4011163 (7th Cir. June 15, 2023).

The Seventh Circuit has long recognized that the government may pursue a gratuity theory under § 666, without proving a *quid pro quo. See United States v. Johnson*, 874 F.3d 990, 1001-02 (7th Cir. 2017) (reaffirming circuit precedent that holds that § 666 criminalizes the receipt of both bribes *and* gratuities); *Hawkins*, 777 F.3d at 881; *Agostino*, 132 F.3d at 1190.[16] On June 15, 2023, in *Snyder*, the Seventh Circuit held once again that the "statutory language 'influenced or rewarded' easily reaches both bribes and gratuities," and rejected the defendant's invitation to reconsider circuit precedent in light of the First and Fifth Circuits decisions in *Fernandez* and *Hamilton. See Snyder*, 2023 WL 4011163, at *16. The court rejected these decisions because "the word 'rewarded' in § 666—which is not found in the federal bribery provision [under § 201]—is a strong indication that § 666 covers gratuities as well as bribes." *Id.* at *17.

---

[16]     The majority of circuits to address the issue similarly permit § 666 prosecutions under a gratuity theory. *See Ganim*, 510 F.3d at 150 ("[A] payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity."); *United States v. Zimmermann*, 509 F.3d 920, 927 (8th Cir. 2007) ("Section 666(a)(1)(B) prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action"); *accord United States v. Jackson*, 688 F. App'x 685, 695 (11th Cir. 2017).

The Seventh Circuit also rejected the First and Fifth Circuit's analysis that a sentencing disparity could arise if § 666 prohibits gratuities, given the different sentencing provisions in § 666 and § 201's gratuities provision (§ 201(c)): "the approach of the First and Fifth Circuits produces its own disparity of a different sort: gratuities paid to federal officials are criminalized, whereas gratuities paid to state and local officials are not under federal law." *Snyder,* 2023 WL 4011163, at *17. The Seventh Circuit further observed that the "corrupt" intent requirement in § 666, which is not present in § 201's gratuity provision, mitigates any concern that § 666 imposes greater penalties than § 201, because a defendant must have "knowledge that giving or receiving the reward is forbidden" under § 666. *Id.*

For these reasons, the First and Fifth Circuit's decisions, which hold that § 666 criminalizes only bribes, not gratuities, are plainly erroneous. There, both courts held that § 666 criminalizes only bribes, not gratuities. *See United States v. Fernandez*, 722 F.3d 1, 22 (1st Cir. 2013); *United States v. Hamilton*, 46 F.4th 389, 397 (5th Cir. 2022). In addition, as discussed in Section I(D)(2) (a) and note 14, above, § 666 was drafted to generally track § 215 (the bank bribery statute), which clearly covers bribes and gratuities. Madigan's interpretation would improperly erase the word "reward" from § 666, which would by inconsistent with the Seventh Circuit's holding in *Snyder,* that "the word "rewarded" in § 666—which is not found in the federal bribery provision [§ 201]—is a strong indication that § 666 covers gratuities as well as bribes." *Snyder,* 2023 WL 4011163, at *17; *see also Jackson*, 688 F. App'x at 695 (declining to follow *Fernandez*).

In short, this Court should follow circuit precedent and allow the government to proceed under both a bribery and a gratuity theory.

> ### d. Whether Payments Were "Bona Fide" and "In The Usual Course Of Business" under 18 U.S.C. § 666(c) Is A Factual Question For The Jury.

Madigan relies on 18 U.S.C. § 666(c) in moving to dismiss Count Two and Three, as they relate to the appointment of Individual BM-1 to ComEd's Board of Directors, the retention of Law Firm A, and the hiring of summer interns associated with the 13th Ward. R. 55 at 54-55.

Section 666(c) provides in its entirety:

> This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

Subsection (c) was added in 1986 in order "to avoid [18 U.S.C. § 666's] possible application to acceptable business practices." *United States v. Cornier-Ortiz*, 361 F.3d 29, 33-34 (1st Cir. 2004) (quoting H.R.Rep. No. 99–797, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153).

Madigan's motion to dismiss Counts Two (in part) and Three on the basis of § 666(c) should be denied because whether a payment was made in the "usual course of business" is a question of fact for the jury. Even if it were a legal question appropriate for determination in a motion to dismiss (which it is not), the allegations in the indictment—assumed to be true—adequately establish that Madigan's conduct was not an acceptable business practice exempted from the reach of § 666.

### i. The application of § 666(c) is a jury question.

The determination under § 666 of whether payments were made or offered in the usual course of business is a question of fact for the jury. *United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (citing *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide."); *see also United States v. Dwyer*, 238 Fed. App'x 631, 647 (1st Cir. 2007) ("Whether wages were bona fide is a question of fact for the jury."). Recognizing this, the Seventh Circuit pattern instruction for § 666(c) provides:

> Bona fide [salary, wages, fees, or other compensation paid; expenses paid or reimbursed], in the usual course of business, [does; do] not qualify as a thing of value [solicited or demanded; given, offered, or agreed to be given] by the defendant.

Pattern Instructions at 306.

In *Lupton*, for example, an agent of the State of Wisconsin was charged with soliciting a kickback in connection with his job of soliciting proposals from parties interested in purchasing property from the state. 620 F.3d at 794-95. In conversations with a real estate broker, Lupton sought a kickback of one-quarter of the fee that the broker would receive if the transaction went through. At a bench trial, Lupton argued that he had simply proposed a legitimate "commission split" with the broker, which was permitted under Wisconsin law, and that this permissible commission split was discussed only hypothetically. *Id.* at 802. Thus, Lupton argued, his discussions with the broker amounted to nothing more than a bona fide business transaction under

65

§ 666(c). In rejecting Lupton's argument and convicting him of the § 666 charge, the district court found that Lupton's "'unusual maneuvering' with [the broker] 'reveals that this was not to be a payment in the ordinary course of business.'" *Id.* at 820 (quoting *Lupton*, 2009 WL 679649, at *5 (E.D. Wisconsin 2009)). The Seventh Circuit agreed and made clear that the issue of whether a payment is in the ordinary course of business is an issue of fact:

> The evidence was sufficient to support the factfinder's conclusion. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.").

> Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular "split" was neither bona fide nor sought in the ordinary course of business.

*Id.* at 802.

Judge Dow denied a defense motion to dismiss public corruption charges where the alleged bribes were legal fees paid to Alderman Ed Burke's law firm. The court held that the charges could not be dismissed based on § 666(c), "because assessing whether any fees [defendant] Cui agreed to pay were made 'in the usual course of business' under § 666(c) is a jury question, not one for this Court on a motion to dismiss." *Burke,* 2022 WL 1970189, at *30. In similar fashion, in another recent corruption prosecution charging the same conspiracy that is alleged in Count Two of the superseding indictment, District Judge Leinenweber decided that the issue of the applicability of § 666(c) should be resolved by the jury at trial. *See McClain*, 2022 WL

66

488944, at *2 ("While Defendants are entitled to use § 666(c) as an affirmative defense at trial, they are not entitled to dismissal at this stage based solely on their version of the facts.").

The Court should follow these cases and find that the application of § 666(c) is a question for the jury.

### ii. Even if properly the subject of a motion to dismiss, the allegations support a conviction under § 666.

Even assuming the Court may properly consider § 666(c) in a motion to dismiss, the superseding indictment's allegations are more than sufficient to prove that ComEd's hiring of Individual BM-1, the Thirteenth Ward interns, and Law Firm A were not bona fide or made in the usual course of business.

The indictment alleges—and the evidence therein will prove—that these were not bona fide payments made in the normal course of business. Law Firm A's contract was maintained, even though there wasn't enough appropriate work for the firm, because ComEd executives sought to ensure that Madigan did not take adverse action against the company. SI, Count 2, ¶¶ 15-18. In addition, the Thirteenth Ward intern applicants were given preferential treatment because of their affiliation with Madigan, and were not treated like interns from other parts of the Chicago area. *Id.* ¶¶ 20-22. And Individual BM-1 was appointed to ComEd's board over push back within ComEd because Madigan instructed McClain that ComEd should "go forward with" his appointment. *Id.* ¶ 31(qq).

Addressing the same conspiracy at issue in this case, Judge Leinenweber concluded that defendants were not entitled to dismissal on the grounds that payments made by ComEd to Madigan's associates fell within the scope of § 666(c). The court ruled: "The fact that these incentives were laundered partially through jobs does not invalidate the indictment. A company cannot use its payroll line on its accounting ledger to circumvent all Government oversight of public corruption." *McClain*, 2022 WL 488944, at *2. (Indeed, the jury was instructed as to Section 666(c), and nevertheless convicted the defendants of all counts. *United States v. McClain,* No. 20 CR 812, Dkt. 249 at 40 & Dkts. 250-253.)

Addressing similar facts, a federal court in New Jersey held that a salary paid under similar circumstances was a bribe. *United States v. Bryant*, 556 F.Supp.2d 378 (D.N.J. 2008). In *Bryant*, the dean of a school of medicine created a paid position for state legislator Wayne Bryant as a "program support coordinator." *Id.* at 385. The indictment alleged that the dean caused Bryant to receive a salary in that role in exchange for Bryant using his position as a state legislator to benefit the medical school. *Id.* at 385-86. The defendants moved to dismiss § 666 charges, relying on § 666(c). The court rejected this argument, holding that Bryant's "salary was not paid 'in the usual course of business' because it was allegedly the *quid* in a *quid pro quo* bribery arrangement." *Id.* at 428. The court explained that, even though it may have been paid for legitimate work, because the "salary itself constitutes the bribe . . . it was not 'bona fide' or paid 'in the regular course of business.'" *Id.* at 428-29 ("If a public official sells his office for wages, even if some legitimate work is performed in

68

exchange for those wages, it is sufficiently clear that such wages are not "bona fide."). It concluded:

> [T]he reason why Bryant's . . . salary was not "bona fide" has nothing to do with the value of the legitimate work he did. Even if Bryant did provide value . . . in the form of legitimate work, his salary cannot be "bona fide" if it was part of a *quid pro quo* bribery deal.

