# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22-CR-00115 |
| v. | ) | |
| | ) | Honorable John Robert Blakey |
| MICHAEL J. MADIGAN and | ) | |
| MICHAEL F. McCLAIN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MICHAEL J. MADIGAN'S MOTION TO DISMISS CERTAIN COUNTS OF THE SUPERSEDING INDICTMENT

# Table of Contents

Preliminary Statement.................................................................................. 1

The Superseding Indictment ...................................................................... 5

    I.      RICO Conspiracy .......................................................................... 6

    II.    Solicitation of Jobs from Utilities ............................................... 7

        A.    ComEd ................................................................................. 7

        B.    AT&T .................................................................................. 8

    III.   Solicitation of Business for Madigan's Law Firm ..................... 9

        A.    Company A ......................................................................... 9

        B.    Company C ....................................................................... 10

        C.    Chinatown Parking Lot .................................................. 10

Legal Standard ........................................................................................ 11

Argument ................................................................................................ 12

    I.      The RICO Conspiracy Charge (Count One) Must Be Dismissed ........... 12

        A.    Count One Does Not Allege a RICO Enterprise. .......................... 13

        B.    Count One Does Not Allege That Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise. .......................................................................... 18

        C.    Count One Charges Racketeering Activity Predicated on Unconstitutional State Statutes. .................................... 22

            1.    The Illinois Bribery and Official Misconduct Statutes Are Facially Overbroad in Violation of the First and Fourteenth Amendments. ........................................ 24

            2.    The Illinois Bribery and Official Misconduct Statutes Are Facially Vague in Violation of the Fifth and Fourteenth Amendments. ........................................ 32

            3.    The Illinois Bribery and Official Misconduct Statutes Are Void for Vagueness as Applied to Madigan. .............. 36

4.      The Illinois Bribery and Official Misconduct Statutes Cannot Be Sufficiently Narrowed by Judicial Construction. ........................................... 41

II.   ComEd ........................................................................................ 42

    A.    The Federal Program Bribery Charges Related to ComEd (Counts Two, Three, Four, and Six) Must Be Dismissed. ........... 42

        1.    Charges Based on a Bribery Theory Must Be Dismissed. ................................................... 45

        2.    Charges Based on a Gratuity Theory Must Also Be Dismissed. ................................................... 49

        3.    Without a *Quid Pro Quo* Requirement for Bribes or a Link for Gratuities, § 666 Is Unconstitutional. ................. 51

        4.    Counts Two, Three, Four, and Six Must Be Dismissed Because the Indictment Fails to Allege the Appropriate *Mens Rea.* ........................................... 51

    B.    The Travel Act Charges Related to ComEd (Counts Five and Seven) Must Be Dismissed. ................................... 56

III.  Company A ................................................................................... 57

    A.    The Federal Program Bribery Charge Related to Company A (Count Eleven) Must Be Dismissed. ............................ 57

    B.    The Travel Act Charges Related to Company A (Counts Twelve, Thirteen, and Fourteen) Must Be Dismissed. ............... 57

IV.   Chinatown Parking Lot ................................................................... 58

    A.    The Federal Program Bribery Charge Related to the Chinatown Parking Lot Must Be Dismissed. ....................... 58

    B.    The Travel Act Charge Related to the Chinatown Parking Lot (Count Twenty-Two) Must Be Dismissed. ................... 59

V.    The Conspiracy Charge Related to AT&T (Count Twenty-Three) Must Be Dismissed. ........................................................... 59

    A.    Count Twenty-Three Fails to Allege that Madigan Was Aware of and Agreed to Commit a Corrupt Exchange in Violation of § 666. ............................**Error! Bookmark not defined.**

Conclusion ......................................................................................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. IBP, Inc.*,
   357 F.3d 685 (7th Cir. 2004) ..................................................................................... 14

*Bell v. Keating*,
   697 F.3d 445 (7th Cir. 2012) .............................................................................. *passim*

*Bible v. United Student Aid Funds, Inc.*,
   799 F.3d 633 (7th Cir. 2015) ............................................................................. 18, 20

*Bobb v. Swartz–Retson P.C.*,
   2018 WL 4384292 (N.D. Ill. Sept. 14, 2018) ......................................................... 20

*Boyle v. United States*,
   556 U.S. 938 (2009) .................................................................................... 13, 14, 18

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) .................................................................................................. 42

*Ciminelli v. United States*,
   143 S.Ct. 1121 (2023) .............................................................................................. 43

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) .................................................................................................. 46

*City of Houston, Tex. v. Hill*,
   482 U.S. 451 (1987) .................................................................................................. 25

*Crichton v. Golden Rule Ins. Co.*,
   576 F.3d 392 (7th Cir. 2009) .................................................................................... 18

*Farrell v. Burke*,
   449 F.3d 470 (2d Cir. 2006) ............................................................................... 37, 41

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) .................................................................................................. 33

*Forsyth County, Ga. v. Nationalist Movement*,
   505 U.S. 123 (1992) .................................................................................................. 25

*Goren v. New Vision Int'l, Inc.*,
   156 F.3d 721 (7th Cir. 1998) .................................................................................... 18

*Guaranteed Rate, Inc. v. Barr*,
   912 F. Supp. 2d 671 (N.D. Ill. 2012) ................................................................. 14, 20

*Hamling v. United States*,
   418 U.S. 87 (1974) ................................................................ 11

*Hynes v. Mayor and Council of Borough of Oradell*,
   425 U.S. 610 (1976) ............................................................... 33

*Kelly v. United States*,
   140 S.Ct. 1565 (2020) ............................................................ 43

*McCormick v. United States*,
   500 U.S. 257 (1991) ............................................................... 42

*McDonnell v. United States*,
   579 U.S. 550 (2016) ........................................................*passim*

*Menzies v. Seyfarth Shaw LLP*,
   197 F. Supp. 3d 1076 (N.D. Ill. 2016) (Blakey, J.) .............. 13

*NAACP v. Button*,
   371 U.S. 415 (1963) ............................................................... 25

*Oberoi v. Mehta*,
   2011 WL 1337107 (N.D. Ill. Apr. 6, 2011) ..................... 20, 21

*Ocasio v. United States*,
   578 U.S. 282 (2016) ......................................................... 48, 60

*People v. Johnson*,
   780 N.E.2d 803 (Ill. App. Ct. 2002) ..................................... 35

*People v. Jordan*,
   304 N.E.2d 713 (Ill. App. Ct. 1973) ..................................... 35

*Percoco v. United States*,
   143 S.Ct. 1130 (2023) ............................................................ 43

*Rao v. BP Products North America, Inc.*,
   589 F.3d 389 (7th Cir. 2009) ..................................... 14, 15, 17

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ............................................................... 18

*Salinas v. United States*,
   522 U.S. 52 (1997) ................................................................. 38

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ............................................................... 13

*Shearson/American Express, Inc. v. McMahon*,
   482 U.S. 220 (1987) ............................................................... 13

*Skilling v. United States*,
    561 U.S. 358 (2010) ......................................................................................................*passim*

*United Food & Commercial Workers Unions and Employers Midwest Health Benefits*
    *Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ........................................................................................*passim*

*United States v. Allen*,
    10 F.3d 405 (7th Cir. 1993) ...........................................................................................47, 48

*United States v. Blagojevich*,
    794 F.3d 729 (7th Cir. 2015) .................................................................................................52

*United States v. Brown*,
    973 F.3d 667 (7th Cir. 2020) ...........................................................................................12, 13

*United States v. Burke*,
    Case No. 19-CR-322, 2022 WL 1970189 (N.D. Ill. June 6, 2022) .........................30, 32, 36

*United States v. ComEd*,
    Case No. 20-CR-368 (N.D. Ill. July 17, 2020), ECF No. 3.........................................54, 55

*United States v. Cook*,
    970 F.3d 866 (7th Cir. 2020) .................................................................................................36

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ......................................................................................36, 37, 41

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ...................................................................................................32, 42

*United States v. Donagher*,
    520 F. Supp. 3d 1034 (N.D. Ill. 2021)...................................................................................11

*United States v. Gimbel*,
    830 F.2d 621 (7th Cir. 1987) .................................................................................................12

*United States v. Huet*,
    665 F.3d 588 (3d Cir. 2012), *abrogated on other grounds by Rehaif v. United States*,
    139 S. Ct. 2191 (2019) ...................................................................................................11, 12

*United States v. Jennings*,
    160 F.3d 1006 (4th Cir. 1998)......................................................................................46, 47, 48

*United States v. Johnson*,
    621 F.2d 1073 (10th Cir. 1980) .............................................................................................46

*United States v. Jones*,
    689 F.3d 696 (7th Cir. 2012) .................................................................................................32

*United States v. Kelerchian*,
    937 F.3d 895 (7th Cir. 2019) ..........................................................................................48, 60

*United States v. Lanier*,
520 U.S. 259 (1997) ................................................................................................ 36, 41

*United States v. McClain*,
20 CR 812, Dkt. 357 ................................................................................................... 4

*United States v. McClain*,
20-CR-812, Dkt. 1 (N.D. Ill. 2020) ........................................................................... 21

*United States v. McClain*,
Case No. 20-CR-812, 2022 WL 488944 (N.D. Ill. Feb. 17, 2022) ............................. 21, 44

*United States v. Mills*,
140 F.3d 630 (6th Cir. 1998) .................................................................................... 55, 56

*United States v. Olson*,
450 F.3d 655 (7th Cir. 2006) .................................................................................... 12

*United States v. Panarella*,
277 F.3d 678 (3d Cir. 2002), *abrogated on other grounds by Skilling v. United States*,
561 U.S. 358 (2010) ................................................................................................. 12

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ....................................................................................... 11

*United States v. Resendiz–Ponce*,
549 U.S. 102 (2007) ........................................................................................... *passim*

*United States v. Ring*,
706 F.3d 460 (D.C. Cir. 2013) .................................................................................. 61

*United States v. Risk*,
843 F.2d 1059 (7th Cir. 1988) ........................................................................ 53, 54, 55, 56

*United States v. Robinson*,
663 F.3d 265 (7th Cir. 2011) ........................................................................... 52, 55, 56

*United States v. Snyder*,
71 F. 4th 555 (7th Cir. 2023) .............................................................................. *passim*

*United States v. Stevens*,
559 U.S. 460 (2010) ................................................................................................. 24

*United States v. Sun–Diamond Growers of Cal.*,
526 U.S. 398 (1999) ........................................................................................... *passim*

*United States v. Tello*,
687 F.3d 785 (7th Cir. 2012) .................................................................................... 38

*United States v. Thirty-Seven (37) Photographs*,
402 U.S. 363 (1971) ................................................................................................. 42

*United States v. White*,
610 F.3d 956 (7th Cir. 2010) .................................................................... 11

*United States v. Williams*,
553 U.S. 285 (2008) ................................................................................... 25

*Wash. St. Grange v. Wash. St. Republican Party*,
552 U.S. 442 (2008) ................................................................................... 24

*Wis. Right to Life, Inc. v. Barland*,
751 F.3d 804 (7th Cir. 2014) .............................................................. 32, 33

**Statutes**

720 ILCS § 5.33-1(d)-(e) ................................................................................... 22

720 ILCS § 5/33-1 ............................................................................................. 42

720 ILCS § 5/33-1(a), (d), (e) .................................................................... 58, 59

720 ILCS § 5/33-1(d) .................................................................................. *passim*

720 ILCS § 5/33-1(e) .................................................................................. *passim*

720 ILCS § 5/33-3(a)(4) ............................................................................. *passim*

720 ILCS § 5/33-8 ......................................................................................... 7, 22

720 ILCS § 645/1 ........................................................................................... 7, 22

780 ILCS § 5/33-1(d) ......................................................................................... 58

780 ILCS § 5/33-1(e) ......................................................................................... 58

18 U.S.C. § 2 ........................................................................................................ 6

18 U.S.C. § 201(a)(3) ........................................................................................ 26

18 U.S.C. § 201(b) ...................................................................................... 43, 46

18 U.S.C. § 201(c) ............................................................................................. 46

18 U.S.C. § 201(c)(1)(B) ................................................................................... 32

18 U.S.C. § 371 ...................................................................................... 6, 46, 48

18 U.S.C. § 666 .......................................................................................... *passim*

18 U.S.C. § 666(a)(1)(B) ...................................................................... 6, 43, 46

18 U.S.C. § 666(a)(2) ........................................................................................ 48

18 U.S.C. § 666(c) ................................................................................................................ 52

18 U.S.C. § 1343 ................................................................................................................ 6

18 U.S.C. § 1346 ................................................................................................................ 6

18 U.S.C. § 1951 ................................................................................................................ 7

18 U.S.C. § 1951(a) ................................................................................................................ 6

18 U.S.C. § 1952 ................................................................................................................ 7

18 U.S.C. § 1952(a)(3) ................................................................................................ 6, 7, 10

18 U.S.C. § 1961(4) ................................................................................................................ 13

18 U.S.C. § 1961 *et seq* ................................................................................................ *passim*

18 U.S.C. § 1962(a) ................................................................................................................ 14

18 U.S.C. § 1962(c) ................................................................................................ 12, 14, 18, 19

18 U.S.C. § 1962(d) ................................................................................................ 6, 12, 14, 18

