UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL J. MADIGAN

No.  22 CR 115-1

Hon. John R. Blakey

**GOVERNMENT'S SENTENCING MEMORANDUM**

## TABLE OF CONTENTS

I. Factual Background and Offense Conduct ....................................................... 2

    A. Bribery Scheme: Madigan Received a Stream of Benefits from ComEd in Exchange for His Official Action on Legislation...................... 4

    B. Wire/Honest Services Fraud Scheme: Madigan Agreed to Recommend Solis for a State Board Position in Exchange for Solis Directing Business to Madigan's Law Firm and His Son. ...................... 8

II. Guidelines Calculation and Objections to the PSR ................................... 13

    A. Offense Level Calculations – "ComEd Group" ........................................ 13

        1. § 666 Offenses .......................................................................................... 13

            a. Guideline § 2C1.1(b)(1) – More Than One Bribe     14

            b. Guideline § 2C1.1(b)(2) – Value of the Benefit     15

            c. Guideline § 3B1.1(c) – Leader / Organizer     18

            d. Guideline § 3C1.1 – Obstruction of Justice     21

            e. Guideline § 4C1.1 – Zero-Point Offender     31

        2. FCPA Objects ........................................................................................... 32

            a. Guideline § 2B1.1(b)(1)(N) - Gain / Loss exceeded $150,000,000     32

            b. Guideline § 2B1.1(b)(10) – Sophisticated Means     35

            c. Guideline § 3B1.1(c) – Leader / Organizer     36

        3. Grouping for ComEd Conduct .................................................................. 37

    B. Offense Level Calculations – "State Board Group"................................. 37

        1. Guideline § 2C1.1(b)(2) – Value of the Benefit ................................. 37

        2. Guideline § 3C1.1 – Obstruction of Justice...................................... 39

    C. Grouping and Total Adjusted Offense Level............................................ 41

    D. Criminal History Category........................................................................ 41

    E. Advisory Guideline Range ......................................................................... 41

    F. The Government's Sentencing Recommendation .................................... 42

III. Sentencing Factors Under 18 U.S.C. § 3553(a)....................................... 42

    A. Nature and Circumstances and Seriousness of the Offense...................... 42

        1. ComEd Conduct....................................................................................... 44

        2. Madigan's Concealment Involving ComEd ...................................... 45

        3. State Board Conduct ............................................................................ 46

        4. Madigan's Concealment Involving Solis ......................................... 48

i

B.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ......................................................... 49

C.     The History and Characteristics of the Defendant ................... 51

      1.    Madigan's Transactional Approach to Politics and Patronage. .................................................................................... 51

      2.    Madigan's Use of Power for Retribution. ............................ 54

      3.    Madigan's Abuse of Legislative Power ................................ 56

      4.    Madigan's Concealment of Wrongdoing .............................. 59

      5.    Madigan's Perjury at Trial ..................................................... 60

      6.    Madigan's Age and His Criminal Acts ................................ 61

D.     The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant ............................................... 62

E.     The Need to Avoid Unwarranted Sentencing Disparities ......... 66

**IV.**    **Supervised Release** ............................................................................ **67**

**V.**    **Fine** ........................................................................................................ **67**

**VI.**    **Conclusion** .......................................................................................... **69**

The UNITED STATES OF AMERICA, by ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully submits this sentencing memorandum concerning defendant Michael J. Madigan.

## PRELIMINARY STATEMENT

Defendant Michael J. Madigan, the longest serving Speaker of the Illinois House of Representatives in history and one of the most powerful politicians in Illinois for decades, was steeped in corruption. The crimes charged and proven at trial demonstrate that Madigan engaged in corrupt activity at the highest level of state government for nearly a decade. Time after time, Madigan exploited his immense power for his own personal benefit by trading his public office for private gain for himself and his associates, all the while carefully and deliberately concealing his conduct from detection.

Madigan stands convicted of ten offenses, including bribery, conspiracy, and fraud. The jury found that, from 2011 to 2019, Madigan used his position as Speaker to solicit and receive a stream of bribes from Commonwealth Edison ("ComEd") in the form of jobs for Madigan's political cronies, many of whom did no work, in exchange for Madigan's official action on ComEd's legislation. In addition, the jury found that, in order to enrich himself with business for his private law firm, Madigan was willing to exploit his political power and that of former Alderman Daniel Solis to obtain a position on a significant State board for Solis. Through his criminal conduct, Madigan put his own self-benefitting interests before his duty as an elected official to the citizens of Illinois.

1

Madigan has expressed no remorse for his crimes, nor has he acknowledged the damage wrought by his conduct. Indeed, Madigan went so far as to commit perjury at trial in an effort to avoid accountability, and he persists in framing his actions as nothing more than helping people.

Given the seriousness of Madigan's crimes, his obstructive conduct in lying on the witness stand, the need to promote respect for the law and provide just punishment, and the need to deter other public officials from committing similar crimes, the government submits that a sentence of 12.5 years' imprisonment and a fine in the amount of $1,500,000 is just and warranted.

## I.    FACTUAL BACKGROUND AND OFFENSE CONDUCT

Through Madigan's all-encompassing leadership roles, Madigan was considered by many to be the most powerful politician in Illinois.

Starting in the early 1970s, Madigan was elected to the Illinois House of Representatives from a district on the southwest side of Chicago largely made up of two wards: the 13th Ward (for which he was Democratic Committeeman and Chairman) and the 23rd Ward. The 13th Ward was Madigan's base of power, where he had an army of loyal political workers to keep him in power and work on his chosen campaigns.

Madigan served as Speaker of the Illinois House from 1983 to 2021, with a two-year gap in the mid-1990s. As Speaker, Madigan controlled the operations of the Illinois House; there was no one in the Illinois House more powerful than him. Madigan controlled the flow of legislation by moving bills forward or killing bills. Madigan made the final decisions about whom to appoint or remove as committee

chairs.[1] In addition, Madigan controlled redistricting in the state and, as a result, could reconfigure legislative districts every ten years to increase the likelihood of a continued Democratic majority in the Illinois House. Madigan also served from 1998 through 2019 as Chairman of the Democratic Party of Illinois and he was a prolific fundraiser. Madigan distributed some of the money raised to Democratic candidates to support their campaigns.

Madigan also was a partner, with a 50% profit share, in the law firm Madigan & Getzendanner, which focused on property tax appeals. The firm was financially successful, and Madigan was its rainmaker, bringing in many of its clients.

The jury heard mountains of evidence of how Madigan received a stream of valuable benefits from ComEd in exchange for Madigan's official action on legislation hugely beneficial to ComEd. At the same time, Madigan exploited his own public office, and Solis's public office, to unlawfully secure business for Madigan & Getzendanner and his son. Based on this conduct, the jury convicted Madigan of ten crimes:

---

[1] *See, e.g.,* Tr. 202 (Madigan "had the most power of the members of the House") (Rep. Carol Sente); Tr. 756 (Madigan was a "very powerful Speaker" and there was no one in the House more powerful than him) (Rep. Lou Lang); Tr. 2368 (Madigan was "immensely powerful" as a public official) (Fidel Marquez).

| Count | Statutes | Offense |
|-------|----------|---------|
| 2 | 18 U.S.C. § 371 | Conspiracy—ComEd Conspiracy from 2011-2019 |
| 4 | 18 U.S.C. § 666(a)(1)(B) 18 U.S.C. § 2 | Bribe Solicitation—ComEd payments to Michael Zalewski in 2018 |
| 5 | 18 U.S.C. § 1952(a)(3) 18 U.S.C. § 2 | Travel Act—ComEd, June 29, 2018 |
| 6 | 18 U.S.C. § 666(a)(1)(B) 18 U.S.C. § 2 | Bribe Solicitation—ComEd Payments to Frank Olivo, Ray Nice, and Michael Zalewski in 2019 |
| 8 | 18 U.S.C. § 1343 18 U.S.C. § 1346 | Wire fraud—State positions for Solis and his relative |
| 9 | 18 U.S.C. § 1343 18 U.S.C. § 1346 | Wire fraud—State positions for Solis and his relative |
| 10 | 18 U.S.C. § 1343 18 U.S.C. § 1346 | Wire fraud—State positions for Solis and his relative |
| 12 | 18 U.S.C. § 1952(a)(3) 18 U.S.C. § 2 | Travel Act— State board, August 15, 2018 |
| 13 | 18 U.S.C. § 1952(a)(3) 18 U.S.C. § 2 | Travel Act— State board, August 31, 2018 |
| 14 | 18 U.S.C. § 1952(a)(3) 18 U.S.C. § 2 | Travel Act— State board, December 1, 2018 |

Madigan's illegal conduct is summarized below and more fully detailed in the government's response to post-trial motions (R. 408) and version of the offense. GVO at 3-19.

### A. Bribery Scheme: Madigan Received a Stream of Benefits from ComEd in Exchange for His Official Action on Legislation.

Madigan engaged in a near decade long conspiracy to solicit and accept bribes from ComEd in the form of jobs and contracts for his political allies and associates. The bribes included ComEd's payment of $1.3 million to low-show or no-show "subcontractors." Madigan knew his coconspirators covered up those improper payments through false records and the circumvention of internal controls. ComEd conferred this stream of benefits upon Madigan in exchange for Madigan's official action on legislation worth hundreds of millions of dollars to ComEd.

The conspiracy began in 2011, when ComEd had major legislation pending in the Illinois House—the Energy Infrastructure Modernization Act ("EIMA" or "Smart Grid"). This legislation sought to implement the formula rate in Illinois, which would place the company in a better financial position and allow the company to modernize the electrical grid.[2] It was while this legislation was pending that the Madigan-approved plan began whereby ComEd paid certain of Madigan's key political workers and allies $4,000 to $5,000 each month indirectly through intermediaries, to conceal the nature and purpose of the payments. Specifically, in August 2011, ComEd increased payments to its consultant, Jay Doherty and his firm, Jay D. Doherty & Associates, under an existing consulting contract, and, in turn, Doherty passed this extra money on to Madigan associate Frank Olivo (former 13th Ward Alderman) as a so-called "subcontractor." The plan was later expanded to include Madigan associates Ray Nice and Edward Moody (both valuable political workers in Madigan's political organization), Edward Acevedo (Madigan's Assistant Majority Leader in the House and leader of the Latino Caucus), and Michael Zalewski (former 23rd Ward Alderman) as so-called "subcontractors." In addition, on the eve of EIMA's final veto-override vote in the House, Madigan secured a lucrative and unique contract for the law firm of valuable fundraiser Victor Reyes, which guaranteed the firm hundreds of hours of work on an annual basis.

---

[2] Later projections found that around $400 million in additional shareholder value would be obtained by extending the formula rate from 2018 through 2022. Tr. 614. The formula rate was so valuable that the company's credit rating improved substantially as a result. Tr. 607.

What these individuals had in common was their value to Madigan and not their value to ComEd. Madigan wanted to find a way to get his associates paid by someone else for work they performed for him, and he found that way through ComEd. ComEd paid more than $1.3 million to the low- and no-show subcontractors and $1.8 million to Victor Reyes's law firm during the conspiracy. GX1520.

The payments to the subcontractors flowed through intermediaries to hide the fact that they did virtually no work, to insulate ComEd from responsibility, and to conceal Madigan's involvement.[3] In addition, phony contracts, invoices, and false entries in ComEd's books and records were employed to conceal the true recipients and nature of the payments made to Madigan's associates.

Madigan, not ComEd, controlled when the "subcontractor" payments started and stopped and the amounts of payment received. Madigan knew that the subcontractors did virtually no work for ComEd. One of the "subcontractors," Ed Moody, testified that he expressly told Madigan he had not done any work for ComEd in exchange for hundreds of thousands of dollars in payments. In response, Madigan told him: "'You have nothing to worry about. What you're doing right now for – what you're doing right now is what I want, it's what [intermediary John Bradley] wants, it's what ComEd wants.'" Tr. 4426. And, in a conversation with Madigan's right-hand man and codefendant, Michael McClain, recorded just

---

[3] In addition to Doherty, the conspirators also used several other individuals as pass-throughs, including Madigan associates John Bradley (former Representative and Assistant Majority Leader) and Shaw Decremer (former Speaker's Office employee and Democratic Party operative).

months after the last subcontractor was added in 2018, Madigan joked about how people who were paid by ComEd had "made out like bandits." GX156. McClain agreed, "for very little work too." *Id.*

Doherty also acknowledged that the subcontractors did no work but "kept their mouths shut," and advised Fidel Marquez, ComEd's former Senior Vice President for Governmental and External Affairs, that ComEd continue paying the subcontractors because "your [ComEd's] money comes from Springfield." GX270. Doherty further explained that these payments were made "to keep Madigan happy, I think it's worth it, because you'd hear otherwise." GX270. In fact, when Marquez asked John Hooker, the person who held Marquez's position before him, how Madigan would react if ComEd stopped paying the subcontractors, Hooker opined that Madigan's reaction would be: "'You're not going to do something for me, I don't have to do anything for you.'" GX286.

