**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22-CR-00115 |
| v. | ) | |
| | ) | Honorable John Robert Blakey |
| MICHAEL J. MADIGAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT MICHAEL J. MADIGAN'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................. 1

II.    A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE WILL SERVE THE FACTORS OUTLINED IN 18 U.S.C. § 3553(A) ...................................... 2

    A.    History and Characteristics of the Defendant ...................................... 3

    B.    Nature and Circumstances of the Offense ........................................... 19

    C.    The Need to Reflect the Seriousness of the Offense and Provide Deterrence .............................................................................. 22

    D.    The need to take into account the types of sentences available. .......... 23

    E.    The need to avoid disparate sentences. ............................................... 26

III. .....TREATMENT OF A PERJURY ENHANCEMENT ....................................... 29

    A.    Mike's testimony was truthful. ........................................................... 29

    B.    Treatment of a perjury enhancement for purposes of 3553(a). ........... 39

IV.    GUIDELINES CALCULATION ......................................................... 40

    A.    ComEd Related Conduct ...................................................................... 40

    B.    State Board Appointment Related Conduct ......................................... 47

V.    APPLICABLE FINES ............................................................................. 49

    A.    Statutory Maximum Fine for Each Count ............................................ 49

    B.    Statutory Maximum Total Potential Fine ............................................. 49

    C.    Guideline Range Fine for Each Count .................................................. 49

    D.    Guideline Total Maximum Fine ........................................................... 50

VI.    CORRECTIONS TO THE PRESENTENCE INVESTIGATION REPORT.... 50

VII.    SUPERVISED RELEASE ........................................................................ 50

VIII.    CONCLUSION ...................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*
552 U.S. 38 (2007) ............................................................................ 3, 22

*Kimbrough v. United States,*
552 U.S. 85 (2007) (Scalia, J., concurring) ......................................... 2

*Pepper v. United States,*
131 S. Ct. 1229 (2011) ........................................................................ 3

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................. 4

*United States v. Anderson,*
517 F.3d 953 (7th Cir. 2008) ............................................................. 41

*United States v. Buncich,*
20 F.4th 1167 (7th Cir. 2021) ............................................................ 41

*United States v. Burgess,*
22 F.4th 630 (7th Cir. 2022) .............................................................. 29

*United States v. Canoy,*
38 F.3d 893 (7th Cir. 1994) ............................................................... 24

*United States v. Carter,*
538 F.3d 784 (7th Cir. 2008) ............................................................. 28

*United States v. Christopher Collins,*
18-cr-00567-VSB (S.D.N.Y.) ............................................................. 27

*United States v. Cooper,*
394 F.3d 172 (3d Cir. 2005) ................................................................ 4

*United States v. Ellis,*
548 F.3d 539 (2008) ...................................................................... 28, 39

*United States v. Gerald G. Lundergan,*
18-cr-00106-GFVT (E.D. Ky.) ........................................................... 27

*United States v. Jesse L. Jackson Jr.,*
13-cr-00058-ABJ (D.C.) ..................................................................... 27

*United States v. Johnson,*
    471 F.3d 764 (7th Cir. 2006) ............................................................ 3

*United States v. Lopez-Pastrana,*
    889 F.3d 13 (1st Cir. 2018) ............................................................ 23

*United States v. Manasrah,*
    347 F. Supp. 2d 634 (E.D. Wis. 2004) ........................................ 24, 25

*United States v. McGee,*
    985 F.3d 559 (7th Cir. 2021) ............................................................ 43

*United States v. Michael G. Grimm.,*
    14-cr-000248-PKC (E.D.N.Y.) ........................................................ 27

*United States v. Muhammad,*
    120 F.3d 688 (7th Cir. 1997) ............................................................ 41

*United States v. Presley,*
    790 F.3d 699 (7th Cir. 2015) ...................................................... 27, 28

*United States v. Prosperi,*
    686 F.3d 32 (1st Cir. 2012) ............................................................ 4

*United States v. Reed,*
    859 F.3d 468 (7th Cir. 2017) ............................................................ 24

*United States v. Roussel,*
    705 F.3d 184 (5th Cir. 2013) ............................................................ 43

*United States v. Sapoznik,*
    161 F.3d 1117 (7th Cir. 1998) ........................................................ 41

*United States v. Serafini,*
    233 F.3d 758 (3d Cir. 2000) ............................................................ 4

*United States v. Thompson,*
    523 F.3d 806 (7th Cir. 2008) ............................................................ 48

*United States v. Tomko,*
    562 F.3d 558 (3d Cir. 2009) ............................................................ 4

*United States v. Warner,*
    792 F.3d 847 (7th Cir. 2015) ............................................................ 4

Defendant Michael J. Madigan, by his undersigned attorney, respectfully submits that a sentence of five years' probation (with a condition of one year home detention), an order to perform community service, and a reasonable fine is a sufficient, but not greater than necessary punishment that serves the factors outlined in 18 U.S.C. § 3553(a). In support, the Defendant states as follows:

## I.   INTRODUCTION

Mike Madigan is a remarkable husband, father, friend, and public servant. Throughout his 83-year life, Mike quite literally changed the lives of tens of thousands of people in his district on the south side of Chicago. He positively impacted millions of people throughout the State of Illinois. The more than 200 letters submitted on Mike's behalf demonstrate that this is not hyperbole.[1] He has been a singularly helpful and devoted public servant who is widely respected for his honesty and integrity. His outlook has always been, and remains today, that he has a responsibility, not only as an elected official but as a person, to do whatever he can to help others. This includes people in his personal life. It includes people in his

---

[1] Exhibit A includes a subset of letters cited throughout Defendant Madigan's Sentencing Memorandum. Exhibit B includes letters from family (Family Letters). Exhibit C includes letters from individuals with a primarily personal relationship with Mike (Personal Letters). Exhibit D includes letters from religious leaders who have a relationship with Mike (Religious Letters). Exhibit E includes letters from employees who worked with Mike (Staff Letters). Exhibit F includes letters from individuals who interacted with Mike related to policy or other public interest related actions (Public Interest Letters). Exhibit G includes letters from residents of the 13th Ward (13th Ward Resident Letters). Exhibit H includes letters from individuals who helped with political work for the 13th Ward or other local politicians (Local Political Letters). Exhibit I includes letters from elected officials who had a relationship with Mike (Elected Official Letters). The letters included in Exhibit A are also included in the relevant category PDF. While counsel has employed best efforts to organize the letters for ease of review, as with life, sometimes the letter writers fall within multiple categories.

legislative district and people in the 13th Ward. But it also includes people who approach him while he is at dinner to ask for help, or when he's in an elevator or walking down the street in downtown Chicago.

The letters submitted on his behalf only scratch the surface of the good deeds Mike has done throughout his life, without asking for anything in return. Letter after letter expresses how Mike improved people's lives. Many letters unsolicited. People wanted to support Mike, just like he was there to lend a hand to countless people throughout his life. Many letter writers share a similar sentiment to the following, which puts it best, "I humbly ask that you consider the full picture of his life—who he is at his core, the quiet strength he has shown time and again, and the profound impact he's had on those fortunate enough to know him. His legacy is one of compassion and unwavering presence. And to me—and to my family—he has been nothing short of exceptional." (Ex. A, p. 3, Letter from E.A.)

## II.     A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE WILL SERVE THE FACTORS OUTLINED IN 18 U.S.C. § 3553(A)

The goal of sentencing is to fashion a sentence that is "sufficient, but not greater than necessary," to promote the goals established and codified by Congress. 18 U.S.C. § 3553(a). The guidelines are advisory, and a court may sentence outside the guideline range as long as all of the § 3553(a) factors are considered. Indeed, it is the district court's duty to "make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration of) the advice of the Guidelines" if the result they suggest does not comport with the sentencing court's view of an

appropriate sentence. *Kimbrough v. United States,* 552 U.S. 85, 113 (2007) (Scalia, J., concurring).

The Supreme Court has emphasized that sentencing courts should impose a punishment that "fit[s] the offender and not merely the crime." *Pepper v. United States,* 131 S. Ct. 1229, 1240 (2011). Moreover, the Supreme Court has rejected outright the notion that "extraordinary" circumstances must exist to justify a sentence outside the advisory Guideline range, including cases in which courts depart significantly from advisory guideline ranges to impose a non-custodial sentence. *Gall v. United States,* 552 U.S. 38, 47 (2007) (finding district court's departure from advisory guideline range of 30-37 months to impose sentence of probation was not an abuse of discretion).

To determine a sentence that is sufficient, but not greater than necessary to fulfill the purposes of sentencing, § 3553 directs consideration of several factors. 18 U.S.C. § 3553(a); *see United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("the statute does not weigh the factors . . . that is left to the sentencing judge, within the bounds of reason, which are wide."). The Defendant respectfully submits that consideration of these factors demonstrates that a sentence of five years' probation (with a condition of one year home detention), an order to perform community service, and a reasonable fine, is sufficient to promote the goals of sentencing.

## A. History and Characteristics of the Defendant

Mike's extraordinary personal and professional acts of generosity and genuine care for others in their most vulnerable moments support a non-custodial sentence.

"[I]f ever a man is to receive credit for the good he has done. . . it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 512–15 (S.D.N.Y. 2006) (sentencing defendant to three-and-a-half years of prison where the guidelines recommended a life sentence).