*Id.*[17] Individual BM-1's appointment, the continued retention of Law Firm A, and the hiring of Thirteenth Ward interns are similar to the arrangement in *Bryant*, in that while some work may have been performed, the payments nevertheless constituted a bribe.

In seeking to have the ComEd charges dismissed, Madigan relies on *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988). R. 55 at 55. *Risk* did not involve a bribery charge. Rather, the defendant was accused of failing to file Currency Transaction Reports under 31 U.S.C. §§ 5313 and 5322. *Id.* at 1060. In discovery, the government disclosed documents (which the government conceded were accurate) demonstrating that none of the relevant transactions totaled more than $10,000, a necessary factual predicate for the charges. *Id.* at 1060-61. Under these unique facts, the Seventh Circuit affirmed the district court's dismissal of the indictment because the undisputed evidence showed that none of the transactions at issue exceeded $10,000. *Id.* Critically, the court dismissed the indictment "not because the government could not prove its case, but because there was no case to prove." *Id.*

---

[17]    Bryant's subsequent conviction for violating 18 U.S.C. § 666 and other statutes was affirmed on other grounds. *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011).

Nothing remotely similar occurred here. Surely, Madigan's efforts to receive bribes by arranging for Individual BM-1's appointment, the continued retention of Law Firm A, and the hiring of interns associated with his Chicago Ward were not the sort of "acceptable business practice" that § 666(c) was intended to protect. *See Cornier–Ortiz*, 361 F.3d at 36 (rejecting a defense under § 666(c) and holding, "[a] scheme designed to evade conflict of interest rules is hardly legitimate or acceptable"); *Lupton*, 620 F.3d at 802 ("Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular 'split' was neither bona fide nor sought in the ordinary course of business.").

Indeed, Madigan's only argument as to Individual BM-1 is that "there is no question that Individual BM-1 filled a vacant, pre-existing seat on ComEd's board of directors and performed the job to which he was appointed." R. 55 at 55. But Madigan ignores the allegations in the indictment that Madigan pushed for Individual BM-1's appointment, despite push back within ComEd, and Pramaggiore agreed to "keep pressing" because McClain and Madigan had taken "good care" of her and she would take good care of them. SI ¶ 31(rr), (ccc).

Similarly, Madigan's only argument as to why § 666(c) bars claims regarding Law Firm A is that "Law Firm A performed substantive work for ComEd" and ultimately reduced its guaranteed hours. R. 55 at 55-56. But the superseding indictment spells out that Law Firm A's contract was renewed, even though there was insufficient work for the firm, and that this renewal was based on McClain's

threat that failure to renew the contract on favorable terms would "provoke a reaction from our Friend," referring to Madigan's ability to affect ComEd's legislation. SI, Count 2, ¶¶ 16, 31(l).

The same is true of the interns. Even though the interns did work for ComEd, they were given a leg up in terms of application that other intern applicants did not receive, only because of their connection to Madigan. *Id.* ¶¶ 19-22. As the indictment makes clear, these are not bona fide payments made in the usual course of business.

**E. The AT&T Related Count Should Not Be Dismissed.**

The defendants argue that Count Twenty-Three related to AT&T should be dismissed, again arguing that a *quid pro quo* is required for § 666 bribery and a link to a specific official act is required for § 666 gratuity. R. 55 at 60-61. As discussed in Section I(D)(2), above, there is no *quid pro quo* or official act requirement under § 666. The government must allege, and ultimately prove at trial, that Madigan intended to be influenced or rewarded in connection with government business when he accepted benefits from AT&T.

Madigan also contends that the superseding indictment does not sufficiently allege that he knew that AT&T intended to hire Individual FR-1 to influence him with regard to AT&T legislation. R. 55 at 61. There is no such requirement. With regard to the Count Twenty-Three conspiracy, the indictment must allege, and the government must prove at trial, that (1) the conspiracy as charged in Twenty-Three existed; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt

act in an effort to advance a goal of the conspiracy. Pattern Instructions at 102. The focus is on Madigan's intent. In addition, the charge specifically alleges, among other things, that the conspirators agreed to corruptly solicit payments to Individual FR-1, for the benefit of Madigan, and then spells out that, as part of this conspiracy, Madigan and McClain "sought to obtain monetary payments for Individual FR-1 from AT&T Illinois." The superseding indictment thus clearly alleges a conspiracy to violate § 666, and goes further by identifying Madigan's role within it. Nothing more is required. *E.g., White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case"). It will be up to the government to prove at trial that Madigan and McClain were "aware of the illegal goal[s] of the conspiracy and knowingly joined the conspiracy." *Id.* at 109.

### F. Madigan's Constitutional Arguments Regarding § 666 Are Meritless.

Madigan argues that all of the § 666 counts and related Travel Act counts should be dismissed, claiming that § 666 is unconstitutional absent a *quid pro quo* requirement for bribes. R. 55 at 49-54, 57-59, 62-63. No court has ever held that § 666—a linchpin of federal law enforcement for upwards of 38 years—is unconstitutionally vague or overbroad, or otherwise constitutionally deficient, and this Court should decline Madigan's invitation to be the first to do so.

### a. Madigan's Overbreadth Challenge Fails.

As described in Section I(C)(3), above, where First Amendment rights are potentially implicated, a defendant may make a facial challenge to a statute but must prove that the statute "substantially" criminalizes or suppresses protected speech in comparison to its plainly legitimate sweep. *Bell*, 697 F.3d at 452-53 (quotations and citations omitted). Section 666 is not constitutionally overbroad under the First Amendment. Preventing corruption and preserving citizens' confidence in government are "interests of the highest importance," *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788-89 (1978) (citations omitted), and measures calculated to prevent bribery plainly accomplish this goal.

Section 666 does not substantially criminalize protected speech. As discussed above, bribes are not protected speech. *See Chaplinsky*, 315 U.S. at 572.[18] Section 666 plainly distinguishes between criminal speech and lawful lobbying through its "corrupt" intent requirement. This type of scienter requirement protects a statute against impermissible infringement of protected speech. For example, in *United States v. Thompson*, 76 F.3d 442 (2d Cir. 1996), the Second Circuit considered whether an obstruction of justice statute that punished "corruptly persuad[ing] another person . . . with intent to influence . . . the testimony of any person in an official proceeding," 18 U.S.C. § 1512(b), was overbroad. Concluding the statute was

---

[18]    It is not clear that the overbreadth doctrine applies to interactions with public officials, as generally the overbreadth doctrine applies to speech and expressive conduct. *See United States v. Donagher*, 520 F. Supp. 3d 1034, 1053 (N.D. Ill. 2021) (discussing cases). Even assuming overbreadth applies, § 666 presents no overbreadth concerns.

73

not overbroad, the Second Circuit explained that the use of the term "corruptly" as a scienter requirement (which it interpreted to mean "motivated by an improper purpose") meant that the statute was "clearly limited to . . . constitutionally unprotected and purportedly illicit activity." 76 F.3d at 452. Likewise, in *United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998), the Eleventh Circuit held that, "[b]y prohibiting only that persuasion which has an improper purpose," § 1512(b) "does not impermissibly limit protected speech." The same "corruptly" requirement is found in 18 U.S.C. § 666, which functions to distinguish between bribes and protected speech.

In addition, the limitation of § 666(a)(1)(B) to bribes made in connection with any "business, transaction, or series of transactions" of the state or local government further limits the scope of the statute. *See, e.g., Donagher*, 520 F. Supp. 3d at 1053 (§ 666(a)(2) not overbroad because it is limited to bribes or rewards related to any "business, transaction, or series of transactions" of governmental unit").

Madigan makes the fanciful claim that he could be convicted because he received benefits "because of his *position* alone," or "because of the power historically vested in the Speaker of the House." R. 55 at 51. This is a straw man. The government will be required to prove the elements of the charged offenses, which require, among other things, that Madigan acted with the intent to be influenced or rewarded in connection with government business when he accepted benefits from ComEd and other entities. Pattern Instructions (2022 updates) at 6-7. This is simply not a situation in which Madigan was indicted, or could be convicted, because of his position

alone.

### b. Madigan's Vagueness Challenge Fails.

As described in Section I(C)(3), above, the void-for-vagueness doctrine, derived from the Due Process Clause, *see* U.S. Const., amend. V, provides that a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. A criminal statute violates the Fifth Amendment's guarantee of due process of law if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To be facially vague, a statute must be vague in all its applications. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).

Section 666 is not vague. Intended to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," *Sabri v. United States*, 541 U.S. 600, 606 (2004) (quotation marks and citation omitted), § 666(a)(1)(B) prohibits a state government agent from corruptly receiving or soliciting anything of value of $5,000 or more to any person, intending to be influenced or rewarded "in connection with any business, transaction, or series of transactions." As multiple courts have held, the language of this statute is adequate to alert a reasonable person of ordinary intelligence to the conduct it prohibits and presents no risk of arbitrary enforcement. *See Ng Lap Seng*, 934 F.3d at 135 (denying

75

defendant's vagueness challenge, noting "that courts have uniformly rejected vagueness challenges both to § 666 and to the FCPA"); *accord United States v. Hardin*, 874 F.3d 672, 677 (10th Cir. 2017); *United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993); *United States v. Ryans*, 709 F. App'x 611, 619 (11th Cir. 2017); *Donagher*, 520 F. Supp. 3d at 1054 ("Every circuit court to have addressed this issue has held that § 666 is not void for vagueness.").