21 U.S.C. § 841 ................................................................................................................ 51

I.C.1–2 ................................................................................................................ 56, 58, 59

§ 855 of the Controlled Substances Act ................................................................................ 52

December 1, 2016 for the Future Energy Jobs Act ................................................................ 49

December 1, 2016 when the Future Energy Jobs Act ............................................................ 3, 4

EIMA ................................................................................................................................ 8, 44

Energy Infrastructure and Modernization Act ..................................................................... 4

FEJA ................................................................................................................................ 8, 40, 41

Individual 13W-1, Individual 13W-2, and Individual 23W-1, Individual BM-1, Law ............................. 53

Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 ................................................................ 13

RICO ................................................................................................................................ 13, 20

Travel Act ................................................................................................................ *passim*

**Rules**

Fed. R. Crim. Proc. 7(d) ................................................................................................ *passim*

Fed. R. Crim. Proc. 12(b)(3)(B)(v) ................................................................................ *passim*

**Other Authorities**

First Amendment .................................................................................... 24, 25, 57, 58

Fifth Amendment ........................................................................................ 48, 57, 58, 62

Sixth Amendment ....................................................................................... 48, 62

First, Fifth, and Fourteenth Amendments ................................................. 56, 58, 59

First and Fourteenth Amendments ............................................................ 31

Email from M. McClain to F. Marquez on January 19, 2016, regarding "Did we hire Tom
Walsh? Under [REDACTED]? Best, Mike." Publicly available at:
https://ilga.gov/house/committees/101Documents/BSPE/2016.01.19%20COMED-
SIC-0000109.pdf .............................................................................. 40

Email from M. McClain to F. Marquez on November 6, 2015, regarding "Walsh's
Resume." Publicly available at:
https://ilga.gov/house/committees/101Documents/BSPE/2015.11.09%20COMED-
SIC-0000105.pdf .............................................................................. 40

House Bill 5626 (introduced in 2018 but never enacted) ........................... 8

House Roll Call for Senate Bill 2814, 99th General Assembly for the State of Illinois
(Dec. 1, 2016). Publicly available at:
https://www.ilga.gov/legislation/votehistory/99/house/09900SB2814_12012016_007
000T.pdf .......................................................................................... 40

Publicly available at: https://apps.ilsos.gov/lobbyistsearch/ .......................... 40, 41

Publicly available at:
https://www.ilga.gov/house/committees/101Documents/BSPE/2016.07.16%20COM
ED-SIC-0000154.pdf ........................................................................ 40

Senate Bill 9 ............................................................................................ 8

Senate Bill 1839 ...................................................................................... 9

U.S. Const. Amendment I ......................................................................... *passim*

U.S. Const. Amendment V ........................................................................ *passim*

U.S. Const. Amendment XIV ..................................................................... *passim*

## Preliminary Statement

Over the course of the prior decade, Madigan responded to requests for assistance in finding employment from hundreds of constituents. He arranged introductions and, in some instances, asked private employers to consider individuals for various positions. Some received employment, some did not. There was no federal or state rule or regulation that forbid such recommendations. Madigan simply responded to requests for help, no different than tens of thousands of other lawmakers working in state capitals across the country who field similar requests. And, frankly, no different than numerous public officials from the executive, legislative, and judicial branches of federal and state governments. These requests for, and offers of, assistance are commonplace interactions between public officials and citizens, and they persist to this day.

Nonetheless, the government picked a handful of recommendations, labeled the individuals at issue as "cronies" and alleged that Madigan *himself* received bribes because private employers hired and compensated these individuals. The government cried foul because these employers, two of the state's largest utilities, had legislation pending in Springfield that would affect their businesses at various points during the same decade. Missing from the government's investigation, however, was any evidence that these private employers' hiring decisions had any effect whatsoever on what Madigan did or did not do as it related to these pieces of legislation. Even where Madigan literally did nothing—not even vote on a bill—the government screamed bribery because, as Speaker, Madigan *could have* chosen not to call the bill. The government has bought into the well-funded, persistent, and—most

importantly—*false* media campaign from Republican opponents that Springfield was a one-man operation and utterly ignored the efforts of numerous legislators (on both sides of the aisle), lobbyists, and advocacy groups who worked hard to move important, consumer-focused legislation through the process.

The Superseding Indictment does not allege a *quid pro quo* between the job hires and any official act that Madigan took or refrained from taking. In 117 pages, the Superseding Indictment does not allege a single word spoken to or by Madigan connecting these job recommendations to any official act by him. Nor does it more generally allege that Madigan took (or agreed to take, or refrained from taking, or agreed to refrain from taking) official action in exchange for any hiring decisions made by ComEd and AT&T. The government carefully avoids any such factual allegation. Instead, it asserts, in the most conclusory terms, that Madigan "accepted" job hires "intending to be influenced" in connection with legislation affecting the utilities, on which he voted "in furtherance" (but only in some instances) and to "effect [the] objects and purposes" of a conspiracy to influence him.

Critical to defending its decision to bring criminal charges against Madigan (but not other public officials) based on job recommendations, the prosecution team has argued for years that the statute at issue—18 U.S.C. § 666—criminalized both gratuities and bribes and further argued that the statute did not require a *quid pro quo* as to both so-called "prongs." As such, the prosecution posited that the lack of connection, temporal or otherwise, between Madigan's official actions and the private employers' hiring decisions was not a fatal flaw to its charges. The government was

wrong. In *Snyder v. United States*, the Supreme Court rejected the government's interpretation of § 666 as "a vague and unfair trap for 19 million state and local officials." 144 S. Ct. 1947, 1959 (June 26, 2024). The Supreme Court clearly and definitively held that the statute applies only to bribes, <u>not</u> gratuities, and that bribery "requires that the official have a corrupt state of mind and accept (or agree to accept) the payment intending to be influenced in the official act." *Id.* at 1955. In other words, the government must establish a *quid pro quo*. Yet in its highly publicized, lengthy speaking indictment, the government fails to allege facts that would support the notion that Madigan acted corruptly or agreed to, or intended to agree to, a *quid pro quo*. For this reason alone, the § 666-related charges in the indictment fail as a matter of law.

*Snyder* upends this prosecution for other reasons. The last official act identified in the Superseding Indictment related to ComEd was on December 1, 2016 when the Future Energy Jobs Act ("FEJA") was called for a vote. (Superseding Indictment, Dkt. 37, Count II, ¶ 31(u)). The indictment identifies no less than four different hiring decisions by ComEd that *arose* and took place *after* December 1, 2016. First, the indictment alleges that ComEd hired and compensated Individual FR-1 starting in March 2017. (*Id.*, Count II, ¶¶ 1(x), 31(y), (ddd)). Second, the indictment alleges that Madigan (as did a number of other uncharged public officials) recommended Individual BM-1 to fill a vacant board seat starting in or around November 2017. (*Id.*, Count II, ¶ 31(aa)). Third, the indictment alleges that Madigan recommended Individual 23W-1 in or around April 2018. (*Id.*, Count II, at 31(ll). Fourth, the

indictment alleges that ComEd hired interns related to the 13th Ward in 2017 and 2018. (*Id.*, Count II, ¶¶ 31(z), (ff)-(hh), (eee)). There is no allegation that Madigan agreed to take official action in exchange for any of these hiring decisions. Nor could it. The government's theory, at best, was that these were gratuities related to some past official act. And, as recognized by Judge Leinenweber in the related ComEd case, the jury may have determined that all of the hiring decisions at issue were made as a gratuity to Madigan for the passage of the Energy Infrastructure and Modernization Act ("EIMA"), which originally passed the Illinois House in 2011 before the alleged conspiracy even took place. *United States v. McClain*, 20 CR 812, Dkt. 357, at 14-15. Now that *Snyder* has held that gratuities are not criminalized by § 666, these and the many other allegations of the Superseding Indictment cannot stand.

The remaining counts of the Superseding Indictment target conduct unrelated to ComEd and AT&T, alleging behavior involving real estate projects and Madigan's private law firm. Some of those counts fall short because of defects in the statutes the government invokes and the thinness of the allegations. One overarching failure stands out, however: the government's effort to allege a single, all-encompassing RICO charge in Count One. That count purports to graft together, into a RICO conspiracy, one half of the Superseding Indictment (criminalizing job recommendations made to ComEd and AT&T) with the other half (alleging misconduct involving Madigan's law firm). But the alleged facts, purposes, and major players at issue in the two halves of the Superseding Indictment are wholly distinct.

A RICO enterprise requires a common purpose. On the face of the Superseding Indictment, no such common purpose is alleged. Whatever may have been the government's reason for cobbling disparate claims together—whether to bolster its cornerstone ComEd/AT&T allegations, or otherwise—it has failed to allege a proper RICO conspiracy claim.

In short, this far-flung Superseding Indictment impermissibly treats job recommendations as illegal bribery, and stitches together unrelated allegations of purported misconduct into a single scheme. The mismatch between the conduct alleged and the statutes invoked is a fatal defect that precludes this prosecution. For these reasons and others described below, Counts One through Seven, Eleven through Fourteen, and Twenty-One through Twenty-Three are fatally infirm, constitutionally and otherwise. Madigan respectfully requests their dismissal either in full or in part.

## The Superseding Indictment

The government filed a twenty-three-count Superseding Indictment that sets forth two distinct fact patterns as summarized in the table below. First, Counts Two through Seven and Count Twenty-Three allege that Madigan corruptly solicited jobs from two utilities, Commonwealth Edison ("ComEd") and Illinois Bell Telephone Company ("AT&T"), intending to be influenced and rewarded in connection with his official duties as Speaker of the Illinois House of Representatives (the "Utility Allegations"). Dkt. 37, at 23–24, 104–05. Separately, Counts Eight through Twenty-Two allege that Madigan unlawfully solicited and received business for his private law firm from "persons and parties having business with the State of Illinois and the

City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf" (the "Law Firm Allegations"). *Id.* at 9. Count One purports to allege a RICO conspiracy covering these two distinct fact patterns.

| Count | Statute(s) | Utility or Law Firm Allegations |
|:---:|:---|:---:|
| 1 | 18 U.S.C. § 1962(d) | Utility and Law Firm |
| 2 | 18 U.S.C. §§ 371 and 2 | Utility |
| 3 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 4 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 5 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 6 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 7 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 8 | 18 U.S.C. §§ 1343 and 1346 | Law Firm |
| 9 | 18 U.S.C. §§ 1343 and 1346 | |
| 10 | 18 U.S.C. §§ 1343 and 1346 | |
| 11 | 18 U.S.C. § 666(a)(1)(B) | |
| 12 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 13 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 14 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 15 | 18 U.S.C. §§ 1951(a) and 2 | Law Firm |
| 16 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 17 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 18 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 19 | 18 U.S.C. §§ 1343 and 1346 | Law Firm |
| 20 | 18 U.S.C. §§ 1343 and 1346 | |
| 21 | 18 U.S.C. §§ 666(a)(1)(B) and 2 | |
| 22 | 18 U.S.C. §§ 1952(a)(3) and 2 | |
| 23 | 18 U.S.C. §§ 371 and 2 | Utility |

## I. RICO Conspiracy

In Count One, the government asserts that Madigan led a nearly decade-long association-in-fact enterprise, the purpose of which was twofold: first, "to cause

various businesses to employ [and] contract with . . . MADIGAN's political allies," and second, to solicit business for Madigan's private law firm from "persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf." Dkt. 37, at 8–9. Count One is predicated on a pattern of racketeering activity consisting of Hobbs Act extortion, 18 U.S.C. § 1951; violation(s) of the Travel Act, 18 U.S.C. § 1952; bribery, 720 ILCS § 5/33-1(d)–(e); official misconduct, 720 ILCS § 5/33-3(a)(4); and legislative misconduct, 720 ILCS § 645/1 (effective until Dec. 31, 2012) and 720 ILCS § 5/33-8 (effective Jan. 1, 2013). *Id.* at 11–12. In Count One, as explained further below, the government melds together two distinct enterprise conspiracies motivated by separate goals and carried out by different actors.

## II. Solicitation of Jobs from Utilities

Counts Two through Seven and Count Twenty-Three center on the assertion that Madigan corruptly solicited jobs for his political allies from ComEd and AT&T.

### A. ComEd

Counts Two through Seven charge Madigan with conspiracy, federal program bribery, and violations of the Travel Act, all premised on the assertion that ComEd sought to influence Madigan by arranging for individuals associated with him to obtain jobs and contracts with ComEd. Dkt. 37 at 24–25. In particular, Counts Three, Four, and Six assert respectively that Madigan corruptly solicited a position on the ComEd board of directors for Individual BM-1, *id.* at 64, payments of $5,000 a month under a ComEd contract for Individual 23W-1, *id.* at 65, and a ComEd contract for

Jay D. Doherty & Associates for the benefit of Individuals 13W-1, 13W-2, and 23W-1, *id.* at 67, all in violation of the federal program bribery statute. Counts Five and Seven charge violations of the Travel Act based on the same allegations, asserting underlying violations of the Illinois bribery and legislative misconduct statutes. *Id.* at 66, 68.