The linkage between Madigan's favorable action on legislation and ComEd's payments to Madigan's associates was further highlighted by the facts surrounding the renewal of the Reyes Kurson contract. In 2016, while ComEd was working to pass FEJA, ComEd's former General Counsel sought to reduce the number of hours that ComEd guaranteed to Reyes Kurson because there was not enough work for the firm. McClain then stepped in and looped in Anne Pramaggiore, former ComEd CEO, and Hooker to make sure the contract was negotiated on favorable terms. McClain put it in stark terms: "I know the drill and so do you. If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will

7

go to our Friend [Madigan]. Our Friend will call me and then I will call you." GX522. McClain threatened that such a step would "provoke a reaction from our Friend." *Id*. After that threat, Reyes Kurson's contract was renewed in 2016 and again in 2017, soon after the passage of FEJA.

The sham subcontractors and Reyes Kurson law firm are just some examples of the numerous hiring requests Madigan made of ComEd. Madigan, through McClain, also repeatedly demanded that ComEd hire individuals tied to Madigan, and the company complied, finding positions for individuals even when they flunked entry-level tests and "bombed" their initial interviews.

"That ComEd agreement," as Madigan called it (GX248), was designed to ensure that Madigan acted favorably on ComEd legislation. ComEd's bribes to Madigan resulted in a string of legislative successes: EIMA in October 2011, with Madigan's vote; Senate Bill 9 in 2013, also with Madigan's vote; and FEJA in late 2016, with Madigan's help in pushing for the final votes needed to pass the bill.

**B.** **Wire/Honest Services Fraud Scheme: Madigan Agreed to Recommend Solis for a State Board Position in Exchange for Solis Directing Business to Madigan's Law Firm and His Son.**

Madigan's efforts to get clients for his law firm was the focus of the State board counts. This conduct involved Madigan's interactions with Daniel Solis, who was then the Alderman of Chicago's 25th Ward and Chairman of Chicago's powerful Committee on Zoning, Landmarks and Building Standards. The State board conduct shows that, while Madigan was *politically* benefiting from the ComEd bribery

8

conspiracy, Madigan also corruptly schemed to obtain business for his law firm to benefit himself and his son *financially*.

Between 2014 and late 2018, both before and after Solis began to cooperate, Madigan used Solis to acquire new clients for Madigan's law firm.[4] Madigan used Solis in this way because of Solis's contact with and control over the developments in Solis's ward, as well as his control over developments city-wide.

Solis first raised the State board appointment on June 20, 2018 (GX125), immediately after a pitch meeting with a real estate developer that Madigan had asked Solis to arrange (GX28). The conversation about the State board position shows the two men's "ask for an ask" arrangement: Solis told Madigan that he was going to run in the next aldermanic election but that he might not finish the term. GX125. Solis told Madigan that he was interested in a State board position. Madigan immediately said, "I'll take a note down. I have a file…." Solis then told Madigan that he would continue to get him legal business. Madigan then asked Solis about Harry Skydell, the developer of the Old Post Office in Solis's ward. Madigan wanted to use Solis's connection to Skydell to secure a pitch meeting with Skydell.

Critically, in the months prior to this meeting, Solis had linked his official action and giving business to Madigan's law firm on *six* separate occasions, as detailed in the Government's Version. GVO at 14-17.

---

[4] Solis's ward included portions of Chicago's West and South Loops and Chinatown, which had substantial real estate development. Solis began cooperating in June 2016. Solis recorded his interactions with Madigan between 2017 and late 2018 as a part of his cooperation.

The first four times in which Solis linked his official action and Madigan's law firm business concerned Madigan's efforts to use Solis to bring in the Union West developer as a client.[5] In the first of those conversations, Solis expressly told Madigan that the developer understood the "*quid pro quo*," that is, the link between the developer meeting with Madigan and Solis approving the Union West project. GX7. Madigan responded "Mhmm. Mhmm" and "yeah, okay," and continued to work with Solis to get business from the Union West developers. Solis expressed the "this for that" arrangement to Madigan again prior to the pitch meeting with the Union West developer and twice after the pitch meeting. GX9, GX12, GX16.

The two other recorded conversations in which Solis expressly linked official action with business for Madigan's law firm related to the Chinatown parcel. In July 2017, in the midst of the conversations between Madigan and Solis about the Union West project, Solis sought Madigan's assistance with the development of the Chinatown parking lot.[6] GX11. On March 26, 2018, after another pitch meeting, Solis privately told Madigan that the Chinatown developer would work with Madigan "and get you the, the property taxes." GX31. The next day, on March 27, 2018, Solis

---

[5] The Union West transaction was the basis of Counts 15, 16, 17, and 18, and the jury found Madigan not guilty of these counts. Evidence related to the Union West transaction is referenced herein for the purpose of providing context to the State board convictions and for the Court's consideration under 18 U.S.C. § 3553(a); the government is not seeking to apply the Union West conduct to the Guidelines calculation.

[6] Madigan and codefendant McClain were charged in Counts 19, 20, 21 and 22 with wire fraud, bribery, and use of interstate facilities in connection with the Chinatown transaction. The jury was unable to reach a verdict on these counts. Evidence related to the Chinatown land transfer is referenced herein to provide context to the State board charges and for the Court's consideration under 18 U.S.C. § 3553(a), and not for purposes of the Guidelines calculation.

repeated this linkage between acquiring developer business and Madigan securing the land transfer to Madigan during a telephone call. GX32. Madigan continued to work on securing the Chinatown parcel transfer after this conversation.

Madigan admitted on cross-examination that, before Solis approached Madigan about the State board position, Solis had on these six occasions suggested exchanging official action for business for Madigan's law firm. Tr. 9189. This demonstrates that Madigan agreed to help Solis obtain an important State board position while knowing that Solis was a willing participant in *quid pro quo* arrangements. Madigan also continued to make asks of Solis for his and his family's benefit. Madigan was comfortable in continuing to participate with Solis in corrupt schemes.

On August 2, 2018, Solis and Madigan met in Madigan's private office to discuss the State board positions. GX151. Solis had earlier informed Madigan that he had reached out to developer Harry Skydell per Madigan's request and arranged for Skydell to attend a pitch meeting at Madigan's office. GX146. This conversation was another example of their transactional, "give and get" relationship. Madigan and Solis, in private, reviewed a list Madigan had sent to Solis of the various boards. Solis told Madigan that he would continue to help Madigan get law firm business and identified the developers with whom he had contact. Madigan then immediately shifted the conversation to the State board positions and confirmed with Solis the two boards he was interested in. Madigan said, "Just leave it in my hands." GX151 at 8. Solis asked if there was anything else Madigan was interested in. *Id.* Madigan

11

responded, "There's one thing you can do." *Id.* Madigan then asked Solis to reach out to Raul Raymundo from a non-profit called the Resurrection Project so that Madigan's son could try to secure insurance business from the non-profit. Madigan advised Solis to ask Raymundo, "Give Andrew something." *Id.* at 8-9. Madigan gave Solis his son's business card. Madigan then shifted back to the State board appointment and said a second time, "just leave this in my hands."[7] *Id.* at 9.

On October 26, 2018, Solis told Madigan that Skydell would give Madigan a real estate project. Madigan told Solis he would discuss the State board position with Governor-elect JB Pritzker and that Madigan would tell him, "here it is, this is what we want to do." GX197. On November 23, 2018, Solis referenced the development in his ward and told Madigan, "I figure I can still help you a lot." GX236. Madigan asked, "Do you want to go forward now on one of those state appointments?" Madigan then asked for Solis's resume. A week later, Madigan called Solis to confirm the boards in which Solis was interested—two Boards with significant responsibilities and lucrative pay, the Illinois Commerce Commission and the Labor Relations Board. GX244.

In January 2019, however, Solis's cooperation was announced in the press, and Madigan knew about these news reports. GX863.

---

[7] The Resurrection Project ultimately engaged Madigan's son's insurance firm; Madigan's son personally earned approximately $43,000 in commissions between 2019 and 2021 and his firm earned even more, as Jennifer Gavelek testified.

Based on these facts, the jury found that Madigan engaged in a scheme (i) to deprive the State of Illinois of money or property because Solis would have received a salary from the State if appointed to a State board, and (ii) to deprive the people of Illinois of Madigan's honest services because Madigan agreed to recommend Solis for a State board position not based on Solis's qualifications but for his own personal profit.

## II. GUIDELINES CALCULATION AND OBJECTIONS TO THE PSR

Madigan's properly calculated Guideline range is life imprisonment, based on an adjusted offense level of 50 (treated as 43) and a criminal history category of I. The government's position as to the disputed Guidelines is set forth below.

### A. Offense Level Calculations – "ComEd Group"

#### 1. § 666 Offenses

The government agrees with the Probation Office's calculation of the Guidelines for the ComEd offenses of conviction (Counts 2, 4, 5, and 6, or the "ComEd Group") with the addition of a two-level enhancement for obstruction of justice.[8] PSR ¶¶ 49-76. The offense level for the ComEd offenses of conviction (Counts 2, 4, 5, and 6, or the "ComEd Group") is 50, as summarized below.[9]

---

[8] The Probation Office did not take a position on the application of the obstruction enhancement under § 3C1.1, deferring to the Court to make that decision given that the Court observed Madigan's testimony and would be in the best position to determine whether he committed perjury. PSR ¶ 59.

[9] Count 2 charges a conspiracy to violate two provisions of § 666 and two provisions of the FCPA.

| Guideline Section | Description | Offense Level |
|---|---|---|
| 2C1.1(a)(1) | Base Offense | 14 |
| 2C1.1(b)(1) | More than one bribe | +2 |
| 2C1.1(b)(2); 2B1.1(b)(1)(N) | Value of the benefit exceeded $150,000,000 | +26 |
| 2C1.1(b)(3) | Elected public official | +4 |
| 3B1.1(c) | Organizer / leader of criminal activity | +2 |
| 3C1.1 | Obstruction of justice | +2 |
| **Total** | | **50** |

### a.      Guideline § 2C1.1(b)(1) – More Than One Bribe

Guideline § 2C1.1(b)(1) provides for a two-level enhancement if the "offense involved more than one bribe." U.S.S.G. § 2C1.1(b)(1). "Related payments that, in essence, constitute a single incident of bribery or extortion (*e.g.*, a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." U.S.S.G. § 2C1.1, Application Note 2.

Courts assessing this provision have found multiple bribes exist where payments involved different payees and payors and where the bribes were designed to elicit different official actions. *See United States v. Arshad*, 239 F.3d 276, 282 (2d Cir. 2001) ("[T]he payments were indisputably and undisputedly intended to achieve several distinct benefits for [defendant] and were therefore more than one bribe irrespective of their manner of payment"); *United States v. Kahlon*, 38 F.3d 467, 470 (9th Cir. 1994) (finding more than one bribe where the payments were for different actions and to different payors); *United States v. Martinez*, 76 F.3d 1145, 1153-54 (10th Cir. 1996) (finding more than one bribe where agreement "was not for a final fixed sum paid in regular installments" but instead was "open-ended" and involved occasional "bonus" payments).

14

As the Probation Office correctly concluded, the evidence clearly established multiple bribes made to different people for different official actions by Madigan. ComEd paid five Madigan allies $1.3 million in monthly payments over a period of 8 years as so-called "subcontractors." GX1520; PSR ¶ 51. Not only that, ComEd made payments to the Reyes Kurson law firm, the 13th Ward interns, and numerous other individuals at Madigan's request. These payments were also separate bribes, intended to influence different official action over the years, starting with EIMA in 2011, FEJA in 2016, and the Lisa Madigan bill in 2018, among others. Madigan's bribery scheme plainly involved multiple bribes.

### b. Guideline § 2C1.1(b)(2) – Value of the Benefit

The government agrees with Probation that a 26-level enhancement is required because the value of the benefit ComEd received from the bribery scheme was at least $150 million. PSR ¶ 53. Madigan incorrectly claims the value of the benefit from the bribes should be zero.[10] DVO at 17.

Pursuant to Guideline § 2C1.1(b)(2), Madigan's offense level must be increased based on "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, *whichever is greatest*." U.S.S.G. 2C1.1(b)(2) (emphasis added). Courts are to apply the higher amount "for deterrence purposes," because "the punishment should be

---

[10] Madigan's claim of zero benefit further underscores his failure to accept responsibility or acknowledge the harm caused by his conduct.

commensurate with the gain to the payer or the recipient of the bribe, whichever is greater." *Id.,* Background Commentary. "[W]hen a district court can reasonably determine the benefit received (or to be received) in return for a bribe, and that amount is greater than the bribe or any loss to the government, § 2C1.1(b)(2)(A) *requires* an enhancement corresponding to the amount of that benefit." *United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997) (emphasis added).[11]

In this case, the value of the benefit is the proper metric under Guideline § 2C1.1(b)(2). The value of the legislation ComEd sought to influence by bribing Madigan can be reasonably estimated and exceeds the value of the bribe payments. Indeed, the government is not required to provide a precise calculation of the anticipated benefit; reasonable estimates based on the information available in the record suffice. *United States v. Buncich*, 20 F.4th 1167, 1172 (7th Cir. 2021) (quoting *United States v. Anderson*, 517 F.3d 953, 963 (7th Cir. 2008)).