Courts have long recognized that a defendant's acts of charity that had "a dramatic and positive impact on the lives of others" are a basis for imposing a below-Guidelines sentence under 18 U.S.C. § 3553(a). *See e.g., United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming below-Guidelines sentence of probation and six months' house arrest where defendant's acts of charity were "hands-on" efforts that had "a dramatic and positive impact on the lives of others."); *United States v. Prosperi*, 686 F.3d 32, 34, 40, 50 (1st Cir. 2012) (affirming the district court's seven-year downward variance in sentencing defendant to six months' home confinement in $5 million fraud case based on defendant's charitable works and care for family); *United States v. Serafini*, 233 F.3d 758, 711-75 (3d Cir. 2000) (affirming state legislator's sentence of five months' imprisonment and five months' home confinement, finding his civic and charitable contributions were exceptional and "above and beyond customary political or charitable giving.").[2]

---

[2] *United States v. Tomko*, 562 F.3d 558, 571–75 (3d Cir. 2009) (affirming sentence of home confinement on the basis of several dozen letters demonstrating pre-indictment charitable

## 1. Personal Background

Michael Joseph Madigan was born on April 19, 1942 to Michael and Mary Madigan. He grew up in a tight-knit community on Chicago' southwest side—the same neighborhood where he has chosen to spend his entire life. He has one sister, Marita. Growing up, Mike's father was very dominating. As with the times, the word nurturing did not exist in his household. His father also had a quick temper and would raise his voice and yell. This is not to suggest Mike had an abusive childhood—it simply provides background for who he is. Mike learned to avoid confrontation, a skill that would prove extremely useful for a long career in politics. As many people recognized in the letters written on his behalf, Mike is generally a quiet man, even to the point that he is not good at small talk. (Ex. A, p. 5, Letter from T.F.: "Mike is quiet, thoughtful, a born observer, and no good at small talk.") After his father died when he was a young man, Mike moved in with his mother to care for her. In 1976, Mike married Shirley and moved into a home nearby—the same house they live in today. Together, they raised four children: Lisa, Tiffany, Nicole and Andrew, and now cherish four grandchildren: Rebecca, Lucy, Eliza, and Ted. Mike's love for his family is paramount. (Ex. A, p. 7-23, Letters from L.M., T.M., N.M., A.M.)

When his children were young and Mike had to be in Springfield for work, he called them at least once a day, if not more. He ordered a second set of schoolbooks that he read so he could help them study for any test or assignment. Mike is even

---

acts that involved not only money but "personal time" by the defendant); *United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015) (affirming sentence of probation in $5.6 million tax evasion case where district court found the defendant's unprecedented charitable works and generosity were genuine and "went further than simply donating.").

closer to his children today, ensuring that he has dinner with them at least once a week. He is also very close with his grandchildren. When Rebecca and Lucy were young, they would stay with Mike and Shirley often. Now, Mike helps Eliza and Ted with their schoolwork in the same way he helped his own children. This assistance is particularly important to his daughter, a single mother who works full-time in a demanding job. Mike anchors their lives, offering unwavering support and serving as a steady father figure they can always count on.

Mike graduated from St. Ignatius High School in 1960, and the University of Notre Dame in 1964. He went on to graduate from Loyola Law School in 1967. When Mike was young, he worked city jobs, starting on dirt trucks and garbage trucks and later a Law Department attorney. He was elected 13th Ward Committeeman in 1969 and served as a delegate to the 1970 Illinois constitutional convention. In 1970, Mike was elected to represent the 22nd District in the Illinois House of Representatives for the first time. He went on to be elected to this position every two years for the next 50 years. Mike was elected by his fellow Democrats to serve as Speaker—the leader of the Democratic caucus—for the first time in 1983. Every two years until 2021, the Democratic caucus re-elected him to serve as their leader.

In the early 1970's, Mike began practicing law with his law school friend and classmate, Vincent "Bud" Getzendanner, ultimately founding the firm Madigan & Getzendanner in 1976. The partners operated the law firm for the next 50 years on a handshake agreement. Madigan & Getzendanner has always been a small firm, consistently employing approximately five or six lawyers, along with a few paralegals

and administrative staff. Initially, Madigan & Getzendanner had a general law practice, taking whatever came in the door. Over time, the firm began specializing in property tax appeals. Madigan & Getzendanner became widely respected as one of the premier property tax appeal firms in Cook County.

Mike's motivating force in each of these roles was to help as many people as possible. Mike is not infallible. He has faults like any other person. He is widely recognized as the hardest worker most people have ever met, but sometimes to a fault. He also wants to be helpful to anyone who asks for his help. Again, sometimes this was a fault as he did not know how to tell people no, that he could not try to help, even when he was extremely busy with family, his role as Speaker, and his law office.

The letters written on his behalf show that his desire to help was not fueled by seeking power or personal gain. Instead, his Catholic values—instilled during his formative years at St. Ignatius, Notre Dame, and Loyola—drove every decision. These institutions taught him an unshakeable duty to serve others, to pursue the common good, and to champion the poor and vulnerable above all else. With these values as his guide, he directly improved the lives of tens of thousands of people and helped improve services for, and the rights of, millions of Illinois citizens.

**2. Mike is known as an incredibly kind and thoughtful person.**

Throughout his life, Mike was incredibly kind and thoughtful to those who have interacted with him, whether the interaction was for five minutes or over fifty years. While it is impossible to capture in a court filing all the moments Mike has

imparted his kindness and thoughtfulness on others, the following examples from the letters provide a glimpse into his character.

Jack Hynes, who considers Mike a second father, shared how Mike and his family were there for Mr. Hynes's family almost daily after his father passed away when Jack was 13. (Ex. A, p. 24, Letter from J.H.) From then on, the Madigan's were like extended family. Mr. Hynes shared that he learned core life values from Mike, about being a good father, a good husband, and a hard worker. Lily Hynes, Mr. Hynes's daughter who considers Mike a grandfather, wrote about his kindness when he came to her maternal grandfather's wake even though he did not know him: "[H]e showed up because there were people[] he cared about that were struggling, and he wanted to be there for those people. While I may not be the wisest person, I do know that going tremendously out of your way to make sure people feel loved when they need it defines a good person.  That is what defines Mike Madigan." (Ex. A, p. 27, Letter from L.H.)

Rhoda Pierce, former executive director of the Illinois Arts Council, shared a similar experience. After her parents and later her husband passed, the Madigan family extended phone calls and notes just to check in as well as care packages of food and flowers and invitations to spend evenings with them. As Ms. Pierce shared, "[t]hat thoughtfulness and compassion meant the world to me and in my opinion defines who Michael is." (Ex. A, p. 29, Letter from R.P.) Ms. Pierce also shared that these qualities are "most evident in the care he provides for his wife Shirley, who is 82 years old, in poor health and very dependent on him." (*Id*.)

Those who worked with Mike also witnessed his kindness over the years. Craig Willert, former Director of the House Issues Staff, shared that he "will never forget how kind and gentle and supportive Mike was to me during the darkest period of my life." (Ex. A, p. 31, Letter from J.B.) April Burgos, Mike's assistant at the 13th Ward Office, also wrote: "I have gotten to know Mike over the years and he is a kind and compassionate individual. I would not be the person I am today if it were not for this man." (Ex. A, p. 33, Letter from A.B.) Mary Morrisey shared how she and her family felt the warmth and support of the Madigan's during difficult times, especially after tragically losing her sister. But they were not the only family who felt this support: "[h]undreds, perhaps thousands, of families across the state were touched by Mike's kindness at the most difficult times in their lives." (Ex. A, p. 36, Letter from M.M.)

3. **Over the 83 years of his life, Mike has selflessly changed the lives of millions of people throughout the State of Illinois.**

Mike's positive impact on others has been nothing short of exceptional. He did not just donate to causes over the years. Instead, he spent his life making his community, the City of Chicago, and the State of Illinois a fundamentally better place to live, work, and thrive. He has done this through his support of broad policy that protects the poor, working families, children and those who simply want to be able to love who they love. Mike also impacted countless individuals through help given on a one-on-one basis. A few examples from the letters wrote on Mike's behalf are illustrative of his impact on others throughout his life.

### a. Mike helped advance policies that positively impacted millions of Illinoisians.

Mike was a devoted public servant who worked tirelessly to advance policies that helped the most vulnerable citizens of our state. As Michael Sacks, who got to know Mike well through his work on the state budget, wrote: "Throughout my work on the budget, I saw Speaker Madigan's unwavering commitment to protecting social services and defending the rights of working men and women. He fought passionately against efforts to cut support for the poor and vulnerable… His values were clear, and his leadership undoubtedly protected millions of Illinoisans." (Ex. A, p. 39-40, Letter from M.S.)

Tom Balanoff, former President of SEIU Local 1, explained several pieces of legislation that supported workers. As one example, Mike "played a crucial role in helping [the] union pass legislation establishing employment standards for Home Healthcare workers and Home Child Care workers." (Ex. A, p. 40, Letter from T.B.) As a result of this legislation, "[t]he lives of over 90,000 workers have changed dramatically." (*Id.*)

Fred Eychaner, who knew Mike professionally and personally for decades, also wrote to support him, noting that "Few public servants have shaped the course of Illinois policy and progress as extensively as Mike Madigan." (Ex. A, p. 42, Letter from F.E.) Mr. Eychaner shared how Mike's help was critical in advancing legislation establishing marriage equality in Illinois: "While our movement was broad and determined and made up of LGBTQ individuals, allies, and advocacy organizations fighting for non-discrimination and, ultimately, marriage equality, I firmly believe it

was Speaker Madigan's courage and quiet commitment that made those victories possible. Under his leadership, Illinois became one of the first states in the nation to pass marriage equality through the legislature—not by court mandate, but by democratic vote." (*Id.* at 42-43) Former Majority Leader Greg Harris also wrote to share the history of the fight for marriage equality in Illinois and Mike's efforts to ensure the measure moved forward. (Ex. A, p. 44-45, Letter from G.H.) In fact, at the time the bill passed, Mike asked Will Cousineau to document Mike's efforts in a memo. (DX 7066)

Former Cook County State's Attorney Richard Devine, who has known Mike for several decades, discussed Mike's help on criminal justice matters in the legislature. Mr. Devine noted, "Mike Madigan was a thoughtful and dedicated legislative leader who was focused on doing what was best for ou[r] community. We did not always agree, but any differences were based on substance and not on personal considerations. When he was supportive, you could go to the bank with it, knowing he would always keep his word. In my many years in government, that is a quality not known in abundance." (Ex. A, p. 48, Letter from R.D.)