This is because, while the scope of § 666 is broad, its reach is limited in important respects. First, it applies only in the context of bribes and gratuities paid to agents of government agencies and organizations that receive more than $10,000 of federal benefits in a one-year period. *See* 18 U.S.C. § 666(b). Second, it applies only to things of value provided to influence or reward such agents "in connection with business, transaction, or series of transactions" having a value of more than §5,000. *See id*. § 666(a). This provision thus effectively excludes a broad swath of corrupt bribe and graft payments at the local level from the ambit of the statute—say, by way of example, a $500 bribe paid to a State prison guard to smuggle a shank and bag of marijuana into a local jail. Third, it applies only to defendants who act with corrupt intent. *Id.* This scienter requirement mitigates any possible ambiguity in the statute. *See Vill. of Hoffman Estates*, 455 U.S. at 499 (explaining that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed"). Recognizing this, District Judge Leinenweber declined to invalidate § 666 as vague in *United States v. McClain et al.*:

"Because the Court reads the 'corruptly' as a limiting factor of the statute, the concerns regarding both the fair warning and the prosecutorial standards are alleviated." *McClain,* 2022 WL 488944, at *6.

Madigan has made no showing that, in the approximately 38 years since § 666 has been on the books, the statute has been applied in a manner that is arbitrary or discriminatory. Notably, no court has found § 666 to be overbroad, facially or as applied.

Relatedly, Madigan argues that the Supreme Court's narrowed construction of the term "official act" in *McDonnell,* was motivated by constitutional concerns that implicitly require all federal bribery statutes to contain an "official act" element; and that, absent such a requirement, the statute is unconstitutionally vague and overbroad and violates principles of federalism. R. 55 at 51. As discussed above, *McDonnell* has no application to § 666, and it does not suggest a constitutional infirmity in that statute. The fact that § 666 does not use the term "official act" does not make the statute so vague as to make it incomprehensible to people of ordinary intelligence or create a risk of arbitrary enforcement. *See Ng Lap Seng*, 934 F.3d at 137 ("[W]e conclude that *McDonnell*'s constitutional concerns simply do not arise in the context of [§ 666].").

## II. McClain's Motion to Dismiss Counts Nineteen and Twenty (R. 69) Should Be Denied.

McClain moves to dismiss Counts Nineteen and Twenty of the superseding indictment (R. 69, 70), which charge Madigan and McClain with wire fraud related

to their efforts to transfer a parcel in Chinatown in Chicago to help Madigan secure lucrative tax work for his law firm. SI, Counts 19 & 20. Madigan joins the motion. R. 71. As discussed below, the government has properly alleged violations of the wire fraud statute.

**A.    The Indictment Properly Alleges Honest Services Fraud.**

The wire fraud statute prohibits honest services fraud, which occurs, for example, where a public official takes a bribe in exchange for taking official action, while holding himself out as an honest public servant. *United States v. Skilling*, 561 U.S. 358, 401 (2010). In this way, a public official is said to deprive the public of their intangible right to the honest services of that official, even though members of the public may not suffer any tangible pecuniary loss from the public official's betrayal. *Id.* It is well settled that "a non-fiduciary who schemes with a fiduciary to deprive the victim of intangible rights is subject to prosecution under the mail fraud statute." *United States v. Alexander*, 741 F.2d 962, 964 (7th Cir. 1984), *overruled on other grounds, United States v. Ginsburg*, 773 F.2d 798 (7th Cir. 1985) (en banc); *see also, e.g., United States v. Lovett*, 811 F.2d 979, 984 (7th Cir. 1987) (lawyer guilty of mail fraud for bribing mayor). Thus, the jury will be instructed that a "defendant need not owe the fiduciary duty personally, so long as he devises or participates in a bribery or a kickback scheme intended to deprive the public of its right to a fiduciary's honest services." Pattern Instructions at 623-24; *see also id.* Committee Comment (discussing cases).

Despite this well-settled precedent, McClain contends that he cannot be criminally liable because he "did not personally owe any fiduciary duty to the people of the State of Illinois." R. 70 at 1. McClain cites a recent Supreme Court decision, *Percoco v. United States*, 143 S. Ct. 1130 (2023), but that decision has no application to his case. Percoco was an associate of Andrew Cuomo, the Governor of New York. Percoco left his position as a government employee while still advising the governor, but continued to exercise control over government while at the same time accepting payments from a private entity to grease the wheels in the governor's office. *Id.* at 1134. He was charged with honest services fraud, in violation of § 1346, among other offenses. *Id.* Governor Cuomo was not alleged to be a co-schemer; rather, Percoco, who was not a government official at the time of the payments, was the sole participant alleged to owe a duty of honest services. The Supreme Court rejected the view that *any* private citizen with influence over government decision-making can be convicted of honest services fraud based on his *own* fiduciary duty to the public. *Id.* at 1137-38. The Court declined to hold that a private citizen can never owe such fiduciary duties to the public, however, and observed that a private citizen may have a fiduciary duty to the public if he becomes an actual agent of government. *Id.*

Notably, the Court did not address the situation in this case: a private citizen (like McClain) who helped facilitate bribes to an elected official. Madigan unquestionably owed a fiduciary duty to Illinois residents—and thus a duty to provide honest services—and the superseding indictment alleges that McClain facilitated

79

bribe payments to Madigan. McClain thus participated in a scheme in which a public official (Madigan) breached his fiduciary duty to the citizens of Illinois.

More specifically, the superseding indictment alleges that McClain helped transfer a piece of State land in Chinatown to the City of Chicago to enable its ultimate sale to a private developer, who would in turn hire Madigan's tax law firm. SI, Count 19, ¶¶ 5, 7. McClain then worked with the developer, lobbyists, and legislators on the land transfer legislation, knowing that Madigan would receive tax work in exchange for this effort. *Id.* ¶¶ 8-11, 31. Based on these allegations alone, McClain is wrong that the honest services fraud statute is void as applied to him; he is not "tangentially connected with a bribery scheme" related to the Chinatown Parcel. To the contrary, the allegations in the superseding indictment allege that McClain along with Madigan schemed to defraud "the people of the State of Illinois of the intangible right to the honest services of MADIGAN through bribery" by attempting to steer business to Madigan's firm in exchange for Madigan's legislative action on the land transfer bill. SI, Count 19, ¶ 3.[19]

## B.    The Indictment Properly Alleges Property Fraud.

McClain also argues that the superseding indictment does not allege sufficient facts to make out a scheme to defraud property or money. R. 71 at 6-7. But the

---

[19] McClain complains that the superseding indictment could have charged him with aiding and abetting, but "[e]very indictment implicitly includes an aiding and abetting charge; it is unnecessary for an indictment specifically to mention 18 U.S.C. § 2." *United States v. Renner*, 238 F.3d 810, 814 (7th Cir. 2001); *accord United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994).

indictment lays out in detail McClain's role in attempting to transfer real property owned by the State of Illinois to the City of Chicago (where Alderman A could control its disposition) in order to place it in the hands of a developer. This is unquestionably a scheme to deprive Illinois citizens of property, and Madigan and McClain worked to conceal Madigan's true interest in the land transfer bill. *E.g.,* SI, Count 19, ¶¶ 13, 19. It is also a scheme to deprive Illinois residents of money, as the government anticipates that evidence at trial will show that part of the purpose of transferring the Chinatown parcel to the City of Chicago via legislation was to avoid a private auction; an auction would have resulted in the land being sold at a higher price, and the State would have therefore received more money for the land. (This was discussed in various conversations detailed Title III filings associated with McClain's phone.)

McClain relies on *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). There, the Supreme Court overturned § 1343 property fraud convictions against the public officials who ordered lane closures on the George Washington Bridge as a means of political retaliation, because the object of the fraud was not to obtain government money or property, and the scheme's use of state employees was "incidental to—the mere cost of implementing—" the lane closures. *Id.* at 1572-73. Significantly, the Court gave examples of cases where a property fraud theory could, in fact, proceed. State employees' time and labor can undergird a property fraud prosecution where, for example, "a city parks commissioner induces his employees into doing gardening work for political contributions." *Id.* at 1573. The Court noted that the defendants

"did not walk away with the lanes; nor did they take the lanes from the Government by converting them to a non-public use." *Id.* at 1573.

Here, Madigan's and McClain's scheme was designed to facilitate the transfer of public property to private hands—exactly the scenario contemplated by the *Kelly* Court. Moreover, unlike in *Kelly*, the Chinatown parcel did not play "some bit part in a scheme." *Id.* at 1573. The entire object of the scheme was to transfer the real property and to allow Madigan to privately benefit from the transfer by cashing in on the associated real estate tax work. *See, e.g., United States v. Kousisi*s, 66 F.4th 406, 416 (3d Cir. 2023) (holding, in case involving false disadvantaged business enterprise certifications, that "obtaining the government's money or property was precisely the object of Appellants' fraudulent scheme"). Accepting the government's allegations as true, as the Court must on a motion to dismiss, the superseding indictment amply alleges a property fraud theory. *See United States v. Palma*, 58 F.4th 246, 250 (6th Cir. 2023) (noting that *Kelly* was decided after conviction, and different standard applied to motion to dismiss).

Contrary to McClain's motion, the plain language of the statute does not require that Madigan or McClain intended to secure the state property *for themselves*. As the Pattern Instructions state, "[a] 'scheme to defraud' is a scheme that is intended to deceive or cheat another and to obtain money or property *or* cause the potential loss of money or property to another by means of materially false or fraudulent pretenses, representations or promises." Pattern Instructions at 615.

### III. Madigan's Motion to Strike (R. 59) Should Be Denied.

#### A. Applicable Law

On the motion of a defendant pursuant to Federal Rule of Criminal Procedure 7(d), it is within a court's discretion to strike immaterial or irrelevant allegations as surplusage. *United States v. Climatemp, Inc.*, 482 F. Supp. 376, 391 (N.D. Ill. 1979), *aff'd sub nom.*, *United States v. Reliable Sheet Metal Works, Inc.*, 705 F.2d 461 (7th Cir.), *cert. denied*, 462 U.S. 1134 (1983). Such motions should be granted, however, "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial"—a "rather exacting" standard that applies "only rarely." *United States v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987); *accord United States v. Black*, 469 F. Supp. 2d 513, 518 (N.D. Ill. 2006).