Count Two alleges a conspiracy to influence and reward Madigan with these and other purported benefits from ComEd, and to "assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business." *Id.* at 24–25. Count Two identifies four pieces of legislation: (1) EIMA (passed in 2011), for which he voted and voted to override the Governor's veto, *id.* at 31; (2) Senate Bill 9 (passed in 2013), for which he voted and overrode the Governor's veto, *id.*; (3) the Future Energy Jobs Act ("FEJA," passed in 2016), for which he did not cast a vote, *id.* at 50; and (4) House Bill 5626 (introduced in 2018 but never enacted), which he allegedly "gave [Michael] McClain permission to work to kill" on behalf of ComEd, *id.* at 57. Beyond identifying the foregoing bills and Madigan's position on them, the Superseding Indictment alleges no facts establishing an agreement by Madigan to take official action in exchange for the benefits he allegedly received.

**B.    AT&T**

Akin to the ComEd-related counts, Count Twenty-Three alleges that Madigan conspired with McClain and a former AT&T employee to arrange for a former member of the Illinois House of Representatives, Individual FR-1, to receive payments made at the direction of AT&T for the purpose of influencing and rewarding Madigan in

connection with his official duties as Speaker, and to assist AT&T with respect to the passage of legislation concerning the utility's carrier of last resort ("COLR") obligation. Dkt. 37 at 105–06. Count Twenty-Three alleges that the Speaker's office requested a "complete roll call" on Senate Bill 1839 (which included COLR legislation) and that Madigan voted in favor of that bill and other COLR-related legislation. *Id.* at 111. As with ComEd, the Superseding Indictment does not allege facts establishing a causal connection between the legislative actions undertaken by Madigan and the benefits he allegedly received from AT&T.

## III. Solicitation of Business for Madigan's Law Firm

Wholly distinct from the ComEd and AT&T factual episodes, Counts Eight through Twenty-Two allege that Madigan unlawfully sought and agreed to accept business for his private law firm from "persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf." Dkt. 37 at 9. These fifteen counts relate to three real estate developments in Chicago involving Company A, Company C, and a parking lot in Chinatown.

### A. Company A

Counts Eight through Fourteen allege that Madigan agreed to accept business from Company A that allegedly was steered to his private law firm by Alderman A, who was acting at the government's direction in the hope of receiving cooperation credit for his unrelated crimes, in exchange for recommending Alderman A to the Governor of Illinois for appointment to a compensated state board position. Dkt. 37 at 70–71. Based on this allegation, Counts Eight, Nine, and Ten charge honest

services fraud, *id.* at 75–77; Count Eleven federal program bribery, *id.* at 78; and Counts Twelve, Thirteen, and Fourteen violations of the Travel Act, *id.* at 79–81.

## B.     Company C

Counts Fifteen through Eighteen allege that Alderman A set up a meeting for Madigan to pitch his law firm's services to Company C, which was seeking to construct an apartment building in Chicago. Dkt. 37 at 82–84. These counts allege that Madigan used the government cooperator Alderman A to extort Company C. *Id.* at 84–85. Although Alderman A's statements to Company C were directed by the government (not Madigan, who simply asked for an introduction) and not even known to Madigan, Count Fifteen charges Madigan with attempted extortion, *id.*; and Counts Sixteen, Seventeen, and Eighteen violations of the Travel Act, *id.* at 86–88.

## C.     Chinatown Parking Lot

Counts Nineteen through Twenty-Two allege that a group of individuals sought to have the State of Illinois transfer ownership of a parking lot in Chinatown to the City of Chicago so that they could in turn acquire the lot from the City. Dkt. 37 at 89. These counts allege that Madigan "agreed to use his position as Speaker of the House to assist with and cause the passage of legislation providing for the transfer of the Chinatown parcel with the understanding that, in exchange, legal work would be steered to his private law firm." *Id.* at 90–91. Based on these allegations, Counts Nineteen and Twenty charge honest services fraud, *id.* at 98–100; Count Twenty-One federal program bribery, *id.* at 101; and Count Twenty-Two a violation of the Travel Act, *id.* at 102.

## Legal Standard

To be legally sufficient, an indictment must: (1) state all the elements of the crime charged; (2) adequately inform the defendant of the nature of the charges so that he may prepare a defense; and (3) allow the defendant to plead the judgment as a bar to any future prosecutions. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quotation marks omitted). But where the statute fails to set forth all the elements necessary to constitute the offense, indictments "must do more than restate the language of the statute." *United States v. Resendiz–Ponce*, 549 U.S. 102, 109–10 (2007). In that case, "when one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Donagher*, 520 F. Supp. 3d 1034, 1041 (N.D. Ill. 2021) (quoting *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)). This is because absent the implicit element, the indictment would fail "to provide fair notice to [the] defendant[] and [] ensure that any conviction [] arise[s] out of the theory of guilt presented to the grand jury." *Resendiz–Ponce*, 549 U.S. at 109–10.

Although a court's review of the facts at this stage is limited, the court "need not blindly accept a recitation in general terms of the elements of the offense." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012), *abrogated on other grounds by Rehaif*

*v. United States*, 139 S. Ct. 2191 (2019). Even if an indictment recites necessary elements in boilerplate wording, "'if the specific facts' that are alleged 'fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation,' the indictment fails to state an offense." *Id.* (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010)); *cf. United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir. 1987) ("In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating.").

## Argument

### I. The RICO Conspiracy Charge (Count One) Must Be Dismissed.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). And it is unlawful for any person to conspire to do the same. 18 U.S.C. § 1962(d). To sustain a RICO conspiracy charge, "the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006)), *cert. denied*, 141 S. Ct. 1253 (2021). The Superseding Indictment fails on all fronts: first and foremost, it does not adequately plead a RICO enterprise; second, it does not plead an agreement to conduct or participate in the *enterprise*'s affairs; and, third, it charges racketeering activity predicated in part on unconstitutional state statutes.

While "Congress' mandate [is] to 'liberally' construe the [RICO Act] in light of its broad remedial purposes," *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1097 (N.D. Ill. 2016) (Blakey, J.) (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947; *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985)), "RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the statute," *United Food & Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 851 (7th Cir. 2013). Indeed, as reflected below, federal courts have dismissed civil RICO actions that fail to allege an agreement to conduct or participate in the affairs of an enterprise. And when one's liberty is at stake, courts should hue to "the Supreme Court's admonition to read the statute's provisions the same way in both a criminal or civil context." *Menzies*, 197 F. Supp. 3d at 1097 (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 239 (1987); *Sedima*, 473 U.S. at 489) (discussing pleading of "pattern" in a civil RICO action).

A.    **Count One Does Not Allege a RICO Enterprise.**

Count One of the Superseding Indictment must be dismissed because it fails to allege a RICO enterprise. The RICO Act defines "enterprise" to include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "An association-in-fact includes any 'group of persons associated together for a common purpose of engaging in a course of conduct.'" *Brown*, 973 F.3d at 682 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). The Supreme Court has held that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and

longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. "The existence of a common goal or purpose is an 'essential ingredient' of an association-in-fact enterprise." *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 687 (N.D. Ill. 2012) (Kendall, J.) (quoting *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)). Count One fails to allege a common purpose uniting the so-called "Madigan Enterprise."

The case of *Rao v. BP Products North America, Inc.*, 589 F.3d 389 (7th Cir. 2009), is instructive. In *Rao*, the Seventh Circuit affirmed dismissal of civil RICO claims brought under 18 U.S.C. § 1962(a), (c), and (d), in part because the complaint failed to show a "group of persons associated together for a ***common purpose*** of engaging in a course of conduct." *Id.* at 400 (emphasis added) (quoting *Boyle*, 556 U.S. at 944). The plaintiff in *Rao* alleged RICO violations against BP, a regional sales manager, an area representative and her husband, and other unnamed employees. *Id.* at 393–95. The plaintiff alleged: (1) the regional sales manager, as well as the area representative and her husband, "forced [the plaintiff] to sell his share of a [gas] station to [the area representative] at a false price, under the threat that he would lose his other franchises if he did not"; (2) "after [the plaintiff] spoke with the FBI, unnamed '[BP] employees' told [the plaintiff] his franchises would be terminated if he sought help"; and (3) "BP allowed [the regional sales manager] to force [the plaintiff] into purchasing two parcels of its land . . . under the threat of increased costs and the loss of his business if he refused." *Id.* at 400. In affirming dismissal of the plaintiff's complaint for failure to allege a RICO enterprise, the Seventh Circuit

reasoned that the plaintiff's allegations "contain different actors for each event," "do not indicate how the different actors are associated," and "do not suggest a group of persons acting together for a common purpose or course of conduct." *Id.*

To be sure, Count One muddies the water by asserting an assortment of purposes for which the purported "Madigan Enterprise" acted, namely:

> (i) to exercise, to preserve, and to enhance MADIGAN's political power and financial well-being; (ii) to financially reward MADIGAN's political allies, political workers, and associates for their loyalty, association with, and work for MADIGAN; and (iii) to generate income for members and associates of the enterprise through illegal activities.

Dkt. 37 at 7. A thorough read of Count One, however—and the indictment as a whole—reveals two distinct enterprise conspiracies motivated by separate goals and carried out by different actors. This bifurcation is best articulated in Count One itself, which states:

> Among other things, MADIGAN utilized his official positions as a Representative and Speaker: (i) to cause various businesses to employ, contract with, and make direct and indirect monetary payments to MADIGAN's political allies, political workers, and associates as a reward for and to promote their loyalty, association with, and work for MADIGAN, at times in return for little or no legitimate work performed for the benefit of the businesses; and (ii) to solicit and receive from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf, including Alderman A, bribes and unlawful personal financial advantage, including but not limited to fees arising from the retention of his law firm, Madigan & Getzendanner. . . .

*Id.* at 8–9.

The first conspiracy allegations, ostensibly encompassing Madigan's interactions with ComEd and AT&T, assert a scheme to benefit Madigan's political power by directing benefits to his alleged political allies to "promote their loyalty." *Id.* at 8. Absent from this conspiracy is any assertion that the alleged enterprise sought to obtain "personal financial advantage" for Madigan. The second conspiracy allegations contend that Madigan, in his capacity as a partner at a private law firm, sought to "reap the benefits of private legal work unlawfully steered to his law firm." *Id.* at 9. The Superseding Indictment fails to allege that the participants of the purported Madigan Enterprise associated together for the "common purpose" of effectuating both schemes.

For example, the Superseding Indictment is devoid of any allegations that Madigan's private law firm shared a common purpose to enhance Madigan's political power or reward Madigan's political allies. Rather, the Law Firm Allegations contend that Madigan sought to obtain "***personal*** financial advantage" through fees arising from the retention of the law firm. *Id.* at 12 (emphasis added). The law firm is not mentioned once in the sixty-five pages charging conduct related to ComEd (Counts Two through Seven) and AT&T (Count Twenty-Three). *Id.* at 15–68, 103–113. Neither is Alderman A, who plays a central role in every one of the Law Firm Allegations set forth in Counts Eight through Twenty-Two. He does not surface once in the Utility Allegations because he is entirely irrelevant to them.

Likewise, the Thirteenth Ward Democratic Organization is conspicuously absent from the thirty-four pages of the Superseding Indictment that outline the Law

Firm Allegations. *Id.* at 69–102. Rather, Count One makes clear that the purpose of the Thirteenth Ward Democratic Organization was political:

> The purpose of the Thirteenth Ward Democratic Organization was to, among other things, cultivate support for political candidates and public officials who ran for and held public office through a variety of means, which included door-to-door campaigning by political workers, including those known as "precinct captains," who were associated with the Thirteenth Ward Democratic Organization.
>
> . . . .
>
> . . . MADIGAN utilized his positions as Democratic Committeeman for the Thirteenth Ward and Chairman of the Thirteenth Ward Democratic Organization to direct the activities of his political allies and political workers within the Thirteenth Ward, and to maintain his political power for purposes of ensuring his continued retention of his positions as a member of the Illinois House of Representatives and Speaker. . . .

*Id.* at 4, 9. The Superseding Indictment lacks any assertion that the Thirteenth Ward Democratic Organization shared a common purpose to obtain personal financial advantage for Madigan.

Like the complaint in *Rao*, Count One of the Superseding Indictment fails to show "a group of persons acting together for a ***common purpose*** or course of conduct." *Rao*, 589 F.3d at 400 (emphasis added). Indeed, Count One reveals the government's attempt to shoehorn two distinct fact patterns—involving ComEd and AT&T on the one hand and Madigan's private law firm on the other—into a single RICO conspiracy charge. Moreover, these disparate fact patterns frequently "contain different actors for each event" and "do not indicate how the different actors are

associated." *Id.* Accordingly, Count One fails to allege an association-in-fact RICO enterprise and, therefore, must be dismissed.

**B.     Count One Does Not Allege That Madigan and McClain Agreed to Conduct or Participate in the Affairs of an Enterprise.**

Even if this Court finds that Count One sufficiently alleges the existence of an association-in-fact enterprise under *Boyle*, Count One should still be dismissed because it fails to allege that each member of the purported enterprise agreed to conduct or participate in the "*enterprise*'s affairs," as opposed to their "*own* affairs." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). In other words, Count One fails to allege "a truly joint enterprise where each individual entity act[ed] in concert with the others to pursue a common interest"; instead, it reveals that "each entity act[ed] in its individual capacity to pursue its individual self-interest." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (citing *United Food*, 719 F.3d at 855; *Crichton*, 576 F.3d at 400). And because "the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute," *United Food*, 719 F.3d at 856 (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998)), "[h]aving failed to [allege] facts that would establish a violation of Section 1962(c), the [government] cannot [bring an indictment] for conspiracy under Section 1962(d) based on those same facts," *id.* at 856–57.