As set forth in the Government's Version (GVO at 9-12), the evidence easily establishes that the benefit "to be received" by ComEd from the bribery conspiracy far exceeded $150 million. Scott Vogt testified about ComEd's dire financial condition before the bribery conspiracy began. Vogt testified that before EIMA was passed in 2011, ComEd lost approximately $100 to 120 million a year in costs that the Illinois

---

[11] The Guideline permits the government to establish the "benefit received" or "to be received" from the bribery—in other words, the actual benefit or the anticipated benefit. *See* Guideline § 2C1.1(b)(2). *Cf. United States v. Blagojevich*, 794 F.3d 729, 743 (7th Cir. 2015) (benefit public official intended to receive through corrupt solicitation was relevant amount for Guidelines, even though no one turned out to be willing or able to pay it); *accord United States v. Chmielewski*, 196 F.3d 893, 895 (7th Cir. 1999).

Commerce Commission ("ICC") did not allow the company to recover through its rates, which amounted to a whopping $1 billion lost between 2002 and 2010. Tr. 570.

Against this backdrop, Madigan began soliciting bribes from ComEd in 2011. Vogt explained that the "formula rate," established in 2011 through EIMA, helped address the volatility in the ICC's rate-setting process. Tr. 571-73. The formula rate was so valuable that, according to Vogt, after EIMA, "we saw our credit ratings improve substantially from middle-of-the-road debt to high-grade debt . . . ." Tr. 607.

In 2014, in the early years of the charged conspiracy, Vogt projected that around $400 million in additional shareholder value would be obtained through the extension of the formula rate from 2018 to 2022. Tr. 614; *see also* GVO Ex. B. Although this forward-looking projection ended up being high due to market conditions, what matters is that the conspirators understood the value of the benefit "to be received" exceeded $400 million during the conspiracy. *See Chmielewski*, 196 F.3d at 895.

Moreover, the $400 million projection only covered a five-year period. The projection did not cover the first five years after the formula rate was enacted (2012 through 2017) or the years after 2022. During the ComEd Four trial, Vogt testified that the projected shareholder value derived from the formula rate for the ten-year period from 2012 to 2030 was $750 million. Gov. Sent. Ex. 1 at 827:18-22 (Vogt's testimony in Case Number 20 CR 812).

In addition, the formula rate was not the only benefit ComEd received during the bribery conspiracy. EIMA also authorized ComEd to spend a whopping $2.6

17

billion in infrastructure investment over a 10-year period. Tr. 597. And the 2016 FEJA legislation also benefited ComEd's parent company, Exelon, by including price support provisions that allowed two struggling nuclear plants in Illinois to remain open. Tr. 625, 634-635. As Scott Vogt testified, "it was very valuable to keep those plants open." Tr. 635.

In short, the evidence clearly establishes that the value of the benefit to ComEd of Madigan's bribery scheme far exceeded $150 million.

### c. Guideline § 3B1.1(c) – Leader / Organizer

The government agrees with the Probation Office that an additional two-level enhancement should be applied, because Madigan was "an organizer, leader, manager, or supervisor in any criminal activity" under Guideline § 3B1.1(c). U.S.S.G. § 3B1.1(c). PSR ¶ 56-57.

To determine whether a defendant is an organizer or leader, courts consider factors such as "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, Application Note 4. "This list of factors, however, is not exhaustive, nor do all of these factors need to be present." *United States v. Sierra*, 188 F.3d 798, 804 (7th Cir. 1999).

Guideline § 3B1.1(c) "only requires that the defendant directed one person," although "the defendant must have exercised some real and direct influence." *Sierra*, 188 F.3d at 803; *see also* U.S.S.G. § 3B1.1, Application Note 2. The court's analysis

involves a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United States v. Lovies*, 16 F.4th 493, 506 (7th Cir. 2021) (internal quotation marks and citations omitted) (Guideline § 3B1.1(c) applied when defendant "told people what to do" and "dictated what would happen").

As summarized below, Madigan was unquestionably at the top of the criminal hierarchy. Madigan told McClain what he wanted from ComEd, and McClain ensured ComEd acted on Madigan's demands. *E.g., United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012).

*Nature of participation, including planning or organizing the offense.* Madigan was the reason the bribes were paid. As Doherty acknowledged, he was paid "all this money" "to keep Mike Madigan happy." GX270. And as McClain put it on another call, "We had to hire these guys because Mike Madigan came to us. . . . [I]t's that simple." GX267. McClain and former ComEd executive John Hooker discussed that Madigan approved of the subcontractors' payment arrangement from its origins in 2011, and thought it was "great." GX267.

Madigan claims that McClain and Hooker were the organizers or leaders, not him. DVO at 18. But "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, Application Note 4. Moreover, even if McClain and Hooker conceived the way to implement Madigan's request to pay his allies, the recordings make clear that the request came from Madigan. The subcontractors were close allies of Madigan, not McClain or Hooker. Indeed, Madigan was forced to admit on cross-examination that

he gave each of the subcontractors' names to McClain. Tr. 9063 (Olivo); Tr. 8678 (Nice), Tr. 8680 (Moody); Tr. 8688 (Zalewski); and Tr. 9110 (Acevedo).

*Exercise of decision-making authority and degree of control and authority exercised over others.* Madigan controlled the subcontractor and other bribe payments. Recordings associated with former Alderman Michael Zalewski's hiring, intercepted on a single day in May 2018, establish Madigan's control and leadership role. Madigan told McClain to talk to Anne Pramaggiore (then CEO of ComEd) about adding Zalewski as a subcontractor. GX73. McClain did as instructed and asked Pramaggiore to confirm that Zalewski would be added. Without hesitation, Pramaggiore confirmed. GX74. McClain then called Marquez and instructed him to pay Zalewski "five," or $5,000. GX75. McClain then called Madigan to confirm that Madigan could let Zalewski know that Doherty would be in touch with him. GX76. Just four minutes after that call, phone records show that Madigan placed a call to Zalewski's number, which was not recorded. GX1618. Zalewski started getting paid shortly thereafter, for no work.

As another example, Madigan controlled the six years of payments to political worker Edward Moody at every step. From the outset, Madigan made it clear that he controlled the payments when he told Moody, "If I leave my politics . . . I'm going to lose the [ComEd] contract." Tr. 4326 (testimony of Moody). Madigan gave instructions to Moody and McClain when Moody was moved from being paid by one intermediary (Doherty) to another (Decremer) in 2016 after Moody became a Cook County Commissioner. *See* Tr. 4401-02; GX3; GX4. And Madigan again reiterated the

message that he was in control in 2018, when Madigan assured Moody that he did not need to worry about doing work for ComEd. In 2018, Madigan made the final decision to stop payments to Moody as part of "that ComEd agreement."

Still another example of Madigan's leadership is that McClain consulted with Madigan before dropping Eddie Acevedo. GX247, GX248.

_Nature and scope of the illegal activity._ Madigan's criminal involvement was extensive and ongoing from 2011 to 2019. The eight-year duration of the bribery conspiracy and the fact that ComEd paid millions of dollars in bribes—both to the subcontractors and the other Madigan hires—further demonstrate Madigan's leadership role.

### d.    Guideline § 3C1.1 – Obstruction of Justice

Madigan's perjury warrants a two-level enhancement for obstruction of justice under Guideline § 3C1.1.

A two-level enhancement is appropriate when a "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. It is well-settled that perjury warrants the enhancement under Guideline § 3C1.1. _See_ § 3C1.1, n.4(B); _United States v. Taylor_, 637 F.3d 812, 817 (7th Cir. 2011).

A defendant's right to testify does not include the right to lie on the witness stand. _United States v. Hickok_, 77 F.3d 992, 1007 (7th Cir. 1996). An enhancement for perjury is appropriate if, while under oath, the defendant gives false testimony

concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993); *Taylor*, 637 F.3d at 817; *United States v. Johnson*, 680 F.3d 966, 981 (7th Cir. 2010); *see also* U.S.S.G. § 3C1.1, n.4(B). The Court should apply the enhancement if, upon "comparing [defendant's] testimony with the evidence presented by the government, the district court determines that [defendant] testified falsely at trial." *United States v. Anderson*, 580 F.3d 639, 648-49 (7th Cir. 2009).

As detailed in the Government's Version, Madigan lied to the jury about material matters. *See* GVO at 19-26.

### i. Madigan Falsely Denied an Intended Exchange for Official Action.

The guilty verdicts as to Counts 2, 4, 5, and 6 demonstrate that the jury rejected Madigan's testimony that he did not believe any company intended to trade official action for jobs offered at Madigan's request (Tr. 8585), and that he did not intend to trade official action for private gain. (Tr. 8585):

```
                              Madigan - direct
                                                           8585
  1    Q.  Mike, let me ask you a few more questions to get to the
  2    heart of things.
  3            Did you ever trade your public office for private
  4    gain?
  5    A.  No.
  6    Q.  Did you ever deband a thing of value in exchange for
  7    promise to take official action?
  8    A.  No.
  9    Q.  Did you ever accept a thing of value in exchange for a
 10    promise to take official action?
 11    A.  No.
 12    Q.  Did you ever believe that a company or any employer who
 13    acted on one of your recommendations sought to improperly
 14    influence you to take official action on their behalf?
 15    A.  No.
```

This testimony was a lie, as the jury's verdict, and the evidence at trial, make clear.

Madigan doubled down on his false testimony during cross-examination by McClain's attorney, Madigan was asked, "During the time period 2011 to 2019, in connection with any request you ever made to Mike McClain, did you ever agree to exchange for some jobs at ComEd official action you would take to help ComEd legislation?" Tr. 8882. Madigan answered definitively, "The answer is no." *Id.* These lies are material and go to the core of the case. Given that Madigan was convicted of exactly that—conspiring to solicit and soliciting payments he knew were made in exchange for official action—his denial of any intended exchange was necessarily false. This testimony alone supports an obstruction enhancement.

23

ii.     **Madigan Falsely Denied Knowing that the Subcontractors Did Not Work.**

Madigan also lied when he testified that McClain never said he believed or suspected that any of the people that Madigan had referred to ComEd were not working. Tr. 8882. This testimony was a lie, as demonstrated by a call the jury heard between Madigan and McClain in which they laughed about the fact that multiple people were paid by ComEd for little work. GX156. Madigan claims that this call related only to Dennis Gannon, whom Madigan claims he did not recommend to ComEd. DVO at 10. But, as the recording makes clear, and as the Court recognized by deciding to admit this exhibit (Tr. 8900-01), Madigan referred to *multiple* people getting paid to do little to no work. GX156 ("Some of *these guys* have made out like bandits . . ." (emphasis added)).

Madigan similarly lied when he claimed to be upset that Olivo, Nice, and the other subcontractors were not working. For example, he testified that he was upset that Nice did not do any work for ComEd: "My reaction again is anger. I knew Nice. He knew me. He knew my work ethic and what I expected from people associated with me. And he should, he should have worked just like everybody else is supposed to work." Tr. 8678. This was a lie because, while Madigan disclaimed any knowledge that Nice did not do work for Doherty or ComEd, Madigan testified that he knew Nice performed work for a State board for which Madigan had recommended him. Tr. 8676, 9353, 9366. The notion that Madigan talked to Nice about his work for the State board, but had no idea that Nice did no work for ComEd for 8 years, a job for which

24

Madigan also recommended Nice, is implausible and inconsistent with the jury's guilty verdict.