Patrick Hickey, who served as the director of development at Leo High School in the 1990's, shared a story about Mike reaching out to the President of the school after Mike read about the school's funding challenges. Mike wanted to help. When the President asked Mike why he wanted to help, Mike said, "he felt Leo was a strong anchor in the community and even though it was not in his district he felt it made Chicago stronger, safer and more stable." (Ex. A, p. 49, Letter from P.H.) From Mr.

Hickey's perspective, Mike "reached out to help a community in need for the sole purpose of strengthening a community and giving young men a fair shot at a great education and the life opportunities that come with that education." (*Id.*)

Barbara Giorgi Vella, Mike's friend and State Representative Zeke Giorgi's daughter, shared how Mike helped keep her father's memory alive by not only donating to a scholarship fund at NIU College of Law but by establishing the Zeke Giorgi Legal Clinic which is housed in Rockford. (Ex. A, p. 52, Letter from B.V.) It opened in 2001 and is still operating today. Since it opened, the Clinic has served, free of charge, approximately 5,506 people, who would otherwise not have access to representation. (*Id.*) As Ms. Vella wrote, "Without Mike's support and guidance, this Clinic would not have been available to our community." (*Id.*)

Mike's generosity did not only extend to fellow democrats. At least ten Republicans stepped forward to write letters documenting moments when Mike offered help and generosity, proving that his dedication to helping others knew no partisan limits. Take Jim Watson, a former House Republican member, who experienced Mike's character firsthand. When Mr. Watson returned to military service in 2007, Mike didn't see a political opponent—he saw someone who needed support. (Ex. A, p. 53, Letter from J.W.) Without hesitation, Mike offered campaign assistance to a man from the opposing party. Andy Van Meter shared his experience with Mike when Springfield faced a railroad proposal that threatened their community. (Ex. A, p. 55, Letter from A.V.) Mike didn't calculate political advantage or party loyalty. As Mr. Van Meter saw it: "He simply did the right thing for a

community that wasn't his responsibility even if it meant opposing every state and federal official in his own Democratic party. I know of no better example of integrity." (*Id.* at 56.)

### b. Mike directly helped countless people who sought his help.

Mike also had an individual impact on countless people. As Jessica Basham, Mike's former Chief of Staff, wrote in her letter on his behalf: "please consider the life-changing positive impact that the Speaker has had not only on me, but countless others that he has impacted in his life of service." (Ex. A, p. 58, Letter from J.B.) Mary Morrissey, a former Special Assistant to the Speaker, shared that she "had the privilege to closely observe Mike's kindness and dedication to his constituents and people of the State of Illinois. I remember clearly him giving me a copy of a napkin with a name and number on it from someone who stopped him at the grocery store asking him to help them with a family member. He would ask me to call them and work on resolving their issue. And he would carry around a copy of the request in a folder, back and forth to Springfield, until the matter was resolved. Hundreds, perhaps thousands, of families across the state were touched by Mike's kindness at the most difficult times in their lives." (Ex. A, p. 36, Letter from M.M.) Father Michael Garanzini, who has known Mike personally and professionally for decades, noted: "Mike was always generous with his time and talent. Doing good things for others,

that is what we are supposed to do." (Ex. A, p. 60, Letter from M.G.) That is what Mike did.

Elliot Miller's unsolicited letter highlights the extent of Mike's assistance to others. Mr. Miller shared that his son suffered a traumatic brain injury 12 years ago, leaving him with a $12,000 bill for a nursing home stay. (Ex. A, p. 61, Letter from E.M.) The family thought that Medicaid would pay the bill, but it did not. Mr. Miller wrote Mike a letter, when no one else would help him. (*Id.*) Two days later, he received a call from Mike who helped ensure Medicaid paid the bill for his son's care. (*Id.*) Mr. Miller did not work for the 13th Ward or know Mike before sending the letter. (*Id.*) They still have never met, but when Mike could help, he did.

Mike helped with deeply personal requests for help. For example, Maria Reynoso wrote about her experience when Mike stood up for her when her immigration status seemed dire: "He willingly went out of his way and wrote a letter to USCIS to help me obtain my residency. Now, I am willfully writing this because we know him as a great community man who stands up for us, his community. He listens and helps out the community as a good public servant should." (Ex. A, p. 62, Letter from M.R.) Daniel and Francine Signore also shared their experience with Mike 30 years ago: "The gift of my daughter, who is a healthy, happily married, women, would not have happened without the kindness of Michael Madigan." (Ex. A, p. 63, Letter from D.S. and F.S.) Mr. and Mrs. Signore were in the process of adopting their daughter from Korea when they were denied insurance coverage over and over again. (*Id.*) They sent several letters out to various public officials seeking help. To

their surprise, they received a phone call from Mike who "immediately got the commissioner [for insurance] on the phone and asked him to review [the] situation." (*Id.*) Their daughter received insurance shortly thereafter. Mike called again a few days later to follow up. (*Id.*) "This was and is the only contact [they] have ever had with Michael Madigan other than a Christmas card of his beautiful family." (*Id.*)

David Koehler shared the story of his nephew, Connor Koehler, who approached Mike while at dinner at Palermo's one evening. Connor approached Mike and shared his ambition of attending the Naval Academy. (Ex. A, p. 64, Letter from D.K.) Mike took down Connor's number and assured him that he would look into what he could do to help. (*Id.*) David shared that it was especially impressive and meaningful to his family that Mike demonstrated personal attention and follow-through on Connor's request for help. (*Id.*) Connor was accepted into the Naval Academy in 2015 and was selected for the United States Navy Strike Fighter Tactics Instructor program, more commonly known as Top Gun, upon graduation. (*Id.*) David also shared his thoughts that Mike's actions "shaped [Connor's] path to success—through the Naval Academy, Top Gun, and ultimately, his military service."[3] (*Id.*)

Mike's constituents experienced this same relentless advocacy—from securing basic city services (Ex. A, p. 65, Letter from J.S.) to finding nursing homes for residents battling aggressive diseases (Ex. A, p. 66, Letter from B.C. and J.C.). Tom

[3] This was not the only time that Mike has helped a young man reach his dream of attending the Navel Academy. Father Michael Caruso shares another story about a young man who attended St. Ignatius who Mike helped in a similar way.

Ryan, a resident of the 13th Ward and former community representative, shared the impact Mike had on his life and how he gravitated to Mike for advice after he lost his own parents. Like countless others, Mr. Ryan discovered that, "He gave me a chance because he saw something in me, beneath the surface." (Ex. A, p. 70, Letter from T.R.) Mike also helped many people address their struggles with alcohol, providing them support to find their way to a second chance in life. For example, Sharon Crowley shared that Mike noticed her struggles and offered guidance that she desperately needed. (Ex. A, p. 72, Letter from S.C.) Mike shared how his own father had battled similar demons and that gave Ms. Crowley the strength she needed to face her own. (*Id.*) Jesse Leone worked for the Speaker's Staff and thought he would have his employment terminated because of his drinking problem. (Ex. A, p. 73, Letter from J.L.) Instead, he was offered assistance and support that he believes saved his life. (*Id.*) Then and now, Mike believes in providing second chances to those who struggled.

Robert Wagner, a resident of the 13th Ward, credits Mike with making his dream to attend West Point a reality: "Mike was instrumental in guiding me to achieve my lifelong dreams and without his support in my high school years things would not be as they are today. He stepped up for me when others did not…" (Ex. A, p. 74, Letter from R.W.) John Skudnig, another resident of the 13th Ward, goes further: "To say that Mike saved my life would NOT be an exaggeration…Mike Madigan is a father figure that I never had." (Ex. A, p. 75, Letter from J.S.) Mr. Skudnig shared how Mike helped him get his life on track and become a firefighter and landlord. (*Id.*) As Mr. Skudnig wrote: "this is one story I am telling you, but I

know about 100 people that have a very similar story. They all say the same thing, Michael Madigan would always try and help them beyond words." (*Id.*)

Father Michael Caruso, who struck up a meaningful friendship with Mike during his time as president of St. Ignatius, also shared several significant acts of service by Mike: donating to St. Ignatius, assisting a young man who wanted to serve our nation in the Navel Academy, and supporting thousands of disadvantaged students in getting a better education. (Ex. A, p. 77, Letter from M.C.) According to Father Caruso, Mike "did so selflessly from the generosity of his heart. His only desire was that these efforts would benefit the lives of the recipients with absolutely no expectations." (*Id.*) Mike and Shirley funded countless college scholarships for students who never even learned their benefactors' names. Mike and Shirley never wanted the recognition, they simply wanted to help. The scope of Mike's generosity and his selfless acts of service cannot be overstated.

### 4. Mike is widely known as an honest person.

Those who know Mike well know him as a man of honesty and the highest integrity. A full summary of the thoughts about his honesty and integrity from over 100 people who have known Mike for decades is attached as Exhibit J. A few illustrative examples are included below:

- *Glenn Poshard*, a former Illinois state senator and U.S. Congressman from southern Illinois, shared a quote from his biography, published years ago:

   - "He never told me an untruth or exaggerated what he could do or would do."

- *Jayne Carr Thompson*:

  - "Whether Jim and Mike were collaborating or fiercely opposed, I always knew that Mike would be truthful about his position on a bill. You could always trust his word."[4]

- *David Bonoma*:

  - "He had a well-known reputation in government and professional circles as someone whose word would be trusted."

- *Rocco Claps*:

  - "Mike Madigan has always displayed qualities of honesty, integrity and responsibility."

- *Sharon Crowley*:

  - "I am deeply grateful for his honesty, his time, and the kindness he showed when I needed it most. Mike Madigan is and was the Most Honest Truthful Man I have ever met in my life."

- *Barbara Flynn Currie*:

  - "I have only known him to tell the truth."