#### B. Analysis

Madigan moves to strike three sets of allegations from the superseding indictment: (i) the phrase "Madigan Enterprise"; (ii) the phrase "Madigan associates"; (iii) allegations regarding ComEd legislation. All three request are meritless.

First, Madigan requests that each reference to the "Madigan Enterprise" in the Count One be changed to the "Enterprise." R. 59 at 3-5. Madigan cites a New Jersey decision in which the phrase "Gatto Group" was substituted for "criminal enterprise" when the indictment went back to the jury. *United States v. Gatto*, 746 F. Supp. 432, 456 (D.N.J. 1990), *rev'd*, 924 F.2d 491 (3d Cir. 1991). But Madigan fails to mention that in that case the government did not oppose redacting the indictment in that manner. *Id.* In a decision cited in *Gatto*, the Third Circuit recognized that naming the

enterprise after a defendant carries potential prejudice, but noted that "the risk of unfair prejudice is greatest where the defendant is only loosely affiliated with the enterprise" *United States v. Vastola*, 899 F.2d 211, 232 (3d Cir.), *judgment vacated*, 497 U.S. 1001 (1990). On the other hand, where it was clear that the defendant after whom the enterprise was named was the leader, then the court ruled that it "cannot see how the naming of the enterprise possibly could have influenced the outcome of this case." *Id.* The same is true here. The entire indictment centers around Madigan's efforts to improperly use his position of power to benefit himself, and the enterprise itself is comprised of the entities that Madigan led: the Office of the Speaker, the Thirteenth Ward Democratic Organization, and Madigan's law firm, Madigan & Getzendanner. SI Count 1, ¶ 2. There is no possible prejudice in naming the enterprise after him.

Second, Madigan requests that references to Madigan's "associates" in Count One and Count Two be stricken from the superseding indictment. R. 59 at 5-6. In places, the superseding indictment refers to the individuals who were paid by ComEd, through intermediaries as "subcontracts" as Madigan's "associates." *E.g.* SI, Count 1, ¶¶ 7, 9, 10, 11. But the allegations unquestionably support that the individuals Madigan helped to get jobs or contracts at ComEd were his "associates," or individuals who were closely associated with Madigan. For example, Individual 13W-1 was the alderman for Madigan's Ward, the Thirteenth Ward, for 16 years. *Id.* ¶ 1(u). Individuals 13W-2 and 13W-3 were both precinct captains in the Thirteenth Ward. *Id.* ¶ 1(v)-(w). And Individual 23W-1 was an alderman for the other Chicago ward in

Madigan's district, the Twenty-Third Ward. *Id.* ¶ 1(y). The superseding indictment alleges that Madigan arranged for ComEd to pay these individuals not for their lobbying or consulting skills but because of their association with Madigan. This association is thus critical to the government's case. These references to "associates" should not be stricken.

Third, Madigan seeks to strike references to four pieces of ComEd legislation, claiming that the superseding indictment does not allege that Madigan caused any particular outcome with regard to that legislation and did not "exert singular power over the legislative process to cause the passage of this legislation." R. 59 at 6, 8-9. There is no such requirement under § 666, and therefore this is not a prerequisite for the reference of legislation in the charge. By its plain text, § 666(a)(1)(B) makes it a crime to corruptly solicit or accept a thing of value, intending to be influenced or rewarded in connection with state business. *See* Pattern Instructions (2022 updates) at 6-7. Under § 666, a defendant's bribe does not even need to be successful. *See, e.g., United States v. Shoemaker*, 746 F.3d 614, 623 & n.10 (5th Cir. 2014) (bribe need not be successful under § 666, although "evidence of a successful scheme is not wholly irrelevant, as it is probative of the intent behind the alleged bribe payments"). Reference to these legislative milestones is appropriate and relevant because they

serve to explain the purpose, motive, and timing of the corrupt solicitations made during the course of the charged conspiracy and substantive counts.[20]

Even though the successful passage or obstruction of legislation is not required in a bribery case, the fact that ComEd successfully advanced its legislative agenda during the charged conspiracy is highly relevant. It shows that Madigan did, in fact, take action to support ComEd's legislation. Thus, references to legislation that ComEd passed during that period (SI, Count 2, ¶¶ 2(m)-(p)) are relevant. The references to the legislation should not be stricken.[21]

The same analysis applies equally to paragraphs of the superseding indictment that relate to the failure of legislation that ComEd opposed, House Bill 5626. SI, Count 2, ¶¶ 2(p), 31(nn), 31(pp), 31(vv), 31(ww). This legislation was defeated in the midst of the charged conspiracy, when ComEd had been paying Madigan associates for years. Indeed, McClain relayed to ComEd employees that Madigan had given "permission to work to kill" the bill. SI, Count 2, ¶¶ 31(nn). This demonstrates that Madigan took steps, by giving instructions to his agent McClain, to help ComEd. This allegation is therefore highly relevant, as it shows that the charged bribery scheme facilitated ComEd's ability to defeat legislation that was bad for the company.

---

[20]     The defendants' request to strike this information from the superseding indictment is also at odds with their motion for a bill of particulars, which complains that there is insufficient reference to legislation in the superseding indictment. *See* Section IV, below.

[21]     Madigan cites a civil case, in which the plaintiff was required to show proximate causation to prevail. Dkt. 59 at 9 (citing *Express Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 730-31 (7th Cir. 2014)). Proximate causation is not required in this criminal case, and that decision is therefore irrelevant.

## IV.    Madigan's Motion for a Bill of Particulars (R. 60) Should Be Denied.

The government has exceeded its obligations to apprise defendants about the nature of the charges against them, both in the superseding indictment and in discovery. Given the detailed allegations of the superseding indictment and the voluminous discovery that has been produced, a bill of particulars is not warranted. At 117 pages long, the superseding indictment in great detail states the elements of each crime, apprises defendants of the nature of the charges so that they may prepare a defense, and allows defendants to plead the judgment as a bar to future prosecution. *See Moore*, 563 F.3d at 585. Additionally, discovery produced to the defendants includes thousands of reports of interview, grand jury transcripts, Title III recordings, and more. Along with those materials, the government has provided comprehensive indices so that materials may be more easily located. As described in greater detail below, the superseding indictment and discovery provide a roadmap of the government's evidence and identify every person who could be called as a potential witness at trial (including defense witnesses). Indeed, a separate case alleging the conspiracy charged in Count Two was tried just several months ago,[22] and the defendants are in possession of the transcripts of testimony from that trial. Indeed, one of the defendants, McClain, personally attended the proceedings.

---

[22] District Judge Leinenweber in large part denied a bill of particulars in that case as well. *See McClain*, 2022 WL 488944, at *8-9.

## A. Applicable Law

A "defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003) (quotations and citation omitted); *see also United States v. Glecier*, 923 F.2d 496, 502 (7th Cir. 1991) (citing *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981)) (a defendant's "constitutional rights under the fifth and sixth amendments require that he be informed of the nature of the offense charged to allow him to prepare a defense and to protect his double jeopardy rights; they do not require the government to reveal the details of how it plans to prove its case"). A motion for a bill of particulars should be denied when the indictment "includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated." *Fassnacht*, 332 F.3d at 446.

Where the indictment, combined with the discovery, adequately informs the defendants of the charges against them, no bill of particulars is warranted. *See, e.g.*, *Vaughn*, 722 F.3d at 927; *United States v. Blanchard*, 542 F.3d 1133, 1140-41 (7th Cir. 2008) (affirming denial of motion for bill of particulars where the defendant "was the beneficiary of extensive pretrial discovery"); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003). The "choice to grant or deny" a bill of particulars "is committed to the discretion of the trial court, and a decision denying a bill of particulars" is reviewable only for an abuse of discretion. *Fassnacht*, 332 F.3d at 446 (citing *Kendall*, 665 F.2d at 134).

**B.    Madigan's Motion For A Bill of Particulars Should Be Denied.**

Madigan's request for a series of exhaustive lists is an improper effort to gain access to a play-by-play of how the government will prove its case, nine months before trial. *See United States v. Khan*, No. 15-CR-00286, 2017 WL 2362572, at *20 (N.D. Ill. May 31, 2017) (Blakey, J.), *aff'd*, 937 F.3d 1042 (7th Cir. 2019) (bill of particulars is not appropriate vehicle to ascertain government theory of the case). As a result of the detailed allegations in the indictment, the discovery produced, and the seven-week trial that recently concluded in *United States v. McClain et al.*, No. 20 CR 812, Madigan and McClain have a road map to prepare for trial. The government is not required to disclose every overt act in furtherance of the charged conspiracy. *See United States v. Busch*, No. 92 CR 20012, 1992 WL 176485, at *1 (N.D. Ill. July 6, 1992) (denying motion for bill of particulars in conspiracy case in light of detailed indictment and voluminous discovery). The superseding indictment fairly informs Madigan of the charges against him. *See Glecier*, 923 F.2d at 500 (affirming denial of bill of particulars in an Operation Greylord RICO case, because indictment specified "the time period during which the alleged conspiracy operated, the locations and courts, the principal actors, and, with some detail, the specific types of predicate crimes to be committed and the modus operandi of the conspiracy").

As discussed below, each of the categories of information Madigan seeks are either inappropriate requests or are amply spelled out in the indictment.

1.    **The Superseding Indictment Identifies the Participants Involved in the Crimes Charged.**

Madigan asks for a bill of particulars listing (i) each unindicted member or associate of the enterprise; and (ii) each unindicted member of the conspiracy charged in Count Two related to ComEd. R. 60 at 2.