In *United Food*, for example, an employee benefit plan brought a RICO action against Walgreens and Par Pharmaceutical, Inc., contending that the two formed an

enterprise to defraud the plan by filling prescriptions of Par's drugs with a dosage form that was more expensive than the form prescribed to the customer. 719 F.3d at 850. The plaintiff alleged extensive evidence of cooperation between Walgreens and Par. Among other things, the complaint asserted that "Par proposed the drug-switching program and Walgreens agreed to implement it"; Walgreens's director of pharmacy marketing conveyed false information to Walgreens's pharmacists about Par's dosage forms; and, after Walgreens stopped switching dosage forms following scrutiny from the Justice Department, the two companies negotiated price reductions to offset Walgreens's revenue losses. *Id.* at 852, 854.

Despite these and other allegations of association, the Seventh Circuit found the complaint "fail[ed] to allege that Walgreens and Par 'conduct[ed]' the affairs of an 'enterprise.'" *Id.* at 853 (quoting 18 U.S.C. § 1962(c)). The Seventh Circuit reasoned:

> [N]othing in the complaint reveals how one might infer that these communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests. The complaint does not allege, for instance, that officials from either company involved themselves in the affairs of the other. . . . Nor does the complaint anywhere suggest that profits from the illegal drug-switching scheme were siphoned off to the [] enterprise or to individual enterprise members. . . .

> To be sure, Walgreens and Par were not strangers. Representatives from the companies regularly communicated with one another, and Walgreens purchased its generic [drugs] from Par. This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling [drug] prescriptions. . . .

*Id.* at 854–55. Moreover, the Seventh Circuit observed, "the fact that Walgreens's and Par's activities were by all appearances illegal [does not] indicate that the companies were acting on behalf of a distinct enterprise." *Id.* at 855. The Seventh Circuit further held that the plaintiff's "failure adequately to allege that Walgreens and Par conducted the affairs of an enterprise is also fatal to its RICO conspiracy claim." *Id.* at 856. The court reasoned that "[j]ust as the complaint fails to allege that Walgreens and Par acted on behalf of the [] enterprise, it equally fails to allege that Walgreens and Par *agreed* to act on behalf of the enterprise." *Id.*

Count One likewise fails to allege that Madigan and McClain acted, or agreed to act, "in concert . . . to pursue a common interest" rather than "in [their] individual capacit[ies] to pursue [their] individual self-interest." *Bible*, 799 F.3d at 655–56. As an initial matter, Count One does not assert that McClain stood to profit from participating in any of the affairs of the alleged enterprise. *See Bobb v. Swartz–Retson P.C.*, 2018 WL 4384292, at *7 (N.D. Ill. Sept. 14, 2018) (no RICO enterprise where defendants made their own respective profits and did not share in the profits of the alleged enterprise); *Guaranteed Rate*, 912 F. Supp. 2d at 687 (same); *Oberoi v. Mehta*, 2011 WL 1337107, at *4 (N.D. Ill. Apr. 6, 2011) (same). This is unsurprising, as Count One makes clear that "McClain served as a lobbyist and/or consultant . . . for [ComEd]." Dkt. 37 at 10. Count One reveals that McClain interacted with Madigan to further the interests of *his* client, ComEd, and to build *his* credentials as a Springfield lobbyist.

The government acknowledged as much when it indicted McClain along with other former ComEd employees and consultants in November 2020. In that case, the government charged McClain and his co-defendants with conspiring to:

> arrange[] for various associates of [Madigan], including [Madigan's] political allies and individuals who performed political work for [Madigan], to obtain jobs, contracts, and monetary payments associated with those jobs and contracts from ComEd and its affiliates, even in instances where such associates performed little or no work that they were purportedly hired to perform for ComEd. . . .

Indictment at 12–13, *United States v. McClain*, Case No. 20-CR-812 (N.D. Ill. Nov. 18, 2020), ECF No. 1. Critically, the *McClain* indictment alleges that this conspiracy was undertaken "for the purpose of influencing and rewarding [Madigan] in connection with his official duties as Speaker of the Illinois House of Representatives, and ***to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business***." *Id.* at 12 (emphasis added). As suggested by the separately-filed *McClain* indictment, McClain associated with Madigan on issues related to ComEd to advance ComEd's legislative interests, not to benefit the so-called "Madigan Enterprise." *United States v. McClain,* 20-CR-812, Dkt. 1 (N.D. Ill. 2020).

With respect to Madigan and McClain's association on matters unrelated to ComEd, Count One also fails to allege that their "communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of [Madigan] and [McClain] in their individual capacities, to advance their individual self-interests." *United Food*, 719 F.3d at 854. To be sure, Madigan and McClain "were not strangers," and they "regularly communicated with one another." *Id.* at 855. But their

interactions demonstrate a relationship between a lobbyist and public official, not an effort to join together to create a distinct entity for the purpose of improperly advancing Madigan's personal interests. *Id.* Therefore, Count One fails to "plausibly alleg[e] the type of concerted activity undertaken on behalf of an identifiable enterprise necessary to a successful RICO claim." *Id.* at 850–51.

### C. Count One Charges Racketeering Activity Predicated on Unconstitutional State Statutes.[1]

Count One is predicated, in part, on an alleged pattern of racketeering consisting of "multiple acts and threats involving bribery chargeable under the law of the State of Illinois," including 720 ILCS § 5/33-1(d)–(e) (bribery) and 720 ILCS § 5/33-3(a)(4) (official misconduct).[2] Dkt. 37 at 11–12. The Illinois bribery statute provides that a person commits bribery when:

> (d) He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of ***any act***

---

[1] Defendants maintain that Illinois Statutes 720 ILCS § 5.33-1(d)-(e) (bribery) and 720 ILCS § 5/33-3(a)(4) (official misconduct), by a plain reading of their text, require, in addition to other elements, that the government prove beyond a reasonable doubt that a specific official act was the object of the alleged knowing agreement to solicit or accept a thing of value. However, should the government take a contrary position, the statutes would be rendered unconstitutional for the reasons set forth in this Memorandum.

[2] As a predicate for racketeering activity, Count One also cites the Illinois statute concerning legislative misconduct, 720 ILCS § 645/1 (effective until Dec. 31, 2012) and 720 ILCS § 5/33-8 (effective Jan. 1, 2013). Superseding Indictment, at 12. That statute is not included in this motion because, in contrast to the vast "any act" requirement in the bribery and official misconduct statutes, it requires a more circumscribed "official act." 720 ILCS § 5/33-8 (forbidding Illinois General Assembly members from receiving any valuable thing for "any vote or influence he or she may give or withhold on any bill, resolution or appropriation, or for any other official act"). While even this "official act" requirement should ultimately be subject to a limiting instruction defining the term in accordance with the Supreme Court's analysis in *McDonnell v. United States*, 579 U.S. 550 (2016), that issue need not be resolved here.

> *related to the employment or function of any public officer*, public employee, juror or witness; or
>
> (e) He or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of *any act related to the employment or function of any public officer*, public employee, juror or witness.

720 ILCS § 5/33-1(d)–(e) (emphasis added). The Illinois official misconduct statute provides:

> A public officer . . . commits misconduct when, in his official capacity . . . [he] [s]olicits or knowingly accepts for the performance of *any act* a fee or reward which he knows is not authorized by law.

720 ILCS § 5/33-3(a)(4) (emphasis added).

As explained below, the sweeping "any act" language found in the Illinois bribery and official misconduct statutes renders both unconstitutional in two respects. First, the statutes are overbroad in violation of the First and Fourteenth Amendments. Second, the statutes are void for vagueness under the Fifth and Fourteenth Amendments, both facially and as applied in Count One. Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Count One must be dismissed insofar as it is predicated on these unconstitutional Illinois statutes. Furthermore, pursuant to Federal Rule of Criminal Procedure 7(d), references to the Illinois bribery and official misconduct statutes should be stricken from the Superseding Indictment.

1. **The Illinois Bribery and Official Misconduct Statutes Are Facially Overbroad in Violation of the First and Fourteenth Amendments.**

Public officials routinely work with lobbyists and entertain outreaches from their constituents. This conduct is central not only to the conduct of office but also to American democracy. Citizens have a First Amendment right to petition elected representatives, and our democratic system envisions that politicians will be responsive to their concerns. Statutes that impermissibly chill such interactions infringe on rights that go to the core of democratic government and violate the First Amendment. Here, the Court must scrutinize the Illinois bribery and official misconduct statutes to ensure that they do not trench on this protected sphere of activity, and strike down prohibitions that are unconstitutionally overbroad.

Statutes infringing First Amendment rights "suffer from overbreadth and necessitate facial invalidation if their unconstitutional applications against otherwise protected expression outnumber their legitimate ones." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 n.6 (2008)) (statute facially invalid as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep"). "Where a sufficient imbalance exists, the statute proves facially invalid, not because it lacks any conceivable constitutional application, but because the 'threat of [its] enforcement . . . deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.'" *Bell*, 697 F.3d at 453 (quoting

*United States v. Williams*, 553 U.S. 285, 292 (2008)). "Technically overbroad statutes, in short, must fail because they unconstitutionally chill protected expression." *Id.*

To determine whether a statute is overbroad, courts perform a two-step analysis. First, the court must "construe the challenged statute." *Williams*, 553 U.S. at 293. Second, the court must determine whether the statute, as so construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297. Criminal statutes must be "scrutinized with particular care" because "those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 (1987). In considering a defendant's challenge to the facial validity of a statute under the First Amendment, the Court should "not hesitate[] to take into account possible applications of the statute in other factual contexts beside[] [those] at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").

### a.    Illinois Bribery Statute

The Illinois bribery statute sweeps much more broadly than the Constitution permits because of its wide and undifferentiated coverage of "any act related to the employment or function of any public officer." 720 ILCS § 5/33-1(d)–(e). This statutory text covers conduct that lies within the protection of the First Amendment. That such all-encompassing coverage chills protected activity is shown most clearly by the

comparison of Illinois law to the federal statute, 18 U.S.C. § 201(a)(3), at issue in *McDonnell v. United States*, 579 U.S. 550 (2016).

In *McDonnell*, the Supreme Court considered the federal analog of the Illinois bribery statute, which requires an "official act," defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). The Court in *McDonnell* narrowed the federal statute substantially, in large measure to avoid constitutional concerns that would arise from an expansive and unbounded interpretation of "official act" encompassing virtually any act an official might perform. Because the statutory narrowing approach in *McDonnell* is not available here for Illinois laws, those same constitutional concerns require a holding that the Illinois bribery statute is unconstitutionally overbroad.

At issue in *McDonnell* were jury instructions on the meaning of an "official act." The trial court first charged the jury on the statutory definition, and then—as the government had requested—advised the jury that the term encompassed "'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" *McDonnell*, 579 U.S. at 564–65. The jury found the defendant, the former Governor of Virginia, Robert McDonnell, guilty of honest services fraud and Hobbs Act extortion. *Id.* at 565. He appealed, challenging the definition of "official act" provided to the jury. *Id.* at 566.

The Supreme Court reversed the conviction, citing the need for "a more bounded interpretation of 'official act.'" *Id.* at 567. The Court began by curtailing the *subject matter* upon which an "official act" may be taken to require "a formal exercise of governmental power" that is "specific and focused." *Id.* at 574. The Court then held that the *conduct* requisite for an "official act" must be a "decision" or "action" *on* a "question, matter, cause, suit, proceeding or controversy" (a definition not met by "[s]etting up a meeting, talking to another official, or organizing an event"). *Id.* Finally, the Court interpreted the phrase "which may at any time be pending, or which may by law be brought" to "suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 570.

The Illinois bribery statute lacks such narrowing features, and thereby encompasses a multitude of ordinary interactions between politicians and their constituents that are constitutionally protected. Such overbreadth poses constitutional concerns akin to those that troubled the Supreme Court in *McDonnell*.

*First*, the Court narrowed what qualifies as an "official act" because public officials routinely engage with their constituents, some of whom may have matters pending before them. In restricting what qualifies as a "decision" or "action," the Supreme Court recalled its analysis in *United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398 (1999). *See McDonnell*, 579 U.S. at 571–72. In *Sun–Diamond*, the Court stated that it was not an "official act" under the statute for the President to host a championship sports team at the White House, the Secretary of Education to

visit a high school, or the Secretary of Agriculture to deliver a speech to farmers on matters of USDA policy. *Id.* at 571 (citing *Sun–Diamond*, 526 U.S. at 407). That is because "the Secretary of Agriculture *always* has before him or in prospect matters that affect farmers, just as the President always has before him or in prospect matters that affect college and professional sports, and the Secretary of Education matters that affect high schools." *Id.* (quoting *Sun–Diamond*, 526 U.S. at 407). The Court explained that "the existence of such pending matters was not enough to find that ***any action*** related to them constituted an 'official act.'" *Id.* (emphasis added) (quoting *Sun–Diamond*, 526 U.S. at 407).