### iii. Madigan Falsely Testified That He Only Wanted to Help People.

On direct examination, Madigan testified that his motivation for recommending people for jobs was to help people who came to the 13th Ward office in need. Tr. 8823-24, 8689. Madigan testified that he viewed it as part of his job as a legislator and as Speaker to help people, including with jobs. Tr. 8824. Madigan's testimony on direct glaringly omitted any mention that in return for finding employment, Madigan expected certain of those individuals to do political work for Madigan. Tr. 9106-09. In context, this was false testimony. On cross-examination, Madigan was confronted with an interview he gave on this topic in 2009 (GX1) and only then did Madigan acknowledge that he used his governmental position to help find jobs for people with the expectation that some of those people would do unpaid political work for Madigan in return. Tr. 9108-09. Madigan's true motivations for finding jobs for his associates, elicited only through cross-examination, demonstrated why Madigan wanted to secure payments for people like Ed Moody and Ray Nice at ComEd and how that work personally benefitted Madigan. Madigan's attempt to hide his true motivation from the jury was an attempt by him to support his false denial of the bribery charges, which supports an obstruction enhancement.[12]

---

[12] Misleading testimony that understates a defendant's role in the offense warrants an obstruction enhancement. *See, e.g., United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012) ("A defendant's deliberate attempt to mislead the court implicates the basic purpose of the

### iv. Madigan Lied About His Role in Payments to Ed Moody.

Madigan lied about his involvement with Ed Moody's contract. Specifically, during his direct examination, Madigan was shown GX248, a December 7, 2018, call where McClain asked Madigan: "So do you want us to keep going with Ed Moody under that ComEd agreement or do you want us to pull off a little bit because of this Recorder of Deeds thing?" Tr. 8686. Madigan then told two lies to the jury. First, he claimed that he merely understood McClain to be "asking for some advice." *Id.* Second, Madigan claimed that McClain's request for advice was because Moody now had a full-time government job (as Recorder of Deeds), as opposed to his prior part-time job with the Cook County Board. *Id.* ("in light of his [Moody's] assumption of a full-time executive position, that he ought to pull back on his extra work with ComEd"). This testimony was false.

As an initial matter, Ed Moody already had a full-time job that Madigan helped obtain with the Circuit Court of Cook County from 1993 to 2016, as Madigan acknowledged during cross examination. Tr. 9079-80. And Madigan's claim that McClain was merely asking for "advice" makes no sense. McClain was clearly asking for instruction from Madigan. GX248 ("Do you want us to keep going with Ed Moody" and "Do you want me to call Ed and tell him?") In both instances, Madigan gave

---

obstruction enhancement . . . ."). Another example of Madigan's calculated effort to mislead the jury about his motivations concerned Kathy Laski. Madigan acknowledged helping Laski find a job during his direct examination and testified that he met her at a block party. Tr. 8733-34. Madigan failed to mention during direct that Laski's husband had been Alderman of the 23rd Ward, which was part of Madigan's legislative district. This detail only came out when Madigan was asked about it on cross examination. Tr. 9097-99.

instructions to McClain, demonstrating his knowledge of and control over the subcontractor arrangement. Indeed, McClain consulted with Madigan before dropping Acevedo as well. GX247, GX248.[13]

Madigan's testimony contradicts Ed Moody's testimony. Moody testified that he saw Madigan while campaigning near Madigan's home and expressed concern that he (Moody) was not doing any work for ComEd. *Compare* Tr. 4426 (Moody's testimony), *with* Tr. 8680-8682 (Madigan's denial). Moody testified that Madigan responded by telling Moody, "You have nothing to worry about. What you're doing right now [campaign work] . . . is what I want . . . it's what ComEd wants." Tr. 4426. Moody's testimony is yet another piece of evidence that shows Madigan's testimony was materially false. Madigan's false explanation about his response to McClain was material because it attempted to present an innocent explanation about a critical part of the charged conspiracy—Madigan's involvement in the hiring of his political workers by ComEd.

### v. Madigan Falsely Denied Telling McClain He Expected a Quick Favorable Response from ComEd.

Madigan lied when he denied having directed McClain to pass a message to ComEd executive Fidel Marquez that he expected a hard and quick favorable response to job requests made to ComEd. Specifically, on direct examination,

---

[13] Madigan's claim that McClain was merely asking for "advice" was further contradicted by his instruction (not "advice") to McClain to secure a ComEd subcontract for Zalewski. *See, e.g.*, GX73, GX74, GX75, GX77.

Madigan was asked about GX466, an email in which McClain informed Marquez that Madigan complained that Marquez was not being responsive to Madigan's requests for jobs for two 13th Ward precinct captains. GX466; Tr. 8745-47. McClain reported that Madigan had asked, "Are there two Fidels?" and then said, "Sometimes Fidel is totally responsive and engaging, and I feel sometimes he is not with us." *Id.* McClain told Marquez, "I do not know how to respond to our friend who believes, in his mind, there should be a hard and quick favorable response." *Id.*

When confronted with this email, Madigan falsely testified that he never passed such a message to McClain. Tr. 8746. This was a lie, contradicted by McClain's email and Madigan's own words in other recorded calls. For example, GX108 and GX62 proved that Madigan *did* authorize McClain to tell Marquez to make hard and quick favorable responses to Madigan's requests. In GX108, Madigan mocked Marquez and complained about his failure to act quickly in relation to ComEd's agreement with labor unions. In GX62, McClain and Hooker discussed that Madigan said talking to Marquez was "like putting something in a dark hole," meaning that Marquez failed to respond quickly enough to Madigan. GX62 at 2.

### vi. Madigan Lied By Minimizing His Relationship with McClain.

Madigan's credibility as a witness was completely undermined by his steadfast refusal to accurately describe his close friendship and agency relationship with McClain. As just one example of Madigan's repeated lies about McClain, when asked during cross-examination by McClain's attorney about the many times that Madigan went to McClain for help with problems, Madigan refused to admit that he "regularly"

28

asked McClain to help with problems, stating only that "some" problems were "submitted" to McClain. Tr. 8856.

Another example of Madigan's false testimony designed to minimize his relationship with McClain concerned McClain's access to the Speaker's suite of offices. Madigan claimed that McClain did not have unique access to his office suite in the Illinois Capitol, that the Speaker's office had an "open-door policy," and that no one would be excluded from his suite of offices. Tr. 8860. This testimony contradicted the testimony of numerous other witnesses who testified about McClain's use of a private conference room in Madigan's office suite. Madigan's own secretary, Mika Baugher, testified that McClain "would usually hang out in the conference room behind my desk [in the Speaker's office suite]." Tr. 5743. When asked if that conference room was open to the public, Baugher testified, "it's not for the public." *Id*. She further testified that, other than McClain, there were no lobbyists who frequented the Speaker's conference room. *Id.*[14]

The multitude of recorded conversations, emails, and documents presented at trial established a uniquely close and longstanding relationship of mutual dependence between Madigan and McClain and demonstrated that Madigan was lying when he tried to distance himself from his key operative. Madigan assigned McClain, and only McClain, to carry out the most sensitive assignments and requests and to engage in the most potentially politically explosive conversations when

---

[14] Madigan's efforts at minimizing his relationship with McClain pervaded his trial testimony. *See, e.g.,* Tr. 8665, Tr. 8750-51, Tr. 8834-36, 8837, 8839-41, 8855-56, 8860-63, 8877, 9116, 9120, 9123, 9125, 9142-43, 9154, 9160.

Madigan wanted bad news delivered, including to legislators who served under Madigan. *See, e.g.*, GX73, GX77, GX183, GX205, GX212, GX248, GX280, Tr. 787-91, GX1306, GX1412. Witness after witness—including defense witnesses—testified that Madigan and McClain were close friends for decades. *E.g.,* Tr. 779-80 (Lou Lang); Tr. 6787-88 (Thomas Cullen); Tr. 8191 (David Ellis); Tr. 8272 (Justin Cox). Records showed that Madigan and McClain had dinner more than 100 times between 2011 and 2019, including three times during the week FEJA passed. *See* Tr. 7327; GX1521.

One recorded call between Madigan and McClain on May 16, 2018 (GX73) exemplifies the true nature of their relationship and the scope of authority Madigan had delegated to McClain. During this single call, Madigan spoke with McClain about: (i) gaming legislation; (ii) the appointment of Juan Ochoa to the ComEd board; (iii) talking to Pramaggiore about who had been proposed as her replacement; (iv) the AT&T small cell bill; (v) the Chinatown property land transfer; and (vi) talking to Pramaggiore about ComEd hiring Michael Zalewski.

Madigan's lies and minimization of his relationship with McClain were highly material to the charges because Madigan was alleged to have conspired with McClain to commit bribery at ComEd. Madigan's attempt to distance himself from McClain and from the job demands he made of ComEd through McClain was necessarily rejected by the jury in finding Madigan guilty of the ComEd counts.

### vii. Madigan Lied In Denying His Role in Securing FEJA's Passage.

Madigan lied when he denied telling Cousineau to round up the final votes necessary to pass FEJA. *Compare* Tr. 1637-39, *with* Tr. 8662. Madigan's denial stood

in stark contrast to Cousineau's testimony that Madigan specifically instructed him to secure the votes to pass FEJA and other evidence of Cousineau's critical role in securing the votes. Tr. 1637-39.

The evidence fully corroborated Cousineau's account. On December 2, 2016, just one day after FEJA passed, McClain wrote to Pramaggiore that Cousineau "was extremely helpful in us acquiring the necessary votes in the Illinois House." GX577. And in 2018, McClain reminded Hooker that Madigan had helped put the final votes on FEJA. GX70 ("[T]hat last day, um, we had to go to Madigan. Madigan put 47 votes on."). Defense witness Craig Willert, whom Madigan claims supports his position, actually testified that he helped to move FEJA out of committee, at Cousineau's direction. Tr. 8421; DX5055. Willert thus corroborates Cousineau's account.[15]

### e.    Guideline § 4C1.1 – Zero-Point Offender

The government agrees with the Probation Office that Madigan does not qualify for the two-level decrease in offense level under Guideline § 4C1.1 because he was a leader or organizer of the criminal activity. PSR ¶ 74. Guideline § 4C1.1. only applies if "the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role)." U.S.S.G. § 4C1.1(a)(10).

---

[15] Madigan is wrong that Willert's testimony that there was no internal Speaker's Office roll call for FEJA contradicts Cousineau. Tr. 8387. Cousineau never said there was an internal roll call; he testified that "I can't remember who brought the information, but I learned that – or based on my analysis of what was presented, there weren't enough votes to pass the [FEJA] bill." Tr. 1636. Willert readily admitted that internal rolls calls were not the only way to obtain information about a bill, that companies and outside lobbyists sometimes complete their own roll calls, and that he was not privy to all Cousineau's conversations with Madigan. Tr. 8417, 8426-27, 8431-33.

### 2. FCPA Objects

The offense level for the false books and records and circumvention of accounting controls objects of Count 2 (the "FCPA objects") is 37.[16]

| Guideline Section | Description | Offense Level |
|---|---|---|
| 2B1.1(a) | Base Offense | 7 |
| 2B1.1(b)(1)(N) | Gain / loss exceeded $150,000,000 | +26 |
| 2B1.1(b)(10) | Sophisticated means | +2 |
| 3B1.1(c) | Organizer / leader of criminal activity | +2 |
| TOTAL | | 37 |

### a. Guideline § 2B1.1(b)(1)(N) - Gain / Loss exceeded $150,000,000

Pursuant to Guideline § 2B1.1(b)(1)(N), a 26-level offense level increase is appropriate because the actual gain from the offense exceeded $150,000,000.

Under Guideline § 2B1.1(b)(1), the offense level is increased "if the loss exceeded $6,500." The Table Notes provide that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1(b)(1), Note B; *see also United States v. Bhutani*, 266 F.3d 661, 668 (7th Cir. 2001) ("If it has been shown that the

---

[16] The Probation Office did not perform a separate calculation of the FCPA objects of the conspiracy. The PSR notes that pursuant to §1B1.2(d), a conviction charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit. PSR ¶ 46. Count 2 included four objects, and thus the separate counts of the conspiracy are for violations of 18 U.S.C. §§ 666(a)(l)(B) and 666(a)(2) and 15 U.S.C. §§ 78m(b)(5). *Id.* Probation grouped all of the subparts of Count 2 because they involved the same victim and acts/transactions connected by a common criminal objective or constituting a common scheme or plan. PSR ¶ 47, citing U.S.S.G. § 3D1.2(b) and Application Note 4. Furthermore, Guideline § 2C1.1 provides for a higher offense level and therefore Probation applied this section. *Id.* The government agrees, but to be complete in its analysis of the Guidelines, the government has calculated the Guidelines for the FCPA objects separately under Guideline § 2B1.1.

32

victims of the fraud suffered a loss and a more precise way of measuring the loss is unavailable, the amount of the defendant's gain may provide a reasonable estimate of the loss."); *United States v. Vrdolyak*, 593 F.3d 676, 680 (7th Cir. 2010) (where "there is a loss but the precise amount of the loss cannot be determined . . . the criminal's gain is treated as the measure of loss").

There Was Loss, Which Cannot Reasonably Be Determined. The falsification of records and circumvention of internal controls caused loss. The contracts and invoices stated that services were rendered, including as "lobbying" and "consulting" expenses, when in reality the payments were not for work but to influence Madigan. The false books and records were designed to deceive those within the company responsible for ensuring vendor payments were accurate and appropriate. Based on this web of lies, ComEd paid $1.3 million to the "subcontractors." That amount plainly constituted a loss to ComEd, Exelon, and its shareholders.