- *Ray Hanania*:

  - "I always believed Mike Madigan was fair and truthful when he spoke with me. I consider Mike Madigan to be among the most honest politicians I have met. I can say with certainty he never lied to me as a reporter."

- *Reverend Gary McCants*:

  - "Throughout my time in Springfield, Representative Madigan was unfailingly honest and principled in his interactions with me."

---

[4] Governor Thompson strongly expressed his opinion regarding Mike's honesty and integrity in a draft letter to the editor in 2014: "I have known Mike Madigan very well, both professionally and personally, for more than 35 years. There is no public servant whose integrity and personal moral code is stronger than Mike Madigan's… And while we had our disagreements, I could always count on Mike to give it to me straight, tell me the truth and stick to his word. Such qualities aren't easy to find in the world of politics." (Exhibit K).

- *Jim McPike*:

  - "The finest man I have ever known is Michael J. Madigan…He always tells the truth."

- *Former Republican Governor Jim Edgar*:

  - "I found Mike Madigan to be a person who always kept his word, and that is somewhat unusual for people in that world."

- *Robert Weisman:*

  - "In my dealings with Mike, he has always exemplified integrity and honesty."

- *Rob Uhe:*

  - "During my eight years working closely with Speaker Madigan, I saw first-hand his dedication, respect, integrity, and care for doing what's right. He is a very good man."

As with his acts of service, the letters written on his behalf only scratch the surface of people who know Mike to be an honest man who has acted with the utmost integrity throughout his life. Counsel respectfully submits that, when weighing the totality of Mike's 83-year life with the offense conduct in this case, Mike's lifetime of good works, genuine care for others, and generosity, as well as his widely recognized dedication to honesty and integrity, support a non-custodial sentence.

## B.    Nature and Circumstances of the Offense

Mike challenged the government's case at trial and, though he maintains his innocence, he respects the jury's work. Because the Court is familiar with the nature and circumstances of the offense, counsel will not repeat every detail again here. Instead, there are three key areas that are helpful to put the offenses in context of bribery convictions. First, Mike did not receive any personal benefit. Second, the government did not dispute that the legislation at issue was good policy and Mike's

staff helped ensure that Illinois consumers were protected. Third, each of the offenses involved Mike's intent to help others.

As to the first point, the evidence at trial showed that Mike did not receive a penny from ComEd and his law firm similarly did not receive any business. Instead, the ComEd offenses were based on ComEd hiring people "associated with" Mike. It is undisputed that the payments to these people were never funneled back to him in any way. He simply did not personally benefit from the conduct, at all. Additionally, Harry Skydell did not hire Madigan & Getzendanner and there was no evidence that the firm received any payments related to the Board seat offenses conduct. The only payments arguably received were based on The Resurrection Project purchasing insurance through Andrew Madigan two years after Mike asked Solis to ask the CEO of the organization to return Andrew's call and perhaps give him a chance to show what he could do. But critically, the evidence showed that The Resurrection Project ultimately purchased insurance through Alliant based on a different person setting up a breakfast between Andrew and the CEO, completely unrelated to Mike. On top of this, the decision to purchase insurance through Alliant was made by the organization's CFO without even knowing anything about Solis or Mike, at all. She did not even connect that Andrew Madigan was Mike's son.

Second, the evidence showed that the legislation at issue was beneficial for Illinois consumers. (*See, e.g.,* Tr. p. 661, ln. 12-16). And Mike's staff always fought for consumers. (*See, e.g.,* Tr. p. 7850, ln 16-23). For Smart Grid, Mike recognized in 2010 that the ICC's rate making process was antiquated and needed a face lift. (GX 401)

Smart Grid ultimately provided consumers better service and stable rates while ensuring ComEd did not receive the "blank check" they wanted. (Tr. p. 1346, 7826, 7850, 8215-16, DX 1022) On FEJA, ComEd did not get *any* of the things it wanted. (DX 5061, TR. p. 683, 8259, 9561) The formula rate request in the FEJA bill came from Ameren, not ComEd. (DX 7050, Tr. p. 1375) The government did not dispute this point but instead argued that it did not matter for purposes of proving the elements of the offense. The fact that the legislation was beneficial to consumers, and that Mike's staff was always in the room fighting for those consumers, not ComEd, provides important context when comparing this case to others for sentencing purposes.

Third, in both the ComEd related conduct and the State Board related conduct, Mike was trying to help others. The ComEd related offense conduct was based on individuals asking for Mike's recommendations and his providing them. For the State Board related conduct, Mike was responding to a request for assistance from a long-time Democrat. Solis repeatedly told Mike that he needed help for family reasons—his daughter was getting married, his son was looking at colleges, he had four children in total and four grandkids with whom he wanted to spend time. Given Mike's decades of helping anyone he could, he said he would try to help when the time came. Mike learned that Solis had committed extensive crimes before he made any recommendation. Mike never made the recommendation.

These mitigating factors set this case apart from any other bribery case. Counsel submits that these factors weigh as mitigation when considering the nature and circumstances of the offenses.

###   C.   The Need to Reflect the Seriousness of the Offense and Provide Deterrence

The defendant respectfully submits that a sentence of imprisonment would be greater than necessary to protect the public or deter him from criminal conduct. Mike does not pose a risk of committing new crimes. He will never hold public office again. He has suffered continuous public embarrassment based on the charges. As one example, Mike was publicly compared to a mob boss.[5] Politicians also continue to use Mike as a cheap political shot, without any regard for his history of good works and positive impact on Illinois. Even more troubling to Mike, his grandchildren are teased at school due to his public embarrassment. This intense public embarrassment for Mike and his family, who he has always strived to support and protect, is a significant punishment in and of itself. He will also live the rest of his years as a felon. Accordingly, counsel respectfully suggests that a sentence involving a period of probation, including a term of home detention, would be more than sufficient to "protect the public from the defendant." 18 U.S.C. § 3553(a)(2)(C). As the Supreme Court recognized in *Gall*, a sentence of probation involves a "substantial restriction of freedom." *Gall,* 552 U.S. at 48, 128 S.Ct. 586.

---

[5] Ray Long and Jason Meisner, Don Madigan? Ex-FBI agent likens former House speaker to mafia boss in perjury trial of former Madigan aide, The Chicago Tribune, Aug. 15, 2023, available at https://www.chicagotribune.com/2023/08/14/don-madigan-ex-fbi-agent-likens-former-house-speaker-to-mafia-boss-in-perjury-trial-of-former-madigan-aide/.

The government will undoubtedly hammer one argument above all others—that only a prison sentence can deter future corruption (18 U.S.C. § 3553(a)(2)(B)).[6] But no criminal defendant in recent memory has endured the relentless, systematic public demolition that this prosecution unleashed upon Mike Madigan. The media feeding frenzy did not just report the case—it created a cultural narrative where "Mike Madigan" became shorthand for corruption itself. These brutal collateral consequences will define every remaining day of Mike Madigan's life. Beyond any sentence the government seeks, Mike faces the consequences already imposed—spending his final years in quiet service to his ailing wife, forever marked by a public humiliation so complete it has rewritten his legacy. The deterrent effect the government seeks has already been achieved through the destruction of a man's reputation in the court of public opinion. Adding a lengthy term of probation and significant community service, when combined with a period of home detention, serves as a strong general deterrent, without imposing a punishment that is greater than necessary given Mike's specific situation.

### D.    The need to take into account the types of sentences available.

The Court must also take into consideration "the kinds of sentences available" under 18 U.S.C. § 3553(a)(3). There is no statutory minimum sentence, and Mike is

---

[6] Academic studies conclude that more rigorous and frequent enforcement and prosecution of financial crimes, rather than longer sentences, more effectively deters white-collar crime. Richard S. Frase, Punishment Purposes, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders . . . have much to lose from being convicted, regardless of the penalty."); Peter J. Henning, Is Deterrence Relevant in Sentencing White Collar Criminals? 61 Wayne Rev. 27, 48-49 (2015).

therefore eligible for an alternative sentence of probation with a period of home detention. *See,* U.S.S.G. §5F1.2. HOME DETENTION.

Within the Sentencing Guidelines and federal statutes, home detention is permissible as a *substitute for* incarceration. *United States v. Lopez-Pastrana*, 889 F.3d 13 (1st Cir. 2018) *citing* 18 U.S.C. § 3583(e)(4) (stating that a court, when including a term of supervised release after imprisonment, may "order the defendant to remain at his place of residence during nonworking hours," but such an order "may be imposed only as an alternative to incarceration"); *id.* § 3563(b)(19) (stating that home confinement during nonworking hours may be imposed as a condition of a sentence of probation "only as an alternative to incarceration"); U.S.S.G. § 5C1.1(e)(3) (stating, under the heading "Schedule of Substitute Punishments": "[o]ne day of home detention for one day of imprisonment"); U.S.S.G. § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."). "Put simply, home confinement is a 'unique' condition of release, permissible only as a *stand-in for* imprisonment." *Id.* (emphasis added). The Sentencing Guidelines recognize that, because criminal behavior tends to decrease with age, "in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing." U.S.S.G. § 5H1.1.

"[A] district court may depart from an applicable guidelines range once it finds that a defendant's family ties and responsibilities or community ties are so unusual that they may be characterized as extraordinary." *United States v. Canoy*, 38 F.3d

893, 906 (7th Cir. 1994); *see also United States v. Reed*, 859 F.3d 468, 473 (7th Cir. 2017) (discussing that extraordinary family circumstances can provide a legitimate basis for a lighter or below-guideline sentence). "[I]f the situation is unusual and a reasonable departure could solve the family's problem, the court must consider whether a departure is normatively proper and consistent with the purposes of sentencing." *United States v. Manasrah*, 347 F. Supp. 2d 634, 637 (E.D. Wis. 2004). "If the nature of the offense and the character of the defendant indicate that a guideline sentence will serve no purpose other than punishment, if the defendant is not a threat to the community and if society will ultimately benefit if the defendant is permitted to continue caring for her family, the court should grant a departure." *Id.* (*citing United States v. Pena*, 930 F.2d 1486, 1494 (10th Cir. 1991)).