Courts in this district have found that the government is not required to disclose unindicted coconspirators, where the indictment and discovery adequately apprise the defendants of the nature of the charges against them. *See United States v. Alex*, 791 F. Supp. 723, 728 (N.D. Ill. 1992) (denying request for identity of unindicted coconspirators); *United States v. Lobue*, 751 F. Supp. 748 (N.D. Ill. 1990) (defendants not entitled to a bill of particulars with names of unindicted coconspirators and other public officials involved in RICO violations); *accord United States v. Norfleet*, No. 05 CR 117, 2005 WL 8150055, at *2 (N.D. Ill. July 1, 2005).[23] Here, the superseding indictment alleges in extensive detail the bribery schemes at issue, including statements by coconspirators who furthered the scheme with Madigan and McClain. In addition, the government just completed a seven-week trial in *United States v. McClain et al.*, No. 20 CR 812, which gave Madigan an in-depth preview into the proof in this case as to the ComEd-related counts. Finally, the government has produced voluminous discovery, including grand jury transcripts from the government's anticipated witnesses, which give Madigan a roadmap as to

---

[23] Courts have observed that "[t]he crucial test is whether the identity of the co-conspirators is necessary for the defendants to prepare for trial." *United States v. Farley*, No. 97 CR 0441, 1997 WL 695680, at *6 (N.D. Ill. Oct. 31, 1997) (Gottschall, J.).

the government's case at trial. Moreover, the government will tender a *Santiago* proffer detailing coconspirator statements the government seeks to admit at trial. *See United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). Madigan is not entitled to any additional information at this stage.

### 2. The Superseding Indictment Adequately Identifies Solicitations.

Madigan requests a bill of particulars listing (iii) every business from which Madigan solicited bribes or gratuities and when such solicitations occurred; (iv) each individual hired to illegally influence or reward Madigan; and (vi) each benefit provided to Madigan intending to influence or reward him. R. 60 at 2.

The government should not be required to prepare and produce a list of every unlawful hiring request or solicitation made by Madigan or McClain on his behalf, or every business unlawfully solicited. *See United States v. Lavin*, 504 F. Supp. 1356, 1361-62 (N.D. Ill. 1981) (denying motion for bill of particulars in a bribery case, where defendants sought list of property owners who paid bribes and how the property owners paid). The examples detailed in the superseding indictment, the voluminous discovery, coupled with defendants' own knowledge of the hiring decisions, are more than sufficient to allow defendants to prepare for trial. *See United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997); *see also United States v. Alex*, 791 F. Supp. 723, 728 (N.D. Ill. 1992) (request for specific information on all instances when defendant and others took steps in furtherance of RICO conspiracy exceeded proper scope of bill of particulars); *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006) ("As

91

a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."). Judge Leinenweber denied a nearly identical request for a list of each individual hired by ComEd at Madigan's request, and a second motion for a bill of particulars requesting a list of the number and timing of each offers/solicitation. *See McClain*, 2022 WL 488944, at *8; *see also United States v. McClain*, No. 20 CR 812, Dkt. 151 (denying motion for bill of particulars filed at Docket Number 107).

Madigan's implication that without a bill of particulars he lacks any "insight into the hiring considerations and decisions after he made a job recommendation" is misguided. R. 60 at 6. This case involves a narrow universe of solicitations – namely, those instigated by Madigan and McClain on his behalf with corrupt intent. The superseding indictment outlines in detail examples, and the discovery reflects McClain following up at length with entities like ComEd and AT&T regarding hiring requests. Defendants are well situated to identify these requests, particularly given the examples described in detail in the superseding indictment and the fact that they were personally involved in these solicitations. *See Agostino*, 132 F.3d at 1191.

### 3. The Superseding Indictment Adequately Identifies the Legislation Sought to Be Influenced

Madigan's request for a bill of particulars listing each illegal legislative action Madigan took or did not take (R. 60 at 2) should also be denied.

The Seventh Circuit rejected a similar request in *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997). There, Agostino was charged with violating

§ 666(a)(2) and sought to require the government to identify the particular "business, transactions, or series of transactions" involved in the bribery. The Seventh Circuit found "unpersuasive" Agostino's claim that he would be unable to prepare a defense without a list of the specific transactions involved in the bribery scheme. *Id.* This was particularly true "where the information requested is peculiarly within the defendant's own knowledge," as was the case for Agostino. *Id.* As the court noted, "No one knows why Agostino gave Goetz $4,000 better than Agostino does." *Id.* Here, as in *Agostino*, Madigan was well aware that his associates were hired and that his law firm obtained business from entities with government business. No one knows better than defendants what legislative action he took.

Madigan's argument also fails because the government will not be required to prove that Madigan intended to be influenced or rewarded with respect to any particular legislation. Instead, the statue requires Madigan intended to be influenced or rewarded in connection with some business, transaction or series of transactions of the government. Pattern Instructions at 6 (2022 updates). And as the Seventh Circuit has recognized, the government may proceed on a stream of benefits theory:

> [T]his is not a case in which a public official had a specific price for each official act that he did, like a menu in a restaurant where you pick an item and it has a particular price. . . . The corruption here was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals.

*Ryan*, 688 F.3d at 852.

As Judge Leinenweber recognized in denying similar motions filed by

defendants in *United States v. McClain et al.*, "neither the words nor the definition of 'official act' are present in the language of the statute upon which Defendants have been indicted. Instead, § 666(a)(2) appears to rely on the word 'corruptly' to differentiate between legal and illegal transfers of value between private individuals and officials." *McClain,* 2022 WL 488944, at *3. The court thus correctly concluded that the indictment adequately alleged the actions by Madigan that the defendants intended to reward as it related to the ComEd conduct. *Id.* at *9.

Even if the government were required to identify specific legislation that each solicitation was intended to influence or reward—and it is not— the superseding indictment spells out some of the most significant pieces of legislation at issue, and others are detailed in the trial transcripts from the prior prosecution before District Judge Leinenweber. SI, Count 2, ¶¶ 2(m)-(p), 31(a)-(d) (ComEd legislation), Count 18, ¶¶ 12-34 (Chinatown parcel land transfer bill), Count 23, ¶¶ 2(f)-(g), 16 (AT&T's Carrier of Last Resort legislation).

### 4. The Superseding Indictment and the Government's Disclosures Identify the ComEd Documents That Were Falsified.

Madigan asks for a bill of particulars listing (vii) every document falsified related to the conspiracy alleged in Count Two related to ComEd. R. 60 at 2. This request demonstrates that Madigan's request for a bill of particulars is an improper fishing expedition, because the exact same information Madigan requests has *already* been publicly disclosed in *United States v. McClain et al.,* No. 20 CR 812, Dkt. 109 (21-page bill of particulars listing false statements that were part of the conspiracy

94

to falsify Exelon's and ComEd's books and records). The government has already disclosed the false statements that are at issue in Count Two of the superseding indictment, and incorporates that disclosure in this case. This portion of Madigan's motion should be denied as moot. In any event, the indictment lists numerous examples and even quotes many of them. *E.g.,* SI ¶¶ 9, 31(x), 31(ee), 31(hh), 31(xx), 31(ggg), 31(ooo).

Given the detailed indictment, the voluminous discovery provided to defendants, and the government's previously-filed bill of particulars, there is no basis for requiring the government to once again specify each and every false statement made by the defendants. *See, e.g., United States v. Elliott*, 771 F.2d 1046, 1050–51 (7th Cir. 1985) (affirming denial of bill of particulars requesting list of false statements, where indictment alleged false statements to government agencies, because "the indictment was specific about those statements, even if it did not quote them"); *United States v. Gladhart*, 68 F. App'x 784, 786 (9th Cir. 2003) (affirming denial of motion for bill of particulars alleging false statements to banks, where indictment sufficiently described failure to disclose transfer of ownership to defendants' son and failure to disclose their business's "true financial picture"); *United States v. Ji Chaoqun*, No. 18 CR 611, 2020 WL 1689826, at *7 (N.D. Ill. Apr. 7, 2020) (denying request for bill of particulars in § 371 case that requested, among other information, a list of "other" material false statements the government would rely upon).

* * * *

95

In short, the lengthy superseding indictment, voluminous discovery, and Madigan's knowledge of his own requests and legislative action will enable him to prepare for trial. His motion for a bill of particulars should be denied.

## V. Madigan's Motion to Suppress Title III Interceptions (R. 58) Should Be Denied.

The government applied for and obtained authorization to intercept wire communications in 2018 over Michael McClain's cellular telephone (referred to in the application as Target Phone 18). The government received authority to continue interceptions over McClain's telephone for several months in 2018 and 2019. These interceptions are powerful evidence of defendants' involvement in unlawful activity—including Madigan's and McClain's efforts to obtain more than one million dollars in bribes from officials at ComEd, which form the basis of the charges in multiple counts of the superseding indictment. *See, e.g.* SI, Count 2.

In an effort to keep this devastating evidence from the jury, Madigan has filed a motion to suppress, which McClain has joined. R. 57, 58, 61. But the motion—which seeks to suppress interceptions conducted in 2018 and 2019—is not actually targeted at the applications filed with respect to McClain's telephone. Instead, it is focused on an application and affidavit to intercept communications over Alderman ███ ███ telephone (Target Phone 2), which was filed roughly four years earlier. That application was granted by Chief Judge Ruben Castillo, who made a probable cause finding and issued an order (the "2014 Order") authorizing the interception of wire communications over Target Phone 2. No charges are based off of this wiretap, and

the government does not anticipate introducing any interceptions made pursuant to the 2014 Order.

As discussed in greater detail below, the motion should be denied for a variety of reasons. As a threshold matter, McClain does not have standing to seek the suppression of evidence derived from the 2014 interceptions over ███ telephone, because he was not named in the interception order and was not even intercepted in 2014. Moreover, suppression is not an appropriate remedy as to either defendant. Suppression has always been a tool of "last resort" for the federal judiciary, not its "first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006); for this reason, the doctrine of attenuation, which recognizes the limited utility of stretching the suppression remedy beyond reasonable bounds forecloses relief here. It simply is not an appropriate remedy in a case such as this, where the defendants propose suppressing evidence gathered through additional investigation years after the 2014 Order was obtained—indeed, some of it four to five years later—particularly when the supposed primary illegality was a court-authorized search.