*Second*, the *McDonnell* Court voiced "significant constitutional concerns" with the government's expansive interpretation of "official act," where "nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a *quo*." *Id.* at 574–75. The Court warned that the government's position "could cast a pall of potential prosecution" over relationships between public officials and their constituents, when the "basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns." *Id.* at 575.

*McDonnell* underscored the substantiality of this concern by noting that "White House counsel who worked in every administration from that of President Reagan to President Obama warn[ed] that the [g]overnment's 'breathtaking expansion of public-corruption law would likely chill federal officials' interactions

with the people they serve and thus damage their ability effectively to perform their duties.'" *Id.* (quoting Brief for Former Federal Officials as Amici Curiae 6). The Court also noted that seventy-seven former state attorneys general—including three from Illinois—filed an amicus brief echoing those concerns. *Id.* (citing Brief for 77 Former State Attorneys General (Non-Virginia) as Amici Curiae 1–2). The Court warned that under the "standardless sweep" of the government's expansive reading, "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions"—which a narrow interpretation of "official act" served to avoid. *Id.* at 576.

Most recently, the Supreme Court in *Snyder* again discussed the overbreadth concerns presented by a bribery statute, noting the problem when no "remotely clear lines" separate "innocuous or obviously benign" conduct from that of criminal conduct. *Snyder*, 144 S. Ct. at 1958. The Court rejected the notion that "federal prosecutors can be trusted not to enforce the statute against small-time violators." *Id.*

The Illinois bribery statute, with its unlimited application to any act by a public official, poses the very constitutional concerns that troubled the Court in *McDonnell* and *Snyder*, and supported its narrowing of the reach of two separate bribery statutes. The *McDonnell* Court envisioned that the government's interpretation of "official act" could "cast a pall of potential prosecution" over a public official's relationship with homeowners seeking answers for why it took five days to restore power to their neighborhood after a storm if, for example, the homeowners had previously invited the official to attend a ballgame. *McDonnell*, 579 U.S. at 575.

Applying the Supreme Court's hypothetical in Illinois, that potential "pall" becomes a reality: if the public official took (or agreed to take) any action in his official capacity to obtain answers for his constituents—for example, if a state representative sought to have the power utility testify before the Illinois General Assembly about why it took five days to restore power—the public official could be found to have violated the Illinois bribery statute.

In short, the Illinois bribery statute is invalid because of its unconstitutional overbreadth. It reaches precisely the sort of constitutionally protected official-constituent interactions highlighted in *McDonnell* and *Snyder*. But unlike in *McDonnell* and *Snyder*, where those constitutional concerns supported a narrowing construction, here, Illinois law has no comparable boundary. For that reason, the statute is facially invalid under the First and Fourteenth Amendments and cannot properly serve as a predicate act for the RICO allegation in Count One of the Superseding Indictment.[3]

### b.    Illinois Official Misconduct Statute

The Illinois official misconduct statute similarly lacks the safeguards to avoid

---

[3] Judge Dow rejected the only post-*McDonnell* challenge to the Illinois bribery statute on First Amendment overbreadth grounds, reasoning that the statute did not encompass nominal gifts because "[t]he plain language of the statute imposes a scienter requirement such that the statute only proscribes the receipt of gifts intended to 'improperly influence' specific conduct." *United States v. Burke*, Case No. 19-CR-322, 2022 WL 1970189, at *39 (N.D. Ill. June 6, 2022). But a scienter requirement cannot save a bribery statute from overbreadth. The federal bribery statute also imposes a scienter requirement that limits the statute's reach to "corrupt[]" conduct, but the *McDonnell* Court still found it necessary to narrow the definition of "official act" to avoid chilling representative-constituent relations—even though there was substantial evidence that Governor McDonnell had accepted things of value in exchange for taking actions favorable to the payor's business interests. *McDonnell*, 579 U.S. at 556–61. Irrespective of a scienter requirement, the government action (the *quo*) must be carefully cabined to avoid "significant constitutional concerns." *Id.* at 574.

sweeping more broadly than the Constitution permits. Under the Illinois statute, a public officer commits official misconduct when "in his official capacity" he "[s]olicits or knowingly accepts for the performance of *any act* a fee or reward which he knows is not authorized by law." 720 ILCS § 5/33-3(a)(4) (emphasis added). The official misconduct statute thus relies on the same sweeping "any act" requirement as the Illinois bribery statute; accordingly, § 5/33-3(a)(4) also threatens to chill representative-constituent relations. Citizens interact with and give gifts to government officials in a wide variety of scenarios, any of which could be criminal under Illinois's statute absent clarity about the specific act for which an official is being rewarded. In federal law, the Supreme Court specified the type of link between reward and act that avoids those constitutional concerns. *See Sun–Diamond*, 526 U.S. at 414. But Illinois law lacks any comparable requirement of a link.

In *Sun–Diamond*, the Court held that to sustain a federal gratuity charge, the government "must prove a link between a thing of value conferred upon a public official and a *specific* 'official act' for or because of which it was given." 526 U.S. at 414 (emphasis added). Unlike the federal gratuity statute, however, Illinois law criminalizes "any act," as opposed to a "specific 'official act.'" Illinois courts have not similarly circumscribed the "any act" required to establish a violation of § 5/33-3(a)(4). As a result, the official misconduct statute, like the Illinois bribery statute, reaches a substantial quantity of constitutionally protected expressive activity. Accordingly, the Illinois official misconduct statute is facially invalid under the First and

Fourteenth Amendments.

In *Burke*, Judge Dow rejected an overbreadth challenge to the Illinois official misconduct statute, reasoning that § 5/33 3(a)(4) "only prohibits soliciting a fee or reward that is 'not authorized by law.'" 2022 WL 1970189, at *41 (quoting 720 ILCS § 5/33-3(a)(4)). Judge Dow analogized this limitation to § 5/33 3(a)(3)'s requirement that the public official perform an act "in excess of his lawful authority," which the Illinois Appellate Court found to have "imposed a limiting principle that 'renders the statute inapplicable to constitutionally protected conduct.'" Id. (quoting People v. Kleffman, 412 N.E.2d 1057, 1060 (Ill. App. Ct. 1980)). But the phrase, "which he knows is not authorized by law," does not save § 5/33-3(a)(4) from overbreadth. The federal gratuity statute includes a similar clause that limits its application to public officials who, "otherwise than as provided by law for the proper discharge of official duty," solicit or accept something of value for or because of an official act. 18 U.S.C. § 201(c)(1)(B). Nevertheless, as noted above, the McDonnell Court substantially curtailed the definition of "official act"—which applies to both gratuities and bribes— citing "significant constitutional concerns" with the government's "expansive interpretation" of the term. 579 U.S. at 574.

>        2.      **The Illinois Bribery and Official Misconduct Statutes Are Facially Vague in Violation of the Fifth and Fourteenth Amendments.**

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The "[v]agueness doctrine rests on concerns about fair notice and arbitrary enforcement." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) (quoting *United States v. Jones*, 689 F.3d 696, 701 (7th Cir.

2012)). "All laws must be clear and precise enough [1] to give a person of ordinary intelligence fair notice about what is required of him and also [2] to guard against the arbitrary and discriminatory exercise of enforcement discretion." *Id.* (citing *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Although the vagueness doctrine derives from due process concerns, "a statute that is vague may implicate a [defendant's] First Amendment rights, fostering those same chilling concerns that attend an overbreadth challenge." *Bell*, 697 F.3d at 455 (citing *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)); *accord Wis. Right to Life*, 751 F.3d at 835. Accordingly, "[i]n those instances when an imprecise law implicates speech and assembly rights, [a defendant] may also facially challenge a statute as void for vagueness." *Bell*, 697 F.3d at 455. "[R]igorous adherence" to the requirements of clarity and precision is "necessary to ensure that ambiguity does not chill protected speech." *Wis. Right to Life*, 751 F.3d at 835 (quoting *Fox Television*, 567 U.S. at 253–54).

### a. Illinois Bribery Statute

In addition to being overly broad, the Illinois bribery statute is facially void for vagueness under the Fifth and Fourteenth Amendments. The statute's shapeless "any act" requirement fails to define bribery "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03). As a result, the statute "foster[s] those same chilling concerns that attend [the] overbreadth challenge" discussed above. *Id.* at 455.

As the Supreme Court noted in *Sun–Diamond* and *McDonnell*, an unbounded "official act" requirement—let alone the far broader "any act" language in the Illinois statute—would criminalize constituents' token gifts to their public officials in exchange for, or because of, ceremonial governmental actions like those described further above. The *Sun–Diamond* Court warned that when "no particular 'official act' need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, ***nothing but the [g]overnment's discretion prevents the foregoing examples [of ceremonial actions] from being prosecuted***." 526 U.S. at 408 (emphasis added). Similarly, the *McDonnell* Court found that under the government's expansive interpretation of the "official act" requirement, the scope of this criminal prohibition would not be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." 579 U.S. at 576 (quoting *Skilling*, 561 U.S. at 402–03); *see also Snyder*, 144 S. Ct. at 1953 (discussing the "lack of fair notice for state and local officials" and that "this Court's precedents caution against leaving the statute's 'outer boundaries ambiguous'") (quoting *McDonnell*, 579 U.S. at 577). *McDonnell* narrowly interpreted the federal bribery statute's "official act" requirement to avoid the "absurdities" and vagueness concerns that would have otherwise resulted. *McDonnell*, 579 U.S. at 5717(quoting *Sun–Diamond*, 526 U.S. at 412).

The breadth of the Illinois bribery statute is revealed by the Illinois courts' application of the "any act" statutory language without any limiting construction. In

*People v. Johnson*, 780 N.E.2d 803 (Ill. App. Ct. 2002), for example, the Illinois Appellate Court overturned the trial court's dismissal of an indictment on vagueness grounds by reasoning, in pertinent part, that the indictment alleged an intent to influence an act that was *related* to the function of a public employee and *tangential* to the duties of the employee's office. *Id.* at 805–06. This sweeping construction of the Illinois bribery statute will yield the very absurdities that provoked the Supreme Court's vagueness concerns and, consequently, chill representative-constituent relations.

### b. Illinois Official Misconduct Statute

The Illinois official misconduct provision criminalizing gratuities, § 5/33-3(a)(4), is also facially void for vagueness under the Fifth and Fourteenth Amendments. It applies the same, shapeless "any act" language seen in the Illinois bribery statute. As a result, it too fails to define official misconduct "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03). As a result, § 5/33-3(a)(4) "foster[s] those same chilling concerns that attend [the] overbreadth challenge" discussed above. *Id.* at 455.

While Illinois courts have suggested the government must identify a specific act to sustain a conviction under § 5/33-3(a)(4), *see, e.g.*, *People v. Jordan*, 304 N.E.2d 713, 716 (Ill. App. Ct. 1973), they have not defined the scope of the required "act," as in *McDonnell*. As a result, the official misconduct statute is "not defined 'with sufficient definiteness that ordinary people can understand what conduct is

prohibited,' or 'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *McDonnell*, 579 U.S. at 576 (quoting *Skilling*, 561 U.S. at 402–03). Because § 5/33-3(a)(4) presents the same vagueness and attendant chilling concerns that were raised in *McDonnell*, the statute is facially void for vagueness under the Fifth and Fourteenth Amendments.[4]

### 3. The Illinois Bribery and Official Misconduct Statutes Are Void for Vagueness as Applied to Madigan.

Even if a statute is not invalidated as facially vague, it may still be vague as applied to "the facts of the particular case." *See United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020). In such circumstances, a penal statute satisfies due process only if it "define[s] the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03). As to the first criterion, the touchstone is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Coscia*, 866 F.3d 782, 792 (7th Cir. 2017) (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)). As to the second criterion, "the defendant must prove that *his* prosecution arose from arbitrary enforcement"; "this inquiry 'involve[s] determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that

---

[4] Judge Dow held that Alderman Edward Burke could not challenge the Illinois bribery and official misconduct statutes as facially vague because his alleged conduct "fit neatly into the [] core" of these statutes. *Burke*, 2022 WL 1970189, at *43, 45. As discussed in the following section, Madigan's alleged conduct is not "clearly proscribed" by the Illinois bribery and official misconduct statutes; therefore, he is not barred from raising a facial vagueness challenge. *Id.* at *42.

there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances.'" *Id.* at 794 (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)).

### a. Illinois Bribery Statute

The Illinois bribery statute is impermissibly vague as applied because it did not provide Madigan with fair notice that his alleged conduct – *i.e.*, recommendations for jobs to private employers – was (even arguably) criminal, nor did it protect him from arbitrary and discriminatory enforcement.

**Lack of Fair Notice.** As discussed above, the Illinois bribery statute's "any act" requirement falls well short of the definiteness provided by the federal bribery statute's "official act" requirement, particularly after *Sun–Diamond* and *McDonnell*. As a result, it failed to make reasonably clear that Madigan's conduct was criminal.