The $1.3 million was not the only loss. Those harmed by the conduct also included ratepaying citizens of Northern Illinois, who expect that regulated utilities are managed with honesty and integrity. Those impacted also included Illinois voters, who expect their elected representatives do not conspire to falsify records and circumvent internal controls but instead represent their own interests. *Cf. United States v. Escamilla*, 509 F. App'x 254, 255 (4th Cir. 2013) (applying gain in immigration fraud case, noting that "[i]mmigration document fraud causes actual economic loss, to the persons whose information is used on the documents, to

employers who mistakenly rely on the counterfeit documents, and to the United States in protecting its borders and citizens").

The harm to the companies, shareholders, and private citizens is complex and difficult to estimate. For example, many critics have complained that ratepayers shouldered the burden of Madigan's and his coconspirators' wrongdoing, as the legislative wins that ComEd achieved led to increased rates. *See, e.g.,* Abe Scarr, Ill. Public Interest Research Group, "New report: Formula rate law at center of ComEd scandal cost consumers billions, under-delivered promised benefits," Dec. 1, 2020, https://illinoispirg.org/news/ilp/new-report-formula-rate-law-center-comed-scandal-cost-consumers-billions-under-delivered (last visited May 30, 2025). FEJA's provisions that allowed Exelon to keep open two nuclear plants in Illinois were viewed by critics as an improper "bail out," which undoubtedly impacted energy markets. *See, e.g.,* Citizens' Utility Board, "What is the Future Energy Jobs Act? CUB analyzes Illinois' biggest energy legislation in years," March 22, 2017, available at www.citizensutilityboard.org/blog/2017/03/22/future-energy-jobs-act-cub-analyzes-illinois-biggest-energy-legislation-years/ (last visited May 30, 2025).

Whether the legislation ultimately harmed consumers is a complex, multi-faceted question that the Court need not address. But the civil litigation that followed the government's investigation going overt, and the jaw-dropping settlements that resulted, are strong indicators that there was substantial loss, and provide an alternative and reasonable means by which to assess loss for purposes of a Guidelines enhancement. Specifically, ComEd and Exelon: (i) agreed to settle outstanding

34

shareholder litigation for $173 million, *see Flynn v. Exelon Corp.*, No. 19 CV 8209 (N.D. Ill.) (Kendall, J.) [ECF #193 at 9]; (ii) agreed to settle securities charges with a payment by Exelon of $46.2 million, *see* https://www.sec.gov/news/press-release/2023-207; and (iii) were ordered by the ICC to pay a refund of approximately $38 million to customers. *See* https://www.chicagotribune.com/politics/ct-comed-returns-38-million-over-madigan-scandal-20220817-bctxrnaec5gvpgg64xh5gsh4ru-story.html. These figures together form an alternate measure of loss. *Cf. United States v. Brathwaite*, 242 F. App'x 900, 905 (4th Cir. 2007) (applying gain in driver's license fraud case, where the DMV was "going to have to take action to cancel the fraudulent licenses").

The Court Should Apply the Total Gain. Consistent with the settlement figures, the conspirators' gain is an appropriate proxy for loss under Guideline § 2B1.1(b)(1). *See Bhutani*, 266 F.3d at 670 (concluding that consumers suffered loss, and applying defendant's gain from fraudulent adulteration of drugs under precursor to Guideline § 2B1.1(b)(1)). As discussed above, the evidence established that the gain from the conspiracy far exceeded $150 million.

### b. Guideline § 2B1.1(b)(10) – Sophisticated Means

The two-level sophisticated means enhancement is properly applied in this case, because: (i) Madigan caused off-books payments to be made through multiple nominees to five Madigan's associates over the course of approximately eight years; (ii) caused the creation of phony contracts, invoices, internal approvals, and false entries in accounting records for the purpose of concealing the illegal activity; and (iii) shifted payments between various nominees as circumstances required. *Cf.*

*United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006) (sophisticated means employed where payments made through nominee corporations to conceal illegal activity); *United States v. Redman*, 887 F.3d 789, 792-93 (7th Cir. 2018) (creation of substantial amount of false paperwork to further and conceal illegal activity constituted sophisticated means).

### c.     Guideline § 3B1.1(c) – Leader / Organizer

The Court should apply an additional two-level leader / organizer enhancement under Guideline § 3B1.1(c), for the same reasons discussed above.

The evidence at trial established that Madigan knew Doherty was being used as an intermediary to conceal payments to his allies and that false records were being prepared. In one phone call, Madigan reported to McClain that Representative Jaime Andrade needed money and suggested using Doherty (though "not necessarily with ComEd") as an intermediary. Madigan said to McClain, "we'd tell Jaime prepare some monthly reports on what she's doing" so the representative has "got it on file." GX135. Faced with this recording, Madigan was forced to concede that he knew Doherty was being used to conceal payments. Tr. 9307 ("Q. When you didn't want folks in the General Assembly to know who was behind payments that were being made to Jaime Andrade's wife, what came to your mind was Jay Doherty, right? . . . A. Okay. I thought of Doherty, yes."). This evidence, and the evidence discussed above, demonstrated that Madigan controlled payments to Doherty, and knew he could call on Doherty to conceal payments. This demonstrates his leadership and control over the ComEd payments through Doherty.

36

### 3. Grouping for ComEd Conduct

Pursuant to Guidelines §§ 3D1.2(b), (c), and (d), Counts 2, 4, 5, and 6 are grouped together. The combined offense level for the ComEd Group is 50, pursuant to Guideline § 3D1.3.

### B. Offense Level Calculations – "State Board Group"

The government agrees with the Probation Office's calculation of the guidelines for the State board offenses of conviction (Counts 8, 9, 10, 12, 13, and 14, or the "State Board Group"), with the exception of the Probation Office not taking a position on whether an enhancement under § 3C1.1 should apply. PSR ¶ 61-69. Including the two-level enhancement under § 3C1.1 on account of Madigan's perjury at trial, the offense level for the State Board Group is 32.

| Guideline Section | Description | Offense Level |
|---|---|---|
| 2C1.1(a)(1) | Base Offense | 14 |
| 2C1.1(b)(2); 2B1.1(b)(1)(G) | Value of the benefit exceeded $250,000 | +12 |
| 2C1.1(b)(3) | Elected public official | +4 |
| 3C1.1 | Obstruction of justice | +2 |
| **TOTAL** | | **32** |

### 1. Guideline § 2C1.1(b)(2) – Value of the Benefit

Pursuant to Guideline § 2C1.1(b)(2) and § 2B1.1(b)(1)(G), a 12-level increase is appropriate, because the value of the benefit received or to be received exceeded $250,000. The lower paid of the two Boards Solis proposed (the Labor board) had a salary of $93,926 per year and a term of four years, for a total of $375,704. The Probation Office agrees. PSR ¶ 63.

Madigan claims that the amount should be zero because he "never recommended Mr. Solis for the Labor board position," "the government chose the

37

State board positions that Mr. Solis suggested," and Madigan "received no private benefit." DVO at 21.

As discussed above, Guideline § 2C1.1(b)(2) instructs that the Court must consider the benefit "to be received in return for the payment." U.S.S.G. 2C1.1(b)(2). The Court considers the anticipated benefit, whether realized or not. *Cf. Blagojevich*, 794 F.3d at 743; *Chmielewski*, 196 F.3d at 895.

During Madigan's and Solis's June 20, 2018 meeting, Madigan offered to put together a list of boards for Solis and told Solis "there's less than ten real nice boards." GX125. Soon thereafter, Madigan delivered to Solis a document describing a subset of State boards (GX1401). Solis then identified for Madigan two high-paying State board positions on that list. Madigan did not miss a beat in agreeing to secure him one of those Board seats. When Solis told him he wanted those two boards because they are "generous in their compensation," Madigan said "Yeah" and informed Solis that he had previously "got [Bob Gierut] appointed" to the Labor Relations Board. GX151. Madigan told Solis to "just leave it my hands." GX151. Madigan even took handwritten notes of Solis's preferred State boards:

38

 

GX1570, GX1592. These were well paid Boards due to their importance to State government. Yet Madigan repeatedly demonstrated his willingness to sell seats on those Boards, by agreeing to champion Solis, in order to acquire more law firm business for Madigan's own personal gain.

Here, the scheme did not get to the point of Madigan recommending Solis; Solis's cooperation was announced in January 2019, which forced Madigan's corrupt efforts to stop. GX863. The crime was nevertheless already complete at this point, and Madigan anticipated a benefit to be conferred on Solis, in the form of a State board salary.

### 2. Guideline § 3C1.1 – Obstruction of Justice

Madigan's false testimony that he only considered recommending Solis to the governor for a State board position warrants a two-level enhancement for obstruction of justice under Guideline § 3C1.1.

The evidence made clear that Madigan intended to recommend Solis to Pritzker, and that this would be successful. *See, e.g.,* GX151 at 7-9; GX197 ( "When I

sit down with Pritzker, that's, I'll tell him here it is, this is what we want to do."). On direct examination, too, Madigan testified that he agreed to recommend Solis for the State board in 2018 because, "I never heard anything negative about Alderman Solis." Tr. 9181.

During cross examination, however, Madigan attempted to minimize his involvement in helping Solis, after he was confronted with the evidence that Madigan knew at the time that Solis had suggested a *quid pro quo*. Specifically, Madigan was forced to acknowledge that, before he agreed to recommend Solis, Madigan knew that, on six prior occasions, Solis had suggested unlawfully exchanging official action for referrals to Madigan's law firm. Tr. 9169-70, Tr. 9187-89. Madigan was then asked, "And in spite of all that . . . you were prepared to actually recommend him [Solis] for a board position, right?" Madigan, lying and contradicting his earlier testimony that he had planned to recommend Solis, answered: "I was prepared to entertain the possibility that I would submit his name [to Pritzker]." Tr. 9189. Madigan was pushed on this obvious contradiction and clear backpedaling:

> Q. You intended to submit his name to the governor, right?
> A. Well, I was compiling my file of potential submissions to the governor.
> Q. Is that a "yes"?
> A. I was -- I was contemplating putting his name in that file, and then I would review it when it came time to do submissions to the governor.

Tr. 9189-90. Confronted specifically with his words to Solis, Madigan was asked, "So your testimony before the jury today, sir, is that, when you said, 'Just leave it in my hands,' what you meant was maybe I'll recommend you, maybe I won't; I'll make that

40

decision later. Is that what you're . . . telling the jury?" Madigan dug into his lie and answered, "That's correct." Tr. 9222-23.

The evidence and the jury's verdict on the State board counts directly refute Madigan's testimony that he had not decided whether to recommend Solis for a State board position. Madigan contradicted himself during his testimony in an effort to mislead and confuse the jury, when the evidence from the recordings could not have been clearer: Madigan intended to recommend Solis to a State board position, and he did so in exchange for Solis agreeing to continue to send legal business to Madigan.

## C.  Grouping and Total Adjusted Offense Level

Pursuant to Guidelines §§ 3D1.3 and 3D1.4, the ComEd Group and the State Board Group are not grouped, but there is no increase to the total offense level because the offense level for the State Board Group is 9 or more levels lower than the offense level for the ComEd Group. PSR ¶¶ 70-73. The total adjusted offense level is therefore 50, which is treated as an offense level of 43. *See* U.S.S.G.§ 5, Pt. A, App. Note 2; PSR ¶ 76.

## D.  Criminal History Category

The government agrees that defendant has no criminal history points and is therefore in criminal history category I. PSR ¶ 81.

## E.  Advisory Guideline Range

Based on the government's calculation of a total offense level of 43, and a criminal history category of I, Madigan's Guideline range is life imprisonment, consistent with the Probation Office's finding. PSR ¶ 126.

### F.     The Government's Sentencing Recommendation

The government's sentencing recommendation of 12.5 years' imprisonment is below the Guideline range of life imprisonment. Madigan implies in the Defense Version that the Guidelines for the ComEd conduct are inflated due to the 26-level increase based on the significant value of the legislation obtained through the bribery scheme. Even setting aside the ComEd conduct, however, and focusing solely on the State board conduct, the offense level is 32, which results in a Guidelines range of 121 to 151 months' imprisonment. The government's recommendation is the high-end of that range—151 months, or 12.5 years—and, as set forth below, is consistent with and warranted by the sentencing factors set forth in 18 U.S.C. § 3553(a).

### III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the sentence to impose, after calculating the Sentencing Guidelines, the Court must consider the statutory factors listed in § 3553(a)(1)-(7). For the reasons set forth below, consideration of the statutory sentencing factors reveals that a sentence of 12.5 years of imprisonment and a $1.5 million fine is warranted and is sufficient but not greater than necessary to comply with § 3553(a).