The key consideration for Mike is Shirley's health. One day of imprisonment for him will upend her entire life, including Mike's constant care for her serious respiratory, mobility, and other ailments. Mike presence is medically necessary to provide the direct assistance, supervision, and emotional support required to maintain Shirley's well-being in a familiar home environment, which is paramount for patients with Shirley's conditions. (Exhibit L[7]) Mike and Shirley live in the same three bedroom, three-and-a-half-bathroom home where they've lived since 1977. It is a nice home, but not large or lavish. A sentence of probation with a condition of home

---

[7] Exhibit L is a letter that includes sensitive details of Shirley's medical condition. As such, Defendant has filed it under seal.

detention allows for a serious sentence that considers Mike's unique circumstances, which include his role as Shirley's caretaker.

### E. The need to avoid disparate sentences.

Sentencing courts are also required to consider the need to avoid unwarranted sentencing disparities between similar defendants convicted of similar crimes under 18 U.S.C. § 3553(a)(6). Mike is a statistically unique defendant, and counsel has not found any comparable case involving an eighty-three-year-old public official-defendant convicted of bribery and wire fraud that involved no personal benefit.

However, U.S. Sentencing Commission data shows that the oldest offenders are the most likely to receive an alternative sentence or fine. According to its 2022 report "Older Offenders in the Federal System," the Commission found that roughly 31.3% of offenders 65-69, and 42.1% of offenders 70 and older received an alternative sentence or a fine. National sentencing statistics show that in 2024, of the 362 defendants convicted of bribery/corruption were, 74% received a prison sentence but 26% received alternative sentences (7.5% received probation and alternatives and 18.5% received probation only).[8] Moreover, in the cases where the bribery defendants received a sentence of prison, the median sentence was only twelve months nationally and sixteen months in the Seventh Circuit.[9] Taking this data together—that 41.2% of defendants roughly Mike's age are not sent to prison, and 26% of all

---

[8] U.S. Sentencing Commission, "Statistical Information Packet Fiscal Year 2024," Table 4 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/7c24.pdf)

[9] U.S. Sentencing Commission, "Statistical Information Packet Fiscal Year 2024," Table 7 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/7c24.pdf)

bribery/corruption defendants are not sent to prison—a non-custodial sentence would not create an unwarranted sentencing disparity. On the other hand, a lengthy prison sentence would create a *significant* disparity both in this Circuit and nationwide.

Numerous other federal courts have imposed sentences significantly below the advisory Guideline range in similar cases, particularly for first-time offenders. For example:

- Ed Burke (former Chicago Alderman): 13 counts of racketeering, bribery and extortion.
    - Guidelines: 78 to 97 months.
    - Sentence: 24 months.
- Jesse L. Jackson Jr. (Former U.S. Rep.): Misused ~$750k in campaign funds. *United States v. Jesse L. Jackson Jr.*, 13-cr-00058-ABJ (D.C.).
    - Guidelines: 46-57 months.
    - Sentence: 30 months.
- Michael G. Grimm (Former U.S. Rep.): Tax fraud (related to ~$900k unreported income). *United States v. Michael G. Grimm.*, 14-cr-000248-PKC (E.D.N.Y.).
    - Guidelines: 24-30 months.
    - Sentence: 8 months.
- Christopher Collins (Former U.S. Rep.): Insider trading/false statements (loss in hundreds of thousands). *United States v. Christopher Collins*, 18-cr-00567-VSB (S.D.N.Y.).
    - Guidelines: 46-57 months.
    - Sentence: 26 months.
- Jerry Lundergan (Former KY Dem. Chair): Illegal campaign contributions (>$200k). *United States v. Gerald G. Lundergan*, 18-cr-00106-GFVT (E.D. Ky.).
    - Guidelines: 51-63 months.
    - Sentence: 21 months.

Mike is 83 years old. The Guidelines Manual specifically recognizes that "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home detention might be equally efficient as and less costly than incarceration." Age (Policy Statement), FCJ Federal Sentencing Guidelines Manual § 5H1.1 (11/1/23). The Guidelines Manual also sets forth sentencing options, including home detention, as a substitute for imprisonment. Home Detention, FCJ Federal Sentencing Guidelines Manual § 5F1.2 (11/1/23).

The Seventh Circuit has called upon district court judges to consider the cost that the government incurs in incarcerating older individuals like Mike. *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015). Prisoners at least fifty years old cost the federal prison system about eight percent (8%) more than younger prisoners, and those costs only rise with age. *Id.* (citing Office of the Inspector General, U.S. Dept. of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, May 2015 (https://oig.justice.gov/reports/2015/e1505)). Indeed, since the pandemic and the passage of the First Step Act, the Bureau of Prisons has increasingly exercised its authority to compassionately release aging and physically vulnerable federal prisoners.

Finally, recidivism rates consistently decline as age increases. See, U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders, p. 3, 22-23 (Dec. 2017). Recidivism rates are strongly correlated to age and the guidelines' ranges do not account for this fact, despite the importance of age in calculating recidivism. *United States v. Carter*, 538 F.3d 784, 791-92 (7th Cir. 2008).

## III.     TREATMENT OF A PERJURY ENHANCEMENT

### A.     Mike's testimony was truthful.

Mike testified in his own defense. "Standing alone, the fact that a defendant denied [his] guilt at trial and then was found guilty is not enough to merit a § 3C1.1 enhancement." *United States v. Ellis*, 548 F.3d 539, 545 (2008) *citing United States v. Webster*, 125 F.3d 1024, 1037 (7th Cir.1997). "To properly support an enhancement for obstruction of justice, the district court must make independent findings as to all of the elements of perjury: falsity, willfulness, and materiality." *Id.* Application Note 6 defines "material" to mean "evidence, fact, statement, or information that, if believed would tend to influence or affect the issue under determination." Even if material, a misstatement or omission must also be "willful." Application Note 2 specifically states that § 3C1.1 "is not intended to punish a defendant for the exercise of a constitutional right." The government "…bears the burden of proving a § 3C1.1 adjustment is warranted by a preponderance of the evidence." *United States v. Burgess*, 22 F.4th 630 (7th Cir. 2022).

The government has asserted that certain areas of Mike's testimony support a perjury enhancement. However, the government repeatedly makes broad claims that Mike attempted to "mislead and confuse" the jury without providing any evidence that the statement, if a statement is even identified, is demonstrably false and material. The government also suggests that supporting a false impression is enough to require a perjury enhancement—it does not. The government must be able to

demonstrate—through evidence, not spin and speculation—that Mike lied when he made a specific statement that was material to the case. It cannot do so.

Based on the government's previous positions, it appears the government takes issue with nine areas of Mike's testimony related to the ComEd counts and one area of his testimony related to the state board appointment conduct. These areas are: (1) Mike's denial of agreeing to exchange jobs at ComEd for official action favorable to ComEd; (2) Mike's denial that Mike McClain ever said anything to him about people Mike recommended doing little or no work; (3) Mike's knowledge of Ray Nice's work related to his state board position while he did not know whether Nice performed work for Jay Doherty; (4) Mike's denial of "control" of payments made by ComEd to Ed Moody; (5) Mike "said nothing in his direct" about the fact that he, at times, recommended people for jobs because they would help with campaign work; (6) Mike's denial that he expected a "hard and favorable response" from ComEd; (7) Mike's testimony that McClain only helped him with "some" problems but not all; (8) Mike's testimony that he did not have a conversation about ComEd with Ed Moody in 2018; (9) Mike's testimony that he not tell Will Cousineau to find members to vote "yes" for the FEJA bill in 2016; and (10) Mike's testimony that he had not decided for certain that he would recommend Solis for a Board position.

1. *Mike's denial of agreeing to trade official action favorable to ComEd for private gain.*

There is no evidence that contradicted Mike's testimony that he did not trade his public office for private gain. The government argues that the jury's verdict on Counts 2, 4, 5, and 6 contradicts this testimony but, the instructions given to the jury

permit conviction if the "thing of value" was given to a third party, not Mike. Additionally, the government repeatedly argued that Mike did not need to agree to take an official action in exchange for the jobs at issue. Instead, the government's position was that the jury could convict if Mike knew that a member of the conspiracy was attempting to influence him. The government argues that John Hooker's stray comment about "getting a leg up" establishes Mike's testimony that he never agreed to exchange jobs at ComEd for an official action favorable to ComEd was false. (GX 294). This statement (<u>not</u> made in Mike's presence) is vague at best, offering no indication that Madigan took, or agreed to take, any "official action" to assist ComEd. Instead, the evidence showed that Mike was ComEd's principal antagonist in negotiating EIMA and FEJA. *See,* Madigan's Post-Trial Motions, Dkt. 401, p. 22-26.

   2. *Mike's denial that Mike McClain ever said anything to him about people Mike recommended doing little or no work.*

The government argues that Exhibit 156, a recording between Mike and Mr. McClain, shows that Mike's testimony that Mr. McClain never told him that *<u>someone he recommended</u>* was not doing work was false. But the government knows very well that Dennis Gannon, the subject of the call was not recommended by Madigan. During the call, McClain described that Mr. Gannon, a labor consultant for ComEd, was asked to drive around a contract to get it signed. When Madigan asked how Gannon got involved (because he did not even know Gannon was employed by ComEd), McClain explained that "we [ComEd]" gave him a contract for $150,000. (GX 156). In response, Madigan stated that some consultants, like Gannon, were making out like "bandits." *Id.*

Three different witnesses confirmed that Mike had no involvement in the hiring of Gannon. Tom O'Neill knew Gannon and recommended that he be hired. Fidel Marquez was supposed to supervise Gannon. And, the government interviewed Gannon himself. All three confirmed that his hiring by ComEd had nothing to do with Madigan. Still, the government claims, in the face of crystal-clear evidence to the contrary, that this call shows Mike's testimony was not truthful. The evidence at trial showed the government was wrong. Mike testified truthfully that he was never told that the people he recommended were doing little or no work for ComEd.