Even if such a disproportionate sanction were available, Chief Judge Castillo's probable cause determination in 2014 was not erroneous. Chief Judge Castillo had ample evidence before him supporting a finding of probable cause, and his determination is entitled to substantial deference on review by this Court. And even if the Chief Judge erred, investigating agents relied in good faith on his probable cause determination.

97

Finally, the defendants grasp at straws in their effort to conjure up a material misstatement in the affidavit that was submitted in support of the application to intercept ███ telephone communications. There were no material misstatements in that affidavit, and no *Franks* hearing is necessary. The motion to suppress should be denied.

### A.    Background

#### 1.    The 2014 Application, Affidavit and Order

On August 18, 2014, the government submitted an application to intercept wire communications over Chicago Alderman ███ ███ cellular telephone, which was identified as Target Phone 2.[24] FBI Special Agent ███ submitted a detailed 53-page affidavit in support of the request to conduct interceptions over ███ telephone.

Specifically, Agent ███ explained ████████████

████████████████████

████████████████████

---

[24]    Alderman ███ is referred to as "Alderman A" in the superseding indictment. The government is not anonymizing all individual and entity names, in order to accurately describe what was in the sealed Title III filings. Because the Title III material is under seal, and some of those materials are not public information, the government's response is being filed under seal. A redacted public version of the government's consolidated response will be filed on the publicly available docket. A copy of the August 18, 2014, application seeking to intercept communications over ███ cellular telephone (and accompanying affidavit) will be provided to the Court for in chambers review. References to the 2014 affidavit appear as "Affidavit ¶ __." References to the affidavit submitted in connection with the application to tap Michael McClain's cellular telephone in 2018 appear as "2018 Affidavit ¶ __."















Michael McClain was not mentioned in the application and affidavit; the named interceptees were ███ and Madigan. On August 18, 2014, Chief Judge Castillo entered an order (the "2014 Order") finding probable cause to conduct interceptions concerning possible violations of 18 U.S.C. § 1951 (attempted extortion and conspiracy to commit extortion) and authorized the interception of wire communications over Target Phone 2. The government does not anticipate using any of the interceptions conducted pursuant to the 2014 Order as trial evidence in the instant case.

### 2. In 2016 ███ is Approached and Begins Cooperating

Pursuant to the 2014 Order, interceptions were conducted over ███ telephone for an initial period of thirty days, and the government received authorization to continue interceptions on a periodic basis until the fall of 2015.[29] On or about June 1, 2016, well after all interceptions over ███ cellular telephone had concluded, ███ was approached by federal law enforcement, and was asked to cooperate. ███ was not arrested at the time he was approached, nor was he charged at that time.[30]

---

[29]     The government does not anticipate using any of the interceptions conducted during this timeframe over Target Phone 2.

[30]     ███

Before deciding whether to cooperate or make any statements to law enforcement, ▮▮▮ retained a private attorney. Several days later, after having an opportunity to meet with his attorney, ▮▮▮ decided to cooperate with the government. ▮▮▮ was interviewed by the government in 2016—in the presence of ▮▮▮ attorney—some two years after Chief Judge Castillo had entered the 2014 Order authorizing interceptions over Target Phone 2. During these and subsequent interviews, ▮▮▮ was played a ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

107



███ began to proactively cooperate with the government, including by making undercover recordings against a number of individuals. Some of these consensual recordings were made over ███ cellular telephone.[31]

---

[31] In a flimsy effort to create an air of impropriety where none exists, Madigan improperly alleges in his motion that the government failed to disclose information ███ provided in his 2016 interviews in subsequent "Title III applications" submitted to the Chief Judge between 2016 and 2018 that were "directed at Madigan." *See, e.g.*, R. 58 at 2. That is false. In truth, the applications defendant Madigan creatively labels as "Title III applications" that were "directed at Madigan" were not Title III applications at all—they were requests for orders to require a service provider to assist with consensual monitoring over ███ ███ cellular telephone. ███ voluntarily recorded conversations over his cellular telephone relating to numerous individuals, including ███ ███. At any rate, when the government engages in consensual recording with the assistance of a telephone company, these recordings are not governed by the requirements of Title III (such as a showing of probable cause, necessity, discussion of prior applications, the issuance of a warrant, sealing of interceptions, and the like), but only require, as a prerequisite, that ███ consented to the consensual recording of calls over his telephone. *See Bakes v. United States*, 350 F. Supp. 547, 548-49 (N.D. Ill. 1972) (provisions of Wiretap Act have no application where party to conversation gives consent), *aff'd*, 478 F.2d 1405 (7th Cir. 1973). *See also* 18 U.S.C. § 2511(c) (specifying that law enforcement may intercept wire communications where one of the parties to the communication consents). As noted *infra*, when the government submitted an actual Title III application that involved

### 3. The 2018 Application, Affidavit and Order

Nearly four years after the Chief Judge authorized the 2014 interceptions, that is, on or about April 6, 2018, the government sought authority to intercept communications over Michael McClain's cellular telephone (which was identified in the application and accompanying affidavit as Target Phone 18). After ███ began cooperating, ███ was repeatedly approached by Madigan to bring new clients to Madigan's law firm. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

Madigan in 2018, namely, when the government sought to intercept communications over McClain's cellular telephone pursuant to a showing of probable cause where Madigan was identified as an interceptee, it included the necessary qualifying information ███ provided in interviews after ███ began cooperating—and the presiding judge made a finding of probable cause and granted the application authorizing interceptions over McClain's telephone nonetheless, further demonstrating the weakness of the arguments presented by the defendants in their motion.



In the context of setting forth the probable cause to conduct interceptions over McClain's cellular telephone, the affiant advised the Court of the statements ▮ made after ▮ began cooperating about ▮ August 18, 2014 meeting with Madigan— this information appeared in a footnote appended to the very same paragraph where ▮ The district court judge who reviewed the application made a finding of probable cause and authorized interceptions over McClain's telephone for a period of thirty days. Thereafter, investigating agents were given authorization to conduct continued interceptions over Target Phone 18. The final interception period over Target Phone 18 concluded in 2019.

### B. McClain Does Not Have Standing.

Neither defendant has challenged the probable cause determination made by issuing judges as to McClain's phone (Target Phone 18) in 2018 and 2019; instead, they challenge the 2014 Order authorizing interceptions over ▮ cellular telephone, Target Phone 2. But McClain was not intercepted on ▮ phone

---

[32] This incident is the subject of Counts 19 and 20 in the superseding indictment.

pursuant to the 2014 Order. As a result, McClain does not have standing to challenge the 2014 Order. *United States v. Vargas*, 116 F.3d 195, 196-97 (7th Cir. 1997) ("The interception of calls to which he was not a party did not intrude upon [Mr. Vargas'] fourth amendment rights . . . so he has no standing to seek suppression of evidence gathered from those intercepts." (quoting *United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991)). Moreover, McClain was not mentioned at all in the 2014 application, much less named as a violator or interceptee in the 2014 Order. Unquestionably, then, he was not a party against whom the interception was "directed." Therefore, under no set of circumstances is he entitled to the remedy of suppression with respect to the interceptions conducted pursuant to the 2014 Order or the fruits thereof. *See* 18 U.S.C. §§ 2510(11), 2518(10)(a) (defining "aggrieved person" who may move to suppress interceptions as party to the interception or "a person against whom the interception was directed").

## C. The Attenuation Doctrine Forecloses Suppression.

Although, as discussed later, the Chief Judge did not err in finding there was probable cause to authorize interceptions over Target Phone 2, this Court need not resolve that issue because the suppression remedy the defendants seek is foreclosed by the attenuation doctrine.

### 1. Applicable Law

The exclusionary rule covers both the primary evidence obtained as a direct result of an illegal search and seizure, as well as evidence later discovered that is derived from the illegal search, otherwise known as the fruit of the poisonous tree.

111

*Utah v. Strieff*, 579 U.S. 232, 237 (2016). However, because of the significant costs the exclusionary rule imposes on society—by letting the guilty go free "because the constable has blundered," *People v. Defore*, 150 N.E. 585, 587 (1926) (Cardozo, J.)— the Supreme Court has made it clear that the suppression of evidence has "always been our last resort, not our first impulse." *Strieff*, 579 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The attenuation doctrine is one means by which the exclusionary rule has been tempered by the Supreme Court. *Id.* Evidence remains admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by the suppression of the evidence obtained." *Id.* (quoting *Hudson*, 547 U.S. at 593). *See also Murray v. United States*, 487 U.S. 533, 540 (1988) (even in cases where an unlawful search is the "but for" cause for the discovery of evidence, the suppression of subsequently obtained evidence is improper where "the connection with the unlawful search becomes so attenuated as to dissipate the taint."); *United States v. Leon*, 468 U.S. 897, 911 (1984) (attenuation doctrine reflects the policy that there comes a "point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies the cost" (quoting *Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring in part)).

Three factors are considered in determining whether subsequently gathered evidence falls within the scope of the attenuation doctrine. *Brown v. Illinois*, 422 U.S. 590 (1975). A reviewing court considers: (i) the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search; (ii) the presence of "intervening circumstances," and (iii) of particular significance, the "purpose and flagrancy of the official misconduct." *Id.* at 603-04.