Count One fails to make reasonably clear—even today—what of Madigan's conduct gave rise to the alleged RICO conspiracy. In fact, Count One fails to allege *any* specific act that Madigan (or any other member of the purported enterprise) agreed (or was aware of an intent) to "influence the performance of" in exchange for the private benefits and personal financial advantage allegedly solicited and received by the enterprise. 720 ILCS § 5/33-1(d)–(e). The closest Count One comes is asserting that the "members and associates" of the purported "Madigan Enterprise":

> (a) solicit[ed] and receiv[ed] bribes and unlawful personal financial advantage from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf; [and] (b) us[ed] MADIGAN's powers as Speaker, including his ability to affect the progress of bills in the

House of Representatives, as well as his control over the resources of the Office of the Speaker, including its staff, in order to cause third parties to financially reward MADIGAN, his political allies, political workers, and associates. . . .

Dkt. 37 at 7–8. This allegation falls short. It does not allege knowledge or an agreement on the part of Madigan, or any other member of the purported enterprise, to attempt to "influence the performance of *any act* related to the employment or function of any public officer." 720 ILCS § 5/33-1(d)–(e) (emphasis added). And it certainly does not allege a decision or action *on* a "specific and focused" "question, matter, cause, suit, proceeding or controversy" involving "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 579 U.S. at 574. Rather, it alleges the *capability* of the Speaker to affect bills or to control his Office's resources, generalized characteristics that accompanied the Office of the Speaker. But it falls short of identifying *conduct* that can inform the basis of a bribery charge—*e.g.*, soliciting or receiving benefits to exercise those powers in a particular way. Governmental power is not the same as government acts.

Of course, the Superseding Indictment need not allege that Madigan *himself* committed or agreed to commit the predicate acts of racketeering, *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) (citing *Salinas v. United States*, 522 U.S. 52, 63, 65–66 (1997)); nor need it allege that any such acts were ultimately committed by anyone, *id.* (citing *Salinas*, 522 U.S. at 63). However, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65. To avoid a "vagueness shoal,"

the *McDonnell* Court required the government to prove a narrowly defined, "specific and focused" official act to sustain a charge of bribery. 579 U.S. at 574, 576. The government has failed to allege such an act here.

**Arbitrary Enforcement.** As applied here, the Illinois bribery statute also fails to protect against arbitrary and discriminatory enforcement. In lieu of alleging a "specific and focused" *act*, the locus of Count One is Madigan's *position*. Count One asserts that the enterprise "us[ed] MADIGAN's powers as Speaker, including his ability to affect the progress of bills in the House of Representatives, as well as his control over the resources of the Office of the Speaker, including its staff" to effectuate certain of the enterprise's activities. Dkt. 37 at 7–8. Count One further alleges that Madigan, himself, "utilized his official positions as a Representative and Speaker" to do the same. *Id.* at 8–9. *Sun–Diamond* portended the danger of such a theory, warning that when "no particular 'official act' need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the government's discretion" prevents benign conduct from being prosecuted. 526 U.S. at 408.

The threat of arbitrary and discriminatory enforcement of the Illinois bribery statute is not merely hypothetical. Publicly available information shows that other Illinois politicians have recommended political allies and associates for private-sector jobs—at utility companies, no less—yet no one has suggested that their conduct violated the Illinois bribery statute. For example, Illinois House Minority Leader Jim Durkin recommended former Illinois State Representative Thomas Walsh for

employment with ComEd in November 2015, as the FEJA negotiations were ongoing. McClain told ComEd, "I really believe it is a wise move to respond favorably to Leader Durkin's request."[5] In January 2016, McClain emailed ComEd again, asking: "Did we hire Tom Walsh?"[6] ComEd engaged Walsh as a subcontracting lobbyist in February 2016.[7] In December 2016, Leader Durkin voted in favor of FEJA.[8] Similarly, McClain emailed Exelon in July 2016:

> I am just following up on my recommendation to you to hire Aaron Winters as a consultant for our efforts. . . .
>
> I think we are approaching a critical time with the Governor's Office. I think we can use his abilities inside the Office, not to lobby, but to help us understand the new personalities and their thought processes.
>
> I hope you will take another look at him and consider hiring him as soon as possible.[9]

In August 2016, Exelon engaged Winters's lobbying firm.[10] Governor Bruce

---

[5] Email from M. McClain to F. Marquez on November 6, 2015, regarding "Walsh's Resume." Publicly available at: https://ilga.gov/house/committees/101Documents/BSPE/2015.11.09%20COMED-SIC-0000105.pdf.

[6] Email from M. McClain to F. Marquez on January 19, 2016, regarding "Did we hire Tom Walsh? Under [REDACTED]? Best, Mike." Publicly available at: https://ilga.gov/house/committees/101Documents/BSPE/2016.01.19%20COMED-SIC-0000109.pdf.

[7] *See* Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by Thomas J. Walsh (Entity ID 3397) in 2016. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/.

[8] House Roll Call for Senate Bill 2814, 99th General Assembly for the State of Illinois (Dec. 1, 2016). Publicly available at: https://www.ilga.gov/legislation/votehistory/99/house/09900SB2814_12012016_007000T.pdf.

[9] Email from M. McClain to Exelon employee on July 16, 2016, regarding "Aaron Winters R[e]sume." Publicly available at: https://www.ilga.gov/house/committees/101Documents/BSPE/2016.07.16%20COMED-SIC-0000154.pdf.

[10] Winters joined Advantage Government Strategies on or about June 23, 2016; Exelon engaged Advantage Government Strategies on or about August 2, 2016. *See* Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by Advantage Government Strategies, LLC (Entity ID 7846) in 2016. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/. On January 9, 2017, Winters registered his own lobbying firm, The Winters Group, with the Illinois Secretary of State, identifying himself as a subcontracting lobbyist (under Advantage Government Strategies) for Exelon. *See* Illinois Lobbying Entity Registration filed with the Illinois Secretary of State by The

Rauner signed FEJA into law in December 2016. As of the date of this motion, no federal or state law enforcement agency has publicly announced bribery-related charges against these public officials for recommending their former colleagues to ComEd and Exelon before taking action on FEJA. To be clear, these examples are not meant to suggest that Leader Durkin or Governor Rauner violated the Illinois bribery statute, but rather to demonstrate a real concern of arbitrary and discriminatory enforcement arising from this law.

### b.  Illinois Official Misconduct Statute

Similarly, even if § 5/33-3(a)(4) of the Illinois official misconduct statute is not facially void for vagueness, it is unduly vague as applied. Section 5/33-3(a)(4), as applied in Count One, does not define official misconduct with sufficient definiteness to have "made it reasonably clear at the relevant time that [Madigan's] conduct was criminal," *Coscia*, 866 F.3d at 792 (quoting *Lanier*, 520 U.S. at 267); nor does Madigan's conduct "fall[] so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement," *id.* at 794 (quoting *Farrell*, 449 F.3d at 494). For the same reasons the vast "any act" requirement renders the Illinois bribery statute unduly vague as applied to Madigan, it also renders vague the official misconduct statute's proscription on gratuities, § 5/33-3(a)(4).

### 4.  The Illinois Bribery and Official Misconduct Statutes Cannot Be Sufficiently Narrowed by Judicial Construction.

---

Winters Group, LLC (Entity ID 7920) in 2017. Publicly available at: https://apps.ilsos.gov/lobbyistsearch/.

No doubt, facially invalidating a statute is "strong medicine" that courts have employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). But federal courts "lack jurisdiction authoritatively to construe state legislation," *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369 (1971), and Illinois courts have offered no basis for a narrowing construction. Accordingly, this Court should treat the Illinois bribery statute, 720 ILCS § 5/33-1, and the gratuity provision of the official misconduct statute, 720 ILCS § 5/33-3(a)(4), as a nullity. *See Davis*, 139 S. Ct. at 2323 ("When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.").

II.  **ComEd**

A.  **The Federal Program Bribery Charges Related to ComEd (Counts Two, Three, Four, and Six) Must Be Dismissed.**

For more than three decades, the Supreme Court has curtailed an array of overbroad and vague bribery statutes. It has done so to ensure the statutes reach only corrupt conduct and not the ordinary interactions between public officials and their constituents. *See, e.g.*, *Snyder*, 144 S. Ct. at 1953; *McDonnell*, 579 U.S. at 567, 574; *Skilling*, 561 U.S. at 408–09; *Sun–Diamond*, 526 U.S. at 414; *McCormick v. United States*, 500 U.S. 257, 274 (1991). Most recently, *Snyder* narrowed the scope of conduct covered by § 666, which "prohibits state and local officials from accepting *bribes* that are promised or given before the official act." *Snyder*, 144 S. Ct. at 1953 (emphasis in original). The Court held that section 666 does not criminalize gratuities — "token[s] of appreciation after the official act." *Id.*

The Supreme Court recognized the concern that a bribe can corrupt an official act taken by a public official, but also noted its concern about the statute's potential application to "acceptable commercial and business practices," particularly for local officials who are part-time and are allowed to hold outside employment. *Snyder*, 144 S. Ct. at 1953. The Court provided six different reasons why the statue should apply only to bribes, which it defined as "payments made or agreed to *before* an official act in order to influence the official with respect to that future act." *Id.* at 1951 (emphasis in original). Starting with the text, the Court recognized that "Congress modeled the text of § 666(a)(1)(B) for state and local officials on § 201(b), the bribery provision for federal officials" and noted that the two provisions share the same "defining characteristics." *Id.* at 1954. The Court also reviewed the history of the statute, its structure, the potential punishments, principles of federalism, and the concepts of overbreadth and fair notice. *Id.* As to the latter points, the Court explained that each state is allowed to develop its own rules and regulations around gratuities and the Court should hesitate before concluding that Congress prohibited conduct that state and local officials otherwise allowed. *Id.* at 1957. Further, the Court rejected what it called "the familiar plea that federal prosecutors can be trusted not to enforce the statute against small-time violators,"[11] and repeated its cautionary refrain that federal prosecutors should not impose their own standards of good government on local and state officials. *Id.* at 1958 (citing *McDonnell*, 579 U.S. at 577).

---

[11] *Snyder,* 144 S. Ct. at 1958 (citing *United States v. McDonnell*, 579 U.S. 550, 575 (2016); *Percoco v. United States*, 143 S.Ct. 1130, 1140 (2023); *Ciminelli v. United States*, 143 S.Ct. 1121, 1126 (2023); *Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020); *Skilling v. United States*, 561 U.S. 358 (2010)).

The impact of *Snyder* on this case cannot be questioned. The current prosecution team has argued for years now both in this case as well as the related "ComEd Four" case that section 666 covered gratuities and did not require a *quid pro quo*. The government undoubtedly charged this case and tried the related ComEd case based on its mistaken views. *See, e.g., United States v. McClain* (20 CR 812), Dkt. 249, No. 31; Dkt. 274 Trial Tr. 274: 6-9 (Government opening statement, arguing that defendants sought "to reward past beneficial conduct to ComEd"); Dkt. 274, Trial Tr. 290: 6-8 (Government arguing that defendants gave benefits "as a thank you to reward [Madigan] for prior beneficial action towards ComEd"); Dkt. 325, at 27 n. 6, 90; *see also* Dkt. 312, Trial Tr. 5002: 17 – 5003: 12 (Mr. Bhachu: "As to the point that was made that we are not pursuing a gratuity theory, that's not correct. There is actually substantial evidence that benefits were for the purpose of rewarding Mr. Madigan . . . So in no way, shape, or form is the government's plan or argument going to be limited to this being a strict straight-up bribery case.") Judge Leinenweber even recognized as much, finding in post-trial motions that the jury could reasonably have concluded that *all* of the payments at issue were made to reward Madigan for the passage of EIMA, legislation that originally passed before the alleged conspiracy began. (*Id.*, Dkt. 257, at 14-15).

The government was not only mistaken about gratuities, but also whether a violation of § 666 requires a *quid pro quo*. After the government charged this case, the Seventh Circuit decided *United States v. Snyder,* 71 F. 4th 555 (7th Cir. 2023). The Seventh Circuit could not have been clearer, "A bribe requires a *quid pro quo* – an

agreement to exchange this for that, to exchange money or something else of value for influence in the future." *Id.*, at 579. The prosecution team nonetheless persisted in arguing otherwise. Only when the Solicitor General weighed in and acknowledged that the Seventh Circuit "correctly determined that Section 666 prohibits [] *quid pro quo* bribery" did the prosecution team in this case start to crack. At the January 3, 2024 hearing in this case, the lead prosecutor stated, "In loose terms **a bribe does require a quid pro quo** or at least an intention to reach a quid pro quo, and I think that's where the devil is in the details because these statutes, when you corruptly solicit a payment in return for official action, your – your purpose is to enter a *quid pro quo*. An actual *quid pro quo* is not required." 22-CR-115, Jan. 4, 2014 Hearing Tr. at 21-22 (emphasis supplied). Madigan is not going to speculate as to what line the current prosecution team is trying to draw. But considering the Solicitor General's position on behalf of the Department of Justice, the Seventh Circuit's definition in *Snyder*, and now the Supreme Court's *Snyder* decision making clear that § 201(b) and § 666 are parallels, there can be no question that the government is required to plead and prove a *quid pro quo* to demonstrate a violation of § 666. The Supreme Court made crystal clear that § 666 was modeled on the federal bribery statute, § 201, and shared the same "defining characteristics." *Snyder*, 144 S. Ct. at 1954; *see also Sun-Diamond,* 526 U.S. at 404-05 (holding that bribery requires a "*quid pro quo* – a specific intent to give or receive something of value *in exchange* for an official act.")