### A.     The Nature and Circumstances and Seriousness of the Offense

Madigan engaged in prolonged, calculated, and deliberate corrupt conduct over the course of years, which involved multiple episodes of criminal activity. The offense conduct unquestionably merits a significant custodial sentence. Madigan's criminal activity spanned nearly a decade and was particularly egregious because it involved

42

efforts to enrich himself—both by maintaining his political power by securing do-nothing jobs for his political allies and by attempting to line his own pockets with legal business. In so doing, Madigan served his own personal interests and not the best interests of Illinoisians.

Madigan adds another sordid chapter to Illinois's storied reputation of corruption and "pay to play" politics. Public corruption has been a persistent scourge on Illinois. Madigan, who held a top position in Illinois government and led the Democratic Party of Illinois, was the most powerful and well-known Illinois public official. Madigan's prominence and state-wide position makes his criminal activity particularly grave and damaging. Madigan was in a special position of trust and responsibility to the public. Yet he deprived all residents of Illinois of honest government and eroded the public's trust. Judge Zagel stated in sentencing former Governor Blagojevich, another corrupt high-level Illinois politician: "the fabric of Illinois is torn and disfigured and not easily or quickly repaired. You did that damage." *United States v. Blagojevich*, No. 08 CR 888 (Dec. 7, 2011) (N.D. Ill.) (Zagel, J.), Dkt. 1036 at 260. Judge Zagel's words are apt here. The damage Madigan has done will not be easy to repair and is a further stain on our state, which has seen in recent history two governors convicted of corruption-related crimes.

The seriousness of Madigan's crimes is heightened by the nature of the entities that he used for purposes of enriching himself and his associates: the State's largest electricity provider, two significant State boards, and the Office of the Speaker.

### 1. ComEd Conduct

In order to pay his political allies, Madigan went so far as to corrupt the largest electric utility in Illinois. The residents and businesses of northern Illinois depend upon ComEd and its electrical grid. The critical nature of electric service is why ComEd was highly regulated, a fact Madigan exploited for his own benefit. Madigan knew that ComEd, as a regulated entity, was dependent on the passage of favorable legislation by the Illinois General Assembly for its livelihood. *See* GX88 (McClain in a recorded call with Andrew Madigan stating, "These people [referring to People's Gas] are in a regulatory body and they're offended if people ask for favors. Hello? Dumb shits."). Madigan then used this public utility for his own ends—to place his political associates in lucrative jobs so that they would continue to support Madigan's political apparatus, thereby ensuring he stayed in power.

Madigan did not care that his actions targeted a regulated utility upon which the public depends. In fact, the jury heard Madigan *laughing* with McClain about the fact that the people whom they had gotten employed at ComEd made a lot of money for very little work:

> MADIGAN:  Mhmm. (Laughs.)
>
> McCLAIN:   Well if, if you remember uh—
>
> MADIGAN:  Some of these guys have made out like bandits Mike.
>
> McCLAIN:   Oh my God, (coughs) for very little work too.
>
> MADIGAN:  Yeah.
>
> McCLAIN:   Very little work.

GX156, Lines 45-55; Tr. 9050.

Madigan's corrupt conduct has financially impacted the citizens of Northern Illinois, ComEd, ComEd's parent company (Exelon), and its shareholders, including by causing the payment of more than $450 million in penalties and settlements.

Another aspect of the nature and circumstances of the offense that weighs in favor of a substantial custodial sentence is the fact that Madigan engaged in corruption over a period of at least *eight years*. This was not a one-time lapse in judgment. Madigan acted with impunity for nearly a decade, bringing his political associates to ComEd to get them paid time and again: Frank Olivo in 2011, Victor Reyes's law firm in 2011, Ray Nice in 2012, Ed Moody in 2012, Eddie Acevedo in 2017, Michael Zalewski in 2018, and others. In exchange, Madigan repeatedly used his power as Speaker to shepherd valuable legislation for ComEd and Exelon (and in at least one instance, stopping legislation adverse to ComEd), including EIMA in 2011, Senate Bill 9 in 2013, FEJA in 2016, and the Lisa Madigan bill in 2018.

Despite the jury's finding that Madigan traded official action on ComEd legislation for this stream of benefits, Madigan persists in claiming that he did nothing for ComEd and that he was ComEd's "principal antagonist." DVO at 4. Madigan's claim is contrary to the evidence and the jury's verdict and demonstrates his complete lack of acknowledgement of his criminal conduct.

### 2. Madigan's Concealment Involving ComEd

Madigan's use of secrecy and concealment allowed his corruption to remain undetected for years. As McClain told Pramaggiore and Marquez, "Our friend is very, very cautious about letting people know and do what he needs done." GX869.

Madigan's secrecy and concealment made his crimes more insidious and difficult to detect, which weighs heavily in favor of a substantial custodial sentence.

Madigan used surrogates—often McClain—and he did not use a cell phone or email. Madigan did this strategically. By using surrogates to carry out his wishes and intermediaries to conceal payments to his allies, Madigan sought to distance himself from criminal exposure. As McClain told a ComEd executive, "I've been doing assignments for him [Madigan] for 25 years . . . you've never read about me in a newspaper. . . . I'm pretty discreet." GX282.

ComEd paid Madigan's associates through intermediaries like Jay Doherty to hide the true nature of the payments and the fact that they were for virtually no work. *E.g.,* GX267 (Hooker noting that the Doherty payments were "clean for all of us"). Despite his continued protestations to the contrary, Madigan knew Doherty was employed as an intermediary to conceal Madigan's involvement. *See, e.g.,* GX135. Madigan admitted on cross examination that, when he wanted to conceal payments, he thought of using Doherty as an intermediary. Tr. 9307. The evidence proved that Madigan was a seasoned professional when it came to concealing payments to his associates, including through intermediaries.

### 3.     State Board Conduct

Madigan also exploited State board positions—which carry out important governmental functions—to line his own pockets. Madigan agreed to recommend Solis to important State boards, even though Madigan knew that Solis was willing to engage in corrupt *quid pro quo* exchanges.

46

Notably, the two State boards that were the focus of the counts of conviction carry out important governmental functions across the State. The Illinois Commerce Commission "regulates public utilities, interstate motor carriers, and rail, bus, and barge transportation; sets rates for privately owned electric, natural gas, telephone, water, and sewer companies, regulates intrastate rates charged by property motor carrier; inspects railroad crossings and tracks, and railroad cars carrying hazardous materials." GX1516 at 5; Stipulation 80. Madigan knew about these functions because he worked as a hearing officer for the ICC in the early years of his legal career. Tr. 8601-02. The salaries of ICC board members reflected their critical role: in 2018, board members were paid $117,043 per year. The ILRB has "jurisdiction over collective bargaining between labor unions and units of local government with populations over 2 million, except Regional Transportation Authority." GX 1516 at 9. The salaries of ILRB board members likewise reflected these important functions: in 2018, board members were paid $93,926.

Madigan cared more about business for his law firm and his son than about the proper functioning of these boards or the proper stewardship of the State finances. Not once did Madigan say that he was concerned with appointing the best or most qualified candidate. Instead, his conversations with Solis centered around what would be in it for Madigan if he secured the State board appointment. In fact, Madigan made clear he was willing to recommend a person who he believed was corrupt to perform these important governmental functions in exchange for business for himself and his son. Madigan thus showed his true motives: Madigan wanted to

enrich himself and his family at the expense of the State.[17] Madigan cast aside his duties to the people of Illinois, and instead sought to use his immense power for his own personal profit. Madigan's atrocious breach of his duties to the public warrants a lengthy custodial sentence.

### 4. Madigan's Concealment Involving Solis

Like with the ComEd conduct, concealment was a hallmark of Madigan's interactions with Solis. For example, after Solis first told Madigan over the phone that the Union West developer understood the "*quid pro quo*" (GX7; *see also* GX9), Madigan asked to meet Solis privately. Once inside Madigan's private office, he chastised Solis for his loose talk and coached Solis on a false explanation to disguise the corrupt exchange. Madigan closed the door and in whispered tones told Solis, "you shouldn't be talking like that." GX11. Madigan went on to give Solis a false story to explain his involvement with Union West: "You're just recommending our law firm—because if, if they don't get a good result on the real estate taxes, the whole project would be in trouble. Which is not good for your ward. So you want high quality representation." GX11.

_____

[17] Madigan was adept at exploiting his power to place his allies on lucrative State boards. Frank Olivo had a position on the Illinois Motor Vehicle Review Board, earning $20,000 each year starting in 1999, and Ray Nice had a position on the Illinois Department of Employment Security Board, earning $15,000 per year starting in late 2013. Stipulations 75 and 76, GX1303 (Madigan letter to Nice confirming his appointment). Madigan acknowledged during cross examination that he recommended Nice for the board position. Tr. 9218-20. Madigan also got Bob Gierut, who like Nice was precinct captain for the 11th Ward, appointed to the Labor Relations Board. GX151 (Madigan telling Solis, "I got him appointed. . .").

Madigan was instructing Solis to conceal Madigan's involvement in a *quid pro quo* exchange—all while continuing to reach out to Solis for introductions to developers. Notably, Madigan did not tell Solis not to *engage* in a *quid pro quo*; rather, Madigan's instruction was that Solis should not *talk* about a "*quid pro quo*" and should hide the corrupt nature of the exchange. Madigan's words and manner of addressing Solis demonstrate that he was an expert at concealment. In fact, Madigan spoke in cryptic terms when discussing whether Solis should vote on the Union West project because his law firm had secured legal business from the developers, by telling Solis he "should go ahead and process that." GX16.

Indeed, given Madigan's deliberate concealment and extreme efforts at secrecy, it took the cooperation of a senior member of Chicago City's Council—and someone who Madigan wanted to use for legal business—and a wiretap on Madigan's trusted agent's cellular phone, among other investigative means, to finally bring to light Madigan's corrupt conduct. The insidious nature of Madigan's crimes and criminal conduct should be met with a significant sentence of incarceration.

For all these reasons, Madigan's abuse of his office through bribery and fraud merits a sentence of 12.5 years' imprisonment.

## B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Madigan's criminal conduct was serious, extended, and extremely damaging. He made a conscious choice to break the law, and then he made a conscious choice to testify at trial and lie under oath.

A non-custodial, or short custodial, sentence for a high-ranking public official

who betrayed his office would not promote respect for the law; rather, it would cause people to question our system of justice, by suggesting that people who choose to who corrupt the highest levels of government and then lie about their crimes, can receive lighter punishment than other, less well-heeled and politically connected individuals.

As the Seventh Circuit has observed, there is no different standard that applies to defendants surrounded by privilege:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted). By the time he committed the offenses of conviction, Madigan was at the pinnacle of power in the State. He wanted for nothing, and he had considerable wealth. PSR ¶ 121. He was well educated, served as an elected official, and had a thriving legal practice. Despite all these advantages, he chose to break the law time and again.

Similarly, it would not promote respect for the law or provide just punishment to impose a low sentence because Madigan has helped his constituents or has done favors for people. It was Madigan's job as a Representative to help his constituents. Moreover, it was Madigan's immense political power that afforded him the ability to do favors—the same immense political power he exploited in committing bribery and

fraud. *See Vrdolyak*, 593 F.3d at 683 ("Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh in sentencing.").[18]

For these reasons, the government submits that a sentence of 12.5 years' imprisonment and a $1.5 million fine is required to promote respect for the law and provide just punishment for the offense.

## C.     The History and Characteristics of the Defendant

Madigan's history and characteristics present both mitigating and aggravating factors. Madigan had an extremely successful career in government, and at the same time, had a lucrative law practice. Madigan has no prior criminal history. Madigan was disciplined and a hard worker and, by all accounts, he is devoted to his wife, children, and grandchildren. The letters of support set forth that Madigan can, at times, be a generous person and helpful to his friends and constituents. These mitigating factors, however, must be considered in the context of the offense conduct, Madigan's positions of power, and Madigan's abuse of power.

### 1.     Madigan's Transactional Approach to Politics and Patronage

Madigan has for years taken advantage of the "give and get" nature of the patronage system to ensure his power and longevity. Madigan got from his political

---

[18] For example, one letter in support of Madigan was from former State Representative Arthur L. Turner. The trial evidence showed that McClain, on behalf of Madigan, pressured ComEd General Counsel Tom O'Neill to help Mr. Turner's son—who at the time was a sitting State Representative—obtain job interviews at law firms. Tr. 1261-68 (O'Neill's testimony, referencing emails contained in GX419, GX421, GX422, GX423).

workers support in elections and, in return, Madigan gave them rewards. Madigan's position as ward committeeman allowed him to recruit and support candidates and select precinct captains. Tr. 2213-14. These precinct captains, in turn, ensured that voters turned out to support the party's candidates in an election cycle. *Id.*

Madigan explained how he benefited by providing jobs to constituents in a 2009 interview for the Richard J. Daley Oral History Collection at the University of Illinois at Chicago. Madigan stated that, as a ward committeeman, a person would come to him wanting a job in the patronage system and that Madigan told them, "Yeah, we can put you in a job, but you're going to work for the Democratic party." GX1 (Clip 2). Madigan saw such a person as "raw material" and he would "teach 'em what to do, how to go about it." *Id.* Madigan explained that, when he became ward committeeman, "everybody wanted to be ward committeeman. They knew the, the power of the patronage system." GX1 (Clip 5).