3. *Mike's knowledge of Ray Nice's work related to his state board position while he did not know whether Nice performed work for Jay Doherty.*

Mike truthfully testified that he did not know whether Ray Nice was doing work for Jay Doherty. Mike also truthfully testified that he talked to Mr. Nice about his work for the State board. There is no evidence to the contrary. These statements do not contradict each other. In fact, it is logical that Mike, an elected state official, would be interested in Mr. Nice's State board work. On the other hand, Mike would not be interested in any work that Mr. Nice was doing for ComEd related to the City of Chicago or Cook County. Finally, even if false (which it is not), this statement is not material to the charges.

4. *Mike's denial of control of payments made by ComEd to Ed Moody.*

Mike's testimony that he was providing Mr. McClain advice on whether ComEd should continue to engage Ed Moody as a lobbyist after news reports came out that Madigan and Moody were "associated" and that Moody had been named to a high-level county wide position (without Madigan's involvement) is consistent with

the evidence presented at trial. As Mike testified, Mr. Moody was elected Cook County Recorder of Deeds, which was a senior-level, full-time elected executive position. Prior to this time, Mr. Moody was an employee in county government and a Cook County Commissioner. Mike explained that both of these positions were not as time intensive as the county wide elected position. This was the basis of his response to a question from Mr. McClain's counsel, and there is nothing in the record that contradicts this testimony.

> 5. *Mike "said nothing during his direct testimony" about the fact that he, at times, recommended people for jobs because they would help with campaign work.*

The government argues that Mike committed perjury because he "said nothing during his direct testimony about the fact that he had other motives in finding work for people, namely, that in return for finding them employment, Madigan expected certain of those individuals to do *political work* for Madigan." This is not perjury. Mike never denied that he had historically participated in the patronage system. The government's support for this argument is an oral history interview about Mayor Richard J. Daley that was filmed in 2009 discussing Madigan's involvement in the patronage system back in the 1970's, *50 years earlier*. In addition to Mike not actually making any false statement on this issue, any conduct by Mike from 50 years before the charges in this case were brought could not be considered material.

> 6. *Mike's denial that he expected a "hard and quick favorable response" from ComEd.*

There is no evidence that Mike "expected a hard and quick favorable response to job requests made to ComEd." The government's argument to the contrary relies

on two points: (1) that Mike was concerned that he could not rely on what Mr. Marquez said about a PLA moving forward to be true (GX108); and (2) that Mr. McClain and Mr. Hooker said that Mike said (a game of telephone) that talking to Marquez was "like putting something in a dark hole" (GX62). Neither of these points support the argument that Mike lied when he said that he never expected a "hard and quick favorable response" from Mr. Marquez on job recommendations. Instead, at most, these recordings show that Mike did not think Mr. Marquez was very reliable to do what Marquez said he would do. Moreover, the evidence demonstrated that more than half of Madigan's recommendations did not result in jobs at ComEd. Madigan did not always demand or expect a positive response.

### 7. *Mike's testimony that McClain only helped him with "some" projects but not all.*

The government also argues, without support, that Mike "lied repeatedly during his testimony when he attempted to minimize his relationship with McClain." Even if Mike's testimony "minimized his relationship" with Mr. McClain, which he did not, this is not perjury. Mike's testimony simply presented the fact that he was not the same person as Mr. McClain and he had a large number of people, staff and other lobbyists, that helped him over the years. While the government may believe that Mike only spoke to Mr. McClain and no one else for the 50 years he was Speaker of the Illinois House of Representatives, this is not supported by the evidence. Mike's testimony regarding the limitations on the scope of his relationship with Mr. McClain are not false statements. Mike repeatedly recognized, on direct and cross examination, that he relied on Mr. McClain at times. (Tr. p. 8709, 8731, 8734, 8827,

8834, 8839, 9116, 9125) His testimony was simply that he did not rely _exclusively_ on Mr. McClain. There is no evidence that contradicts Mike's testimony. In fact, the government even presented recordings of Mike consulting with staff members. And, the defense presented the testimony of former staffers who shared that Mike sought and relied on their advice. This testimony was corroborated by numerous other exhibits.

   8. *Mike's testimony that he did not have a conversation about ComEd with Ed Moody in 2018.*

Mike testified truthfully that he never had a conversation with Ed Moody about the fact that Mr. Moody was not doing work for ComEd. The only evidence the government cites to support its argument on this point is the testimony of Mr. Moody himself. Mr. Moody's testimony was not corroborated by any documents or other witnesses. Joe Lullo, a government witness, testified that Ed Moody, and his twin brother Fred Moody, had a reputation for not telling the truth. (Tr. p. 2291). There was no testimony that Madigan was not known to be a truthful person. To the contrary, the letters summarized in Exhibit J show Mike is well-known as an honest person.

Mr. Moody's story is not credible. Mr. Moody testified that he just happened to be walking across the street from Mike's house when Madigan parked his car outside his house and walked over to talk to him. (Tr. p. 4487) But Mike does not have a full driveway. (DX 5064, Tr. p. 8325) Madigan's garage is attached to his home. (DX 5064, Tr. p. 8681) Mike's regular practice when he comes home is to back the car into that attached garage and close the garage door before he enters his home through the

interior door in the garage. (Tr. p. 8681) Mike would not have parked his car in the driveway, blocking the sidewalk. Additionally, Mr. Moody testified that he was campaigning in a district that only includes the area across the street and diagonally away from the Madigan home. (Tr. p. 8329-30) From that area, Mr. Moody could not have even seen Mike's garage doors. (Tr. p. 8360) Finally, Mr. Moody had no record of being in the area campaigning at the time. (Tr. p. 4485) There is simply nothing to corroborate Mr. Moody's testimony, for which he received complete immunity from the government.

> 9. *Mike's testimony that he did not have a conversation with Will Cousineau about finding votes for the FEJA bill in 2016.*

Mike did not lie when he testified that he did not direct Will Cousineau to get votes for FEJA. The government relies on Cousineau's testimony, a later email where Mr. McClain is trying to get Mr. Cousineau a job with ComEd, and a call a year later where Mr. McClain and Mr. Hooker are bragging about their value (even though their statements were proven to be false). Cousineau, after being immunized for his role in paying Kevin Quinn (something that Mike had no part in), offered his vague and grossly incomplete recollection that he had a phone call with Mike and Mr. McClain about a roll call and need to round up additional votes. In fact, Cousineau's testimony was so hazy that the Court struck a portion of his testimony that Mr. McClain was in the room for this phone call after determining that he did not have a sufficient foundation to support it. (Tr. p. 1649) Cousineau admitted that he didn't "have a specific recollection" of why or how he knew that Mr. McClain was in the room.

Instead, he continuously stated that he was trying to be consistent with his grand jury statement. But he was not able to recall any details <u>at all</u> about this call.

Cousineau's testimony was directly contradicted by defense witness Craig Willert and contemporaneous documents he produced pursuant to a defense subpoena. Willert testified that Madigan pulled enough Democrats off the bill such that Exelon did not meet its goal of a three-fifth's majority. (Tr. p. 8392-8408). In other words, people were encouraged, at Madigan's suggestion, to vote "no" —the exact oppositive of what Cousineau testified. Willert, who was set to inherit Cousineau's position and acted as Cousineau's floor leader at that time, affirmatively testified that there was no such roll call and no effort to round up "yes" votes. (Tr. p. 8392, 8407-08). Willert made clear that had such an instruction been given, he would have been aware of it. (Tr. p. 8393, ln. 2-6). It did <u>not</u> happen. Willert rought forth the contemporaneous emails and text messages that established that Cousineau was dead wrong. (Tr. p. 8392-8408). As the testimony (and records) demonstrated, Madigan's staff encouraged at least nine separate members to vote "no" to protect them politically, thus denying Exelon its "goal" of having a bill with immediate effect. The floor debates, the vote record, Willert's testimony, and the contemporaneous records also contradicted Mr. McClain's random statement to Mr. Hooker that Madigan "put 47 votes on" FEJA two years earlier. Obviously, there was no opportunity to cross-examine this statement from McClain. Most importantly, the full record shows it is just plain false. There were not even 47 Democratic votes in favor

of the bill and not one legislator testified that Madigan sought to influence their vote on FEJA. Madigan himself did not even vote for FEJA.

> ### 10. Mike's testimony that he had not decided for certain that he would recommend Solis for a Board position.

Mike did not lie when he testified that he had not decided whether to recommend Solis for a State board position. The government recognized in its closing that Mike never recommended Mr. Solis for a Board position. (Tr. 10276, 10277) The fact that Mike told Mr. Solis what would happen *if* Mike recommended him for a State board position does not mean that Mike had made a decision to do so. In fact, the government mischaracterizes GX 151 in an attempt to support its argument. The government selectively quotes from that recording that Mike "further told Solis that Madigan would 'go to Pritzker' to recommend Solis, and that 'you'd come in as Pritzker's recommendation.'" But, looking at the full context, this statement from Mike was prompted by Mr. Solis and was simply a hypothetical of what would happen *if* Mike eventually made the decision to recommend Mr. Solis:

```
- - -
289   SOLIS:        So, what would happen if you recommended me?
290
291   MADIGAN:      For this board? (Points to paper.)
292
293   SOLIS:        Yeah.
294
295   MADIGAN:      See, I would go to Pritzker. That's what I would do.
296
297   SOLIS:        Okay. Okay.
298
299   MADIGAN:      So, you'd come in as Pritzker's recommendation.
300
301   SOLIS:        Mhmm. Okay.
```

The government also cites GX 197 as support for this argument because Mike said, "When I sit down with Pritzker, that's, I'll tell him here it is, this is what we want to do." What the government neglects to mention is that, at this point, Mr. Solis

told Mike that he was going to run for re-election as Alderman so any decision on whether to recommend Mr. Solis was at least two years away. *See* GX 197 (Solis: "I'm gonna run again" "And stay two years."). Finally, the government asserts that Mike's statement of "just leave it in my hands" *must* mean that Mike intended to recommend Mr. Solis. But no evidence at trial contradicted Mike's testimony that his intent from this statement was that he was contemplating recommending Mr. Solis but would make a final decision when it came time to either make the recommendation or not. There was no evidence that Mike ever committed to recommending Solis for the Board seat. He simply said that he put a note in his file for recommendations and would decide whether to make the recommendation later. Over the course of several months (and prior to January 2019), Mike submitted approximately 10 lists of Board recommendations (ultimately comprising nearly one hundred different individuals from both political parties) and met with Governor-elect Pritzker and his staff numerous times about those recommendations. Importantly, less than half of those recommended by Madigan received positions. Mike never recommended Solis.