With respect to the first factor, the temporal proximity between the purportedly illegal search and the subsequent discovery of derivative evidence, this factor favors a finding of attenuation where a substantial period of time has elapsed between the unlawful act and the derivative evidence obtained. *Strieff*, 579 U.S. at 239. While there is no bright-line test for what constitutes a sufficient period of time, the passage of just several hours between the illegal search and the acquisition of derivative evidence has been found to favor attenuation. *United States v. Conrad*, 673 F.3d 728, 733 (7th Cir. 2012). Indeed, even a period of forty-five minutes has been deemed sufficient by the Supreme Court and the Court of Appeals. *Id.* (citing *Rawlings v. Kentucky*, 448 U.S. 98, 107-08 (1980)); *United States v. Davis*, 44 F.4th 685, 689 (7th Cir. 2022) (forty-five minutes "is more than sufficient time to support attenuation") (citations omitted).

With respect to the second factor, courts have found the existence of intervening circumstances in a variety of different contexts. For example, where subsequent investigatory steps are required to uncover necessary incriminating

113

evidence after an initial limited piece of information is obtained through an illegal search, these intervening circumstances favor attenuation. *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 112 (D.D.C. 2014) (citing *United States v. Friedland*, 441 F.2d 855 (2d Cir 1971) (Friendly, J.)). The Seventh Circuit has also adopted the view that where additional investigatory steps are taken after an illegal search—such as the interview of additional witnesses who voluntarily cooperate with an investigation and provide the police with tangible evidence—suppression of derivative evidence is precluded. *United States v. Carter*, 573 F.3d 418, 422-25 (7th Cir. 2009) (reversing district court's suppression of evidence on attenuation grounds). Indeed, the Seventh Circuit has expressly held that a voluntary act by a witness who has been the subject of an unlawful search constitutes an intervening circumstance that precludes the suppression of evidence obtained through the voluntary act. *Conrad*, 673 F.3d at 735 (finding voluntary consents to search and waivers of *Miranda* rights were intervening circumstances occurring after illegal search; an "act of free will" will purge the primary taint of an unlawful search).

The third factor, the purpose and flagrancy of the misconduct, is considered most important in determining whether the attenuation doctrine comes into play. *Davis*, 44 F.4th at 689; *Conrad*, 673 F.3d at 735. More severe police misconduct is required than the mere absence of proper cause for the seizure. *Strieff*, 579 U.S. at 243 (citing *Kaupp v Texas*, 538 U.S. 626, 628 (2003) (finding flagrant violation where warrantless arrest was made in arrestee's home after police were denied a warrant and at least some officers knew they lacked probable cause). In addition, courts will

114

consider whether the unlawful search was part of a systemic or recurrent form of misconduct. *Strieff*, 579 U.S. at 242.

### 2.     Analysis

Irrespective of the Court's conclusions regarding probable cause and good faith, this is a clear case where the attenuation doctrine forecloses suppression of evidence. The first factor, temporal proximity, clearly weighs in favor of attenuation. In this case, the government does not intend to utilize any recordings made pursuant to the 2014 Order, or interceptions made over Target Phone 2 before ██ began cooperating in June 2016, which was approximately two years after the 2014 Order was entered.[33] Moreover, many of the recordings █ made as it concerns the current charges faced by Madigan and McClain were made in 2017 and 2018, and the interceptions over McClain's cellular telephone occurred in 2018 and 2019. A lapse of years between the purportedly illegal search and the acquisition of derivative evidence far exceeds the amount of time that courts have found sufficiently attenuated in other cases. *See, e.g.*, *Davis*, 44 F.4th at 689 (forty-five minutes); *Conrad*, 673 F.3d at 733 (several hours); *Rawlings*, 448 U.S. at 107-08 (forty-five minutes).

---

[33]     The government does intend to use later consensual and wiretap recordings that were made after ██ began cooperating in 2016, including recordings made in 2018 that reference efforts to transfer a portion of land owned by the State to the City—these recordings involve substantially the same transaction as was discussed during the meeting at Madigan's office in August 2014. These later recordings will be introduced as part of the government's evidence with respect to the offenses charged in Counts 1, and 19 through 22 of the superseding indictment.

The second factor also favors attenuation. As an initial matter, the defendants do not begin to explain how evidence gathered years later during the course of the investigation are fairly traceable to the interceptions conducted pursuant to the 2014 Order, such that exclusion of *all* the subsequent recordings of McClain and Madigan should be excluded. Indeed, defendants do not even point to a single interception conducted pursuant to the 2014 Order that resulted in the acquisition of evidence against Madigan in 2018 or 2019. That deficiency aside, there were numerous intervening circumstances between the issuance of the 2014 Order and the gathering of subsequent evidence. To begin with, multiple significant investigatory steps took place between the 2014 Order and the collection of further evidence against Madigan and McClain in 2018 and 2019. For example, ███ was approached in June 2016. He hired an attorney, and made an independent and voluntary decision to cooperate.

After he began cooperating, ███ voluntarily agreed, with the advice of counsel, to consensually record calls at the direction of law enforcement. Moreover, after ███ began cooperating, *Madigan* approached ███ and sought ███ assistance again in directing legal work to his private law firm. Not only that, but as discussed above and in the 2018 Affidavit, Madigan also was advised by ███ on more than one occasion that a certain developer that ███ introduced to Madigan as a prospective client would award business to Madigan's private firm because the developer needed ███ support to obtain the requisite approvals from the City of Chicago. Madigan was also advised by ███ that if Madigan was able to transfer State land to the City, the developer would give Madigan's law firm business. All of these events and more

116

transpired years after the 2014 Order was entered, and it was these events that established probable cause to intercept McClain's cellular telephone in 2018 and 2019. The presence of these pivotal intervening circumstances weighs heavily in favor of attenuation; neither Madigan or McClain is entitled to "life-long immunity from investigation and prosecution" based on a purported violation of the Fourth Amendment occurring four years earlier. *Carter*, 573 F.3d at 242 (quoting *Friedland*, 441 F.2d at 861).

Finally, the third factor also favors attenuation. Here, federal law enforcement agents sought the approval of an impartial judge, and were granted authority to conduct wire interceptions pursuant to the 2014 Order. Their decision to seek court authorization for their search is prima facie evidence that they acted in good faith. *Leon*, 468 U.S. at 921 n. 21. There was no severe police misconduct here; on the contrary, the 2014 Order was obtained through normal procedures and subsequent interceptions over ▇▇▇ telephone were approved in due course. Because there was no misconduct, let alone flagrant misconduct here, this factor favors attenuation. *Strieff*, 579 U.S. at 243.

Because all three factors favor attenuation, the defendants are not entitled to the remedy of suppression with respect to any evidence recovered after ▇▇▇ began cooperating in 2016.

**D.    There Was Probable Cause Supporting Entry of the 2014 Order.**

Even if the standing and attenuation doctrines do not foreclose the relief sought by the defendants, Chief Judge Castillo's 2014 Order was clearly supported by probable cause for the reasons set forth below.

**1.    Applicable Law**

The Fourth Amendment provides that a warrant, including for electronic surveillance, shall issue upon a showing of probable cause—that is, "sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause involves a common-sense view of the everyday realities of life, *Brinegar v. United States,* 338 U.S. 160, 175 (1949), and requires only a "fair probability" that evidence of a crime will be found in a particular place. *Gates*, 462 U.S. at 238-39. Even if there is a possibly innocent explanation for the conduct under investigation, as long as there is a reasonable probability that there is criminal activity afoot, the probable-cause standard is met. *See, e.g., United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) (citations omitted). The conclusion of the judge issuing the search warrant is entitled to "great deference." *Leon*, 468 U.S. at 914. Courts do not "undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole," *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988), and in reviewing the issuing court's decision, even doubtful cases should be resolved in favor of upholding the

warrant. *United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992); *United States v. Griffin*, 827 F.2d 1108, 1111 (7th Cir. 1987).

### 2.    The 2014 Affidavit Established Probable Cause.

The affidavit presented facts from which Chief Judge Castillo could readily conclude that there as a "fair probability" that evidence of attempted extortion and conspiracy to commit extortion would be uncovered through wire interceptions over ███ cellular telephone. As discussed below, the affidavit presented facts showing

███████████████████████████████████

███████████████████████████████████

███████████████████████. *E.g., United States v. Jenner*, 52 F.3d 1419 (7th Cir. 1995) (extortion under color of official right occurs when official accepts bribe knowing it is made in hopes of influencing him in exercise of his office, and knowing this, accepts the bribe); *United States v. Crowley*, 504 F.2d 992, 994 (7th Cir. 1974). ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████

████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

The defendants' claim that Chief Judge Castillo erred in finding probable cause

is without merit. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ █████████ ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████ █ ███████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

even if this were a case on the margins, Chief Judge Castillo's probable cause determination is due great deference and should not be disturbed. *Pless*, 982 F.2d at 1124; *Griffin*, 827 F.2d at 1111.

██████████████████████████████████████████████████████

████. *See United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (extortion statute does not have a magic word requirement; "Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"). *See also United States v. Jenner*, 52 F.3d 1419 (7th Cir. 1995) (extortion under color of official right occurs when official accepts bribe knowing it is made in hopes of influencing him in exercise of his office, and knowing this, accepts the bribe); *United States v. Holzer*, 816 F.2d 304, 310-11 (7th Cir.) (extortion statute does not require public official to make explicit demand for property), *vacated on other grounds*, 484 U.S. 807 (1987). ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



Regarding the attempted extortion charge, it was not necessary for the government to make a showing of probable cause for each individual named in a wiretap application and affidavit. *See, e.g., United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985); *United States v. Figueroa*, 757 F.2d 466, 475 (2d Cir. 1985)

("[T]he government need not establish probable cause as to all participants in a conversation. If probable cause has been shown as to one such participant, the statement of the other participants may be intercepted if pertinent to the investigation.") (citations omitted); *United States v. Vargas*, 116 F.3d 195, 196 n.1 (7th Cir. 1997) (no probable cause needed to simply list a defendant in a wiretap application as a probable converser); *United States v. Little*, No. 11-189-01, 2012 WL 489194, at *3 (W.D. La. Feb. 14, 2012) ("There is no requirement for probable cause to be demonstrated as to every individual who is named as a target interceptee."); *United States v. Marcy*, 777 F. Supp. 1400, 1402 (N.D. Ill. 1991) (government need not establish probable cause with respect to each and every person named in a wiretap order). ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

Although not a focus of their argument section, the outset of defendant's motion emphasizes the interviews of ████ that took place after he began cooperating in June 2016—the first coming nearly two years after the 2014 Order was signed—in suggesting that they somehow undermine the probable cause finding made by Judge Castillo in the 2014 Order. As an initial matter, ████ statements in 2016 of

course were not available to law enforcement or the Chief Judge in 2014.[35] Accordingly, neither law enforcement nor Chief Judge Castillo's probable cause determination can reasonably be second-guessed based on information that was not available in 2014. As the Court of Appeals has explained, "[s]ubsequent evidence of guilt cannot validate the probable cause determination, nor can evidence of innocence invalidate it. Prescience is not required of the officers. Instead, courts must focus on the real-world situation as known to the officer at that time." *United States v. Reed,* 443 F.3d 600, 603 (7th Cir. 2006). *Cf. United States v. Carrillo,* 269 F.3d 761, 767 (7th Cir. 2001) (probable cause turns on information known to officers at time arrest is made, not on subsequently received information).