1.      **Charges Based on a Bribery Theory Must Be Dismissed.**

"[A] good will gift to an official to foster a favorable business climate, given simply with the 'generalized hope or expectation of ultimate benefit on the part of the

donor,' does not constitute a bribe." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (quoting *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980)); *cf. Sun–Diamond*, 526 U.S. at 405–06 (18 U.S.C. § 201(c) does not criminalize acts taken "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future"). Simply put, "ingratiation and access . . . are not corruption." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010). To avoid sweeping this innocent conduct into the ambit of federal anti-bribery statutes, the Supreme Court has required the government to identify a *quid pro quo*—that is, "a specific intent to give or receive something of value *in exchange* for an official act." *Sun–Diamond*, 526 U.S. at 404–05 (discussing 18 U.S.C. § 201(b)).

Fatally, here, the Superseding Indictment does not allege that Madigan solicited, demanded, or accepted a *quid pro quo* connecting any official act to ComEd's hiring decisions. Counts Three, Four, and Six charge Madigan with violating § 666(a)(1)(B) by soliciting, demanding, and agreeing to accept things of value from ComEd intending to be influenced "in connection with . . . legislation affecting ComEd and its business." Dkt. 37 at 64–65, 67. Premised largely on the same conduct, Count Two charges Madigan with conspiring to, among other things, offer and accept bribes under § 666(a)(1)(B), (a)(2), in violation of § 371. *Id.* at 23–24. Although each of these counts tracks the language of § 666, the language of the statute alone is insufficient to state all essential elements of a violation of the federal program bribery statute. *See Resendiz–Ponce*, 549 U.S. at 109–10. As noted, bribery charges under § 666 must

allege a *quid pro quo*—that is, a specific intent to give or receive something of value *in exchange for* an official act. *Snyder*, 144 S. Ct. at 1951 ("bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act"). The Superseding Indictment fails to allege this essential *quid pro quo* element.

The government alleges that ComEd hired certain individuals or entities at Madigan's recommendation and contends that, because legislation affecting ComEd passed the Illinois General Assembly during the same decade, crime was afoot. That is not enough. Yes, the government identifies votes that Madigan previously had cast with respect to prior energy legislation, but it failed to assert that Madigan took any of those votes in exchange for its hiring decisions. Dkt. 37 at 31, 57. It is not enough to allege that Madigan took actions that *happened* to benefit ComEd—indeed, myriad interest groups across Illinois supported the same legislation as ComEd. Nor would it be enough for the government to allege that Madigan took actions *intending* to benefit ComEd. The government must allege that Madigan solicited jobs from ComEd intending to take official acts to benefit ComEd *in exchange for* ComEd's hiring decisions. It has not done so.

"Vague expectations of some future benefit" are not sufficient. *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993). For example, in *Jennings*, the Fourth Circuit reviewed the district court's jury instructions, which "repeatedly charged that it was sufficient if [the bribor] paid [the bribee] to influence [the bribee] 'in connection with'

47

or 'in reference to' HABC business." *Id.* at 1022.[12] The *Jennings* court found the jury instructions were erroneous, reasoning that the district court's "allusions to HABC business were too general because they did not describe any official acts that [the bribor] intended to induce with his payments to [the bribee]." *Id.* The *Jennings* court explained that the jury instructions "could have described a situation in which [the bribor] paid [the bribee] with a '[v]ague expectation[] of some future benefit,'" *id.* (quoting *Allen*, 10 F.3d at 411); as a result, the jury instructions "did not necessarily require the jury to find that [the bribor] had the intent to engage in a quid pro quo," *id.* The Superseding Indictment is just as vague. The government's allusions to "legislation affecting ComEd and its business," Dkt. 37 at 24, 64–65, 67, fail to allege a "specific *type* of official action" that has enough definiteness to support a *quid pro quo*, *Jennings*, 160 F.3d at 1014. And without any factual allegations illustrating a *quid pro quo*, the Superseding Indictment violates Madigan's Fifth Amendment rights to indictment by a grand jury and protection against double jeopardy, as well as his Sixth Amendment right to be informed of the nature and cause of the accusations against him. *See Resendiz–Ponce*, 549 U.S. at 108.[13] Therefore, this Court

---

[12] In *Jennings*, the defendant, a housing repair contractor, was convicted of violating § 666(a)(2) for making payments to a Baltimore Housing Authority employee who awarded contracts for the renovation of vacant housing units owned by the Authority. *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998).

[13] To establish a conspiracy to commit an offense against the United States in violation of § 371, "each conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense." *United States v. Kelerchian*, 937 F.3d 895, 915 (7th Cir. 2019) (quoting *Ocasio v. United States*, 578 U.S. 282, 292 (2016)). "[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all the elements of [the underlying substantive] criminal offense.'" *Id.* (quoting *Ocasio*, 578 U.S. at 287). As discussed, an essential element of a bribery charge under § 666 is a *quid pro quo*. Thus, for a charge of conspiracy to commit bribery, the Superseding Indictment must allege that Madigan specifically intended that some conspirator would give or receive something of value in exchange for a specific action (or course of action) in connection with the business of the Illinois General Assembly.

should dismiss Counts Three, Four, and Six in full and Count Two (the conspiracy count) to the extent it is based on a violation of § 666.

## 2. Charges Based on a Gratuity Theory Must Also Be Dismissed.

*Snyder* made clear that anything of value provided after the official act is not violative of section 666. *Snyder*, 144 S. Ct. at 1954. The last official act identified in the Superseding Indictment related to ComEd was Madigan's vote on December 1, 2016 for the Future Energy Jobs Act (FEJA). (Dkt 37, Count II, ¶ 31(u)). Nonetheless, the indictment identifies no less than four different hiring decisions by ComEd that *arose* and took place *after* December 1, 2016. First, the indictment alleges that ComEd hired and compensated Individual FR-1 starting in March 2017. (*Id.,* Count II, ¶¶ 1(x), 31(y), (ddd); Count III, Count IV, Count VI.) Second, the indictment alleges that Madigan recommended Individual BM-1 to fill a vacant board seat starting in or around November 2017. (*Id.*, Count II, 31(aa)). Third, the indictment alleges that Madigan recommended Individual 23W-1 in or around April 2018. (*Id.*, Count II, ¶ 31(ll)). Fourth, the indictment alleges that ComEd hired interns related to the 13th Ward in 2017 and 2018. (*Id.*, Count II, ¶¶ 31(z), (ff)-(hh), (eee)). The government does not allege that Madigan agreed to take official action in exchange for any of these hiring decisions. Nor could it.

The government clearly brought these charges based on its belief that section 666 covered gratuities. That belief was mistaken – the allegations of benefits being solicited and provided *after* the official act do not state an offense. *Snyder*, 144 S. Ct. at 1959 ("a state or local official does not violate § 666 if the official has taken the

official act before any reward is agreed to, much less given.") Therefore, this Court should dismiss Counts Three, Four, and Six in full and Count Two (the conspiracy count) to the extent it is based on a violation of § 666.

The government's past references to an alleged McClain conversation about HB 5626 (introduced in 2018) do not save these gratuity counts from dismissal. Count II, paragraph 31(n)(n) alleges that "[i]n or around April 2018, Madigan gave McClain permission to work to kill HB 5626 on behalf of ComEd, and ComEd thereafter worked to defeat HB 5626." The source of this allegation is one phone call between McClain and another ComEd representative, where McClain reports a conversation with Madigan. According to McClain, Madigan asked "Mike are you aware of this [the proposed bill]?" McClain goes on to explain that he interpreted Madigan's question as some sort of permission to lobby against the proposed bill on behalf of ComEd. There is no official act contemplated whatsoever, let alone any discussion of an exchange for benefits. And, as the government well knows, the sponsor of the bill was not aware of any efforts by Madigan to "kill" the bill and, in fact, believed that the Speaker had in fact called a version of the bill for a vote. To the contrary, the sponsor was well aware of Republican opposition and described to the government a number of procedural tactics by Republicans to block the bill. Madigan neither contemplated nor took any official action in relation to HB 5626. These counts were gratuities, and any suggestion to the contrary is hogwash. Their dismissal in light of *Snyder* is required.

### 3. Without a *Quid Pro Quo* Requirement for Bribes or a Link for Gratuities, § 666 Is Unconstitutional.

If the prosecution team somehow wishes to persist in its disagreement with the Solicitor General (and, more importantly, the Supreme Court) and this court was inclined to find that § 666 does not require a *quid pro quo*, then it should hold § 666 unconstitutional. This essential element requires the government to allege a *connection* between a thing of value conferred upon a public official and a *specific action* intended to be influenced or rewarded. Without this foundational element, § 666 is overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment, both facially and as applied. Therefore, Counts Two (in part), Three, Four, and Six must be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), and stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).[14]

### 4. Counts Two, Three, Four, and Six Must Be Dismissed Because the Indictment Fails to Allege the Appropriate *Mens Rea*.

Counts Two, Three, Four, and Six of the superseding indictment fail to allege the appropriate *mens rea* under the statute. In *Ruan v. United States*, the Supreme Court held that when a statute includes a *mens rea*, it modifies not only the words following it, but also the words of the statue that distinguish wrongful from innocent acts. 597 U.S. 450, 458 (2022). *Ruan* analyzed the appropriate scienter for "[e]xcept as authorized" in 21 U.S.C. § 841. The Court examined this provision and other

---

[14] Madigan includes this argument out of an abundance of caution, as it understands that the government may take the position that *Snyder* has no impact on this case. If the government argues that section 666 does not require a *quid pro quo*, Madigan would incorporate as though fully stated herein relevant sections from his originally filed motion to dismiss pre-*Snyder*. Dkt. 55, pp. 34-54.

provisions in different criminal statutes, which all had some conduct that they did not criminalize. The Court decided that these exceptions were "critical" for the mental state required for the crime. Id. at 461. The Court emphasized that a "strong scienter requirement helps to diminish the risk of 'overdeterrence,' i.e., punishing acceptable and beneficial conduct that lies close to but on the permissible side, of the criminal line." *Id.* at 459. Accordingly, the Court rejected the government's argument that the "except as authorized" clause did not constitute an element, holding that the government needed to demonstrate defendants "knowingly or intentionally acted in an unauthorized manner." *Id.* at 468. The government received some relief because section 855 of the Controlled Substances Act specifically provides that an indictment (or other charging document) need not negate every exemption or exception. *Id.* at 462. But section 855 of the Controlled Substances Act of course does not apply here. Instead, the general rule requiring an indictment to set forth all elements of the charged crime directly applies. *Resendiz-Ponce,* 549 U.S. at 108.

Section 666 has a comparable exception as it "does not apply to bona fide salary, wages, fees, or other compensation paid ... in the usual course of business." 18 U.S.C. § 666(c). The Seventh Circuit has opined that the "[t]he natural reading of the exception is that … compensation paid in the ordinary course shall not be construed as a bribe." *United States v. Robinson*, 663 F.3d 265, 272 (7th Cir. 2011); see also *United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015) ("Compensation for a job by someone other than a ghost worker is a 'bona fide salary.'"). Thus, to demonstrate that Madigan violated § 666, the government was required to allege not

only that Madigan corruptly solicited something of value, but – as it relates to jobs – that he corruptly solicited non-*bona fide* salary, wages, and fees for the individuals identified in Counts Two (Individual 13W-1, Individual 13W-2, and Individual 23W-1, Individual BM-1, Law Firm A, Thirteenth Ward Interns), Three (Individual BM-1), Four (Individual 23W-1), and Six (Individual 13W-1, Individual 13W-2, and Individual 23W-1). The indictment fails to allege that Madigan did so.

**Subcontractors.** Counts Two, Four and Six allege that Madigan sought employment for Individual 13W-1, Individual 13W-2, and Individual 23W-1 "intending . . . to be influenced and rewarded in connection with . . . legislation affecting ComEd and its business." Dkt. 37 at 29-30. Madigan recognizes that the government has alleged that certain of these subcontractors performed little to no work. This is insufficient as the government is required to allege that *Madigan* corruptly solicited non-*bona fide* salary, wages, fees, or other compensation jobs for these individuals. The government does not. Nor could it, as Madigan did not do so. Therefore, Counts Two (in part), Four and Six must be dismissed. *See Risk*, 843 F.2d at 1061.

**Individual BM-1.** Counts Two and Three allege that Madigan sought Individual BM-1's appointment to ComEd's board of directors. Dkt. 37 at 29-30, 64. But there is no question that Individual BM-1 filled a vacant, pre-existing seat on ComEd's board of directors and performed the job to which he was appointed. *See* Dkt. 37 at 63 ("On or about April 26, 2019, ComEd filed notice with the U.S. Securities and Exchange Commission stating that Individual BM-1 had served as a director of

ComEd since April 2019."); Deferred Prosecution Agreement ("DPA") at A-10, *United States v. ComEd*, Case No. 20-CR-368 (N.D. Ill. July 17, 2020), ECF No. 3 ("Board Member 1" filled a "vacant board seat" after "ComEd and Exelon conducted due diligence on Board Member 1 and ultimately determined he was qualified for a [b]oard position."). Therefore, Counts Two and Three do not allege the proper *mens rea* and must be dismissed. *See United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (Where an indictment fails to charge a valid statutory violation, a district court may dismiss the indictment "not because the government [can] not prove its case, but because there [is] no case to prove.").