Madigan's largesse to political workers was anchored in expediency, because it was conditioned on the political workers' continued support of him. Ed Moody, for example, was a 13th Ward precinct captain and long-time door to door political worker for Madigan. Tr. 4260-61. Madigan got him a job at the Bridgeview courthouse in January 1993, which he testified was connected to his continued political work for Madigan. Tr. 4300, 4317-18. In 2011 or 2012, when Moody asked Madigan for a way to make more money, Madigan lined up payments from ComEd. Tr. 4320, 4325. Madigan told Moody at that time that if Moody left his politics, Moody would lose the consulting contract. Tr. 4326-27.

Madigan has helped many people during his long political career and, as the letters submitted on his behalf reflect, the help Madigan gave was not always tied to any request for or expectation of the recipient's political support of him. But much of the help Madigan gave, as Ed Moody illustrates, was connected to political support in return. It is no surprise that the names on ComEd's "roster" discussed by McClain and Fidel Marquez on May 16, 2018 were individuals who performed political work for Madigan or who had loyally supported Madigan for years. The value of these individuals was not in what they were doing for ComEd but in what they were doing or had done for Madigan.

> McCLAIN: So 1—let, let me just ell you about each guy as you go through 'em. . . . So, Ray Nice, he's, um, one of, um, he's one of the top three precinct captains, and he also trains, uh, people how to go door to door. . . . An--, and um, so just to give you and idea- . . . how important the guy is. . . . Frank Olivo, former Alderman [of the 13th Ward]. Ed Moody. . . . Eddie Acevedo. I gotta talk to M-, somebody about that, let me talk about that. . . .

> MARQUEZ: Um, we're gonna, we're gonna go ahead and add Frank, oh, um, Mike Zalewski [Alderman of the 23rd Ward].

GX75. One hour later, McClain told Madigan, "you can call Mike Zalewski and say that they're gonna get in touch with him." GX77. Zalewski had recently—at Madigan's request—left his position as Alderman of the 23rd Ward.[19] Tr. 8687.

---

[19] Madigan testified at trial that Zalewski came to him after winning reelection and told Madigan that he did not want to run again and asked for his help growing Zalewski's lobbying practice. Tr. 8687. A recorded conversation between McClain and John Hooker on April 13, 2018, presents a different reason for Zalewski stepping down as Alderman—that Madigan orchestrated the maneuver in order to make the reelection of Marty Quinn, the Alderman of Madigan's 13th Ward, more likely. Hooker told McClain that he did not "understand Mike Z.

Madigan should be commended for the help he gave to individuals without asking anything of them in return. But, at the same time, in performing deeds for constituents, such as arranging for public services, Madigan was doing the job that he was elected to do. He should not get credit for simply doing his job. *See United States v. Serafini,* 233 F.3d 758, 773 (3rd Cir. 2000) ("[I]f a public servant performs civic and charitable work as part of his daily functions, there should not be considered in his sentencing because we expect such work from our public servants."); *Vrdolayk,* 593 F.3d at 683 (noting that defendants who commit good deeds because they are in a position to do so should not gain advantage over those who do not because they cannot do so).

## 2. Madigan's Use of Power for Retribution

Madigan's power as Speaker was a double-edged sword that Madigan wielded to both effect change on behalf of the public good and also to act on behalf of himself for his own political and personal gain. The image Madigan tried to craft of himself during his direct examination as a benevolent avoider of conflict and consensus builder was an incomplete portrait of Madigan as a public servant. *E.g.,* Tr. 8629-30.

Madigan, as Speaker, doled out punishment on members of the General Assembly whose conduct displeased him or who, in his view, stepped out of line.

---

leaving?" McClain explained, "I'll give you the truth. So, uh, al-, Madigan's ward is fifty-two percent Latino, Zalewski's ward's almost seventy percent Latino, and Burke's ward is seventy percent Latino. . . . And um, Madigan's view is for Marty Quinn, if there are three white guys trying to keep their seats but with those (unintelligible) and Latinos, somebody's gonna lose. . . . And it could be Marty. And so, Madigan said, to Zalewski, I mean, wh-, who was, who was kind of tired of it anyway. Um- . . . Oh, okay. So, he um, um, he was ready to go anyway, but, uh, Madigan convinced him that he ought to step down. . . ." GX 37.

54

Madigan's purported open hand closed into an iron fist on these occasions. Madigan was, and could be, a "street-fighter" in McClain's words. GX180. A committee chaired by former Representative Carol Sente disappeared after Sente introduced bills that Madigan did not support, including one proposing term limits for the Speaker of the House. Tr. 199-200. State Representative Michael J. Zalewski was in Madigan's "penalty box" because he had called a bill in his committee that Madigan had held up by placing a brick on it. GX86. Madigan used McClain to "lower the boom" on long-time Representative Lou Lang when Madigan decided Lang needed to resign his House seat. GX212. Madigan and McClain discussed what steps should be taken against former Senator John Cullerton for what they believed to be his hand in negative ads against Madigan. GX180. McClain told Madigan during the conversation that if Madigan wanted "to put the squeeze on the guy you could hurt him pretty badly." *Id.* at 3. Madigan responded that he would "think about it."[20] *Id.*

Madigan's acts of pique, which he expressed by exercising his legislative and political authority, were not limited to perceived transgressions by General Assembly members. Madigan's retribution also negatively affected the citizens of the state. Juan Ochoa testified about serving as the Chief Executive Officer of the Metropolitan

---

[20] Madigan's testimony that he developed a trait in childhood to avoid conflict (Tr. 8593, 8620) is contradicted by other testimony from Madigan about legislative battles he waged. Madigan, for example, described how he told the Democratic Caucus that he would not stand for what he perceived as an attack by Governor Rauner on the "heart and soul" of the Democratic Party. Tr. 8659 ("And so I scheduled a meeting of the House Democratic Caucus, and I simply told our members, Ladies and gentlemen, we're going to be involved in a monumental struggle against the Governor of Illinois. And in my view, this is all about the heart and soul of the Democratic Party. I'm not going to stand for it.").

Pier and Exposition Authority (McPier) between 2007 and 2010. Tr. 4142, 4144. During his tenure, Ochoa tried to pass legislation in Springfield to allow McPier to restructure its debt. But Madigan took issue with Ochoa, as Madigan testified, because Madigan believed that Ochoa had fired one of his former employees at the request of then Governor Blagojevich and because Blagojevich had "defamed" the Madigan name. Tr. 8724-25; 9145-50. Madigan admitted on cross examination that he refused to support the restructuring legislation until language was added providing for a new CEO at McCormick Place. Tr. 9148. The legislation passed shortly after Ochoa resigned as CEO. Tr. 9149. Madigan's interpersonal spat was costly. The failure to pass the debt restructuring legislation during Ochoa's tenure meant that McPier, that is, Illinois taxpayers, had to pay half a billion dollars in interest on loans that restructuring would have prevented. *Cf.* Tr. 9147. *See* Gov. Sent. Ex. 2, Crain's Chicago Business, *Madigan's Revenge,* Nov. 12, 2011. Madigan did not use his legislative might exclusively for good but also for his own personal and political aims.

### 3. Madigan's Other Abuses of Power

Madigan had a duty as an elected public official to represent the best interests of the citizens and the state. Yet Madigan abused his office and his legislative authority to benefit himself, including his crimes related to ComEd and the State board position.

One example, not presented at trial, illustrates how Madigan exerted his legislative muscle to benefit himself: Madigan worked to derail an agency rule change that, if enacted, could have reduced Madigan's law firm's profits.

In January 2018, then Governor Bruce Rauner issued an Executive Order prohibiting state legislators and other state officials from practicing before the Property Tax Appeal Board (PTAB) while in office. Gov. Sent. Ex. 3. PTAB is one of the entities to which an appeal can be made from a denial of a tax reduction by the Cook County Assessor's Office. The Executive Order directed PTAB to amend its rules and procedures to reflect the prohibition. *Id.* The PTAB's rulemaking process is conducted through the Joint Committee on Administrative Rules (JCAR). JCAR is a bipartisan legislative oversight committee created by the General Assembly to conduct systematic reviews of administrative rules promulgated by state agencies. *See* "Joint Committee on Administrative Rules," available at www.ilga.gov/commission/jcar (last visited May 30, 2025).

In late 2018, the proposed amendment to PTAB's rules based on the Executive Order was pending before JCAR. On November 6, 2018, the day that Governor Rauner lost his reelection campaign against JB Pritzker, Madigan told McClain in a recorded call that the PTAB amendment was scheduled for hearing at JCAR's meeting on November 13, 2018. GX205 at 2-3. Madigan instructed McClain that, if Rauner lost, "maybe John Bradley, as the lobbyist for those guys should go over and talk to the Chairman of PTAB." *Id.* Madigan suggested that Bradley "tell the guy, 'You know, there's gonna be a lawsuit, and there's gonna be depositions. And you're gonna be asked, 'Did you take directives from the Governor's office, which is contrary to how the statute reads. You're supposed to be independent.' . . . 'So why don't you

withdraw that thing?' . . . 'Get yourself out of trouble.'"[21] *Id.* McClain responded, "Yup, will do." *Id.*

On November 13, 2018, before the JCAR meeting, Bradley told McClain that another intermediary had "completed his mission" and had received a "favorable response." Gov. Sent. Ex. 4. Two hours later, after the JCAR meeting, McClain reported to Madigan that it was "Eleven to zero prohibition on PTAB. So, it's over." Gov. Sent. Ex. 5.[22] Madigan responded, "Mhm, okay, very good." *Id.* Thus, with the assistance of multiple intermediaries (including John Bradley, who also paid the ComEd "subcontractors" as a pass-through), Madigan accomplished his self-benefitting mission to kill the rule change.

This episode demonstrates that the checks and balances in place to prevent Madigan from participating in legislation that might benefit his law firm and his own bottom line, as described by defense witnesses, *see e.g.,* Tr. 9411-12 (Vincent Getzendanner); 9589-94 (Heather Wier Vaught), did not prevent Madigan from trying to kill a rule change to benefit himself.

---

[21] Madigan's "explanation" here is another example of Madigan priming the listener, the person to whom he is speaking, with seemingly legal or logical reasons to cover the improper personal gains Madigan was trying to secure for himself. Madigan did the same thing when he chastised Solis for saying out loud the words "*quid pro quo*" in relation to the Union West development. The bogus justification Madigan articulated for Solis on that occasion ("You're just recommending our law firm—because if, if they don't get a good result on the real estate taxes, the whole project would be in trouble. . . . So you want high quality representation." (GX11)) was a similar false narrative designed to secure the end Madigan sought to achieve—continuing to use Solis as a source of law firm clients.

[22] This conversation was part of the same call between Madigan and McClain transcribed and admitted at trial as GX218.

### 4. Madigan's Concealment of Wrongdoing

Concealment and secrecy were the hallmarks of Madigan's conduct. The JCAR incident is one example of how Madigan used intermediaries, or surrogates, to insulate himself and to cause others to dirty their hands on his behalf. McClain was Madigan's lead surrogate for years. McClain willingly allowed Madigan to use him to, in McClain's words, avoid Madigan's "fingerprints" being left. *See, e.g.,* GX 251.

Madigan's steadfast refusal to use his own cell phone or send emails under his own name also shielded Madigan from exposure. This was no generational aberration as defense counsel posited to the jury at trial. *See, e.g.*, Tr. 78. This was a deliberate choice. In an era, of which Madigan was very much aware, when wire interceptions became the hallmark of criminal prosecutions of public officials and others, Madigan tried to shield himself by shunning direct, personal contact using these technologies. When Madigan did speak on the phone, he disguised what he was doing and what he wanted by talking in cryptic terms. For example, Madigan told Solis to "go ahead and process that" (GX16), when he was really telling Solis to take official action on the Union West project; Madigan told Solis "you know why I'm interested" (GX28) when Madigan was really asking Solis to introduce him to a developer with a project in Solis's ward; and Madigan told McClain to "put the file in a drawer for a while" (GX105), when Madigan was really telling McClain to wait until the next opportunity to push the legislative transfer of the Chinatown parcel.

Madigan's careful use of technology, his cryptic way of speaking, and his use of surrogates made it more difficult to uncover the depths of his corruption. The wall Madigan erected around himself through these means remained in place for years.

But after years of investigative work, including the use of wire interceptions, recorded meetings, and extensive interviews, Madigan's corrupt words and actions were exposed. Madigan's decades-long efforts at concealment are highly aggravating.