**B.      Treatment of a perjury enhancement for purposes of 3553(a).**

If the Court determines a perjury enhancement is appropriate (which it should not), the Defendant has found no case law that *requires* the Court to treat such enhancement as an aggravating factor for purposes of 3553(a). A critical consideration in this case is that Mike testified based on his memory and his intent. There was no evidence that showed he willfully provided false, material testimony. Instead, he took the stand in his own defense to provide his account of what occurred.

He should not receive a heightened sentence for availing himself of his constitutional right to testify in his own defense simply because the jury found him guilty on some counts. *United States v. Ellis*, 548 F.3d 539, 545 (2008).

## IV.    GUIDELINES CALCULATION

With the exception of the obstruction enhancement, the Probation Officer agreed with the government's calculation of the advisory guidelines. In identifying Madigan's objections to the PSR and in the hope that this assists the Court's review, defense counsel has included below both the government's position as well as the defendant's position such that the Court can see both in one filing.

### A. ComEd Related Conduct

#### 1.    Count 2 (18 U.S.C. § 371)

Pursuant to Guideline § 1B1.2(d), because the defendant was convicted of a conspiracy to commit more than one offense, the defendant is treated as if the defendant had been convicted on a separate count of conspiracy for each offense that he conspired to commit.

**The Defendant agrees.**

##### a)  Section 666 Objects.

The government asserts that the anticipated offense level for the Section 666 objects as to Count 2 is 50.

**Based on Defendant's calculation, the anticipated offense level for the Section 666 objects of Count 2 as 16.**

1) Pursuant to Guideline § 2X1.1, the base offense level for the underlying offense (18 U.S.C. § 666(a)(1)(B), 18 U.S.C. § 666(a)(2)) applies plus any adjustments for any intended offense conduct that can be established with reasonable certainty.

**Defendant agrees.**

2) Pursuant to Guideline § 2C1.1(a)(1), the base offense level is 14.

**Defendant agrees.**

3) Pursuant to Guideline § 2C1.1(b)(1), a 2-level increase is appropriate because the offense involved more than one bribe.

**Defendant objects to this increase. The government argued that the conduct at issue was a "stream of benefits" that ComEd provided Mike over the relevant time period in exchange for acting favorably on ComEd legislation. Based on this argument, there was only one alleged bribe that was an ongoing "stream of benefits", and this increase does not apply to this case.**

4) Pursuant to Guideline § 2C1.1(b)(2) and § 2B1.1(b)(1)(N), a 26-level increase is appropriate, because the value of the benefit received or to be received in return for the payments exceeded $150,000,000.

**Defendant objects to this increase. The $150 million estimate by the government is speculative with no reliable support in the record. Because the government has provided no reliable evidence to support its guess as to the benefit received by ComEd, the court should look to the benefit received by the public official, here Mike. As discussed, Mike received no personal benefit. Because of this, there is no increase pursuant to Guideline § 2C1.1(b)(2) and § 2B1.1(b)(1)(N).**

**Courts may accept reasonable benefit estimates based on information available in the record. *United States v. Anderson*, 517 F.3d 953, 963 (7th Cir. 2008), citing *United States v. Schaeffer*, 291 F.3d 932, 939 (7th Cir. 2002). "Permitting 'reasonable estimates,' however, does not mean accepting any number put forth." *United States v. Buncich*, 20 F.4th 1167, 1177 (7th Cir. 2021). Additionally, under § 2C1.1(b)(2), the relevant "benefit received" calculation reflects the benefit's net value, not its gross value. *United States v. Sapoznik*, 161 F.3d 1117, 1119 (7th Cir. 1998). The "value of the benefit to be received" may be overly speculative. *United States v. Muhammad*, 120 F.3d 688, 700 (7th Cir. 1997).**

The government's benefit calculation is based on three things: (1) ComEd executive Scott Vogt's testimony; (2) a slide from an internal ComEd document that was not admitted at trial; and (3) the ComEd Deferred Prosecution Agreement ("DPA").

Mr. Vogt's testimony is uncertain, unproven, and logically disconnected. At trial, in response to the government's question, "about how much additional shareholder value did you project would be gained by extending the formula rate from 2018 to 2022?" Vogt testified, "[a]round $400 million." Tr. 614. When asked, "[d]id you ever do any after-the-fact analysis of the formula rate to see if that $400 million was spot on?" Vogt replied, "[n]ever really did." Tr. 615. The government asked whether the estimate might be too high or too low, Vogt said, "...probably too high." Id. The government, seeking clarification, asked, "[s]o let me try to translate that a bit. It sounds like some of the assumptions baked in ended up not shaking out quite the way you had anticipated?" Vogt agreed. Tr. 616. Moreover, in combination with repeated qualification, Vogt testified that the analysis arriving at the $400 million figure was performed in 2014. Tr. 615. Ultimately, the only concrete statement made in connection to the $400 million estimate came in response to the government's question, "[s]o even if that $400 million estimate is a little bit too high based on all those factors, what effect did the formula rate legislation have on shareholder value for ComEd?" Vogt replied, "it was still beneficial and increased shareholder value." Tr. 616. Mr. Vogt's testimony provided only high-level figures. In other words, the only thing that Scott Vogt could reliably say was that the legislation at issue increased shareholder value by some indeterminate amount.

The government also points to a slide from an internal ComEd document that broadly states "shareholder value" of the legislation "is estimated to be worth roughly $400 million." (NBG00040979 at p.34). This calculation of shareholder gain is unreliable for several reasons. First, as Mr. Vogt testified, the analysis was performed before the legislation passed and was never reviewed after that time for actual impact. Second, the estimate was based on gross figures—projecting the company's share price appreciation or market capitalization growth—without

any evidence of the net benefit resulting from the alleged misconduct. The government does not even attempt to draw a distinction between the legislation's gross and net values to ComEd. The government's calculation of the purported benefit to shareholders suffers from the same flaw courts have recognized when the government relies on gross figures without accounting for net values — it overstates the true economic impact by ignoring necessary offsets, costs, or losses. Just as gross revenue, standing alone, says nothing about net profit, the government's calculation of gross shareholder gains says nothing about the true economic benefit attributable to the alleged misconduct. Both approaches improperly invite the Court to assume, without evidence, that all upward movement reflects unlawful gain, ignoring the real-world complexity of costs, offsets, and independent drivers of value.

The DPA also provides no support for the government's argument because it is simply a document that was negotiated between the government and ComEd. It does not cite to any data to support the broad statement that the legislation "exceeded $150,000,000." The government points to several different numbers and argues that the benefit *must* be at least $150 million. There is no reliable evidence that supports this assertion. For these reasons, the government's benefit calculation is impermissibly speculative.

When courts are unable to accurately calculate the expected benefit, they must resort to sounder, more concrete methods for arriving at a benefit figure. *United States v. Roussel*, 705 F.3d 184, 201 (5th Cir. 2013) (distinguishing between calculation driven by arbitrary benchmark and calculation based upon "known amounts of profits from various land deals… which the district court could concretely base its calculation."). That figure is typically the personal benefit that the public official received. Here, Mike received *no* personal benefit and, as such, no increase is warranted.

5) Pursuant to Guideline § 2C1.1(b)(3), a 4-level increase is appropriate because the offense involved an elected public official.

   **Defendant agrees.**

6) Pursuant to Guideline § 3B1.1(c), a 2-level increase is appropriate because the defendant was an organizer or leader of a criminal activity.

   **Defendant objects to this increase. There is no evidence that Mike was the organizer or leader of the ComEd conspiracy. Instead, the evidence presented showed conversations between ComEd employees and external lobbyists. There were no discussions with Mike that established he organized or led the activity or controlled any alleged member of the conspiracy. _See, e.g., United States v. McGee_, 985 F.3d 559, 564 n.5 (7th Cir. 2021) ("[A] defendant must exercise control over 'one or more other participants,' to be subject to an enhancement under § 3B1.1." (citation omitted)). In fact, the government argued extensively at trial that a call between Mr. McClain and John Hooker established proof of a criminal conspiracy. (GX 267) In this call, Mr. McClain and Mr. Hooker claimed credit for being the organizers and leaders of the conspiracy multiple times. (_Id._ Hooker: "We came up with this plan." McClain: "you and I came up with it." "They didn't come up with the idea. You and I came up with it").**

   **The government asserts that Mike "controlled" the payments to various subcontractors but there is no evidence that he alone decided when someone was hired, fired or otherwise controlled them. Mike made job recommendations and Mr. McClain consulted with him on whether Mr. Moody should continue after getting a senior-level, full time position as a countywide elected official. These two points do not establish "control" over the employment of the people hired by ComEd based on Mike's recommendation.**

7) Pursuant to Guideline § 3C1.1, a 2-level increase is appropriate because the defendant willfully attempted to obstruct or impede the administration of justice with respect to the prosecution by committing perjury at trial.