[35]

### 3. In the Alternative, The Government Relied in Good Faith on the Orders Authorizing Interception.

Even if Judge Castillo erred in finding a fair probability of criminality on these facts, the agents who intercepted the wire communications after judicial approval acted in good faith reliance on the Chief Judge's determination. It is well settled that evidence obtained pursuant to a warrant later declared invalid should not be suppressed if law enforcement relied in good faith on the issuing judge's finding of probable cause. *United States v. Watts*, 535 F.3d 650, 656-57 (7th Cir. 2008) (citing *Leon*, 468 U.S. at 920). Indeed, an officer's decision to obtain a warrant is *prima facie* evidence that he was acting in good faith. *Leon*, 468 U.S. at 921 n. 21; *United States v. Reed*, 744 F.3d 519, 522 (7th Cir. 2014). A defendant may rebut this presumption, but only by demonstrating (1) that the issuing judge failed to perform his neutral and detached function and served as a rubber stamp; (2) that the officer was dishonest or reckless in preparing the affidavit; or (3) that the affidavit was so lacking in probable cause that no officer could have reasonably relied on it. *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008).

Defendant cannot carry his burden of establishing any of these exceptions to the good-faith rule. Madigan does not argue (nor could he) that the Chief Judge failed to perform his neutral and detached function, and, as discussed below, he has not shown that the affiant was dishonest or reckless in preparing the affidavit.[36] Further,

---

[36]    That the affiant obtained approval from a prosecutor further bolsters that he was acting in objective good faith. *See United States v. Pappas*, 592 F.3d 799, 802 (7th Cir. 2010)

he has not shown that the affidavit was so lacking in probable cause that a reasonable agent could not have relied on it, for all of the reasons identified above. As such, even if this Court were to identify a fatal flaw in the wiretap affidavit or in Chief Judge Castillo's judgment, no evidence should be suppressed, in light of the agents' good faith reliance on the warrant's legality.

While the Seventh Circuit has not had occasion to consider the question, persuasive authority—and sound logic—support the application of the good-faith exception to Title III orders. Title III's suppression provision was modeled on the Supreme Court's exclusionary rule in the Fourth Amendment context and was intended to incorporate subsequent Supreme Court precedent, as District Judge Durkin recently has explained:

> The exclusionary rule was first created by the Supreme Court and then adopted by Congress. The Senate report cited a number of Supreme Court cases defining the contours of the exclusionary rule to the date of enactment. In this context, the words "existing" and "present" [in the Senate Report on the wiretap statute] do not imply that Congress rejected any future developments in the Supreme Court's application of the exclusionary rule. Rather, those words, along with the breadth of cases cited, indicate that Congress was adopting the *entirety* of the exclusionary rule as applied by the Supreme Court. Without express rejection of future developments, this Court does not see a reason to understand that to be Congress's intent. Indeed, it would be unreasonable for Congress to adopt a judicial doctrine but reject any further developments of that doctrine, leaving Title III with a judicially undeveloped exclusionary rule.

---

("Consulting with the prosecutor prior to applying for [a] search warrant provides additional evidence of [that officer's] objective good faith." (quotation marks and citations omitted)).

*United States v. Spann*, 409 F. Supp. 3d 619, 625 (N.D. Ill. 2019) (Durkin, J.). This analysis is supported by the House Report that accompanied the initial draft of the Electronic Communications Privacy Act of 1986, which amended a portion of the wiretap statute and specified that: "In the event that there is a violation of law of a constitutional magnitude the court involved in a subsequent criminal trial will apply the existing constitutional law with respect to the exclusionary rule." H.R. No. 99-647 at 48 (1986) (citing the case establishing the existence of the good faith exception, *Leon*, 468 U.S. 897, among other cases).

Moreover, limitations on the exclusionary rule were suggested by cases that predated the enactment of the wiretap statute, and therefore, it is unlikely Congress intended to exclude good-faith jurisprudence from the Title III suppression provision. *Spann,* 409 F. Supp.3d at 625-26. Indeed, as the Supreme Court explained in *Hudson v. Michigan*, 547 U.S. 586, 591-95 (2006), "[s]uppression of evidence . . . has always been our last resort, not our first impulse," and the rule has never been applied where its deterrent benefit was outweighed by substantial social costs. There is no deterrent benefit here, where the Chief Judge found, based on a 53-page affidavit containing undercover recordings of both Madigan and ▮▮▮▮ that there was probable cause to intercept communications over ▮▮▮▮ telephone.

### E. The Request for a *Franks* Hearing Should Be Denied.

#### 1. Applicable Law

A defendant is entitled to a *Franks* hearing only if he can make a "substantial preliminary showing" that (1) the warrant affidavit contained materially inaccurate

information, (2) the authorities knew of or recklessly disregarded relevant inaccuracies in the affidavit, and (3) the purported inaccuracies were necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Williams*, 718 F.3d 644, 649 (7th Cir. 2013); *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001). All three requirements must be met. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013).

"'*Franks* makes it clear that affidavits supporting a search warrant are presumed valid, and that the 'substantial preliminary showing' that must be made to entitle the defendant to an evidentiary hearing must focus on the state of mind of the warrant affiant'—that is, the law enforcement officer who sought the search warrant." *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7079609, at *5 (E.D. Wis. Dec. 5, 2016) (quoting *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000)). Allegations of negligence, or the identification of mere factual errors, do not entitle a defendant to a *Franks* hearing. *McMurtrey*, 704 F.3d at 509. A defendant's conclusory allegations of deliberate or recklessly false factual representations likewise are inadequate. *Id.*; *see also United States v. McAllister,* 18 F.3d 1412, 1416 (7th Cir. 1994) (defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine" the affiant). Rather, "[t]he defendant must offer evidence showing either that the warrant affiant lied or that the warrant affiant recklessly disregarded the truth because he 'in fact entertained serious doubts as to the truth of his allegations' or had 'obvious reasons to doubt the veracity of the allegations.'" *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) (citations

omitted). This is a difficult burden to meet. *See United States v. Swanson*, 210 F.3d 788, 789-90 (7th Cir. 2000). In fact, the Seventh Circuit has stressed that a showing of "egregious errors" is necessary for a *Franks* hearing. *Maro*, 272 F.3d at 822.

The alleged errors must also be material—that is, the allegedly false statements in the challenged affidavit must have been "necessary to find probable cause." *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009). If probable cause existed irrespective of the affiant's alleged errors, a hearing is unnecessary and the motion should be denied. *See United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006). In other words, a defendant must make a substantial preliminary showing that, absent the misrepresentations, a judge would not have found probable cause. *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016).

Because the requirements for a *Franks* hearing "are hard to prove," and there is a presumption in favor of the warrant's validity that requires more than self-interested inferences and conclusory statements, "*Franks* hearings are rarely held." *Maro*, 272 F.3d at 821 (internal marks omitted); *see also United States v. Slizewski*, 809 F.3d 382, 384 (7th Cir. 2016) ("Because these elements are hard to prove, *Franks* hearings are rarely required.").

### 2. The Affidavit Did Not Contain Material Misrepresentations or Omissions Relating to the Determination of Probable Cause.

The defendants' claim that the affidavit submitted in support of the 2014 application contains material misrepresentations that undermine the judge's finding of probable cause are meritless. First,██████████████████████████████

131



this





███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ Viewed alongside all the other evidence presented in the affidavit, the inference drawn by the affiant was a reasonable one, and certainly does not amount to a substantial showing that the affiant lied or recklessly disregarded the truth. *Jones*, 208 F.3d at 607. *See, e.g., United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (to meet his burden, defendant "must offer direct evidence" of the agent's state of mind or sufficient "circumstantial evidence" that he possessed "a subjective intent to deceive based on the nature of the omissions) (citing *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990)).

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Madigan, it could not amount to the sort of "egregious" error that would justify a *Franks* hearing. Nor have the defendants demonstrated that the affiant had substantial reason to know this one-word transcription was inaccurate or otherwise acted recklessly.

### 3. Madigan Has Not Made a Substantial Preliminary Showing That the Affiant Made Intentional or Reckless Misrepresentations.

Even if there were falsities in the affidavit (and there are not), Madigan has not made the substantial preliminary showing that he must that the affiant deliberately lied or had a reckless disregard for the truth, or that the false or omitted information was material. *Hancock*, 844 F.3d at 708; *Maro*, 272 F.3d at 821.

In short, there were no errors in the affidavit, let alone material and intentionally made ones, that would justify an evidentiary hearing. The motion to suppress should be denied.

## CONCLUSION

For foregoing reasons, the government respectfully requests that the Court deny defendants' pretrial motions.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

/s/ *Amarjeet Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH E. STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300