**Law Firm A.** Count Two alleges that "the conspirators caused ComEd to retain Law Firm A, for the purpose of influencing and rewarding MADIGAN in connection with MADIGAN's official duties." Dkt. 37 at 27. As with Individual BM-1, the undisputed facts establish that Law Firm A performed substantive work for ComEd. Count Two asserts that in 2011, "Law Firm A was retained by ComEd pursuant to a contract that provided Law Firm A would be provided with approximately 850 hours of work a year." *Id.* ComEd entered into a new contract with Law Firm A in 2016. *Id.* at 28. The DPA provides additional color about the renewal discussions:

> [P]ersonnel within ComEd sought to reduce the hours of legal work they provided to Law Firm A from the 850 hours specified in the 2011 retention agreement ***because ComEd paid only for hours worked*** and there was not enough appropriate legal work to give Law Firm A to fill 850 annual hours.

DPA at A-11, *ComEd*, Case No. 20-CR-368 (emphasis added). Ultimately, "ComEd agreed in or around June 2016 to renew Law Firm A's contract **with substantially reduced annual hours**." *Id.* (emphasis added). These facts show, indisputably, that ComEd not only expected Law Firm A to perform substantive legal work, but it "substantially reduced [Law Firm A's] annual hours" when it became concerned that "there was not enough appropriate legal work to give Law Firm A." *Id.* Because ComEd's retention of Law Firm A was bona fide and in the ordinary course of business, it cannot be construed as a bribe. *See Robinson*, 663 F.3d at 272; *cf. United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998). Count Two does not allege the proper *mens rea* and must be dismissed to the extent it is predicated on ComEd's retention of Law Firm A. *See Risk*, 843 F.2d at 1061.

**Thirteenth Ward Interns.** Count Two alleges that "[i]t was further part of the conspiracy that, for the purpose of influencing and rewarding MADIGAN, the conspirators caused positions in the ComEd Internship Program to be set aside for individuals associated with the Thirteenth Ward who were identified to ComEd by McClain." Dkt. 37 at 28. To be clear, this was "a summer internship program . . . that provided paid internship positions to students." *Id.* at 15. Here, again, there is no contention that the internship positions in question were "unnecessary." *Mills*, 140 F.3d at 633. In fact, Count Two quotes numerous emails stating that ComEd "put aside," "save[d]," or "allotted" a handful of internship "slots" for kids from the Thirteenth Ward—language evincing that ComEd would have assigned the

internships to someone else if not a student from the Thirteenth Ward. Dkt. 37 at 48–49, 54, 60.

Moreover, the Superseding Indictment makes no contention that students hailing from the Thirteenth Ward did not "responsibly fulfill the[ir] duties." *Mills*, 140 F.3d at 633. Rather, it asserts that "[b]ased on their performance during the internship, participating students could be considered for subsequent summer internship positions or full-time jobs within ComEd." Dkt. 37 at 15. This says it all—ComEd expected its interns to put in the work and, if the students proved their merit, they might be invited back. The Thirteenth Ward Interns received bona fide compensation "paid in the ordinary course" of the ComEd Internship Program; accordingly, their hiring "shall not be construed as a bribe." *Robinson*, 663 F.3d at 272. Count Two does not allege the proper *mens rea* and must be dismissed to the extent it is predicated on ComEd's hiring of Thirteenth Ward Interns. *See Risk*, 843 F.2d at 1061.

### B. The Travel Act Charges Related to ComEd (Counts Five and Seven) Must Be Dismissed.

Counts Five and Seven assert Travel Act violations predicated on conduct that is purportedly unlawful under the Illinois bribery and legislative misconduct statutes. Dkt. 37 at 66, 68. As discussed, the Illinois bribery statute is facially overbroad and vague in violation of the First, Fifth, and Fourteenth Amendments. *See* Argument, § I.C.1–2, *supra*. Therefore, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Counts Five and Seven must be dismissed insofar as they are predicated on the Illinois bribery statute. And references to the Illinois bribery

statute should be stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

## III. Company A

### A. The Federal Program Bribery Charge Related to Company A (Count Eleven) Must Be Dismissed.

As discussed, if the prosecution team somehow wishes to persist in its disagreement with the Solicitor General (and, more importantly, the Supreme Court) and this court was inclined to find that § 666 does not require a *quid pro quo*, then it should hold § 666 unconstitutional. This essential element requires the government to allege a *connection* between a thing of value conferred upon a public official and a *specific action* intended to be influenced or rewarded. Without this foundational element, § 666 is overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment, both facially and as applied. Therefore, Count Eleven must be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), and stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).[15]

### B. The Travel Act Charges Related to Company A (Counts Twelve, Thirteen, and Fourteen) Must Be Dismissed.

Counts Twelve through Fourteen assert Travel Act violations predicated on conduct that is purportedly unlawful under the Illinois bribery and legislative misconduct statutes. Dkt. 37 at 79–81. As discussed, the Illinois bribery statute is

---

[15] Madigan includes this argument out of an abundance of caution, as it understands that the government may take the position that *Snyder* has no impact on this case. If the government argues that section 666 does not require a *quid pro quo*, Madigan would incorporate as though fully stated herein relevant sections from his originally filed motion to dismiss pre-*Snyder*. Dkt. 55, pp. 34-54.

facially overbroad and vague in violation of the First, Fifth, and Fourteenth Amendments.[16] *See* Argument, § I.C.1–2, *supra*. Therefore, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Counts Twelve, Thirteen, and Fourteen must be dismissed insofar as they are predicated on the Illinois bribery statute. And references to the Illinois bribery statute should be stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

## IV. Chinatown Parking Lot

### A. The Federal Program Bribery Charge Related to the Chinatown Parking Lot Must Be Dismissed.

As discussed, if the prosecution team somehow wishes to persist in its disagreement with the Solicitor General (and, more importantly, the Supreme Court) and this court was inclined to find that § 666 does not require a *quid pro quo*, then it should hold § 666 unconstitutional. This essential element requires the government to allege a *connection* between a thing of value conferred upon a public official and a *specific action* intended to be influenced or rewarded. Without this foundational element, § 666 is overbroad in violation of the First Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment, both facially and as applied. Therefore, Count Twenty-Two must be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), and stricken from the Superseding

---

[16] Counts Twelve through Fourteen cite subsections (a), (d), and (e) of the Illinois bribery statute, 720 ILCS § 5/33-1(a), (d), (e), as predicate unlawful activity for the Travel Act charges. Superseding Indictment, at 79–81. Section I.C of the Argument, *supra*, addresses subsections (d) and (e) of the Illinois bribery statute because those subsections form the predicate activity alleged in Count One. Superseding Indictment, at 5, 11–12. Section 5/33-1(a) employs the same boundless "any act" language that renders subsections (d) and (e) unconstitutional.

Indictment pursuant to Federal Rule of Criminal Procedure 7(d).[17]

## B. The Travel Act Charge Related to the Chinatown Parking Lot (Count Twenty-Two) Must Be Dismissed.

Count Twenty-Two asserts a Travel Act violation predicated on conduct that is purportedly unlawful under the Illinois bribery and legislative misconduct statutes. Dkt. 37 at 102. As discussed, the Illinois bribery statute is facially overbroad and vague in violation of the First, Fifth, and Fourteenth Amendments.[18] *See* Argument, § I.C.1–2, *supra*. Therefore, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Count Twenty-Two must be dismissed insofar as it is predicated on the Illinois bribery statute. And references to the Illinois bribery statute should be stricken from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d).

## V. The Conspiracy Charge Related to AT&T (Count Twenty-Three) Must Be Dismissed Because it Fails to Allege that Madigan was Aware of and Agreed to Commit a Corrupt Exchange in violation of § 666.

Count Twenty-Three asserts that Madigan took part in a conspiracy to violate § 666(a)(1)(B), (a)(2). Dkt. 37 at 104–05. The conspiracy, it alleges, was to arrange for a former member of the Illinois House of Representatives, Individual FR-1, to be hired by AT&T for the purpose of "influencing and rewarding" Madigan "in connection with his official duties as Speaker" and "to assist AT&T Illinois with respect to the passage

---

[17] Madigan includes this argument out of an abundance of caution, as it understands that the government may take the position that *Snyder* has no impact on this case. If the government argues that section 666 does not require a *quid pro quo*, Madigan would incorporate as though fully stated herein relevant sections from his originally filed motion to dismiss pre-*Snyder*. Dkt. 55, pp. 34-54.

[18] Like Counts Twelve through Fourteen, Count Twenty-Two cites subsections (a), (d), and (e) of the Illinois bribery statute, 720 ILCS § 5/33-1(a), (d), (e), as predicate unlawful activity for the Travel Act charges. Dkt. 37 at 102. *See* note 18, *supra*, regarding § 5/33-1(a).

of COLR legislation." *Id.* at 105–06. Count Twenty-Three must be dismissed because it fails to allege Madigan agreed to take an official act in exchange for AT&T's engagement of Individual FR-1; therefore, it necessarily fails to allege that Madigan was aware of or agreed to commit a corrupt exchange in violation of § 666.

"[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all the elements of [the underlying substantive] criminal offense.'" *United States v. Kelerchian*, 937 F.3d 895, 915 (7th Cir. 2019) (quoting *Ocasio v. United States*, 578 U.S. 282, 287 (2016)). "[E]ach conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense." *Id.* (quoting *Ocasio*, 578 U.S. at 292). As discussed, a *quid pro quo* is an essential element of a § 666 charge. Thus, to charge Madigan with conspiring to violate § 666, the government must allege that he ***knew*** of the object of the conspiracy—*i.e.*, that AT&T hired Individual FR-1 *in exchange for* his support for COLR legislation—and ***agreed*** to accomplish its unlawful objective. *Id.* at 914. Count Twenty-Three must be dismissed because it fails to allege that Madigan knew of and agreed to effectuate such a transaction with AT&T.

**Agreement.** Count Twenty-Three alleges that Madigan and McClain "sought to obtain monetary payments for Individual FR-1 from AT&T"—a topic that McClain purportedly broached in February 2017 when he contacted AT&T about a "small contract" for Individual FR-1. Superseding Indictment, at 106, 108. Count Twenty-Three further asserts that two days after McClain raised the topic of Individual FR-1's contract, "McCLAIN advised AT&T . . . that MADIGAN had assigned McCLAIN

to work on the COLR legislation . . . as a 'Special Project' for MADIGAN." Superseding Indictment, at 106. As it relates to Madigan, Count Twenty-Three next identifies three votes that Madigan cast in favor of COLR legislation on May 31, June 29, and July 1, 2017. Superseding Indictment, at 111. In short, the government identifies a "thing of value" on the one hand (Individual FR-1's engagement) and an act on the other (Madigan's support of COLR legislation), and calls it a day. But that is not enough. The government must also allege that the benefit was *in exchange for* the official act; it has failed to do so. As a result, the government has necessarily failed to allege that Madigan intended or agreed that his support for COLR (or any subsequent) legislation would be "in exchange for" AT&T's engagement of Individual FR-1.

**Knowledge.** Count Twenty-Three cites various emails *among* AT&T employees discussing whether AT&T will "get credit from the powers that be" if Individual FR-1 is engaged indirectly as a consultant through an intermediary, instead of directly as a lobbyist. Superseding Indictment, at 109–10. But this language does not prove a crime. *Cf. United States v. Ring*, 706 F.3d 460, 463 (D.C. Cir. 2013) ("In order to more effectively communicate their clients' policy goals, lobbyists often seek to cultivate personal relationships with public officials."). There is no suggestion that AT&T hired Individual FR-1 in exchange for a specific official act. More importantly, even if these *internal* emails sufficiently alleged (though they do not) that AT&T intended its hiring of Individual FR-1 to bribe Madigan, Count

Twenty-Three does not allege that Madigan knew of these emails or, more generally, believed that AT&T harbored such an intent.

Because Count Twenty-Three fails to allege that Madigan knew of the object of the purported conspiracy and agreed to accomplish its unlawful objective, the Superseding Indictment violates Madigan's Fifth Amendment rights to indictment by a grand jury and protection against double jeopardy, as well as his Sixth Amendment right to be informed of the nature and cause of the accusations against him. *See Resendiz–Ponce*, 549 U.S. at 108.

## Conclusion

For the reasons given above, Madigan respectfully requests that Counts One through Seven, Eleven through Fourteen, and Twenty-One through Twenty-Three be dismissed.

Date: July 15, 2024

Respectfully submitted,

/s/ *Daniel J. Collins*                          /s/ *Thomas M. Breen*
Daniel J. Collins                                Thomas M. Breen
Lari A. Dierks                                   Todd S. Pugh
Katten Muchin Rosenman LLP                       BREEN & PUGH
525 West Monroe Street                           53 W. Jackson Blvd., Suite 1550
Chicago, Illinois 60661                          Chicago, Illinois 60604
(312) 902-5434                                   (312) 360-1001
Daniel.Collins@Katten.com                        tbreen@breenpughlaw.com
Lari.Dierks@Katten.com                           tpugh@breenpughlaw.com

***Attorneys for Michael J. Madigan***