### 5. Madigan's Perjury at Trial

Any consideration of Madigan's character must include the fact that, when faced with recordings of his own statements, and with his back against the wall, Madigan chose to testify and lie to protect himself. The recordings and other evidence proved, without question, Madigan's longstanding reliance on McClain and McClain's regular follow-up with Madigan to report on the tasks he had performed at Madigan's behest. Yet, at trial, Madigan distanced himself from McClain and falsely downplayed the uniqueness and closeness of their decades' long friendship.

Similarly, Madigan attributed his monosyllabic assents to Solis's statements ("yeah, okay") to a childhood-learned technique to bring a quick end to conversations. But the evidence showed that Madigan was no shrinking violet, who was unable to say what he meant. Indeed, Madigan made his own affirmative asks of Solis at the same time Solis asked for Madigan's assistance in securing a state board appointment.

Madigan's lies during his testimony demonstrate his lack of integrity and candor, and his interest in prioritizing his own self-interest over the truth. That theme runs directly contrary to the experiences others have had with Madigan as expressed in their letters.

### 6.    Madigan's Age and His Criminal Acts

The government has taken Madigan's age—he is now 83 years old—into account in its sentencing recommendation, which otherwise would be higher given the seriousness and extent of his crimes. Madigan himself described his age, at the time of his testimony as "I am 82 years old, a young 82." Tr. 8607. Madigan's age must be viewed with the perspective that the actions focused upon in this case took place in the latter portion of Madigan's life when Madigan was between 68 and 82 years old. Significantly, Madigan was an elected official until four years ago and a practicing lawyer until two years ago. Madigan's age neither deterred nor prevented him from abusing his public office for personal benefit. To the contrary, Madigan's age and longevity allowed him to amass the substantial amount of power that he wielded, and abused, in committing the crimes for which he was convicted.

As just some examples of how age has not slowed Madigan's criminal or public facing conduct, the jury convicted Madigan of crimes that spanned from 2011 to 2019, when Madigan was between 68 and 77 years old. Madigan was reelected in November 2020 at age 78, and served as Speaker until approximately February 2021. Madigan met Solis in his law firm office—and was still trying to develop new clients—in his mid-70s. Madigan was 80 or 81 years old in 2023 when he last registered to practice law. And Madigan was 82 years old when he lied under oath at trial. Tr. 8556, 8607. These age markers demonstrate that Madigan's age has neither deterred him from abusing his public office or from committing crime, and thus, his age should not serve as a significant mitigating factor. *See, e.g., United States v. Johnson,* 685 F.3d 660, 663 (7th Cir. 2012) (rejecting a rule that a post-70 year old defendant can be

61

sentenced to no more than six months in prison "lest he die there," because such a rule would provide a weak disincentive to a post-70 year old defendant to end their criminal career); *see also United States v. Moreland,* 703 F.3d 976, 991 (7th Cir. 2012) ("As for age and infirmity, age 59 is not elderly in our society; the elderly do not have a license to commit crime, and adequate medical care is available in federal prisons."); *United States v. Brown,* 26 F.4th 48, 70-71 (1st Cir. 2022) (citing *Johnson* in affirming a 300-month sentence for a defendant who was 64 years old when he committed the crimes and would be 91 years old at the time of release from prison; affirming district court's conclusion that the other relevant sentencing factors outweighed defendant's age).

Indeed, Madigan's decades leading the House and the 13th Ward and the power he amassed over those decades enabled him to commit these crimes. Madigan was aware of the power of invoking his name to cause others to act and he chose to abuse that power to achieve his own personal ends.

A sentence of 12.5 years is a significant sentence for someone of Madigan's age. But, here, Madigan is in good health, and he ably engaged in a four-month long trial. PSR ¶ ¶ 101-106. For all the reasons discussed herein, Madigan's age should not be considered as a significant mitigating factor.

### D. The Need for the Sentence Imposed to Afford Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

High-level public officials in the State of Illinois need to receive the simple, undiluted, and unequivocal message that if they engage in corruption, they will be sent to prison for a long period of time. Public corruption "undermines the essential

confidence in our democracy," and it must be deterred. *United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

"Bribery is a premeditated crime—those tempted to sell out the public have plenty of time to weigh the risks and rewards before doing so." *United States v. Arroyo*, 75 F.4th 705, 708-09 (7th Cir. 2023). The need for general deterrence is particularly compelling in this case. This public corruption prosecution has been identified as one of the most significant in this district for many years, and everyone within City and State government will be aware of what this Court does. The message should be that corruption of the extent and magnitude here will be met with a very stiff sentence.

It is clear that a significant sentence of imprisonment is necessary to deter current and future public officials and their associates from engaging in bribery and fraud. Indeed, "[t]he only way to protect the public from the ongoing problem of public corruption and promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences." *Spano*, 411 F.Supp.2d at 940.

Judge Seeger previously recognized the importance of general deterrence in public corruption cases during the sentencing of former Illinois State Representative Luis Arroyo:

> Public corruption is deeply damaging. Public corruption makes the public cynical about their government. Public corruption infects the culture, too. It's so prevalent in Chicago that people kind of expect it. Public corruption, unfortunately, is in the air in Chicago. Public corruption breeds more public corruption. Public corruption leads to

cynicism. It leads people to think that that's just how things go around here.

\* \* \* \*

I have to think about other members of the Illinois House. I need to think about the senators. I need to think about aldermen. I need to think about all of the public officials in the state/city government, high and low who might be tempted to sell out the public like you did and turn to public corruption. Public officials are watching. Public officials are listening. I need to make sure that they hear a message loud and clear. The message is this: Public corruption isn't worth it. I need to make sure that the message gets out that public corruption isn't worth it.

From a supply-and-demand perspective, the length of the sentence matters. The lower the cost—in other words, the lower the sentence—the more public corruption you're going to get. Public officials are rational actors. They think about the costs and benefits of public corruption. They think about how likely it is they're going to get caught. They think about what will happen to them if they do get caught. They think about the costs and benefits of corruption.

Judges play a role in that decision-making. Judges need to make sure that the costs of public corruption are high enough to deter other people from engaging in public corruption. For whatever reason, that message isn't getting through. I don't know why public officials in this city and in this state aren't hearing the message, but they need to. Public corruption isn't worth it. If you engage in public corruption, like Mr. Arroyo, there will be serious consequences. Public corruption doesn't pay.

*United States v. Arroyo*, 19 CR 805 (N.D. Ill.), Dkt. 162 at 107-08, 120-22. In affirming Judge Seeger's sentence, the Seventh Circuit recognized that the need for general deterrence can outweigh other mitigating factors, such as age and lack of criminal history. *Arroyo*, 75 F.4th at 709.

The need for general deterrence is also particularly strong for crimes that are lucrative and difficult for law enforcement to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). Public corruption crimes certainly fall into that category—particularly where, as here, Madigan was a master when it came to secrecy and concealment. Given the challenges of detecting corruption crimes and the fact that these crimes erode public trust in our government, there is an even greater need for general deterrence.

The role of specific deterrence is limited here. Madigan no longer holds public office and is 83 years old. On the other hand, the sentences imposed on previous high-level politicians for public corruption crimes—including the approximately 6.5-year sentence imposed upon former Governor George Ryan and the 14-year sentence imposed upon former Governor Rod Blagojevich—were not sufficient to dissuade Madigan from engaging in criminal acts. Further, it is apparent from the character letters received that there are current and former government officials who are still strong allies of Madigan—despite the evidence of his illegal conduct presented at trial and his 10 counts of conviction. This too shows that there is a strong need for a significant custodial sentence, of 12.5 years in length, for public officials to know that what Madigan did—repeatedly—was illegal and that the consequences for doing so are high. Madigan so far has failed to accept responsibility in this case and went so

far as to testify at trial and lie. These facts indicate that the need for specific deterrence, although perhaps minimal, cannot be ignored.

In summary, the epidemic of public corruption in Illinois and the substantial need for deterrence weigh in favor of a 12.5-year sentence in this case.

### E. The Need to Avoid Unwarranted Sentencing Disparities

The government respectfully requests that the Court impose a significant custodial sentence for another reason: to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)). Madigan's case is unique in terms of his long-standing high-level position in Illinois government, his abuse of multiple positions of trust, the many years that he engaged in criminal conduct, the sophisticated nature of his criminal activity, including his efforts at concealment, and his perjury at trial. Nevertheless, it may be instructive to review sentences imposed on other high-ranking state officials:

- Former Governor Rod Blagojevich was sentenced to 14 years' imprisonment following a conviction after trial for honest services fraud and making false statements. Case No. 08 CR 888 (N.D. Ill.), R. 1247.

- Former Governor George Ryan was sentenced to 6.5 years' imprisonment following a conviction after trial for racketeering, mail fraud, and false statements. Case No. 02 CR 506 (N.D. Ill.), R. 888.

- Former Speaker of the Ohio House of Representatives Larry Householder was sentenced to 20 years' imprisonment following a conviction at trial for racketeering conspiracy related to an approximately $60 million bribery scheme to pass and uphold a nuclear plant bailout. Case No. 20 CR 77 (S.D. Ohio), R. 288.

- Former seven-term member of the Illinois House of Representatives, Luis Arroyo, was sentenced to 57 months' imprisonment following a

conviction for honest services fraud. Case No. 19 CR 805 (N.D. Ill.), R. 144.

The significant sentences imposed on other high-ranking public officials further confirm that a significant custodial sentence is warranted and appropriate in this case.

## IV. SUPERVISED RELEASE

The government agrees with the Probation Office that a term of supervised release of one year is appropriate and reasonable to protect the community and ensure that Madigan does not engage in future criminal activity, as well as to promote respect for the law. The government also agrees with the Probation Office's recommended conditions of release (contained at pages 24 to 29 of the PSR), which are necessary to ensure Madigan is not committing crimes, to protect the public, and to ensure that the Probation Office can effectively supervise the defendant.

The government requests one additional condition: Discretionary Condition #5—Defendant shall refrain from engaging in the following occupation, business or profession bearing a reasonably direct relationship to the conduct constituting the offense: elected public office. Madigan's elected position directly related to the crimes; this condition is necessary to protect the public from future crimes by this defendant.

## V. FINE

Statutory Maximum Fine: For each of the 10 counts of conviction, the maximum fine is "not more than $250,000," 18 U.S.C. § 3571(b)(3), or "not more than the greater of twice the gross gain or twice the gross loss." 18 U.S.C. § 3571(b)(2) & 3571(d). The Court may impose consecutive fines on each count of conviction. *See*

18 U.S.C. § 3584; *United States v. Sessa*, 821 F. Supp. 870, 876 (E.D.N.Y. 1993) (cleaned up). Accordingly, the statutory maximum total potential fine is $2.5 million, based on $250,000 multiplied by 10 counts of conviction.[23]

Guideline Fine: Guideline § 5E1.2(a) provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Madigan is able to pay a fine, and thus a fine is appropriate here. The Guideline range for a fine is $50,000 to $500,000 (for all counts of conviction) under Guideline § 5E1.2(c)(3).

Factors Applicable to a Fine: The Court must consider the § 3553(a) factors in imposing a fine, and the additional factors set forth in 18 U.S.C. § 3572. Those additional factors include, as relevant here:

> (1) the defendant's income, earning capacity, and financial resources;
>
> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
>
> (3) any pecuniary loss inflicted upon others as a result of the offense;
>
> (4) whether restitution is ordered or made and the amount of such restitution;
>
> (5) the need to deprive the defendant of illegally obtained gains from the offense;

---

[23] The Supreme Court has held that the rule of *Apprendi* applies to the imposition of criminal fines, meaning that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury. *See S. Union Co. v. United States*, 567 U.S. 343, 360 (2012). Here, the government is being conservative in using the $250,000 figure to calculate the statutory maximum fine rather than the gross gain or loss. 18 U.S.C. § 3571(b)(3).

(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence . . .

*Id.*

Government's Position on a Fine: The government agrees with the Probation Office that a fine is appropriate. Madigan caused immense harm to the people of the State of Illinois by exploiting his public office for private gain for nearly a decade. Furthermore, Madigan has very significant financial means, and thus an above-Guidelines fine will not impose an undue burden on any of Madigan's family members. Given the seriousness of this offense, the harm it caused, and Madigan's ready ability to pay, the government requests that the Court impose an above-Guidelines fine of $1,500,000.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully submits that defendant's pervasive corruption, his failure to accept responsibility and obstructive conduct, and the need for deterrence and just punishment warrant a sentence of 12.5 years' imprisonment and a $1,500,000 fine.

Respectfully submitted.
ANDREW S. BOUTROS
United States Attorney

By:*/s/ Sarah Streicker*
SARAH STREICKER
DIANE MacARTHUR
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 S. Dearborn St., 5th Floor
Chicago, IL 60604

69