**Defendant disputes this increase. As discussed above, Mike did not willfully attempt to obstruct or impede the administration of justice with respect to the prosecution because he did not commit perjury at trial.**

8) **Defendant objects to Probation's conclusion that a 2-level decrease is not appropriate pursuant Guideline § 4C1.1 because the defendant meets all criteria for an adjustment for certain zero-point offenders, as noted herein.**

b) *FCPA Objects.*

Based on the facts now known to the government, the anticipated offense level for the FCPA objects as to Count 2 is 37.

**Based on Defendant's calculation, the anticipated offense level for the FCPA objects as to Count 2 is 5.**

1) Pursuant to Guideline § 2X1.1, the base offense level for the underlying offense (15 U.S.C. §§ 78m(b)(5) and 78ff(a)) applies plus any adjustments for any intended offense conduct that can be established with reasonable certainty.

**Defendant agrees.**

2) Pursuant to Guideline § 2B1.1(a), the base offense level is 7.

**Defendant agrees.**

3) Pursuant to Guideline § 2B1.1(b)(1)(N), a 26- level increase is appropriate because the actual loss and actual gain from the offense exceeded $150,000,000.

**As discussed above, Defendant objects to this increase.**

4) Pursuant to Guideline § 2B1.1(b)(10), a 2- level increase is appropriate because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

**Defendant objects to this increase. It was undisputed at trial that Mike had no role in, or knowledge of, the internal ComEd recordkeeping or Code of Conduct.**

**Because of this, he could not have intentionally engaged in or caused conduct constituting sophisticated means.**

**Additionally, even the conduct of the ComEd individuals was not "especially complex or especially intricate." U.S.S.G. § 2B1.1(b)(10)(C), cmt. 9(B) (defining "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense").**

**Finally, multiple witnesses testified that the invoices, contracts and other documents at issue were routine documents used by ComEd and Jay D. Doherty and Associates. Thus, sophisticated means were not used to carry out the conspiracy, even beyond Mike's knowledge and involvement.**

5) Pursuant to Guideline § 3B1.1(c), a 2-level increase is appropriate because the defendant was an organizer or leader of a criminal activity.

**Defendant objects to this increase. As discussed above, Mike was not an organizer or leader of a criminal activity.**

6) **Defendant objects to Probation's conclusion that a 2-level decrease is not appropriate pursuant Guideline § 4C1.1 because the defendant meets all criteria for an adjustment for certain zero-point offenders, as noted herein.**

## 2. Counts 4 and 6 (18 U.S.C. § 666) and 5 (18 U.S.C. § 1952).

The offense level calculations for these substantive counts of conviction are the same as those discussed above with respect to the § 666 Objects as to Count 2. *See* U.S.S.G. § 2E1.2(a)(2).

**Defendant agrees.**

## 3. Grouping.

Pursuant to Guidelines §§ 3D1.2(b), (c), and (d), Counts 2, 4, 5, and 6 are grouped together. The combined offense level for the ComEd Group is 50, pursuant to Guideline § 3D1.3.

**Defendant agrees that Counts 2, 4, 5, and 6 are grouped together. Based on the arguments above, the combined offense level for the ComEd group is 16.**

### B. State Board Appointment Related Conduct

Based on the facts now known to the government, the anticipated offense level for the State Board offenses of conviction (Counts 8, 9, 10, 12, 13, and 14, or the "State Board Group") is 32, as discussed below.

**Defendant states that the anticipated offense level for the State Board Group is 16.**

### 1. Counts 8, 9, 10 (18 U.S.C. §§ 1343 & 1346)

1) Pursuant to Guideline § 2C1.1(a)(1), the base offense level is 14.

   **Defendant agrees.**

2) Pursuant to Guideline § 2C1.1(b)(2) and § 2B1.1(b)(1)(G), a 12-level increase is appropriate, because the value of the benefit received or to be received in return for the payments exceeded $250,000, because the lower paid of the two Boards Solis proposed (the Labor board) had a salary of $93,926 per year and a term of four years.

   **Defendant objects to this increase. Mike never recommended Mr. Solis for the Labor board position. Additionally, the government chose the State board positions that Mr. Solis suggested to Mike for the purposes of these counts; as a result, the government cannot satisfy the Guidelines' causation requirement between the alleged conduct and the unrealized benefit. Again, Mike received *no* private benefit as the result of any conduct related to the State Board Group charges.**

3) Pursuant to Guideline § 2C1.1(b)(3), a 4-level increase is appropriate because the offense involved an elected public official.

   **Defendant agrees.**

4) Pursuant to Guideline § 3C1.1, a 2-level increase is appropriate because the defendant willfully attempted to obstruct or impede the administration of justice with respect to the prosecution by committing perjury at trial.

**Defendant disputes this increase. As discussed above, Mike did not willfully attempt to obstruct or impede the administration of justice with respect to the prosecution because he did not commit perjury at trial.**

5) **Defendant objects to Probation's conclusion that a 2-level decrease is not appropriate pursuant Guideline § 4C1.1 because the defendant meets all criteria for an adjustment for certain zero-point offenders, as noted herein.**

## 2. Counts 12, 13, and 14 (18 U.S.C. § 1952)

The offense level for these substantive counts of conviction is the same as those discussed above with respect to Counts 8, 9, and 10. See U.S.S.G. § 2E1.2(a)(2).

**Defendant agrees.**

## 3. Grouping.

Pursuant to Guidelines §§ 3D1.2(a) and (b), Counts 8, 9, 10, 12, 13, and 14 are grouped together.

**Defendant agrees that Counts 8, 9, 10, 12, 13, and 14 are grouped together. Based on the arguments above, the combined offense level for the State Board group is 16.**

### *Grouping and Total Adjusted Offense Level*

Pursuant to Guidelines §§ 3D1.3 and 3D1.4, the ComEd Group and the State Board Group are not grouped, but there is no increase to the total offense level because the offense level for the State Board Group is 9 or more levels lower than the offense level for the ComEd Group. The total adjusted offense level is therefore 50.

**Defendant agrees that the ComEd Group and the State Board Group are not grouped. Because the ComEd Group and the State Board Group each have an offense level of 16, the total adjusted offense level pursuant to Guideline § 3D1.4 is 18.**

### *Anticipated Advisory Sentencing Guidelines Range*

Based on the facts now known to the government, the anticipated offense level is 43. When combined with the anticipated criminal history category of I, the anticipated advisory guidelines range is life in prison, in addition to any supervised release, fine and restitution the Court may impose. Pursuant to Guidelines §§ 5G1.1 and 5G1.2, as well as the application notes thereto, because the statutorily authorized

maximum sentence of the offenses of conviction is less than the total punishment of life, a consecutive sentence should be imposed to produce a combined sentence equivalent to the total punishment. *See United States v. Thompson*, 523 F.3d 806, 814 (7th Cir. 2008) (affirming imposition of consecutive maximum sentence totaling 190 years where guidelines called for sentence of life in prison).

**Defendant respectfully submits that the offense level is 18. When combined with the anticipated criminal history category of I, the advisory guidelines range is 27 to 33 months, in addition to any supervised release and fine the Court may impose.**

## V.     APPLICABLE FINES

The Court asked the parties to address their positions on: (1) the statutory maximum fine for each count (and whether such calculation is governed by 18 U.S.C. § 3571(b)(2) or (b)(3)); (2) The statutory maximum total potential fine; (3) The guideline range for a fine for each count; and (4) The total fine maximum under the guidelines (for all counts of conviction). Defendant's position on these points is set forth below.

### A.     Statutory Maximum Fine for Each Count

Counts 2, 4-6, 8-10, 12-14: The maximum fine is $250,000 per count. 18 U.S.C. § 3571(b). 18 U.S.C. § 3571(b)(2) governs the statutory maximum fine calculation in this case because the government has not proven any pecuniary gain or loss as required to apply a fine under § 3571(b)(3) and § 3571(d).

### B.     Statutory Maximum Total Potential Fine

The statutory maximum total potential fine is $2,500,000. 18 U.S.C. § 3571(b).

### C.     Guideline Range Fine for Each Count

Counts 2, 4, 5, and 6 are grouped together. Based on the arguments above, the combined offense level for the ComEd group is 16 and the Guideline maximum fine

is $95,000.

Counts 8, 9, 10, 12, 13, and 14 are grouped together. Based on the arguments above, the combined offense level for the State Board group is 16 and the Guideline maximum fine is $95,000.

### D. Guideline Total Maximum Fine

As the offense level is 18, the Guideline total maximum fine is $100,000. U.S.S.G. §5E1.2(c)(3).

## VI. CORRECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Paragraph 98 provides an incorrect address for where the defendant and Mrs. Madigan live.

## VII. SUPERVISED RELEASE

Defendant has reviewed Probation's recommendations of conditions of supervised release with his undersigned counsel and has no objections except one. Defendant would request that the area allowed for travel include Wisconsin such that, as the needs arises, Madigan can travel to their home in Wisconsin.

## VIII. CONCLUSION

Mike Madigan is a good man who has selflessly done an exceptional amount of good for others. He is widely respected for his dedication to honesty and integrity. Considering the whole of his life, and the need to care for his ailing wife, counsel respectfully submits that a sentence of five years' probation (with a condition of one year home detention), an order to perform community service, and reasonable fine is a sufficient, but not greater than necessary punishment.

Dated: May 30, 2025

Respectfully submitted,


By: /s/ *Daniel J. Collins*
Daniel J. Collins, Esq. (ARDC #6224698)
Lari A. Dierks, Esq. (ARDC # 6329610)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
(312) 902-5434
Daniel.Collins@Katten.com
Lari.Dierks@Katten.com

By: /s/ *Thomas M. Breen*
Thomas M. Breen, Esq. (ARDC #0287547)
Todd S. Pugh, Esq. (ARDC #6243692)
Breen & Pugh
53 West Jackson Blvd., Suite 1550
Chicago, Illinois 60604
(312) 360-1001
tbreen@breenpughlaw.com
tpugh@breenpughlaw.com

***Attorneys for Michael J. Madigan***