# **<u>EXHIBIT E</u>**

**Staff Letters**

| | | | | |
|---|---|---|---|---|
| 1. | Basham, Jessica | 21. | McCabe, John |
| 2. | Brown, Steve | 22. | McDermott, Mike |
| 3. | Burgos, April | 23. | McMahon, Joe |
| 4. | Carpentier, Susan | 24. | Melamed, Caleb |
| 5. | Christ, Monica | 25. | Morphew, James |
| 6. | Claps, Rocco | 26. | Morrissey, Mary |
| 7. | Collins, James | 27. | Olson, Michelle |
| 8. | Conway, DJavan | 28. | Pollak, Michael |
| 9. | DeWeese, Kurt | 29. | Prinzi, Michael |
| 10. | Ellis, Jon | 30. | Purkey, Gail |
| 11. | Filan, William | 31. | Ramas, Angela |
| 12. | Flynn, Neil | 32. | Rossi, Anthony |
| 13. | Houlihan Smith, Margaret | 33. | Thomas, Marsha |
| 14. | Jarmer, Mark | 34. | Thomson, Michael |
| 15. | Kinsella, Mary Leone | 35. | Uhe, Robert |
| 16. | Kunkel, Charlene | 36. | Watkins, Victoria |
| 17. | Ladas, Mary | 37. | Weir, Michael |
| 18. | Leone, Jesse | 38. | Willert, Craig |
| 19. | Lowder, John | 39. | Wier Vaught, Heather |
| 20. | Lynch, Veronica | 40. | Wurth, Emily |

Dear Judge Blakey,

My name is Jessica Basham, and I currently work as a governmental consultant through my firm, Basham Government Solutions, LLC. Before starting that firm, I worked on the Illinois House Democratic Staff for over 18 years, from January 2003 through August 2021. In brief, I served as a Research Analyst from 2003-2013, Budget Director from 2013-2018, and Chief of Staff from 2018-2021. For most of that time, Mr. Madigan served as Speaker of the Illinois House, and I reported directly or indirectly to him.

I have interacted with Mr. Madigan for more than 20 years, and during that time, Mr. Madigan consistently treated me with nothing but respect and kindness. The profession I choose to work in has not historically maintained a reputation as one that is respectful and kind to women. Even as a young staffer with relatively little experience, I believe Mr. Madigan could see my hard work and dedication, and he encouraged me to learn more and grow as a professional. For example, at times I would ask Mr. Madigan questions about people or issues so I could gain context and knowledge to better understand why things played out the way they did. While others might have not taken the time to explain, Mr. Madigan would share with me his honest insights. When circumstances necessitated the selection of a new Chief of Staff, replacing one that had served in the role for decades, Mr. Madigan put his full faith and confidence in me, supporting me in helping him to lead the caucus and staff through a tumultuous time.

While under his supervision, there were several times when Mr. Madigan prioritized my well-being over issues concerning the job. I can remember an instance in particular when, as Chief, I needed to have a difficult conversation with a caucus member concerning staff management. It was very appropriate that I engage with this caucus member and set boundaries concerning their intrusion into my role as Chief of Staff, and while I insisted that I do so, Mr. Madigan was more concerned about my well-being. Just as this example illustrates, I always knew that Mr. Madigan cared for me as a person, even over a dispute with a caucus member. He gave me the support I needed to be confident in my choices, as well as grace when I made a mistake.

I have always known Mr. Madigan to be an honest and trustworthy person, both in terms of my direct interactions with him as well as my impressions of his interactions with others. I don't believe he would ever lie, and once given, he is always true and faithful to his word. I've come to rely on Mr. Madigan as a person I can go to for an honest and truthful assessment of anything, whether it be about my career, the people we have both worked with, or the issues of the day.

After Mr. Madigan was no longer serving in the role of Speaker, our relationship changed into a friendship, rather than a working relationship. We often talk on the phone about the policies, politics, and people we've dealt with for many years, and I always make a special effort to visit him in person when I travel to Chicagoland. To be perfectly honest, I am not happy and will never be happy about the circumstances surrounding his departure from the Illinois Legislature. Just as I know how deeply he cared for, and how hard he fought to protect, Illinois' working-class families, the Democratic Party, and Legislature, I believe he struggles with no longer being in a position to be that Protector. I hope that through our conversations, I help to provide him with some connection with the happenings in Springfield.

It's not lost on me that while I speak so fondly of him, I do not refer to Mr. Madigan as "Mike." While he has suggested that I can and should call him "Mike," I simply cannot bring myself to do so. Frankly, it's hard for me to refer to him as Mr. Madigan. The way I was raised, when someone duly earns respect, that respect is reciprocated wholeheartedly. When I speak with

him, I will always refer to him as "Speaker," in reflection of the hard work and sacrifice he gave for decades and the respect he has earned from me.

I ask you, Judge, to please consider the life-changing positive impact that Speaker has had not only on me, but countless others that he has impacted in his life of service.

Most sincerely,
Jessica Basham

STEVEN E. BROWN
███████████████████████

April 16, 2025

The Honorable John Robert Blakey
U.S. District Court
219 South Dearborn Street
Chicago, IL 60604

Dear Judge Blakey:

I appreciate this opportunity to share my thoughts on Michael Madigan, but I must admit it saddens me for the need to put pen to paper under these circumstances.

I have known Mike for 45 years. He is both a friend and a former employer. My first memorable encounter occurred on a State House elevator when I was a newspaper reporter. He and State Sen. Richard M. Daley were on their way to the third floor. Routine pleasantries were exchanged. All was cordial until I pulled out a notebook and asked about a legislative issue. There was silence. They exited a floor early.

In the late 70's I spent considerable time with Mike when I represented the City of Chicago. Times were challenging. The city faced extremely difficult times. For instance, the public schools were forced into a type of receivership known as the School Finance Authority. Fledgling public unions brought more tension.

Through all these episodes Mike remained a strong advocate and an advisor. He offered sound advice. I learned more about government, politics, and journalism in that period than at any other time of my life.

Those years led to a new phase of my life when Mayor Jane Byrne lost her reelection to Harold Washington in 1983. Upon his inauguration Mayor Washington requested and received my resignation.

-2-

Mike and I met for dinner at the Italian Village in Chicago. I expected career advice. I planned to pursue a corporate government relations position. There was at least one solid prospect. Mike offered to help, but he also asked if I had any interest in working for him. He had just been elected House Speaker for the first time.

While there had been some public and media speculation that he might have aspired for a higher office, it was clear to me his total focus was on staying in the legislature and helping people.

He stated he wanted to restore the legislature as a co-equal branch of government.

Initially I was given a three-month contract with a legislative study commission. At the same time, I pursued consulting projects in and out of Illinois. Later I was asked to join the speaker's staff. The opportunity seemed interesting. But I had one drawback. The likely annual salary was less than I had been making in city government. I had a wife and a mortgage. My salary exceeded the legislative chief of staff. I mention this because it led me to suggest I continue my legislative work on a personal services contract. It was a unique situation which allowed me to both work on the legislative staff and pursue other consulting opportunities.

It also gave me an immediate understanding of the need for ethical conduct that did not allow me to use my position to benefit other clients. As he had done earlier Mike reviewed with me his personal code of conduct. It was designed to address this area. His personal conduct was such that he refused to allow his public position to benefit himself, his law firm, or clients of his law firm. He would not accept clients with business involving the state and if a client did become involved in a state issue, he would recuse himself from any involvement.

-3-

Over the years I adopted similar policies and practices to prevent conflicts or the appearance of improprieties. I prepared a standard agreement for services that included a provision informing a client my work for that client did not entitle them to any consideration with another client or special information. This provided a very clear message that hiring me did not mean there was a gateway to Mike Madigan.

I never made an exception to this provision. I learned from Mike that honesty and integrity were paramount.

I do not know of an instance when Mike violated his code of conduct. In fact, he carried a printed copy of the code with him. As technology evolved, I took a picture of the document. I carry it with me to this day.

I saw many examples of Mike living by his code of conduct. As an example, I am aware of an instance where his law firm resigned from working with a client because it got involved in a real estate transaction that involved the state. I am also aware of his decision not to accept legal work involving individuals who were politically active and had the potential to cause a violation of the code going forward.

These instances were demonstrations that Mike Madigan's Code of Conduct was real. It confirmed that he is a truthful person.

As a person, Mike Madigan always showed compassion and a helping attitude. I am aware of his concern for staff members and others who encountered significant personal difficulties. In my mind, his actions and the direction he gave senior staff actually led to saving lives. I can provide more details if you wish.

-4-

I know of charitable efforts to support fundraising causes through donations of items like baseball tickets for some of the best seats available to Cubs or White Sox games. I know of his personal practice of paying when he or his family used those same seats. These are all practices that are certain signs of a man who takes ethical conduct very seriously.

He also supported efforts by other family members to bolster charitable activities. He was an ardent supporter of Shirley Madigan's leadership of the Illinois Arts Council.

Finally, it is important to provide my view of the full context of dealings between Mike Madigan and entities like Commonwealth Edison and regulated industries. Historically, ComEd and others ignored the legislature, because rates hikes, and regulatory relief was granted by the Illinois Commerce Commission.

In the 2000s ComEd and others were allowed a practice called a "reverse auction." Consumer rates spiked and resulted in public demand for relief.

Mike Madigan led a contentious effort to provide that relief. After a lengthy legislative battle, the result was the creation of the Illinois Power Authority, strong guidelines for environmentally friendly Renewable Energy Portfolio and a $1 billion refund for consumers.

The Mike Madigan I have known and worked with for more than 40 years was not the person I saw portrayed by through reporting in recent months.

Ironically, some of those reports came from a news organization that in 2010 spent considerable time and resources searching for instances of personal misconduct and special treatment for law firm's clients. In the end the effort was a failure because the misconduct did not exist.

-5-

Mike Madigan is a considerate, deliberate person who can address the issues and concerns of everyday people as well as well as well financed, well organized interest groups and national leaders in many settings. He has done this over a very lengthy time. In my view Illinois is a better place because of his service.

If appropriate I am willing to discuss any of the topics I have mentioned with you at any time.

Sincerely

Steven E. Brown

April 24, 2025


Hon. John Robert Blakey
U.S. District Court for the
Northern District of Illinois
219 S Dearborn Street
Courtroom 1203
Chicago, IL 60604


Dear Judge Blakey,

I am writing to you today as an employee and friend of Michael Madigan regarding his upcoming sentencing hearing. I have had the pleasure of working for the office of Michael Madigan for over 25 years. I started as a teenager, still unsure of where I was going in life; and because of his influence, professionally and personally, have become a decent, well grounded, kind hearted adult. I was taught from day one that we do everything by the book around the ward office. It was instilled in me to help others when we could and to always be truthful and honest. Mr. Madigan ingrained in me and his employees that no political work be done during government time, that our timesheets are always accurate and that we show up to work every day. In June of 2024, I was diagnosed with Breast Cancer. I went through 20 rounds of radiation and never missed a day of work during treatment. Good work ethic was something I learned from working closely with Mr. Madigan.

I have gotten to know Mr. Madigan over the years and he is a kind and compassionate individual. I would not be the person I am today if it were not for this man. Everything good in me I have learned by watching him. I have watched him help constituents in any and every way he possibly could. I witnessed countless people in need reach out for help, some about to lose their job, some about to lose their home and he would always try to assist in any way he could. I have personally seen and read hundreds of letters come in thanking him for things he has done over the years to help others. They always made me so proud to work for him. I was able to see firsthand, that there truly are good people who are willing to help others. I have observed him pick up food and drop it off, over and over again, for a man who lives down the street and has no family.

During his trial, I have watched him stay patient in situations that most would lose their temper. With all the scrutiny of the media he never let it get to him; day after day, coming in with a "good morning". He always asked how I was as if nothing was happening. There are times in my own life, I reflect on those moments and ask myself how would Mr. Madigan react? I have undoubtedly avoided confrontation with family and friends after witnessing his demeanor time and time again which in turn has saved a lot of my personal relationships.

Mr. Madigan is an amazing husband and father. The level of care and concern he shows his wife and children on a daily bases is truly extraordinary. Mrs. Madigan is not in the best of health and she relies on him for medication pick up, grocery shopping and doctor visits. He lives a very reserved life. They don't have fancy upgrades in their home or flashy cars. He is not this money hungry person they paint him to be. Mr. Madigan is just the opposite. I even had to talk him into a smart tv (only a 32 in) to watch the Notre Dame games on because the TVs in their home from the 80s and he was unable to get some of the games. He is a simple man who just enjoys a good book and dinners with his children and grandchildren, and of course Notre Dame football games.

One story I would like to share is a little personal. I was raised in a home where not everyone got along. My Dad is a retired Chicago police officer who was tough on us to say the least. My older brother and him did not always see eye to eye. This broke my Moms heart as well as mine. My brother wanted to get away and attend West Point for college. He thought that would be a good fit for him since he had no money for college and things weren't great at home. Mike Madigan helped make that a reality for him. Mr. Madigan never asked us for anything in return, just wanted to help a neighborhood kid out who truly needed it and I am proud to say my brother went on to graduate from West Point in 1997. My parents ended up divorcing which was best for everyone.

Looking back, I probably acted up a bit as a teenager and young adult due to things in my personal life but then came the summer job I never left. In a way it grounded me, taught me responsibility, how to help others, which felt good. 28 years later I am still trying to help others. I am far from perfect but there is no doubt I am a better human being, raising 2 good human beings, because of Mike Madigan. I ask that you please consider all these amazing things he is when determining his sentence and I thank you for taking the time to read my letter.


Sincerely,


April Burgos

Dear Judge Blakey:

I am Susan Carpentier. I began working for the city of Chicago in 1971. My assignment in the Office of the Mayor is where I met Mike Madigan in his capacity of 13th Ward Committeeman.

I left the Mayor's Office in 1983 for the Department of Economic Development. My co-worker met with Mike Madigan to discuss his future employment and mentioned my name. The next day I had a phone call from then 13th Ward Alderman John Madrzyk. We discussed working for him as secretary in City Council where I remained until 1986. At which time Mike requested I work at the 13th Ward Service Office just 4 blocks from my home. How nice! I retired in 2005 with a pension and a part time position. When asked about my long term employment with the Speaker I reply "You don't quit the church do you." Amen.

He is one of the hardest working people I know with strong ethics. We were taught to do a days work for a days pay. His family comes first. I witnessed in 50+ years that he would help anyone and if he couldn't he would tell you. He is very truthful.

In 1995 I had a total hip replacement. Upon returning to work Mike handed me a letter from Philip Corboy a respected personal injury attorney. Unknown to me Mike asked Mr. Corboy to research my surgeon for malpractice law suits. He passed with flying colors. This was something he took upon himself to do for me.

Thank you.

Sincerely,

Susan Carpentier

April 30, 2025

The Honorable John Blakey
United States District Judge
219 South Dearborn Street
Chicago IL 60604

Dear Judge Blakey:

I have known **Michael J. Madigan** for 45 years. I began my employment with the Illinois House of Representatives in 1974 and served until my retirement on June 30, 2014. During that time, I worked for three House Democratic Leaders: Clyde Choate, William Redmond, and Michael J. Madigan. My jobs included receptionist; committee clerk; secretary to assistants to the Democratic leader; supervisor of support staff/House Democratic Research; secretary to director of Appropriations Staff; secretary to Director of House Democratic Issues Staff; and administrative assistant to chief of staff in Speaker's office.

In 1981, when House Democratic Leader Michael Madigan formed the House Democratic Issues Unit, I became an assistant to the Issues Staff Director. In 1983, I became assistant to Speaker Madigan's Chief of Staff Gary LaPaille, and began working with Chief of Staff Tim Mapes in 1992. I served in that positon until my retirement.

During my 31 years working in Speaker Madigan's Office, I generally interacted with Speaker Madigan several times daily when he was in Springfield for House Session. The Speaker usually dealt directly with his Chief of Staff, but occasionally I would be asked to locate and/or coordinate their schedules. I would also perform miscellaneous clerical tasks: providing an LIS Bill Status Report, copy/fax documents, setup a meeting room, assemble Bill Review meeting packets, place telephone calls, etc. Also In the absence of his assistant, I took dictation from the Speaker, maintained his daily schedule, scheduled meetings, greeted guests, sorted through the mail, and other miscellaneous clerical tasks.

In addition to my State employment, I was a volunteer and payroll employee during the general elections for the House Democratic political Committees from the early 1980s thru 2004. Specifically from 1990 to 2004, I served as bookkeeper, payroll officer, compliance officer (prepared and filed the state and federal election reports), and maintained the fundraising data base for the Democratic Party of Illinois and other political committees under Michael J Madigan's control. I coordinated and assisted at fundraising events in Springfield and Chicago under the guidance of the Democratic Party of Illinois Executive Director.

I worked directly with the Chair of the Democratic Party Michael J. Madigan with respect to the fundraising receipts and generation of special reports. We had a specific procedure in place for when contributions were received and approved. I prepared a Batch Report (name of contributor/address/phone/date of receipt/ amount of contribution), which Chair Madigan verbally approved prior to any funds being deposited. Aware of Chair Madigan's schedule and the reporting constraints, I made every attempt to be available to receive his signoff so the process could be expedited. Chair Madigan and I also worked together to ensure we had updated names/addresses for his mailing lists.

The Honorable John Blakey
2
April 30, 2025

Michael J. Madigan promoted good discipline at work and had a strong work ethic. Employees knew what was expected which created less stress and confusion in the work environment. All of us were working toward a common goal. In both my dealings with Speaker Madigan at my State and political employments, he was always professional. His high level of excellence motivated me to do my best. I never had reason to doubt his honesty or truthfulness.

His life is rooted in the importance of family. I have witnessed many times his love for his family through his words and actions. One evening during session, before Speaker Madigan headed to the House Floor, he asked me to place a call to his home to assist his grade school-aged daughter in reciting her spelling words. His instructions were to "say the word and ask her to spell it. Do not help her, and report back to me."

In 2004, I resigned from my payroll/reporting duties with the Democratic Party of Illinois, but remained a volunteer, assisting at fundraising events, and working at State Fair tent. I also served as staff member for the Illinois Delegation at the Democratic National Conventions in 1992, 1996, 2000, 2004, 2008, and 2012. After my State retirement in 2014, I always looked forward to visiting with and supporting Speaker Madigan and his family at these events.

Michael J. Madigan is one of the finest men I have ever known, and I am honored and proud to have worked for him.

I ask that you please show mercy to Michael J. Madigan who has done many good things in his life and will continue to do so.

Sincerely,

Monica Christ

Monica Christ



16 April 2025

Honorable Judge John Robert Blakey
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street
Chicago, Illinois  60604

Dear Judge Blakey,

I am writing to you in my capacity as a professional acquaintance and friend to Michael J. Madigan, whom I have known for 38 years. It is an honor to write to you on his behalf and vouch for his character and integrity based on all of the time that I have known him.

Mike Madigan has always displayed qualities of honesty, integrity, and responsibility, during my work with him when I was a staff member at the Illinois House of Representatives, as Chief of Staff of the Democratic National Convention, as Director of the Illinois Department of Human Rights and in our personal interactions.

In the late 1980's and early 1990's, as a staff member at the Illinois House, I worked very closely with a small network of advocates who proposed establishing hate crimes protections—long before such advocacy was popular or, for that matter, very well understood.  I was struck by Mike's inherent understanding of the issue, his underlying sense of fairness and compassion and his strong support for such a measure.  I always admired his ability to build bridges among numerous legislators who had disparate constituencies, from all regions of the state, and to build consensus on this and many other challenging issues.  Throughout these interactions, I found Mike to be truthful and a person who consistently kept his word--something not always the case in political interactions.

When I served as Director of the Illinois Department of Human Rights from 2003 to 2016, I knew I always had a supporter and friend in Mike.  He was an ally of an agency that worked every day to ensure fairness in workplaces and housing across the state.   And whether it was his support of a more inclusive Human Rights Act, for prevention of harassment in education or for marriage equality, communities that have traditionally been overlooked and underserved had someone in Mike Madigan who could be counted upon.

In personal interactions and conversations, he has been a devoted husband, father and loyal friend. His commitment to professional and personal relationships is testament to his sense of duty and compassion towards others.

In my experience and knowledge, I believe that Mike Madigan's conduct and character have been exemplary and I hope that you find them deserving of your consideration. Please feel free to contact me at the number or email address listed above should you require any further information or clarification.

Thank you for your time and consideration.

Sincerely,

Rocco Claps

The Honorable Judge John Robert Blakey
United States District Court
Northern District of Illinois

April 2, 2025

Dear Judge Blakey,

I am writing this letter as a character reference for Michael Madigan, who I have known since 1988, first as an employee in the Speaker's office, and later as a lobbyist, an occupation in which I continue to be engaged in today. Through these various roles, I have found Michael Madigan to be an honest, loyal and conscientious person, and I consider him a friend.

Over the last 37 years I have had many opportunities to observe and interact with Michael Madigan. I have always found him to be principled, hardworking and respectful. These traits were the same whether we agreed or disagreed on the topics or issues being discussed.

Usually, when we spoke, we would first talk about our families and then chat about the current state of the Chicago White Sox or Notre Dame football. We would then move on to legislation, politics, a common issue we had, or something I was working on. In every one of these conversations, Michael Madigan was honest and straightforward.

In closing, Michael Madigan is a good and decent man and upstanding member of his community. He is a loving husband, father, grandfather and a good friend to many.

When determining his sentence, I am requesting that you consider Michael Madigan's lifetime of public service and all the positive outcomes he has achieved for his constituents and the people of Illinois.

Judge Blakey, thank you for your service and for taking the time to read this letter in support of Michael Madigan.

Sincerely,

James M. Collins

DJavan Conway

█████████████████████

May 20, 2025

The Honorable John Robert Blakey
Judge of Northern District of Illinois
United States District Court

Re: Sentencing of Michael J. Madigan

Dear Judge Blakey,

      I first met Mr. Madigan in 2009 as a new staffer on the Illinois House Democratic staff. Like any new employee I was anxious to learn more about the leadership and culture of the staff. It did not take long to understand what was expected of each staffer: honesty, integrity and a strong work ethic, all of which was driven by the daily example set by Mr. Madigan.

Watching Mr. Madigan from afar one thing was very apparent and that was his work ethic. Often, if you called his district office on a Saturday or Sunday morning, he was the voice you would hear answering the phone. I thought it was quite impressive for someone that had served his community and the state for decades to still be humble enough to answer the phone. To me, that signaled that he truly believed the real job qualification of an elected official was above all else, public service.

The most important quality I learned about Mr. Madigan was his level of honesty. As a new lobbyist, I recall having a meeting with a client and Mr. Madigan. After the meeting, I debriefed with the client and they asked me if I could clarify something Mr. Madigan said. My response to the client was simple. He meant exactly what he said and it was best to take his feedback as fact and it was safe to make their decision based off of the information he provided. Taking 24 hour cable news pundits as evidence, there is often translation and analysis of politicians comments, but in my experience Mr. Madigan was always honest to the best of his ability and I never had to question that.

I have an immense amount of respect for the time and dedication he has shown to the people of Chicago and the state of Illinois.  Taking time away from ones family to serve in the interest of others is an enormously gracious act.

I respectfully ask for you to consider this when making your sentencing decision.

Respectfully,

DJavan Conway

February 28, 2025

Judge John Robert Blakey
United States District Judge
219 South Dearborn Street – 2125
Chicago, Illinois 60604

Dear Judge Blakey:                                        Re: Michael J. Madigan

I commend Michael J. Madigan for providing outstanding public service in the course of the 50 years served as an elected Representative of the Illinois House of Representatives, and especially as the leader of the Democratic caucus repeatedly elected by its members for 18 General Assemblies. I often recall Speaker Madigan saying that: "I serve(d) at the pleasure of the members (of the House of Representatives)," which was reflected in his repeated selection.

Representative Madigan's ability to navigate the unique political culture of the City of Chicago and Illinois has been impressive. It is something I was never a part of, but realized during my service as a legislative staff analyst that it impacted his leadership on a constant basis, always having to balance the interests of Chicago and Downstate, as well as those of the diverse House membership. His intelligent, respectful and careful methods contributed to an historic record.

The State of Illinois experienced severe economic stress in recent years. I believe that could only have been overcome by the steadfast and strong leadership of the Speaker of the IL House of Representative Michael J. Madigan. His length-of-service as Speaker is a testament to the value of that stewardship. I sincerely hope that his record of public service will be taken into full consideration in the final determination of his sentence.

I first met Michael Madigan when I began as a Legislative Intern in October 1971 of the Fall Session of the 77th General Assembly. I was assigned to work for the Democratic Leadership of the Illinois House of Representative. That Intern program was established in 1962 and administered by The Institute of Government and Public Affairs (IGPA) at the University of Illinois System, and continues today under the Institute for Legal, Legislative and Policy Studies at the University of Illinois Springfield.

I applied for the Legislative Internship as I neared graduation from Illinois State University in Normal, IL. I had no political affiliation at that time, nor association with any elected official or candidate.  I served for 39 years as full-time staffer under House Democratic Leaders Clyde Choate, William Redmond and Michael Madigan, and retired at the end of the 2010 Spring Session of the 96th General Assembly.

As the Health & Human Services Analyst for the Democratic Leadership of the Illinois House of Representatives, I reviewed and wrote analyses for thousands of bills, conducted research and assisted in the preparation of many important pieces of legislation, staffed many committees and committee meetings, consulted with

legislators, lobbyists, constituents of many legislators, and reviewed issues with Democratic and Republican Leaders as well as my counterparts in the Senate Democratic and Republican staffs. This was accomplished knowing and believing that the Democratic leaders of the Illinois House of Representative, especially Michael J. Madigan, recognized and respected my abilities, competence and effectiveness. The trust in my abilities was most evident when I assumed almost exclusive control of negotiating and drafting key amendments to critical bills. I attribute my successful legislative career to Michael Madigan's extensive term as Speaker. In recognition of my efforts, I was honored that Speaker Madigan sponsored an extraordinary retirement celebration on my behalf at a local restaurant.

On many occasions Representative Madigan spoke about and emphasized his concern about people who needed special consideration and support due to their disabilities or disadvantages. It was that focus that was especially on my mind as I worked on issues relating to health and social services matters, particularly in the case of nursing home regulatory and financing reforms. I was aware that representatives of the nursing home industry had been actively lobbying to modify and weaken proposed reforms. I sincerely believe that the Speaker enabled the stronger reforms to be enacted.

My relationship with Speaker Madigan was entirely professional. It was rarely personal, but I enjoyed his occasional wit. At the end of a one-on-one meeting about a legislative matter, he commented about the wide and multi-colored tie that I wore that day. It had been created by my wife Diana. I regularly wore "ddt's" (Diana DeWeese Ties). He said: "Kurt you should hold onto that tie. It may come back in style someday." I took it as a compliment.

It is Michael Madigan's focus on the public's interest and his corresponding record of service that I commend him and request the Court's consideration of the entirety of his service to the people of the State of Illinois.

Sincerely,

Kurt R DeWeese

Kurt R DeWeese

March 18, 2025

The Honorable Judge John R. Blakey
United States District Court
219 South Dearborn Street - Room 1203
Chicago, Illinois 60604

**Re: Michael J. Madigan**

Dear Judge Blakey:

I am Jon Ellis, a retired Springfield attorney, and the proud parent of 3 adopted daughters and 6 grandchildren. When we married, my wife Sally and I, together with her two biological daughters, Sara Jane and Katie Sue, became a family unit. The girls were 4 years old and 18 months old, respectively, when I first met them. Later, Sally and I adopted our youngest daughter, Brittany Lynn.

On February 27, 1998, Sally died of breast cancer at the age of 42. In her final days, she was terrified the older girls' biological father would show up unannounced and take Sara Jane and Katie Sue away from the only family they had ever really known. At that time, Illinois law did not grant a stepparent standing in child custody or visitation cases. Thus, the girls, then in their early teens, Brittany, and I were at the mercy of someone hardly more than a stranger blowing apart our family.

I knew Representative Madigan from working for the House Democratic staff in the early 1980s before attending law school. I wrote a letter to him that described my situation, the status of then-current Illinois law that precluded me as a stepparent from standing in a custody or visitation case, and a draft of narrowly-crafted legislation that would grant me standing to participate in a hearing on what was "in the best interest" of my stepdaughters. He introduced the legislation and it became law.

Thanks to Representative Madigan's concern and hard work, and the efforts of a lot of other people and some good fortune, Sally's fears were not realized. No stepparent in the same situation as myself would ever have to endure the stress and uncertainty that I and the girls endured during the months immediately after Sally's death. One of Sally's many legacies is this change in the law. I was able to legally adopt my 2 stepdaughters, Sara Jane and Katie Sue, later in 1998.

What Representative Madigan did for me and my daughters at a very difficult time is something I will hold in my memory and my heart forever. It kept our family together. Yet, at no time has he ever asked for anything in return.

Michael Madigan is a good man, whom I believe deserves leniency in sentencing.

Respectfully,

*/s/ Jon K. Ellis*
Jon K. Ellis

# WILLIAM FILAN



April 28, 2025

I have known Mike Madigan for over 40 years. I consider him a friend who has been helpful to me and my family over the years. He has always been honest and straight forward in his approach with me.  I first met him in 1981 when I was interviewing for a new position on his staff. I was fortunate to be offered the position to oversee forty people and soon after became his Director of Issue Development.  That summer he asked me to help him identify projects and programs from the City and State that he might not be aware of that could be beneficial for his constituents. He also talked about the need to revitalize Chicago Midway Airport which surrounded his district. The airport had only 20 flights daily. In the next few years Mike was able to use his talents and organization to unite the residents of the existing neighborhoods who were concerned about the noise and traffic that a revitalized  airport would bring. The Speaker turned the issue around and convinced the skeptics the benefits of jobs and revitalizing the various neighborhoods and businesses the expansion would bring. The Speaker worked with City, State and Federal Officials and today we have the 34th largest airport in the country with over 218 daily flights.

It was a lesson I learned from him of how you bring people together with various beliefs into a common goal by compromising and listening to their needs. He showed the same skills as the leader of the General Assembly by listening and compromising with the various legislative members and their caucuses on both sides of the aisle to move Illinois forward.

In 1989 I left when I was asked to run the Neil Hartigan Campaign for Governor. I took with me all those valuable traits that I observed working for him on how to manage complex problems in high pressure situations

and to supervise in a low key fashion which enabled me to combine idealism with practicality.

In 1991 I became Chief of Staff to Cook County President Dick Phelan. The Speaker was very helpful to us dealing with overcrowding of the Cook County jail by suggesting for us to work with the Sheriff to develop alternative drug and other rehab programs to help end recidivism. He was the catalyst helping us pass a law that brought hundreds of millions of dollars to Cook County Hospital from the Federal and State Government. His advice and support was crucial to us working with the Governor to make this happen. This Intergovernmental hospital Assessment program is still working today.

After leaving Cook County, I started my own firm as a Corporate and Government Planner. I represented the City of Chicago through four mayors, along with corporate firms and not for profit organizations. I lobbied him for my clients over the years, he never suggested or asked me to do anything improper or illegal, he was truthful with me at all times. During this time he challenged me and others to analyze all aspects of our situation, building consensus and determining the most effective solutions to our issues.

 As a lifelong campaign advisor and enthusiast I also continued to stay involved in helping him run campaigns as a volunteer to keep the Democrats in control of the House. In one instance, I had a major fall in the campaign which brought about a major concussion which sidelined me for a couple of days. After a few days in the hospital and getting clearance from my doctor. I was released. A day later Mike called me and told me that I was not going to be allowed back in the campaign until I saw another doctor. He indicated that he had made me an appointment with a specialist and until he gave me clearance I would stay on the sidelines. The Speaker made an extra effort to call someone and made me get a second opinion. I'm not sure many people would have made that extra effort to make sure I was alright. It showed the type of person that took the time to be concerned about others. I am sure there are hundreds of these stories that no one knows about, of how many people the Speaker has been helpful to.

I got married late in my life and am fortunate to have a wonderful son and wife. The Speaker called to congratulate me on the arrival of my son. He said that nothing is more important than to take this gift and spend as

much time as possible with him because these are precious and valuable times for you, your son and your wife to be together. This is another example of getting solid advice from a friend.

The Speaker also has wonderful White Sox game tickets and knew my mother was a Sox fan. In the 1990's he would occasionally call and ask if my Mom wanted to use his tickets with her friends. My mom would take her friends and when asked if they wanted to sit in the shade instead of the sun one of her friends said he waited 50 years to sit in those seats. Once again thinking about doing something nice for someone he barely knew.

Like the examples I gave earlier on Midway Airport and Cook County Hospital, the Speaker has been involved in most major decisions and accomplishments in the City and State over the last 50 years like keeping the White Sox in Chicago, protecting the home rule powers of the City of Chicago to protecting the the three tier system of our government in Springfield. Whether it be Navy Pier, casinos throughout the State or every major social issue that confronted us to major gun control laws.The Speaker has always tried to be a problem solver. He developed an agreed bill process bringing labor and businesses together on issues to streamline the legislative process saving time and resources. He has also prevented countless legislation from being passed that would have been detrimental to the City and State. I could go on for many pages but all you have to do is look around and see all the accomplishment and the difference in our City and State.

In conclusion, the Speaker has been kind, thoughtful and respectful to the people who have worked for him and around him throughout his career. He has always been honest and truthful in all our encounters. I ask you to consider all the accomplishments he has contributed over his lifetime for the betterment of our City and State.

Respectfully,

*William Filan*

William M. Filan

# NEIL F. FLYNN



March 17, 2025

Judge John Robert Blakey
United States District Judge
219 South Dearborn Street
Chicago, IL 60604

**Re: Michael J. Madigan**

Dear Judge Blakey,

My name is Neil Flynn. I was born and raised in St. Louis, Missouri. I am an Illinois licensed attorney and have practiced continually here in Illinois since admission to the bar in October of 1980.

After graduating from Western Illinois University in 1976 with a degree in Political Science, I applied for and was accepted into the Illinois Legislative Staff Internship Program in Springfield. As part of that program, students received both academic credit and practical experience working as a member of the legislative staff for one of the four Illinois House and Senate Legislative Caucuses. I had requested and was assigned to work on the Illinois House Democratic Staff.

I first met Michael J. Madigan ("Mike") in person during the Spring Session of 1977. At that time, Mike was House Democratic Majority Leader. That year I had the chance to meet and to work with some very bright, hard working, and outstanding legislative staff members, legislators and Illinois government officials. It was also during that year that I began to understand the appropriate role of legislative staff in the legislative process, and perhaps more importantly, began to appreciate the dedication and discipline required to do the job proficiently. These lessons, instilled in me and every staff member, were reinforced by the Staff Directors as a direct result of Leader Michael Madigan's guidance.

Mike's insistence on thorough, complete and careful review (and re-review) of each bill, amendment, resolution was standard operating procedure — top to bottom. In addition to preparing an analysis of each legislative measure, it was certainly not uncommon to receive a specific request from the Leader for additional detail or for a

memorandum focusing on a specific provision or provisions of a bill. Mike's directives and expectation for clear, concise and precise legislative drafting was universal. That approach to the legislative process, and the principles imposed by the Leader were not lost on any of the staff — and those guiding principles served each of us well then — and in our future endeavors and experiences beyond our respective days as staff members. Without a doubt, my staff experience as a legislative intern that year was central to my decision to apply for admission to law school the following year.

Upon graduating from law school (St. Louis University) in 1980, I continued to work as a lawyer on the House Legal Staff. In 1983, Mike was elected House Speaker. In January of 1983, Mike offered me another opportunity to work on the Speaker's legal team — a group of highly experienced and accomplished lawyers — which was a tremendous opportunity for a young lawyer, and one that I enthusiastically accepted.

As Speaker, Mike's utilization and reliance upon staff, meticulous attention to detail, and leadership in directing the legislative process within the Illinois House of Representatives not only continued, but was further enhanced. The opportunity to be a part of that staff, and the many important lessons I learned during that experience profoundly impacted and shaped my approach to and throughout my career. *Said differently, nearly 45 years ago, Mike Madigan provided an opportunity for me that did not merely change my career path, it changed my life.*

What I want to emphasize, Your Honor, is that the experience I am describing here is not unique to me. Rather, it was Mike Madigan who offered that same opportunity to literally hundreds of young people —and not just lawyers— to obtain an experience of working in government. I assure you that many of those individuals went on to serve in government in a variety of roles—as members of the judiciary, as members of the State legislature, in positions in the various executive branch agencies of Illinois government, and in the private sector in areas including healthcare, law enforcement, social service agencies and many other critically important roles. As a result, the State of Illinois and its citizens are better off because of the leadership, commitment, vision and the opportunities that Mike Madigan provided to so many.

In the mid-1980s, I left the House Staff to pursue an opportunity in private practice in Springfield. Since that time, my practice consists largely of representing individuals and organizations on legislative matters before the General Assembly; before the various Executive Branch agencies on a variety of regulatory, licensing and permitting matters; and in administrative hearings before the various Executive Branch departments and agencies.

Consequently, I have had the opportunity to interact with Mike in his capacity as Speaker on many occasions over the last three plus decades. In that capacity, I found Mike to continue to be an effective Illinois House Speaker, to be a dedicated public servant, and to be truthful and honest in every instance. Despite his workload and responsibilities, and despite the many demands on his time, I would be woefully remiss if I did not mention the many instances and conversations over the years, and to express my special appreciation for his kind expressions of concern and personal notes—whether it was his expression of condolences regarding the death of my father, or my mother, or whether it was his note of congratulations on the adoption of my daughter over 30 years ago.

I have also had the pleasure of knowing Mike's wife, Shirley, his daughters Lisa, Tiffany, Nicole, and his son, Andrew and their spouses. Not surprisingly, Mike dearly loves and is proud of his family. Mike Madigan is a good spouse, a caring and loving father, good friend to me, and to many others.

The opportunity and many kindnesses Mike extended to me over the years have never been forgotten, nor will they ever be forgotten. They shaped my career as a lawyer and as a person, and changed my life. Again, I cannot overstate that my experience is far from unique.

In closing, I respectfully and prayerfully request that appropriate and fair assessment of Mike Madigan the individual be fully taken into account when the Court imposes its sentence in this case.

Sincerely,

Neil F. Flynn

Honorable Justice Blakey
Northern District Federal Court
219 South Dearborn Street
Chicago, IL 60604

Dear Judge Blakey:

My family and I have known Mike Madigan and his family for over 40 years. That friendship began when my late father, Daniel Houlihan and Mike were starting their careers as young attorneys and a few years later served together in the Illinois House of Representatives.

After graduating college, I was unsure of what I wanted to do and lacked direction. After working several temporary jobs, nothing had clicked. My Dad mentioned to Mike that I was struggling to figure out what to do with my life and Mike suggested joining his team on a three-month contract. That three-month contract turned into a four-year job which was the beginning of a 35+ year successful career. A career which I have enjoyed immensely and has allowed me to provide for my family. As a young person, trying to find my place in the world, the opportunity to work on Mike's staff was life changing. Mike surrounded himself with hard working people, many of whom have become some of my closest friends. That type of camaraderie comes from the top, we all saw how hard our boss worked and the leadership and guidance he provided was instrumental to our young staff. I am just one of many young people who Mike helped get their careers started.

One of the first things I learned working on Mike's staff was the motto "You're only as good as your word." In Springfield, things can often move quickly and there is no time to write things down, so verbally relating information is often the norm as the legislative process proceeds. "You're only as good as your word" came from the top, because Mike Madigan always spoke the truth, he was a man of his word. Even those who disagreed with him appreciated Mike's directness because when he told you something you knew he was being straight with you, even if you did not like the message, his reputation as a straight shooter was widely known and respected.

Mike Madigan is a good man; he has helped countless people throughout his life. When one of my closest friends and co-workers struggled with an addiction issue, instead of firing the young staffer, Mike showed compassion and support and provided the necessary time off required to properly address and treat their illness. Because this person received the proper treatment, they were able to conquer their addiction and went on to have a successful career and family life. In my heart, this is one of the best things Mike has ever done, he helped save this person's life.

Even when I was no longer working for Mike, he always showed care and concern. Shortly after I purchased my first home, I had a pipe burst and had to cancel a meeting with

him.  Despite how busy he was professionally and personally with his own family, when he heard about my pipe issue, he called to make sure I was okay.  He knew I was a young single woman with my first home and unfamiliar with all that goes along with homeownership.  Even with his busy workload, he continued to check in with me all week to see if I needed anything and even recommended a dependable contractor for the job. He did not have to do all that, but he did because he is a caring person.

Thank you for the opportunity to share my thoughts on Mike Madigan.  I hope you will take into consideration all the good works Mike has done over his lifetime for so many people when determining his sentence.

Thank you,

Margaret Houlihan Smith

To Whom It May Concern,

My name is Mark S. Jarmer – and I write to share my thoughts on Michael J. Madigan, the former Speaker of the Illinois House of Representatives; someone I've had the privilege of working with for 16 years; someone, in my opinion, to have consistently demonstrated qualities of integrity, dedication and kindness — traits worthy of character consideration. Many have known the former Speaker; some knew him well. I knew him well enough to significantly change my life.

I want to distinguish myself from many of the legislative and political staff who worked for the former Speaker. I arrived here from out-of-state, I knew nobody – including the Speaker. I was nobody that nobody had sent – an unknown entity fresh from a small-town Kansas wheat farm. But Speaker Madigan is the kind of man to give a once-in-a-lifetime opportunity to a deserving but absolute outsider; and that's what he did for me. Speaker Madigan's nurturing of my potential and his belief in me, coupled with his unwavering support, allowed me to progress through the ranks of his Office. For this wonderful opportunity to work for one of the most sophisticated and accomplished political structures ever established, legions of staff just like me are forever and truly grateful.

Unlike most who join the Office of the Speaker's ranks right out of college, I joined as a 40-year-old adult with a family of five children. I had graduated summa cum laude at Arizona State University, spent time in the Arizona legislature, was published by the National Science Foundation, served a decade of my life honorably and with recognitions in the United States Army, and instructed college history and coached intercollegiate parliamentary debate for 10 years. In short, I was no doe-eyed sycophant. I knew a well-run organization when I saw it – and this was it.

Michael Madigan is one of the most impressive, honest, forthright, hard-working, and compassionate individuals I have ever met. In my time serving as an Illinois House of Representatives' staff analyst, and later as the House Democratic Director of Research and Appropriations, to properly summarize Speaker Madigan's tenure in the House, I would craft a description of a pronounced and profound understanding of the praxis of serving a multitude of diverse and often diametrically opposed ideas germinating and rising from within (and without) his caucus.

When I began my journey in the Illinois Capitol in March of 2008, right-off I observed that working for Michael Madigan, the Speaker of the Illinois House of Representatives, would become the professional highlight of my life. His standards were incredibly and impeccably high; his analytical skills – exceptionally acute. More – it was evident to me by

the sheer excellence of caliber of the people surrounding Speaker Michael Madigan that this was a locus of opportunity. The "Class the Stars Fell Upon" is an expression used to describe West Point's 1915 graduating class. It was known as such because it matriculated both General Dwight David Eisenhower and Omar Bradley. Despite on-going departures and arrivals of senior staff, I can say without reservation that Speaker Madigan had the talent, insight and fortitude to surround himself with some of the most intelligent and dedicated "stars" I've ever had the pleasure of meeting and working alongside: Steve Brown, David Ellis, Michael Kasper, Rob Uhe, Heather Wier Vaught, Justin Cox, John Lowder, Jessica Basham, John Hollman, Mike Thompson, Craig Willert, and Mika Baugher. All of these talents and so many more served the former Speaker Madigan at one time or another. And all are individuals I admire beyond words and count dearly among friends. It was former Speaker Madigan to select and elevate these stars. In so doing, Michael Madigan created one of the most accomplished legislative staff in the history of this state, if not the nation. Speaker Madigan formed such a top-shelf coterie because he demanded we press back vigorously and effectively against his ideas and plans. He loved enthusiastic debate and expected us to voice our disagreement if we had such. In doing so, former Speaker Madigan exhibited the highest traits of leadership, and he allowed his staff to grow exponentially over time as a result.

I found always Michael Madigan to be a consummate professional. In all of my interactions with him, I observed him to be a man of his word, empathetic to those around him, and sympathetic to the needs of others -especially the less fortunate. Working in the Office of the Speaker was a "vocation" to advance democracy's values and priorities which all of us took incredibly seriously – and that mindset and calibration came directly from Speaker Madigan. I know this because at one time there was a defamatory rumor about me. Far from true, I was privately suffering my own hell from PTSD from past military experiences. However, Speaker Madigan's courageous and enduring example in the face of opposition gave me the fortitude and courage to seek and begin treatment through the Veterans' Administration. Today I owe my life to former Speaker Madigan.

Former Speaker Madigan was committed to the legislative process; and this process is one of Sisyphean complications within intricacies. This commitment of the Speaker manifests itself from the ground up – and is visible in his routines to thoroughly understand every separate piece of legislation filed. As an example, thousands of bills are introduced every legislative session – and only a sparse handful of persons take the time and exert the energy necessary to read through them all. Speaker Madigan did. I know this because I was once drafting legislation in our Legislative Research Bureau (LRB) when Speaker called the lawyer I was drafting with – to correct an error in the bill synopsis she had drafted. Not the bill itself mind you – the short (non-binding) parenthetical summary completed by LRB.

This was somehow vague; and he demanded it fixed. We all understood from examples like this that the Speaker's expectations were astronomically high, but we accepted those standards as the stewardship of genius.

Speaker Madigan's pristine commitment to the legislative process was also self-evident in his advocacy for the measures he advanced for his members – even at great personal risk. Time and again the record reflects, over the measured life of his work, that Speaker Madigan honestly brokered and advanced the many priorities of his party and his members – despite considerable resistance and personal defamation: the ERA amendment, the Impeachment of Rod Blagojevich; Gay Marriage; the Legalization of Marijuana; and the Assault Weapons Ban – just to name a few. And I think it important to recall that, in allowing Gay Marriage to advance under the direction of the former House Democratic Leader, Greg Harris, and by allowing Kelly Cassidy to carry forward pro-choice legislation, former Speaker Madigan opposed his own personal religion – and eventually suffered a forbiddance from receiving Holy Communion, a central pillar of the Catholic faith, from Bishop Paprocki in 2019 as a result.

Another salient example of former Speaker Madigan's striking character was during the Covid-19 pandemic. Do you recall the panic and severe anxiety of that time? I do. I recall the streets emptying of cars and people – in Florida; I recall the morgues overflowing – in New York; But not here in Illinois. Here in Illinois, under the insightful and tenacious leadership of Speaker Madigan and Governor Pritzker, it was a different story. Here, I and those few around me who were mustered quickly into the Speaker's Office during the pandemic for an incredibly truncated session, were counseled to quickly craft a state budget for all Illinoisans. The mantra was simple: Adhere to the science, prophylactically protect us, continue resolutely to accomplish the work of the people – especially the most socially and economically disadvantaged, and most importantly, find the money to make it all happen. Had it not been for former Speaker Madigan's direction and guidance – it is incredibly doubtful millions of Illinoisans would have received the life-saving assistance they received in the nick of time.

This leadership of the Speaker was nothing new. His is a career deeply demarcated with so many challenges facing our state; challenges for which he provided invaluable leadership; the Constitutional convention; the Equal Rights Amendment; Environmentalism and Energy; gun violence; 9-11; the crash of 2008; Rod Blagojevich's CHIPS standoff before the Joint Committee on Administrative Rules (JCAR); the pension crises and rehabilitation with the Tier II rehabilitation program; Illinois' near junk bond status and 8 downgrades of Illinois' bonds between 2015-2017 by Moody's; the Legionnaires disease outbreak in

Quincy; a former Governor's financial chokehold on the state; and the Covid-19 pandemic - to name but a few.

In 2019 I was promoted to Director of the House Democratic Research and Appropriations Unit. In this capacity I was responsible to present a summary and answer questions of each bill introduced into the General Assembly – during weekly meetings with the Speaker and 20 (or so) members of his Legislative Leadership Team. During these presentations, Speaker Madigan would always engage me with insightful questions and discussions, not only highlighting his depth of knowledge but also fostering my own growth in the various legislative topics at hand.

In this same capacity I was also able to frequently witness the Speaker recuse himself from legislative issues with which it might be argued he had a conflict of interest. Once, despite my resolute displeasure, Speaker refused me any counsel on a particularly complicated and troubling issue moving through the legislature with which he had a conflict. And despite the significant inconvenience to me, I recall distinctly how much I respected him for that. I found in all actions Speaker Madigan was incredibly vigilant about separating items that were deemed personal or professional conflicts with our legislative process, despite the fact that the two are so intimately intertwined. But a bright line was always in place for us – enforcing a maxim of no political work on state time.

A pinnacle example I can offer of Michael Madigan's character – was his resolve to step down when it became apparent to him that the support of his caucus had wavered. A lesser man could have fought this motion; a smaller man would have. But Michael Madigan, as always, thought most of what was best for his members and his party. And when it was time to step aside, Michael Madigan did so without reservation or complaint.

But perhaps the most descriptive statement I can offer about Michael Madigan is the depth of his compassion and empathy. In 2019 I asked Michael Madigan if I could bring my family into his office for a photograph. He agreed. But when my autistic son, Ethan, arrived, it was hard to watch as my son left the reservation and started roughly handling all of the Speaker's beautiful political artifacts. And you can imagine my horror when Ethan donned the Notre Dame football helmet the Speaker had been given and started running around the Speaker's office and bouncing off the walls. Through it all though, Michael Madigan calmly just smiled and enjoyed the wild energy of a 6-year-old. His easy patience with my young child, a trait not incredibly common under the dome, will never, ever be forgotten.

While I understand the seriousness of the charges against the former Speaker, I also recognize that these actions do not define the entirety of who Michael J. Madigan is. Throughout his life, former Speaker Madigan contributed positively to his neighborhood, his

District, his city, and his State.  Moreover, I believe that former Speaker Madigan has the capacity, drive and desire to continue making meaningful contributions in the future.

I respectfully ask that you consider Michael's humanity and the possibility of a sentence that balances justice with compassion. I trust that he will use this opportunity to rebuild his life and continue to grow as a person.

Thank you for your time and consideration.

Sincerely,

Mark S. Jarmer

April 14, 2025

Dear Judge Blakey:

I met Mike Madigan in the early 80's when I worked as part of the Issues Development Staff under the Speaker's Office. I have known him for nearly 40 years.

Working as part of the Speaker's staff often consisted of long hours into the night during months of legislative session and temperaments of others were not always the best. My stomach would drop when the phone would ring and it was his Chief of Staff because he tended to be extremely hostile. I never once dreaded a call from Mike Madigan. He was always extremely kind and understanding. If the person he was seeking was not in, he respectfully left a message, and his courteous demeanor never changed.

I can also say that he is supportive of Veterans. I was called up for Active Duty to serve in the Gulf War in 1990, and I received more than the required support and backing that was expected by any employer. When I returned home it was under unusual circumstances because all of my belongings had been stolen from a local storage center that was robbed. With the Speaker's approval, funds were raised to help me and my 6-year-old son rebuild our lives. The Speaker's staff also had a ceremony for me on the House Floor and even a House Resolution.

Despite any other issues, I have always held the highest respect for him because throughout the years, he has always been a consistently kind and caring employer.

Sincerely,

Mary Kinsella

Mary (Leone) Kinsella

# Charlene Kunkel



May 15, 2025

Judge John Robert Blakey
c/o Daniel J. Collins, Esq.
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL. 60661

Re: Michael J. Madigan

Dear Judge Blakey,

I met Michael Madigan in 1990 when I was hired as Office Manager of Madigan & Getzendanner, a position I held for the next 20 years. It was a relatively small firm, so everyone interacted with one another on a daily basis. Michael was no exception. While everyone recognized that Michael was an "important" person, he was unfailingly polite and respectful towards everyone. Prior to my working at Madigan & Getzendanner, I had worked in a management position at two larger downtown Chicago litigation firms where many of the name partners didn't meet Michael's standard of behavior toward firm employees.

During my time at the Firm, I assisted Michael with payment of his and his family's personal expenses and charitable contributions. He was careful about separating his personal expenses from law firm expenses. He was just as careful about paying his personal expenses on a timely basis and preserving a written record of all payments made. When I left the firm in 2010, he still maintained written expense payment records from the 1970's !

Michael was even more careful to avoid receiving a gift from any individuals or companies who had a stake in any legislation pending in the Legislature. Accordingly, the Firm established a protocol for screening gifts to Michael. All packages sent to him at the Firm without an identified sender were summarily refused. Those with an identified sender were checked against a list of lobbyists or other

Judge John Robert Blakey

May 15, 2025

Page 2

individuals and companies known to have an interest in pending legislation.   If a conflict or appearance of a conflict was  found, the package was not accepted  for delivery or returned promptly.   In a couple of instances, an individual paid for a lunch or dinner with Michael and upon subsequently learning that the individual had some relevant interest or potential interest in a legislative matter, Michael would direct me to send a reimbursement check to the individual with an explanatory letter.

In retrospect, my lasting impression of Michael was how well he treated others.  It made people in the office want to do things for him even if it was something as mundane as reheating his coffee (30 seconds in the microwave please, not 29 or 31) because they knew he wasn't above doing something equally mundane, but helpful to them.  Yes, he was an "important" person by any measure but one completely lacking in any pretense or self-importance.   When he talked to you, he genuinely wanted to know how you were doing.  He listened to your thoughts and concerns and , admittedly only sometimes, shared his own.  He was a pleasure to work for.

Respectfully,


Charlene Kunkel

April 17, 2025

The Honorable John Robert Blakey
United States District Court
Northern District of Illinois
219 South Dearborn Street
Chicago, IL  60604

Re:  Michael J. Madigan

Dear Judge Blakey:

My name is Mary Ladas.  I was hired in 1984 to fill a secretarial vacancy in the Chicago Office of the Speaker.  I performed numerous duties there, and when the Speaker was in the office, I welcomed his visitors, put his calls through to him, took dictation and typed correspondence. Later, I served as Office Manager for 10 years.  I retired after 20 years and was later asked to fill a secretarial position at his Law Office, Madigan and Getzendanner.   My sister Angela Ramas and I filled that position together as a Job Share for 8-1/2 years  from 2004 to 2012.

Michael Madigan was a very professional, even-tempered, and reserved boss to work for.  I never saw him lose his temper or be unkind to anyone.  Annual ethics tests were given at the Speaker's Office both in the Chicago and Springfield offices to each and every employee, from the highest to the lowest positions.  As state employees, we also had a code of conduct we were expected to follow.

When Michael Madigan married Shirley Madigan over 40 years ago, he adopted her daughter Lisa from a previous marriage and treated Lisa as his own daughter.  Lisa Madigan later became an Illinois State Senator and the Illinois Attorney General.

Shirley and Michael Madigan had three other children, two daughters Nicole and Tiffany and a son Andrew.  Michael Madigan was a wonderful father. I had seen him tutoring his children with their homework and taking them to baseball games and other activities.

It was standard procedure in the office, that if his wife Shirley or one of the children called to speak to him, we were to put the call through to him immediately.

The Honorable Judge John Robert Blakey
April 17, 2025
Page 2

Mr. and Mrs. Madigan are lifetime parishioners of St. Mary Star of the Sea Church. The Catholic values and morals of the religion were instilled in their children as they were growing up. I remember him taking the children to the Stations of the Cross during Lent, as we were let out early from work on Good Friday. All four of his children are decent, hardworking and upstanding citizens.

Many years ago, the Hynes family, neighbors of the Madigan's, suffered the tragedy of the loss of a husband and father, who died at 49 years of age. Michael Madigan took the children under his wing and became a father figure to them. I worked briefly with both of the Hynes children. They had expressed to me their admiration and respect for him.

Over the years, Michael Madigan attended many wakes and/or funerals, not only of his peers, but also those of staffers' families' and his constituents. If he was unable to attend, he often sent someone in his place, or sent a mass card or made a personal phone call to the bereaved. I fondly remember when he did so when both of my parents died, 25 years apart.

Michael Madigan's South side legislative district office offered assistance to seniors with numerous programs. Staffers would help those seniors that were too elderly to sign up or apply for programs on their own. I occasionally helped out at that office and saw the care and concern he had for the elderly. We were taught to always treat the seniors respectfully even if they occasionally became difficult to deal with.

I had observed that upon receiving checks at his Law Office for the Friends of Michael J. Madigan or the Democratic Party of Illinois accounts, Mr. Madigan would sometimes cut out the signature portion of the check and return it to the sender, if it was from a donor from whom he did not want to accept a donation. Mr. Madigan always went by the book, often conferring with his legal counsel at the time (including outstanding attorneys such as James Morphew, Michael Kasper, Robert Uhe and Judge David Ellis) to make sure that everything he did was within legal and ethical standards. I always felt so proud to work for such a conscientious, honest and ethical legislator, because these are values that are very important to me.

The Honorable Judge John Robert Blakey
April 17, 2025
Page 3

During snowstorms, of which there were very many back in those days, Michael Madigan would
get up early and personally cleared all snow from the sidewalks of his entire block of the street
where he lived. There were numerous elderly people on his block who really could not shovel
the snow themselves. He never talked about it, but others did with great admiration and
appreciation for his efforts.

At Halloween, Mr. and Mrs. Madigan opened up their home to the neighborhood children.
Mrs. Madigan loved Halloween. Both the outside and inside of their home were decorated.
Mrs. Madigan would often dress up in a costume to amuse the children. Italian food from
Palermo's was spread out on the table for the children to help themselves to food and candy. It
was a wonderful sight to behold, as I myself saw as a guest. Both the children and the adults
loved it. No child left without a generous gift of candy.

At Christmas, each staffer received a beautiful Christmas card of a recent picture of the
Madigan family. It made us feel very special for him to think of us at the holidays.

Dear Judge Blakey, please try to be as lenient as possible towards the sentencing of Michael J.
Madigan, considering his lifetime of public service, good deeds, his advanced age of 83 years
this April 19th, and the frail health of his beloved wife Shirley.

Respectfully,

Mary R. Ladas

Mary R. Ladas

Jesse Leone



April 15, 2025

Hon. Judge Blakey
U.S. District Court - Northern District of IL

Dear Judge Blakey,

In addition to family, friends and colleagues of Mr. Madigan, I hope you will take a moment to hear how a rank and file state employee for the Speaker's Office during Mr. Madigan's leadership felt about the former Speaker, and the positive impact I believe he had on his staff and folks such as myself, both professionally and personally.

My mother worked for the Speaker's Office in the 80's and 90's, and I have fond memories of her time there and the people within the office. She was a young single mother raising me, and was also in the Army Reserve. When she returned home from a tour of active duty during the Gulf War, Speaker Madigan and his staff welcomed my mother back with a ceremony and the office offered her support during her absence and upon her return.

When I began working for the same office nearly 25 years later, it felt like much the same place but with different faces. Unfortunately, I entered my employment with a drinking issue that ended up worsening during my tenure. When I thought I'd have my employment terminated, I was instead offered assistance and support - guided assistance on getting help for my issue, and words of encouragement from my bosses and peers. I accepted the help and remained employed.

After a couple of years of being alcohol-free, I took it upon myself to write then-Speaker Madigan a letter thanking him for the way I felt he ran his office, and for his office quite literally saving my life. My impression and the general feeling I got from those who knew the Speaker personally was that he was kind, generous and honest, and while my interactions with Mr. Madigan were few and in passing, that was always the experience I had. Staff would sometimes muse we would rather have the Speaker call the office than other staff because of how polite he was. Most importantly, I write this letter today with the same belief of Mr. Madigan that I've always had - he's a decent and honest man of integrity who lead by example. This letter and my aforementioned letter would not exist if I believed or had witnessed anything to the contrary, and I truly do not believe the office environment I experienced would have functioned as it did were that not the case.

Thank you for your time regarding this matter.


With best regards,

Jesse N. Leone

Dear Judge Blakey,

My name is John Lowder. I am currently the President of Lowder Governmental Solutions and a partner Governmental Consulting Solutions. Prior to becoming a legislative consultant, I worked on House Democratic Staff for 18 years. For 14 of those years, I served as the Director of the Research and Appropriation staff.

Within that role, I was a top advisor to Speaker Michael J. Madigan. My staff analyzed approximately 50% of all the legislation that was filed in each General Assembly and my role was to use those analyses to explain the legislation to the Speaker and his leadership team to determine to which committee those bills, and any subsequent amendments, should be assigned. Secondly, my staff worked with members of the House Democratic Caucus to analyze, critique, and eventually draft the State budget. In both roles, I worked with Speaker Madigan to help caucus members advanced their legislative agendas, as well as worked with the other caucus staffs and the Governor's Office to negotiate annual state budgets that were both balanced and addressed as many of pressures of the House Democratic Caucus as financially possible.

I wish to give you my insights on the character of Mike Madigan and, more importantly, what he means to me and how he has influenced my life. I can say without any reservation, outside of my father, Mike Madigan has had more positive influence on my life than any other human being. He instilled in me a dedicated work ethic and the self-gratification to know that you did everything you could to be successful – leave nothing on the table. He showed me the value of honoring your commitments and holding true to your word. He showed me that respect is earned, not taken.

During my time of interaction with him, we worked long, hard and stressful hours to facilitate the workings of the House of Representatives. But he never expected anything of me that he didn't expect from himself. I thankfully worked those long, hard hours because I knew Mike Madigan's expectation was that we strive for excellence and that we were never to be outworked by any other caucus. That is what he expected of himself, and it's what he expected of his staff. He expected me to always be honest and to honor my commitments. He taught me that life is a life-long learning experience and that it is okay to ask questions when you do not understand something or need further clarification. Because of that, he never expected anyone to have all the answers to his questions, but he did expect you to be able to find the answer. All these things have molded and developed me into the person I am today. I only hope he is as proud of me as I am indebted to him.

Thank you for your consideration,
John Lowder

3/21/2025

The Honorable John Blakey
Judge of the United States District Court for the Northern District of Illinois
United States Courthouse
219 S. Dearborn St.
Chicago, Il 60604

Dear Judge Blakey,

I appreciate the opportunity to provide input into consideration of the sentencing of Michael J. Madigan.

I have known Mike for 49 years. I began my career as a legislative/budget analyst for the House Democratic Staff in 1976 and was appointed Director of the Research and Appropriations Committee Staff by Mike in 1983. I resigned my position with the House of Representatives Staff in 1990 and have maintained an interpersonal relationship with him, his wife Shirley and his daughter Lisa since that time.

In the 1970's and '80's, many work environments had not yet overcome gender bias. During that era, it was a great privilege to have worked for Mike and his leadership team. I was provided guidance in my work product, treated with respect and given every opportunity to succeed.

It has been my experience that Mike is forthright with his adversaries, has been intentional in recusing himself from conflicts of interest, is reserved and strategic in deliberations and endeavors to reconcile differences of policy or social impact in a collaborative environment. He is truthful, and regardless of any outcome, he is true to his word.

The success of Mike's tenure should be measured by his legislative stewardship and the positive impact his leadership has contributed to the state. He has affected the needs of his constituents and collaborated with statewide leaders to address major concerns throughout Illinois.

When I resigned as Staff Director in 1990, I provided a budget analysis to the Democratic members of the House of Representatives and included Ralph Waldo Emerson's poem "What is Success". Ten years later, in a conversation with Mike, he mentioned his frequent recall of that Emerson selection. This small notation in our conversation sincerely reinforced my appreciation of his character.

Thank you for the opportunity to have provided my insights. Should you require any further information or clarification, feel free to contact me at the number or email address listed below.

Kind regards,

M. Veronica Lynch

March 25, 2025

The Honorable John Robert Blakey
Circuit Judge
United States District Court – Northern District of Illinois
219 S. Dearborn Avenue – Room 1288
Chicago, IL  60604

Dear Judge Blakey:

I am writing to you concerning my knowledge of a recent defendant in your court, Michael J. Madigan.  I have known Mr. Madigan for just shy of fifty years.  I believe I have knowledge of the type of individual he is, based on my close observations during that time.

I have worked for the General Assembly, for the City of Chicago, and for a number of clients in a government affairs business I established 42 years ago.  I first met Mr. Madigan when I was an Appropriations Committee staff member, working for the House Democratic Staff.  The Speaker of the House when I was on staff was William Redmond, a Democrat from then solidly Republican DuPage County.  I was hired by the House Staff through a Legislative Intern Program run by Sangamon State University.

The first time I met Mr. Madigan, I was asked by the sponsor of a bill I had analyzed to meet with him and then the new House Majority Leader, Michael Madigan.  The legislation was the annual budget for a small commission providing services to counties outside of Cook County for States' Attorneys Appellate Court assistance.

The head of this agency was a bit cavalier in his attitude toward spending, his expenses, and giving himself a raise, when the General Assembly denied him that raise.  Mr. Madigan made a joke about the agency head's administration, comparing him to a former House Majority Leader.  I was too nervous to laugh, which is highly unusual for me, but did point out the agency head's friendship with the former Majority Leader.

After then, Mr. Madigan was always cordial to me but he was never the gregarious type of political figure.  Whenever he asked a question, it was never frivolous.  Always pointed, and important to whatever issue he saw in legislation.

In my next career move, I became a Legislative Liaison for the City of Chicago, under Mayor Jane Byrne.  I spent more time with him in those four years than the three years before and probably the forty years since.  Always cordial, wanted to know the City of Chicago position on legislation, and offered suggestions.  He very often was supportive of those positions, and suggested alternatives when he thought they needed refinement.

Judge Blakey
Re: Michael J. Madigan
March 25, 2025
Page 2


After Mayor Byrne was defeated in her re-election bid, I found myself out of work and started my own government affairs practice. It did not go well early, as finding clients was not easy when working for defeated political figures. When I learned of a potential opening at the RTA, I asked him and several other people for a recommendation. He was very gracious in taking my call and promptly made a call on my behalf. He never made a request of me, expecting a quid pro quo in return. He did contact me in the normal course of responding to constituent requests, whether from his own district or from members of the House. Never did he ever remind me of his help.

I would like to point out an instance of what I think is the true essence of his character. In 2002, Mike Madigan was working on his daughter's first campaign for Attorney General. At that time, in a non-campaign discussion with a top campaign staff member, they told me they were looking for paid campaign workers to follow up with phone calls to voters. At the time, my best friend, John Swift, was a medical device salesman who was out of work. He had always been interested in politics. I recommended him to the campaign.

Mr. Swift was hired and given the option to work out of the campaign's South Side location, because Mr. Swift lived in the South suburbs. Mr. Swift was excited to be working, having an income, and working on a political campaign. Mike Madigan would regularly stop the campaign office and would talk individually to the campaign workers. John's desk was a regular stop on Mr. Madigan's visits.

This had an unbelievably positive effect on Mr. Swift. He went from unemployment to working, and while working was engaged in regular conversation by one of the most recognized public figures in Chicago. Unemployment takes a toll on one's mental health and Mike Madigan rescued my friend in a very difficult time. Mr. Madigan may not have been aware of what he did, but I will always remember his kindness to a friend in need.

I had represented several local government pension funds in my business, including the Chicago Firemen's Annuity and Benefit Fund. Pension law is designed to take benefit decisions away from the pressures of local governments negotiating with their employees. But pension laws weren't always drafted perfectly and occasionally have some unfortunate impact. My client discovered a single case where the law penalized a fireman who had first worked for the city in the Municipal Employees' fund and later became a firefighter. The penalty which made no sense would have cost him a significant portion of his pension that he otherwise fully qualified for.

I was visiting another legislator near Speaker Madigan's office when I was told I needed to see The Speaker. At the time, there was a considerable amount of interest in pension costs and the Speaker was very concerned about these costs. He wanted to know the

Judge Blakey
Re: Michael J. Madigan
March 25, 2025
Page 3

purpose and cost of the proposed change. I explained that the archaic language had unfairly penalized this person, it was not a case of double dipping, there was no overlap of salary or benefits earning, and that this was the only individual that the proposed fix applied to. He closely read the language and understood the issue very quickly despite the archaic drafting. He agreed that the change should be made. It was clear that his concern was for this firefighter who was being penalized unfairly and that it should be corrected. After that meeting, I had no problem passing that legislation.

Now, I have had a close view of Michael Madigan that very few others have had the opportunity to see. Yes, I see a politician. But I see an individual who works hard every day, who remembers where he came from, and that there are people who he feels need assistance. And he hasn't hesitated to step up on their behalf. And more importantly, unlike a significant number of political figures, Mr. Madigan was always truthful. He made his arguments in discussions and debate but didn't take shortcuts to make them.

Your honor, please recognize the Michael Madigan that I have come to know. You have a difficult task ahead of you. I urge you to consider the considerable amount of good that I have witnessed.

Sincerely,

John McCabe

The Honorable John Robert Blakey
U.S. District Court
219 South Dearborn Street, Suite 1288
Chicago, Illinois 60604

Dear Judge Blakey,

Please allow me to submit this letter in support of Michael J. Madigan.

I have known Mr. Madigan since 1987, when I had the honor to work on his staff at the Illinois House of Representatives.

Like Mr. Madigan, I graduated from St. Ignatius College Prep in Chicago. As the ninth child in a family of eleven children, I worked various jobs to pay 100% of my tuition at St. Ignatius. I also paid 100% of my college tuition, something I owe to Mr. Madigan. In 1987, I found myself unable to cover the ever-increasing costs to attend college and was thinking about dropping out. To save money, I transferred from Illinois State University to Sangamon State University (now the University of Illinois - Springfield) where I was fortunate to land an hourly-waged job in the House Clerk's Fiscal office. Occasionally I would help the House Clerks' assistants on the House floor as "bill control clerk" where I first met Mr. Madigan. During this encounter, Mr. Madigan asked me about myself and I casually mentioned that I paid *my* own way through high school and was, at that time, trying to pay for college. Mr. Madigan, unbeknownst to me, had me moved from a temporary hourly position to a full-time position, albeit one with a nominal salary, to help cover the costs of classes I was taking at night to finish my degree. When I graduated in December, 1988, Mr. Madigan offered me a full-time position as a Program Specialist *on* the House Democrat Issues Development Staff. I should add that this job offer did *not* come with any requirement that I do political work *on* my own time. Please understand that I did not come from a politically connected family. To paraphrase the late Honorable Abner Mikva, I truly was the one "nobody nobody sent" and yet Mr. Madigan hired me nevertheless.

To say that Mr. Madigan had a tremendous impact on my life would be an understatement. When I was on the Issues Development Staff, I met my wife of over 30 years, who also worked on that staff. I know of at least five couples who met and married while working for Mr. Madigan during my four years working there.

My experiences on his staff opened many doors professionally. When prospective employers saw on my resume that I worked with Mr Madigan, it was understood that I worked under the tutelage of one of the best political organizations in the country. Over the past 34 years, I have been a slate government affairs professional. For 28 of those years, I have worked for a Fortune 20 company overseeing their legislative and regulatory matters in *five* states, including Illinois. In this capacity, I have seen Mr. Madigan tirelessly champion the "little guy". I witnessed firsthand how he fought for workers' rights and sought to protect the people of Illinois from the hard-to-comprehend side of the "sausage making", a term that some have used to describe the legislative process. He often frustrated people, including me, when he stood between special interests and the best interests of the people of Illinois. But he often stood alone, even when it was unpopular to do so.

I respectfully ask you to consider Mr. Madigan's life "in toto" *and* weigh all the good he has done for his constituents, the beneficiaries of his selfless deeds, and his family when making your decision about his sentencing. Even though he is approaching 83 years of age, I absolutely believe he has a lot of good left in him to offer society as a contributing member.

Sincerely,

Michael A. McDermott

March 31, 2025

Honorable Judge John Robert Blakey
United States District Judge
219 South Dearborn Street
Chicago, IL 60604

RE: Michael J. Madigan

Dear Judge Blakey,

I am writing this character letter on behalf of Michael J. Madigan (Mike), whom I have had
the privilege of knowing for over 50 years in both a personal and professional capacity. It is
an honor to share my perspective on his remarkable attributes and unwavering dedication
that he brought to being a public servant.

Please allow me to introduce myself, my name is Joe McMahon, and I was born and raised
on the southwest side of Chicago. I was the oldest of six children in a blue-collar
household. For the past four decades I have resided in Springfield, Illinois. I am currently
the Executive Director of the Illinois Automobile Dealers Association (IADA), representing
Illinois Franchised dealerships throughout the state.

I first met Mike during my youth as he was a friend of my father and even then, I realized the
positive impact he had in the neighborhood. After graduating college, I was fortunate to
have the opportunity to be accepted into a legislative staff position in Springfield. At the
time, Mike was the leader of the Illinois House Democrats, and I was a legislative staffer for
four years.

Under his leadership tutelage, I learned the value of being a dedicated and organized
individual to perform the specific legislative tasks necessary to complete the job.
Throughout my tenure on staff, I have consistently been impressed by Mike's integrity,
truthfulness and his public service for improving the lives of his constituents.

In 1985, I left staff to pursue an opportunity to work for a trade association. The lessons I
learned under Mike and his Executive staff leadership team such as dedication, detail,
work-ethic and that your word is your bond still carries with me to this day. Mike believes in
being a good listener and that at the end of the day we all have a civic duty to do the right
thing in life.

In fact, what he has done for my old neighborhood is simply remarkable. He's always
sponsored the Little League teams, established and beautified neighborhood parks, and
redeveloped Midway Airport and numerous hospitals. In my 45 years of dealing with
various legislatures, I have worked with hundreds of elected officials and Mike's countless

constituent services programs set him apart from any other public servant that I have ever come across. Simply, he is head and shoulders above the rest.

My father always told me about Mike, he is always there to level the playing field and elevate the low/middle class on their wages and standard of living. He has a unique ability to connect with people from all walks of life. His capacity to understand diverse perspectives is complemented with his straight, truthful approach to tackle tough problems.

Your honor, what I would like to highlight, was the opportunity Mike has afforded myself and hundreds of others like me to experience the inner workings in the government/legislative arena. On a personal note, Mike was one of the first individuals to reach out to the family on my dad's passing at 59 years of age. His kindness during those tough times will never be forgotten by the McMahon family.

I also understand the seriousness of the charges brought against Mike and I am not in any position to comment on the specifics of the case. However, I can attest to Mike's character and the positive impact he has had on my boyhood neighborhood, his constituents and to the citizens of Illinois.

In a nutshell, I consider myself fortunate to have a friend like Mike. I'm sure he doesn't realize how his influence as a frank and honest person has shaped my career and has transformed my life and my family's. He has made me the person that I am today. For this I am truly grateful.

In closing Your Honor, I respectfully ask that you consider Mike's true character and all the exemplary works which I believe will illuminate his unwavering commitment to serving his constituents with distinction, prior to the Court imposing his sentence.

Sincerely,

Joe McMahon

April 15, 2025

The Honorable Judge Robert Blakey

United States District Court

Northern District of Illinois

Honorable Judge Blakey:

My name is Caleb Joseph Melamed. I am an attorney licensed to practice law in the State of Illinois. Almost my entire legal career has been spent working for Illinois state government. I have been employed by the Illinois House Democratic staff as a legal analyst and researcher (1979-1984 and 1987-2003), the Illinois Educational Labor Relations Board as a hearing officer and investigator (1984-1987), the Illinois Attorney General's Office as an Assistant Attorney General in its Opinions Unit (2003-2006), and the Illinois Gaming Board as legislative liaison and legal counsel (2006 to present). I am now retired from state government though I continue to do contractual work for the Illinois Gaming Board. I am also currently serving as the president of the synagogue to which I and my family belong, Congregation Temple Israel in Springfield, Illinois.

During my more than 20 years of service as an employee of the Illinois House, I developed a close working relationship with Michael Madigan. After Michael Madigan became Democratic Minority Leader in 1981 and then House Speaker in 1983, I provided research and legislative review and assistance, including bill analysis, the drafting of memos on pending legislation, and formulation of bill and amendment drafts on diverse legislative topics. My areas of committee assignment were labor and commerce (focusing particularly workers' compensation, unemployment insurance and collective bargaining legislation), insurance, civil judiciary, and pensions, though I also addressed a broader range of legislation issues as required. Michael Madigan reviewed much of my work and called me frequently into his Springfield legislative office for discussions and clarifications. During my many years working for him, I believe that I got to know Michael Madigan very well not only as a legislator but also as a person.

Michael Madigan was always a fair and gracious boss who not only fully appreciated my work but also took an interest in my life, for example when my wife and I adopted a baby girl from China. I was always impressed by his devotion to detail and familiarity with every item of legislation that came before the House. My most numerous personal interactions with the Speaker were in the area of pension legislation, a topic of particular interest to him. From the early 1990s until 2003, I staffed the House Personnel and Pensions Committee for the House Democrats. Pension law was then (as it is now) an area of great general concern to the State of Illinois because of the substantial underfunding of the State pension systems that has created tens of billions of dollars of long-term liabilities for the State. More than any other legislative leader at the time, Michael Madigan focused on this long-term liability problem and the steps that should be taken to address it. All of Michael Madigan's decisions in this area were characterized by fiscal prudence. For example, a legislative proposal was repeatedly drafted and presented to him to create a special, higher pension benefit for certain legislative staff and employees of the State pension systems. Speaker Madigan opposed this legislation as an imprudent use of State funds though it affected his own staff. He was the only legislative leader to register opposition, stopping the legislation from near-certain passage on multiple occasions. I believe this action demonstrated his concern for broad questions of public policy entirely apart from any personal connections.

Michael Madigan's approach to legislation was both probing and direct. When confronting a newly introduced bill or amendment, his first step was always to find out exactly what it did, who supported and opposed it, and the reasons for their positions. I remember that once, on a complex item of pension legislation that he did not at first fully understand, he telephoned me multiple times, prefacing his conversation with "let's go through this one more time." After Michael Madigan understood a piece of legislation and its implications he was always, in my experience, completely forthright as to his support or opposition and the reasons for his stance. This honesty and directness I found to be the exception, rather than the rule, in Springfield political life.

What most impressed me about Michael Madigan as House Speaker was his abiding concern for individuals whom he felt were not getting a fair break. You might think that with the power of his position and his ability to influence the course of legislation, his primary focus always would be on larger issues of general importance to the State that involved large amounts of State spending

and broad public policy concerns.  My experience was the contrary.  What typically drew some of his most devoted attention were those individuals whom he felt had been deprived of fair benefits through inequitable legislative provisions.  Specifically, I remember the instance of a Chicago firefighter widow who was ineligible to receive an adequate spousal death benefit.  Speaker Madigan brought up this matter in a House staff and leadership meeting with much emotion.  He called me to his office to ensure that corrective legislation had been drafted.  There was nothing in this legislation that could have benefitted Michael Madigan either personally or politically.  Rather, his sole, strongly felt concern was the welfare of the affected individual.  I believe that this action demonstrated his compassion and his eagerness to use the power of his office to help those who did not otherwise have a voice.

Sincerely,

Caleb Melamed

**JAMES M. MORPHEW**

May 20, 2025

Honorable John Robert Blakey
United States District Court Judge
219 South Dearborn – 1288
Chicago, IL 60604

RE:    Michael J. Madigan

Dear Judge Blakey:

By way of introduction, my name is Jim Morphew.  I am an attorney residing and
practicing in Springfield, Illinois.  I am submitting this letter on behalf of Michael J.
Madigan.

I was born and raised on the Southwest side of Chicago.  I first met Michael Madigan in
1971 during my senior year at St. Laurence High School, located in Burbank, Illinois.
The introduction was made by a family friend and neighbor who had just become a 13th
Ward Democratic precinct captain.  Due to my interest in government and politics at a
young age, I often volunteered at the 13th Ward Office during evening and Saturday
office hours to answer phones, schedule meetings, and perform other secretarial-type
tasks.  I would also assist Mr. Madigan and other candidates running for office when
they would campaign at church picnics, Little League events, and block parties.  I
enjoyed this activity very much.  After graduating from high school, I attended Lewis
University in Romeoville, Illinois.  I was interested in Lewis for a few reasons – its
proximity to Chicago, several high school friends were also enrolling, and I hoped to
play on Lewis' hockey team.  The University' short distance from Chicago also allowed
me to continue my part-time volunteer activities at the 13th Ward office.

As I approached graduation in the spring of 1975, Mr. Madigan, then a member of the
Illinois House of Representatives, asked me about my post-college graduation plans.  I
would be receiving a degree in business administration, so I had planned on attending
career days on the campus with the hope of landing a job related to my degree.  It was
around that time that Mr. Madigan informed me that each legislative caucus employed
staff to assist with analyzing legislation and conducting committee hearings.  Knowing
my interest in government and politics, Mr. Madigan asked if I might be interested in
applying for a position on the House of Representatives Democratic Staff.  I expressed

interest, applied for a staff position, and interviewed with the staff director. I was hired, moved to Springfield, and began my employment on October 1, 1975.

After approximately four years of staff work, I applied to law school, and in 1980, I began as a full-time student at Loyola University School of Law in Chicago. Upon graduating and passing the Illinois Bar Exam in 1983, I returned to Springfield to work part-time for the Illinois House and practice law at a small Springfield, Illinois law firm. In a short period of time, my interest in government and politics took over and I became a full-time attorney for the Illinois House. Mr. Madigan had just been elected Speaker of the House. It was an exciting time for a young attorney to work on his legal staff. While I and his other attorneys worked extremely hard, we all loved the work and the frequent interaction with Speaker Madigan and the members of the House Democratic Caucus on the legislative issues of the day. In late 1985, I was promoted to the position of Chief Counsel.

As my personal history demonstrates, I have known Mike Madigan my entire adult life. I worked for him as his Counsel until I entered private practice on January 1, 1993. Leaving his employment and the work I thoroughly enjoyed was difficult. For that reason, it took me several weeks to accept a partnership with a respected law firm. I did so because it was in the best interests of my young family.

My time serving as Counsel to the Speaker was the best job I have ever held. Mike Madigan was a wonderful boss. He was good to his employees. He treated us with respect, but he expected professionalism from his legal staff. The hours were often long and taxing. However, we were energized by the strong sense of camaraderie that existed among the staff, the Speaker, and the members of the Democratic Caucus. You knew that as hard as you and your fellow staff members were working, Mike was working just as hard. Also, your hard work was not in vain. You knew that the memorandum Mr. Madigan requested analyzing a legislative or constitutional issue would be closely reviewed by him – often returned to you with his handwritten requests for clarification or further information. Mr. Madigan valued the advice he received from his legal staff. When he sought your legal opinion on legislation or a government matter, he followed that advice.

The expression "your word is your bond" is frequently invoked at the State Capitol, but not always followed. To me, this maxim exemplifies how Mr. Madigan conducted himself as a political leader and as Speaker of the House. Political allies as well as many of those who have opposed him share the same opinion – Mr. Madigan is a trustworthy person who keeps his word. If he made a commitment, he lived up to it. This has certainly been my experience in my interactions with Mr. Madigan over the many years that I have known him.

Also, avoiding conflicts of interest was important to Mr. Madigan. During my time as Counsel, it was standard practice to maintain a list of legislation, the substance of

2

which may present a conflict of interest for Mr. Madigan. This list of legislation was regularly updated at the direction of Mr. Madigan and kept as his desk on the House floor. Mr. Madigan's votes on legislation were cast according to the information on that list. It is my understanding that this practice continued throughout Mr. Madigan's speakership.

Judge Blakey, as you contemplate Mike Madigan's sentence, it is my sincere hope that you will recognize and give weight to the letters you will likely receive describing how he helped people in their time of need. I also respectfully request that you recognize and consider Mr. Madigan's outstanding qualities as a husband, father, grandfather, and friend to many.

Sincerely,

James M. Morphew

James M. Morphew

JMM:dwe

3

Mary Morrissey



May 19, 2025

The Honorable Robert Blakey
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street, Room 1288
Chicago, Illinois 60604

Dear Judge Blakey:

I am writing to ask for your consideration of the long history of compassion and kind acts that
Michael Madigan has done over his lifetime and in particular during his years of service as a
state representative. I have had a front row seat to many of those kind acts including the
kindness and compassion that he expressed to my family after a devastating loss.

Just a bit about how I came to know Mr. Madigan and the Madigan family. I grew up in the 13th
Ward in Chicago. My parents were not involved in politics and did not have political
connections. My Dad was an airline mechanic and my Mother a stay-at-home mom. They
taught us about standing up to injustice and helping those that had less than we did. Those
guiding principles and the social justice teachings at Lourdes High School drove me to pursue an
undergraduate degree in political science so that I could tackle the problems that I saw in the
world at a systemic level. Unfortunately, when I graduated, I had neither family nor political
connections to get a start in politics or government despite serving as President of College
Democrats at Illinois State University. In 1983, I asked Mr. Madigan, my state representative, for
a letter of support for my application for the Illinois Legislative Staff Internship Program
operated by Sangamon State University (now University of Illinois Springfield) which he
provided. With his support, I began a 17-year career as a legislative staff person working on the
staff of the House Democratic caucus, rising from intern to Special Assistant to the Speaker.
During that long period, I had the privilege to closely observe Mr. Madigan's kindness and
dedication to his constituents and people of the State of Illinois.

During my tenure, I served in many different roles but the one in which I worked closest with
him was during the 1990s when I served as Special Assistant to the Speaker. In that role, I
worked closely with him on projects and constituent services which were always his first
priority. At a district wide level, he established a tracking system for every request received by
his office. Some were larger projects like the renovation of a vacant block into a baseball field
for a local little league and the redevelopment of vacant property on 63rd Street as subsidized
senior housing. Some were smaller ongoing projects like the program to enlist the city
inspectors and the courts to secure and rehabilitate abandoned and dangerous residential and
commercial buildings in the community and ensuring that potholes and collapsed sewers were
repaired.

But the requests that he took most seriously were those individual requests from people in need who had nowhere else to turn. I remember clearly him giving me a copy of a napkin with a name and number on it from someone who had approached him at a restaurant and another time it was a note from someone who stopped him at the grocery store asking him to help them with a family member. He would ask me to call them and work on resolving their issue. And he would carry around a copy of the request in a folder, back and forth to Springfield, until the matter was resolved. And if the request uncovered a problem with a private or government office, he would use those cases to advance changes in state law.

The most powerful and personal example of his compassion and humanity stems from the most difficult time in my life. In 1997, my 28 year-old sister was killed in a car accident; she hit a pothole at 73rd and Kedzie in Chicago, went into oncoming traffic and was killed. For me, my family, and especially her twin-sister, this sudden loss shattered our worlds. During this very difficult time, he and his wife Shirley went above and beyond to support our family – not only did they bring the 13th Ward staff and volunteers to the services, notify other elected officials about the loss, but he postponed the start of the legislative session that week so that he and Shirley could attend the wake and funeral. Even further, Mike and Shirley continued to support my family in many ways – even giving my late sister's twin a ride home from law school once a week for months.

And ours was not the only family that felt their warmth and support during difficult times. Hundreds, perhaps thousands, of families across the state were touched by Mr. Madigan's kindness at the most difficult times in their lives. For example, when a neighbor passed away suddenly leaving behind four school-age children, Mike helped look out for the sons and mentored them through school and into their careers.

I apologize for not being able to give you the names of the many, many, many people that he has helped throughout his career without requesting anything in return, but I hope that my letter gives you a sense of the depth and breadth of the kindness and compassion that he has demonstrated during the time that I have known him. I hope that you will consider this letter as you make your sentencing decision in the coming weeks and that you will show him compassion and leniency in light of his many years of making a difference in the lives of the people of our state.

Sincerely,

Mary Morrissey

April 21, 2025

The Honorable John Robert Blakey
United States District Court, Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

Dear Judge Blakey,

My name is Michelle Olson, and I am writing to ask that you show mercy when sentencing Michael J. Madigan.

I started working for Speaker Madigan in his Issues Development Unit after graduating college. I first worked as an intern, then as a staffer in the In-District Program and finally as the Northern Regional In-District Coordinator. I left after four years to attend law school, and I have largely worked in private practice since then.

I do not come from a politically connected family, and I was hired by the Speaker's Office, and promoted within, based on merit alone. My colleagues were committed, capable and principled. The emphasis in the Office was on hard work, discipline and follow-through. Speaker Madigan set this tone from the top. He was known to be a tireless worker who paid close attention to every detail and meticulously studied and mastered all aspects of his job—both legal and political.

Speaker Madigan placed great demands on himself, and both he and his family made great sacrifices that allowed him to work at the highest level of government. He also placed great demands on his staff, but he always led by example, and he was always true to his word. These are important characteristics in a leader, but they are lacking in too many of our political leaders today. In fashioning a sentence, I ask that you consider the many positive qualities of Speaker Madigan as a leader and a lawmaker.

Finally, I ask that you carefully consider the purposes of sentencing as I know you will. I believe that no good purpose can be served here by imposing a lengthy sentence. Speaker Madigan and his family have already suffered greatly in this process and to sentence him harshly at his age would be cruel. Moreover, he poses no threat of recidivism, as his professional career is over, and his painful and costly fall from grace should serve as a sufficient deterrent to others, absent a lengthy sentence. I ask that you please show him mercy.

Sincerely,

Michelle Olson

# MICHAEL E. POLLAK

## ATTORNEY AT LAW

███████████████████████

MICHAEL E. POLLAK                                               ██████████████

May 2, 2025

The Honorable Judge John Blakey
United States District Judge
   For the Northern District of Illinois
Everett McKinley Dirksen U.S. Courthouse
219 South Dearborn Street
Chicago, IL 60604

Dear Judge Blakey

My relationship with Mike Madigan goes back a long time. We met in 1966 when Mike and I were law students at Loyola University Chicago. Since that time, I served on the staff of both Lt. Governor Paul Simon and Senate President Tom Hynes. In 1979 I joined the House Staff. I was appointed by Mike as Parliamentarian of the House in 1984 and remained in that position until 1994. In 1997 I started lobbying representing mostly not-for-profits organizations.

Beginning in1979 and continuing while I was on staff, I had frequent contact with Mike. From 1979 to 1994, I participated in leadership meetings as part of the senior staff. I got to know Mike and was able to see a side of him that the public did not. I was able to see how he cared not only about the people of Illinois, but also his family. His children came down to Springfield after school was over, and like other members of the General Assembly, they were with him in his office and on the floor of the House where they had an opportunity to see what their father did when he went to work.

Mike was under attack by newspapers, interest groups and others for years for executing the powers of the Speaker's office. But what they lost sight of was what he did to protect the people of the state of Illinois. Those groups did not realize how he put the interests of the people of Illinois first. Or that he protected the public from various attacks by interest groups and governors Blagojevich and Rauner. No one with influence was there to say we do not have the money or resources to pay for these programs year after year, but Mike. If the state did not have Madigan to stop those programs, the State would have been in a much sadder shape.

For example, Blagojevich wanted to allocate non-recurring revenue to his pet projects, which had funding for the first year, but not available after that on a year-to-year basis.

# MICHAEL E. POLLAK
## ATTORNEY AT LAW

Here are some examples:

- Governor Blagojevich proposed "All Kids" Health insurance in 2006. He wanted to offer affordable health insurance to all children regardless of family income. A worthy cause, but unaffordable to the state.

- The Governor Blagojevich proposed "Illinois Covered" which was close to universal health coverage for all Illinois residents. The Governor proposed funding this with a gross receipts tax. Another worthy cause, but unacceptable because of the funding mechanism.

- Blagojevich proposed a gross receipts tax in addition to the Illinois Income Tax to fund state government.

- The sale or lease of the Illinois Lottery and the Illinois Tollway

- A capital plan, "Illinois Works", a $25 Billion bonding debt. There were disputes over how to repay the bonds and a complete lack of trust of the Governor by the Speaker and others as to how the Governor was to spend the proceeds.

Had it not been for the Speaker's opposition, the State of Illinois would have been saddled with substantial debt due to the proposed programs.

Governor Blagojevich was not the only governor that Mike took on. Under Governor Rauner, the State went for 2 years without a budget. Rauner was trying to destroy the public and other unions, by not adopting a budget until the General Assembly adopted his "reforms. After 2 years the public and the General Assembly had enough. Mike stood up to the Governor and was instrumental in passing a budget over the veto of the Governor with bi-partisan support to allow critical funding of the State's needs.

Mike also supported and was instrumental in passing legislation that made Illinois a leader among the states. With Mike's backing:

- Illinois included sexual orientation in the Illinois Civil Rights Act.
- Illinois passed the "Illinois Religious Freedom and Marriage Fairness Act" allowing same sex marriages to be legal in Illinois. Two years prior to that, Illinois adopted Civil Union legislation.
- Illinois passed the medical marijuana act.

In addition, Mike supported capital grants for not-for-profits serving vulnerable populations, educational institutions, social services, environmental, and cultural groups.

Mike took advice from all sorts of people, including his wife. I represented one of Chicago's larger museums in need of renovating a part of its facility. I found out my client received a grant in an unusual way. Mike and his wife, Shirley, were at a reception welcoming guests and I stepped up to say hello. As I was talking to Mike, Shirley burst in with pride, saying she had talked to the Speaker, and he was going to sponsor a grant to the museum.

# MICHAEL E. POLLAK
## ATTORNEY AT LAW

I have always found Mike to be truthful. In fact, that was his reputation. If he said something you could rely on it, whether it was favorable toward your cause or against it. He was a man of his word, which is not a description that fits many people in Springfield.

In determining your sentence, please consider the goodness and value Mike has done for the people of the State of Illinois. Without Mike, the State would have experienced significantly greater disorder and chaos.


Sincerely yours,

*Michael E. Pollak*

Michael E. Pollak

**Michael C. Prinzi**

███████████████

March 19, 2025

The Honorable Judge John Robert Blakey
United States District Court
for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

Re: Michael J. Madigan: Case No. 22-cr-115

Dear Judge Blakey:

I am writing on behalf of Michael J. Madigan as the Court undertakes its deliberations as part of the sentencing phase of the instant case. Lest my comments be misinterpreted, I wish to assure the Court that I fully appreciate and accept a jury's prerogative as fact finder in reaching a verdict in any case including this one.

While I consider Mr. Madigan a friend, I am perhaps better described as a professional colleague who served with him at his law firm for fourteen years. My judgment regarding his character is of course informed by that experience, but my time as an advocate in opposition was equally availing in establishing an unvarnished opinion of the man and the law firm he led. As a Cook County Assistant State's Attorney with significant supervisory responsibility, I had ample opportunity to review the high level of preparation that was routinely brought to bear both in litigation and settlement negotiations by the Madigan firm. Never in those years was a demand made of me or an effort made to persuade me of the merits or relative strength of any case beyond that which the facts and the law would reasonably allow.

When I joined the firm in 2008, it was apparent that the quality of representation and the ethical conduct that I had observed reflected the personal ethos and direction of Mr. Madigan and his partner. As a seasoned attorney I was afforded considerable discretion in the management of my case load. The sole expectation placed upon me was that matters would be fully prepared and appropriately pressed to a fair resolution. In advancing a case or issue, any reference on my part to Mr. Madigan's public stature in order to improve a potential outcome would have been an anathema to him. Moreover, in matters of firm governance, I am personally aware of situations where potential representation was declined and, in some instances, existing representation was terminated when any possible conflict with Mr. Madigan's public duties could be discerned.

Page 2
Re: Michael J. Madigan
    March 19, 2025

This combination of personal decorum and professional conduct was not an exception, it was the norm. This standard defines integrity, a significant aspect of Mr. Madigan's character. It is pertinent here as it is a constant, a truer indicator of his beliefs and corresponding action over time.

I had occasion during my tenure to directly observe Mr. Madigan consulting with existing and potential commercial clients. I also observed him meeting with ordinary men and women, persons whose property tax concerns were minor by any objective comparison and more often than not, incapable of resolution in any cost-effective manner, except by payment of the tax. In those instances, I was struck by the kindness and humility with which Mr. Madigan extended himself to these individuals, according them the same, and perhaps more, time and consideration than commercial clients whose financial value to the firm was immeasurably higher.

As my comments are based on observations garnered in a professional setting, allow me in closing to share a personal story, one that in my estimation better captures the private decency of a very public man. On a quiet Saturday, Mr. Madigan and I were at work and at one point he came down to my office and said "Look at this." With that he handed me a copy of a letter received by his father from the Chicago White Sox in the Spring of 1945, offering advance sale game tickets. A fond memory of simpler days, the letter triggered a conversation about much more than baseball, centering on the value of time spent with family. Matters of personal achievement and the notoriety that accompanied it paled by comparison and could never be properly exchanged for his family's well-being and respect. I came away from that conversation with the clear sense that for Michael Madigan, success alone, be it measured in the public arena or private endeavors, never surpassed the importance of his family and the people he served.

I appreciate the Court's time and consideration of this letter, offered in support of the Court's deliberative process. Should the Court require further information or clarification, please feel free to contact me.

Very truly yours,

Michael C. Prinzi

# GAIL PURKEY

20 March 2025

The Honorable Judge John Robert Blakey
United States District Court Judge

Dear Judge Blakey:

I have known Michael Madigan since 1981, when I was hired by him to work on the Democratic staff in the Illinois House of Representatives.

Over the decades, those of us who had worked for House Democrats and had gone on to other pursuits were proud that we had worked for Michael Madigan, a man who had such a strong work ethic and high expectations of his staff. We learned so much about the legislative process from a man with such deep respect for the General Assembly and its responsibilities to the citizens of Illinois.

During the years I worked on staff, I witnessed the hours of work and meticulous attention to detail that Madigan gave to his responsibilities as Democratic leader and then Speaker. In the 1980's, legislative sessions ran until the end of June. Often, the House staff would work over Memorial Day weekend to review the bills that had come over from the Senate for consideration by the House. And Michael Madigan was there with us on those holiday weekends. If we were called into a meeting with him on a particular bill, it was clear that he had already read the legislation, knew the support and opposition to the bill, and what the bill's chances were in the House. He studied everything.

Wherever jobs I had later, I took the skills honed by the expectations Michael Madigan held for the people who worked for House Democrats. There was no better boot camp for any job than having worked under the leadership of Speaker Madigan.

Many of us wanted to keep that connection to our work for House Democrats, so several of us set up a loose alumni organization which we jokingly dubbed "Minions." Every two years or so, an invitation would go out for a gathering in Springfield or Chicago, and more than 100 of us would gather at a local watering hole to reminisce about our time on staff. We were proud of the work we did for the House Democrats, and proud that we had worked for Michael Madigan. We still are.

Over the years, I saw Michael Madigan work without fanfare in countless situations for citizens. I worked for the Illinois Federation of Teachers, and the Chicago Teachers Union (the IFT's largest local union) was in tough contract talks in the early 1990's. A strike seemed unavoidable. CTU President Jacqueline B. Vaughn and her team went to City Hall one weekend in a last-ditch attempt to reach an agreement. Mayor Richard M. Daley, the Chicago Public Schools negotiators and the CTU bargaining team worked through the night to settle the contract. And Speaker Madigan was there, working with the parties to reach an agreement and avoid a crippling strike. It took all night and into the following day, but a settlement was reached. Michael Madigan slipped out the door, avoiding the reporters and TV crews. He came to do a job, and the job was completed. But the public schools parents and students, teachers and support staff, never knew about his work on their behalf.

Over the decades, Michael Madigan had a lead role in securing state budgets, moving major legislation, and helping solve thorny problems like the CTU contract. I was a participant in or an observer of some of these events, and I came away with one overriding belief – Michael Madigan is an honest broker. When you dealt with him on any issue, you knew he did not lie. His word was

Letter To Judge Blakey                                                                    Page 2

good. You may not have always wanted to hear what he was telling you, but you knew it was the truth. Telling the truth – a trait sorely lacking in today's political arena – is Michael Madigan's bedrock mode of operation..

But there is so much more to Michael Madigan than his tenure as Speaker. I also remember him as a deeply caring person. I attended the funeral in 1993 for State. Representative E.J. "Zeke" Giorgi in Rockford, and I watched Michael Madigan give a heartfelt eulogy for his friend and colleague. When he broke down at the end of his remarks, the entire church gasped at the deep emotion he displayed. I knew, in that raw and vulnerable moment, that we were witnessing a truer picture of the essence of Michael Madigan –someone who cares and feels deeply, but seldom lets it show.

Michael Madigan is utterly devoted to his family. When I worked at the Illinois Arts Council, which was chaired by his wife Shirley Madigan, I would see the Speaker come to arts events to support her. He was so proud of her work to bring the arts to every corner of Illinois. You could see him beaming as she made her presentations. Shirley devoted decades to the unpaid position of IAC chairperson because she believed in the power of the arts to improve lives and communities. Michael always supported Shirley in that work, her passion.

I would occasionally see the Speaker out to dinner with one of his children. He made time to focus on his children as individuals worthy of his singular focus. Seeing him at dinner with Lisa, or Tiffany, or Nicole, just the two of them deep in conversation, always stayed with me. He took up golf to spend time with his youngest child Andrew. Later, when his children were grown, my husband and I saw Michael and Shirley out to dinner with one of their grandchildren. That focus on each child and grandchild as deserving of undivided attention is something I will always remember.

Press coverage has referred to Michael Madigan as "Sphinx-like." That is an incomplete rendering of the man. He was, and is, meticulous in his public comments and dealings with the media, legislators and people involved in the legislative process. That discretion was essential to his role as Speaker. But the depiction of him as inscrutable fails to recognize the other aspects of Michael Madigan – loving husband, devoted father, doting grandfather, dear friend.

I would ask, Judge Blakey, that you consider a more complete view of Michael Madigan as your prepare your decision.

Sincerely,

Gail L Purkey

Angela Ramas

████████████████████

The Honorable John Robert Blakey
United States District Court
Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

March 18, 2025

**Re: Michael J. Madigan**

Dear Judge Blakey,

My name is Angela Ramas. I worked in Michael Madigan's law office, Madigan and Getzendanner, as a receptionist and secretary for twelve years from 2004 to 2017. When I was first hired, I was given the chance to job share with my sister, Mary Ladas. This arrangement was uncommon at law firms twenty years ago, but it worked seamlessly because the office was so well run. My sister and I were both grateful to Mr. Madigan for letting us try job sharing.

I knew the Speaker as very scrupulous and proper. He was always cautious about responding to all of the demands that he received, which were numerous.

He is an amazing father and husband, and he treated his staff (and even the firm's clients) like family. We all had tremendous respect for him. He was interested in the backgrounds of all his employees, especially from the perspective of a history buff. Few people ever ask about the refugee camp in which I was born and the oppressive Soviet regime from which my parents fled Lithuania. But Mr. Madigan was truly interested. He cared about me as an employee, and also about the people of my ethnic background, who had been a good part of his constituency.

Mr. Madigan has remained true to his middle class values. He raised his family in a modest neighborhood on the Southwest Side and still lives there with his wife, Shirley. He was never ostentatious and owned an average priced sedan. As the receptionist at the Speaker's law office, I often saw elected officials come in with one or two bodyguards. Mr. Madigan never had bodyguards, which saved taxpayers enormous sums of money over the years.

Every Christmas the law office employees received gifts from the Speaker that were crafted by local artisans. Mr. and Mrs. Madigan supported local craftspeople whenever they could.

Michael Madigan is one of the kindest, most decent and ethical individuals I have ever known. Please be as considerate and compassionate as possible when determining his sentence.

Sincerely,

*Angela Ramas*

Angela Ramas

████████████████████

Anthony D. Rossi



March 14, 2025

Honorable Judge Blakely

Your Honor,

My name is Tony Rossi, and I am writing this letter on behalf of Michael J. Madigan. I have had the privilege of knowing him for nearly 40 years, beginning in 1987 when I accepted an internship with the Illinois House Democratic Staff. At that time, he was Speaker of the House, and I worked directly under his leadership. What started as a 9½-month internship turned into a 16-year career, during which I served in multiple supervisory roles, including Director of the House Research Appropriations Staff and, later, as the elected Clerk of the House.

Throughout those years, I came to know Speaker Madigan not just as a leader but as a person. He was deeply committed to the Illinois Constitution and the integrity of the legislative process. He set high expectations, demanded hard work, and, in turn, stood by those who worked for him. One of the first lessons I learned was that your word is your bond—an ethic he himself embodied. If Speaker Madigan gave you his word, you could count on it.

Beyond his public service, I witnessed the personal side of Speaker Madigan—a devoted family man, deeply connected to his children and his wife, Shirley. I experienced his kindness firsthand when my infant daughter faced health complications at birth. He reached out, offering support and guidance on specialized care options in Chicago. It was an act of genuine concern that spoke volumes about his character.

During my time in state government, I also saw how he was perceived by political opponents. When I transitioned to the Blagojevich administration, I was recruited, in part, because of my knowledge of Speaker Madigan. The administration was convinced he was working against them, but I repeatedly defended his integrity. I wanted no part in any effort to undermine him, and ultimately, this conflict of principle contributed to my departure from the Governor's office.

When I left Speaker Madigan's staff to take a job with the Governor, a statehouse reporter asked me about my experience working with him. My response was simple: "I owe everything to him." The truth is, I am not the only staffer who felt that way. Many staff left feeling the exact same way; that they experienced a great leader and someone who would continue to fight for them. When the article was published, Speaker Madigan called to thank me for my words. In true form, he humbly responded, "It was a partnership, and it worked for both of us." It did and I will always be grateful.

Michael Madigan is a man who dedicated his life to public service. He cared deeply about Illinois and its people. He did a lot of good and helped so many people along the way, myself included. I respectfully ask that you consider not just his legacy in government but the man himself when determining his sentence.

Sincerely,

Anthony D. Rossi

**Marsha L. Thomas**

██████████████████

March 6, 2025

The Honorable John Robert Blakey
United State District Court – Northern District of Illinois
219 South Dearborn Street
Chambers:  1288
Chicago, IL  60604

Re:     Michael J. Madigan

Dear Judge Blakey:

I have known Michael for over 40 years. During the first 20 years, I worked as an admin for another attorney in the office before becoming the Office Manager of Madigan & Getzendanner. In those early years, our conversations often revolved around baseball and Ireland. However, it was during the next 20+ years that I truly got to know him.

Mike was a tireless worker—the first one in and the last one out. Yet, he also understood the importance of following office protocol. Twice a year, our office building held a fire drill, an event everyone dreaded. Many colleagues would ask me for advance warning so they could conveniently be out getting coffee or arrive late. But Mike was not among them. While firefighters had to round up reluctant employees, Mike willingly participated. He left his office, closed his door as required, and walked down the four flights of stairs on the righthand side—leading by quiet, precise example. Seeing this, others became more cooperative in the future.

While it is often declared that all politicians are dishonest, Mike was the exception who proved the rule. He was scrupulously honest—even paying his bills without being prompted by an invoice. I spoke with several local service providers who confirmed that Mike tracked unpaid work on his own and ensured every vendor received prompt payment.

Mike was also meticulous in keeping his personal expenses separate from those of the State of Illinois or his law firm. All tax withholdings were paid for household employees and quarterly payroll reports were submitted to government entities.  His honesty extended beyond finances. If he could help with a problem, he would say so; if he couldn't, he told you plainly. There was no pretense in his interactions—he dealt in truth and facts. That unwavering honesty is the major reason he earned such deep trust of those of us who worked with him.

The Honorable Robert John Blakey
March 6, 2025
Page 2


The Law Office has consistently maintained a strict policy regarding packages addressed to Mike: no package is accepted without proper evaluation. The current list of lobbyists is maintained by the Springfield staff and shared with the firm whenever updates occur.

Upon delivery, the receptionist typically verifies whether the sender—individual or company—is listed. If they are, the package is refused. If the sender cannot be identified (e.g., items sent via third-party gift services), the package is automatically declined. No exceptions are made.

In the receptionist's absence, front office staff are instructed on the list's location and follow the same verification protocol. Any uncertainty about a package's origin results in its refusal.

This policy originated at the firm's former office at 111 W. Washington, which was vacated in 1991. Although I was not an employee at the time, I occasionally greeted visitors with packages. Back then, I was not responsible for screening deliveries; instead, I would refer the visitor to a staff member who had access to the list.

In many law firms, it's not uncommon to encounter lawyers who are screamers—those who treat staff poorly or are generally unpleasant. Mike was never one of them. His requests were always respectful, calm, and focused on the task at hand. He never asked anyone to fetch him coffee, yet there were staff members who would offer to refill his cup simply because they respected him.

Over the past 20 years, as I wrote personal checks for him to sign, I came to understand just how generous he was. He donated freely to his alma maters, high school scholarship funds, after-school programs, and numerous civic initiatives in Chicago. But he was not one for black-tie galas or public recognition—he gave quietly and privately.

Mike and I didn't always see eye to eye politically—he leaned a bit too conservative for me—but he never dismissed my opinions. He would listen, make eye contact, smile, and let me finish. When time allowed, he would offer his own perspective, always concise and thoughtful. And if he had heard my argument before, he never showed exasperation—just patience and respect. If someone in the office needed help with a personal matter, Mike always listened. I believe he did what he could to assist, but those conversations remained private. That was simply the kind of person he was.

We also shared a deep love of Ireland. We often discussed its history and current political landscape, and he was always kind enough to share books he thought I'd enjoy. In return, I made a point to find books for him whenever I traveled to Ireland. Knowing my passion for all things Irish, he even invited my husband and me to join his family at Chieftains concerts at Orchestra Hall—an invitation I deeply appreciated.

The Honorable Robert John Blakey
March 6, 2025
Page 3


Despite everything he was dealing with in recent years, Mike made the time to attend a
"Celebration of Life" for my husband, Austin McGreal. It was held at City Pool Hall, a crowded
space that could have been uncomfortable for him. But Mike came—for me—as a show of
support and kindness.

That is who he is.

Very truly yours,



Marsha L. Thomas

**Michael S. Thomson**

April 16, 2025

Judge John Robert Blakey
United States District Judge
219 South Dearborn Street – 1288
Chicago, Illinois 60604

Dear Judge Blakey,

I have known Michael Madigan since January 1996 when I began work on the Illinois House of Representatives' Issues Development staff. Over the next 13 years, I was able to serve the public in many meaningful and impactful ways while developing a skill set and work ethic that has enabled me to enjoy a successful and productive private sector career.

I advanced through a variety of leadership positions on the speaker's staff not because I was wealthy or well connected (I was neither), but, instead, based on a meritocracy established by Mr. Madigan.

My experience with Mr. Madigan was both profoundly challenging and rewarding. He demanded excellence from his staff and held himself to the same standard. Outworking the speaker was not possible and, with that, I did my best to keep up with his seven-day-a-week pace. I know Mr. Madigan to be an honest and trustworthy individual. Indeed, during my time on his staff, he led by example and insisted that those who worked for him did so with honesty and integrity.

As demanding as Mr. Madigan was, he was also a thoughtful leader who took a genuine interest in those who worked for him and advocated for them and their families. In the thirty years I have known him, I have regularly observed his commitment to helping others and being responsive to those in need. Many years ago, he and I shared the observation that it was important to fight for those that needed a small break in life just to get their heads above water and then, hopefully, be able to make a positive contribution to our state and country. I believe that philosophy has been a guiding principle for Mr. Madigan both personally and professionally.

It was an honor to have worked for and learned from Mr. Madigan. He is an honest, trustworthy, and charitable man. I hope you will consider the full scope of his life and contributions to his family, community, and the state of Illinois when you impose his sentence.

Thank you for your time and consideration.

Sincerely,

Michael S. Thomson

February 28, 2025

Hon. Judge John Robert Blakey
United States District Judge
Northern District of Illinois
219 South Dearborn Street, Room 1203
Chicago, Illinois 60604

RE: Character Letter in Support of Michael J. Madigan

Dear Judge Blakey:

Please accept this character letter in support of Michael J. Madigan, whom I will refer to as "Speaker Madigan", because that is what I have always called him out of respect and fondness. I humbly ask that you take these reflections into consideration as you consider his sentence.

In January of 1999, Speaker Madigan selected me to serve as Chief Legal Counsel to the Speaker and House Parliamentarian (and later, House Ethics Officer, once that position was established by legislation). I ended up serving concurrently in those capacities for eight years, until 2007, before moving on to the private sector.

While working for Speaker Madigan, I spent many hundreds of hours with him in key staff meetings, in one-on-one meetings, in meetings with other officials and interests, and on phone calls with him when we were in different locations. We had a very close working relationship.

Those eight years were the most rewarding, personally fulfilling, and simply the best years of my professional career. And I can only say that because Speaker Madigan was such an amazing mentor and example to me.

I do not share those sentiments lightly, because I am fortunate to have had other experiences in my career working with incredible people and lawyers, including stints at Phelan, Pope & John and Vedder Price prior to my government service, and then at Mayer Brown after leaving the Speaker's office, before founding my own law firm. In all of my professional experiences over a 30-year career, there is no one that I admired more than Speaker Madigan.

As counsel to the Speaker, my role was not in title only – instead it was to truly serve as his counsel. Speaker Madigan had the utmost respect for the position of a legal counselor, and he took it seriously and literally.

On legal issues related to legislation, ethics, or parliamentary procedure, Speaker Madigan always sought my counsel. He made clear to me from the very beginning that he wanted my best honest judgment, regardless of externalities or outside influence. This meant that my input, on the legal aspects of legislation and ethics matters in the office, was always followed by the Speaker. And while we might have robust discussions to thoroughly explore an issue (and typically did), he never asked me to change my opinion, even if a different outcome would make his job easier in terms of managing his Caucus Members or other pressures.

1

This was quite well known around the Capitol – that he trusted my input and stood by my recommendations or conclusions. On numerous occasions, when my legal counsel meant a negative outcome for a Member or a lobbying interest, Speaker Madigan would ask them to take it up with me, as he stood by my recommendation. I felt completely empowered to stand my ground when my interpretations were challenged by others. And so I did!

Another of my roles within the office, expressly requested by Speaker Madigan, was to advise on any question of a potential conflict of interest, where there was a matter before the General Assembly that could possibly affect Speaker Madigan in a personal capacity, such as his law firm work. I was asked to err on the side of caution, and to avoid any conflict of interest consistent with Illinois law and legal ethical guidelines. And again, to repeat myself a bit here, Speaker Madigan always followed my opinion and recused himself from consideration of those matters when indicated. In all such cases, a log of possible conflicts was kept, and staff were instructed to not discuss those matters with the Speaker. Subsequently, the Speaker voted "present" when those matters came to a vote, in adherence to my legal counsel.

During my eight years working closely with Speaker Madigan, I saw first-hand his dedication, respect, integrity, and care for doing what's right. He is a very good man. Judge Blakey, I again ask that you please take my testimonial into account as you consider sentencing. I do earnestly believe that Speaker Madigan is deserving of the greatest leniency possible with regard to his sentence.

Sincerely yours,

Robert A. Uhe

# Victoria Watkins

April 23, 2025

Dear Judge Blakey,

My name is Victoria Watkins. I am writing to share a bit about Mike, who I have had the pleasure of knowing for about 15 years.

While I worked on the Illinois House legislative staff for 2 sessions, I got to know Mike a bit better during my time as a local government advisor. During my time on staff, though, I heard something that set the tone for what I saw happen over his remaining time as Speaker. At an Inauguration event, I heard his wife mention to his young granddaughters "Papa helps so many people". This warmed my heart, not only as someone who cherishes her relationships with her grandparents, but also as someone who was working for him—on behalf of the people of Illinois.

I've always found Mike to be thoughtful and diligent; hardworking and intelligent. As a lawyer myself, I admire his attention to detail. As a resident of Illinois, I was always comforted in knowing his leadership was done from the lens of a smart lawyer, kind man, and State Representative from the south side. Some in or near his level have been consistently overstated, even flashy, prioritizing politics over policy, and power over productivity. Mike is not like that. He knew intricately about the bills coming through the House. He read each of them. He understood the law, its leaps and bounds, because he studied and dug into them. When we reflect on the current positioning of Illinois, and the laws and policies which have passed (or not passed) over the last 40 years, it is in no insignificant part because of the work of Mike.

I know many people have not had the opportunity to know and work with Mike as a person or professional counterpart, but I know the constituents of the 22nd House district know his service full well. I know many of us who worked in the legislature during his tenure see him as the upstanding person we know him to be. I always appreciated knowing he was working honestly and as a truthful public servant. In the same way he considered the people who elected him, in his district and in his chamber, I hope you will take in these personal traits and humanity when making your considerations.

Sincerely,

Victoria Watkins

# Michael Weir

████████████████

April 22, 2025

The Honorable John Robert Blakey
United States District Judge
219 South Dearborn Street – 1288
Chicago, Illinois 60604

Dear Judge Blakey:

I have known Michael J. Madigan since 2000 when I was hired as a legislative aide for the Illinois House of Representatives, where I was employed for eleven years. Over that span I also worked on various election campaigns for which he had ultimate responsibility as the leader of the state party. After leaving government service I continued to interact with him occasionally on a professional basis in my role as a consultant.

During my tenure on the legislative staff, including as the communications coordinator for the caucus, I had the privilege of writing statements, press releases, letters, and resolutions on Mr. Madigan's behalf. The majority of my years working for the speaker coincided with Rod Blagojevich's gubernatorial administration. After an initial "honeymoon" period of working in a constructive fashion to try and help the first Democratic governor in a generation to be successful, the dynamic between the speaker and governor deteriorated. It became apparent the latter's agenda was solely in the service of his own narrow interests and, if left unchecked, it would be to the vast detriment of Illinois' citizens and taxpayers.

The easiest thing in the world would have been for Mr. Madigan to go along with Blagojevich and his allies (both in and out of government), but Mr. Madigan eschewed the path of least resistance and, at considerable risk to his own political fortunes, instead chose to oppose a governor of his own party, often making common cause with Republican legislators to frustrate the governor's reckless schemes. Therefore, the vast majority of my energy on staff was not expended against the opposition party, as would typically be the case, but rather at Mr. Madigan's direction fighting full force against a fellow Democrat. Ultimately, the decision to oppose Blagojevich was fully vindicated, and it was Mr. Madigan who initiated the governor's impeachment and removal from office. Among Mr. Madigan's legacies following that trauma for our state is one of the nation's most stringent procurement codes, designed to frustrate improper influences on state purchasing decisions and which today some criticize as too restrictive.

The Michael J. Madigan I have known is always on the side of the little guy, the person who wasn't born to wealth or privilege and whose main desire was to gain a purchase on the American dream – and keep it. Despite Mr. Madigan's academic and professional accomplishments, he stayed fully grounded and in-touch with the working-class community in which he grew up and has remained. And, while he helped plenty of people from the neighborhood, he also helped people like me to whom he had no connection. In my case, he gave me a job and the opportunity to prove my merit by working hard, with honesty and integrity, for the people of Illinois.

**Michael Weir**
Michael J. Madigan Letter, P2

Among the qualities I admire about Mr. Madigan is that he is a voracious reader – someone who is genuinely curious about the world, the people who have shaped it, and the experiences of those who have lived in it throughout history. He has never been a person who believed he had all the answers, but rather knew that it was imperative to solicit a wide range of opinions and, through reason and critical thinking, come to a consensus on the best decisions.

From that belief followed action. To expand the kinds of life experiences and perspectives of those within his circle of key advisors, Mr. Madigan made history twice, first by appointing Barbara Flynn Currie, the first woman and, after her, Greg Harris, the first gay man, to serve as Illinois House Majority Leader. Mr. Madigan also took care to recruit to run for office women and people of color, and facilitated their rise within legislative leadership and to higher offices. Throughout his tenure as speaker he also appointed Republicans to chair committees and worked with national, state and local GOP officials for the greater good of Illinois, a bipartisan orientation that we could use much more of in this polarized age.

Mr. Madigan can truly be said to have led by example. I know from my own experience, as well as through countless conversations over the years with others who served on his staff, that the values he instilled in us – the importance of honesty, discipline, and to be persons of our word – were an essential foundation for our own success and that we, in turn, have sought to pass on to those who will follow us.

This is not intended as hagiography. Mr. Madigan is human and flawed, as are we all. He has misstepped, as have we all. He no doubt has made decisions that he regrets and would do differently were he given the chance, as would we all. Nevertheless, his contributions to the betterment of our state over a lifetime of public service far outweigh his shortfalls.

I do not believe myself to be in Mr. Madigan's debt nor owing him for some past favor – I put in an honest day's work for him and the people of Illinois as he required. The motivation to write this letter rests solely on my belief in the possibility of redemption and certainty that Mr. Madigan is a good person who still has much to contribute. If given the opportunity, even at his advanced age, I expect that he would still find ways to employ his legendary work ethic, knowledge and the hard-won wisdom gained over a lifetime to the benefit of our state.

Finally, I do not wish for Mr. Madigan anything more than what he himself afforded to others when he was in a position to decide their fates. Rather than write-off people who had committed serious mistakes or considerably underperformed, Mr. Madigan opted for mercy, treating their transgressions as anomalies from which they would learn and not repeat.

As you weigh your difficult decision about how justice may best be served, thank you for your consideration of my thoughts.

Sincerely,

Michael Weir



May 8, 2025

Honorable John Robert Blakey
United States District Court

Re:  Michael J. Madigan

Dear Judge Blakely:

I know you learned a lot about Michael Madigan during the trial.  I am writing to Your Honor to share personal insights about Mike that I developed over the course of working for him for over ten years.    I am doing so because I greatly admire, respect and look up to Michael Madigan.  I hope that this will help Your Honor gain additional insight to the type of man he truly is.

I first met Mike when I started working in his Pulaski Street office in 2011.  I had no political pedigree.  I nor anyone else in my family had ever worked in Illinois politics.  I had no connections whatsoever.  In Chicago parlance, I am "the nobody that nobody sent."  But as I testified during the trial, a year after graduating from college with a degree in communications, I saw an ad for a low-level data entry position while searching for opportunities in Illinois specific to government and politics.  I applied online, got an interview and to my surprise I got the job.  I gradually worked my way up the ladder and was rewarded for my strong work ethic and effectiveness each step of the way.

I continued that trend until Mike named me the Political Director for the Illinois Speaker of the House in January of 2017. No inside track. No special treatment. Just recognition of my talent and hard work.  I tell that story because it breaks down the inaccurate image I think many people have about Mike.  He rewarded me not because of who I knew, but only because of my hard work, radical honesty and commitment.

There are many things I came to admire about Mike as I got to know him through the years.  One thing many people don't know about him is he invited disagreement.  He encouraged it.  He wanted honest opinions.  He didn't want "yes" people. He wanted people to speak their mind, even if it ran counter to his opinion – especially if it ran counter to his opinion. Debate over issues and strategic decisions was encouraged. He wanted the truth, even if it was hard to hear. I will always admire and respect Mike Madigan for that.

1

I remember one time we were talking about certain elected officials who were known to misrepresent facts. He said that he never understood why they lied because doing so can create too many landmines to navigate and keep track of. He always said it's much easier to just tell the truth because then you never have to worry about stepping on one of those mines. That story and that lesson have stuck with me ever since. It's something I continue to live by, both personally and professionally.

Too often, showing vulnerability is considered a sign of weakness and asking for help is an indication that one may not be "up for the job." When I first became political director, that's how I felt, too. Be tough. Hide your emotions. But I struggled with mental issues and when I worked up the courage to tell Mike I was simply in awe of the incredible empathy and compassion he showed me.

In the summer of 2018, I finally sought help for my mental struggles. I was diagnosed with moderate depression and anxiety. I began taking medication and seeing a therapist, working through a whole host of issues while also trying to get to a safe and secure place where I felt comfortable. At that point, I was living in Springfield. Having been born and raised in Chicago, Springfield was not my cup of tea. I was 30 years old and single. I didn't have any friends outside of the office and my closest friends and family were three hours away in Chicago. Simply put, I was really hurting.

Following the November election in 2018, I decided that for the betterment of my mental health, I needed to move back to Chicago, regardless of the consequences. Closer to friends and family and an environment where I could thrive mentally. Prior to myself, no Political Director had ever done the job while living outside of Springfield. It was a reasonable requirement that you had to live there, and so naturally I was afraid of the consequences should I make the request.

One day in the fall of 2018, I sat down with the Speaker and told him about the mental issues I was struggling with and that I felt that I needed to move back to Chicago. I told him I understood what that meant in regards to my job but that I was OK with whatever decision he made. Without hesitation Mike encouraged me to move back home, in fact he insisted on it. He expressed sincere empathy for what I was going through and said that we'll work through whatever logistical challenges come with the move. He told me a personal story about someone close to him who also struggled with anxiety and depression and said he was happy that I opened up to him. He told me that he would do whatever was necessary to make sure I properly addressed my mental health. I am so grateful to Mike. I will never forget how kind and gentle and supportive Mike was to me during the darkest period of my life.

It may not seem like a big deal, but so many people have an inaccurate image of Mike Madigan being a ruthless, emotionless and down-right heartless person, but as the result of the many years that I had the privilege of working with him I know that, in fact, he is the exact opposite.

2

I will always hold the utmost respect and admiration for Mike. He has helped shape me into the man I am today. He showed me the importance of always being truthful. He rewarded me, a nobody that nobody sent, for my hard work. He helped me during one of the lowest times in my life.

Thank you for your time reading this letter.

Sincerely,


Craig Willert

To the Honorable Judge Blakey:

I write this letter to provide you my personal insights into Mike Madigan for purposes of your sentencing decision.

I've known Mr. Madigan for 20 years. My first job after being admitted to the bar in Illinois in 2005 was in the Speaker's office as a contract attorney. I was "nobody nobody sent" when I joined the Office of the Speaker of the Illinois House of Representatives. From 2006 through 2019, I worked as assistant counsel, deputy counsel, chief counsel, special counsel, ethics officer, Parliamentarian of the House, and assistant prosecutor for the impeachment of Governor Rod Blagojevich.

During these years, I witnessed Mike Madigan meet and work with Governors, executive branch officials, members of the Illinois Supreme Court, members of the General Assembly, lobbyists, business executives, constituents, school children, and foreign dignitaries. I saw him operate in public and private. I helped him navigate difficult legal and political issues. To the extent he had an inner circle of people he worked closely with on the legislative issues facing the General Assembly, I think it's safe to say I was in it.

My tenure with the Office of the Speaker was both the most rewarding and most challenging time of my life. As a woman in a very male dominated profession, I faced an incredibly amount of disrespect and harassment throughout my tenure. I never experienced this type of treatment from Madigan himself, and in fact, he empowered me to speak my mind and stand up for myself whenever I had the chance. I spent countless days and hundreds, if not thousands, of hours with Mr. Madigan. I came to know the man behind the Velvet Hammer mystique and can attest to his character, integrity, generosity, and kindness.

I learned many things from him, including that it is better to admit a mistake than cover it up; better to acknowledge you're wrong than pretend to be right; better to do what's right than what's easy; and better to admit you've changed your mind than break your word. That's the man I worked with for 13 years. He wasn't perfect. Like all of us, he has his flaws, but he cared deeply about the State of Illinois and its people, and it was a privilege to work with him during some of the most trying times in Illinois' history.

The man I know is a very honest person. If Mike Madigan tells you he will do something, he will do it. Furthermore, unlike many people in Springfield, he did not enjoy confrontation or conflict and would avoid it if he could. These characteristics, however, also led him to be a man of few words, and someone who avoided the media as much as possible. (Ironically, that likely led to more conflict for him and why so many have a negative view of him, but my thoughts on that are probably not relevant for your purposes.) In my experience, he would never commit to a particular position until he felt he understood all the relevant issues, nor did he want to browbeat someone just because he could.

I sat in hundreds, if not thousands, of meetings with him with thousands of interested parties. His style was always to gather information from as many sources as he could, including from his

staff, members of the General Assembly, executive officers and staff, lobbyists, advocates, opponents, constituents, acquaintances, friends, family, and even random strangers. He would ask many questions but rarely offer his thoughts. He knew that if you ask the right questions and let people talk, eventually they will tell you everything you need to know.

As a result, people desperate to know what he was thinking would start to read into the questions he asked, or comments he made, or even what he was eating or drinking when having said conversation, to try to decern Mr. Madigan's "true" plan. In my opinion, he was not always purposely being cagey or withholding his thoughts – most of the time he did not yet have an opinion or a plan. Instead, he was trying to learn the issue. He wanted to learn how the proposed policy would work, who it would affect, who was politically for or against it, and how did the policy fit in with the other priorities in any given legislative session, among other concerns. And until he was comfortable that he understood the relevant information from the relevant parties, he would not commit to a position. His reticence to commit would be interpreted as anything from gamesmanship, to obstinance, to imperialism. In reality, he knew that once he said he would do something that he would follow through. He was not going to commit himself until he knew it was the right position to take. He would push his staff to look at situations from all angles, and he wanted people to provide differing views and perspectives. He wanted all information available before deciding what to do in any given situation.

I came to realize that on any given day the Speaker was asked to make hundreds of decisions, and his mind there were many decisions that didn't need to be made by a leader – they could be handled by staff or members or others. Ultimately it was my experience that he followed the advice of staff regardless of his own personal interests. On the matters that required his direction, he would not give it until he was sure it was the right decision. I have spent a great deal of time looking back and considering the many decisions that were made over the years, and I cannot think of a single decision made in that office that wasn't in the best interest of the Democratic Caucus. Throughout all of it, I felt confident that he was attempting to do what he believed was right and appropriate for the future of the State of Illinois. I was always struck by the fact that it was clear to just about everyone that it meant something when he made a promise or gave his word. That was, and continues to be, incredibly rare in politics.

The job of Speaker of the House is thankless. It is simply not one a person could do for any significant length of time unless it was for more than self-aggrandizement. Someone was always asking him for something. Former Illinois Senate President Phil Rock titled his autobiography "Nobody Calls Just to Say Hello," and that's as apt a description as I can come up with to describe what Mike Madigan dealt with daily as Speaker of the House. In my experience, he would do his best to help anyone he could, regardless of whether they could return the favor. What I saw was a man who lived up to his reputation for being an honest broker, and if he didn't think he could deliver on a promise, he was forthright about it.

I was also responsible for providing legal and ethics advice to the Speaker, as well as the members and staff of the House Democratic Caucus. I worked with then Speaker Madigan to develop a conflicts of interest process aimed at minimizing any potential allegations of impropriety,

including for recusals on issues that might lead to the perception of a conflict, as well as any actual conflicts. He insisted on meticulously reviewing all legislation and any possible conflicts. He entrusted me to advise him if I thought he should recuse himself from a matter, and he never once disputed or disagreed with my advice. The result would often create a situation where another member of his leadership team would be responsible for taking the lead on an issue. In numerous instances he would direct his law partner to terminate a client just to avoid the appearance of impropriety, even though there wasn't a direct or indirect conflict. Over the course of my tenure, I never witnessed the Speaker engage in any conduct or take an action that I found legally or ethically inappropriate.

For many years it was clear there were numerous individuals, and some reporters, focused on questioning his credibility and ethics, and the Speaker was under intense scrutiny. In my experience, his reaction to this was to examine the facts to determine whether he had engaged in any impropriety and then determine whether there was a way to alter our internal systems to ensure the integrity of the Office of the Speaker. For example, in 2010 and 2012 when scathing articles were published that implied conflicts of interest, Madigan provided a fully factual rebuttal in the hopes of demonstrating that you cannot always believe what you read. (See https://capitolfax.com/Madiganresponsechgotribarticles.pdf) I never viewed this as an attempt to masquerade or evade responsibility, but rather an effort to demonstrate how easy it can be to spin a story if you don't have all of the facts and to lay out the code he established for himself as a public official.

He never cared how reporters or the general public viewed him because he knew that if he was honest and forthright with his colleagues and constituents, they would take him at his word, because that's who he was as a person and as a legislative leader. Perhaps it was an error, but he never viewed the office through the lens of celebrity. He was not trying to be the most popular person in Illinois; he was trying to be the most effective legislative leader he could be.

He also spent a tremendous amount of time and effort to help people, many who had nothing to give, for no reason other than he could. Madigan didn't seek to simply help people who were affiliated with his political organization or who might benefit his political or governmental function. He would often assist random strangers or people who needed help simply because he knew he could make a difference. No one who came into his local offices seeking help were asked what party they supported or who they voted for. If they came for help and it could be provided, help was given.

And it wasn't just governmental help. As just one example, in 2014 a man reached out to the Speaker's Office looking for advice on how to help his son. His son, who had provided ministry to firefighters in New York on 9/11 and was gravely ill because of air he breathed near ground zero, found himself with a judgment against him in a nonsensical civil lawsuit. This wasn't a person affiliated with the political operation or a constituent – he was simply someone who needed help, and Madigan knew he might be able to make a difference. Mr. Madigan found pro bono counsel to assist the son, and the matter ultimately resulted in a favorable result. This is one of dozens of examples where Madigan went out of his way to help "nobody nobody sent."

As you make your sentencing decision, I hope you will take into consideration the many contributions that Speaker Madigan made to our state and the many people whose lives he changed for the better. I could burden you with many more pages about his legislative accomplishments and actions he took to benefit those who may never know – including working to keep people in their homes during the mortgage crisis, securing unprecedented resources for Black and brown communities, pushing against his allies to provide thousands of kids with private school scholarships, fighting against his own religion to help protect a woman's right to choose, securing good paying union jobs on thousands of projects throughout Illinois, or trying to keep payday lenders from preying on our most financially vulnerable. But no matter how you view the sins you now sit in judgment on, the totality of his good works far exceeds them. I hope you agree that should be an important factor as you make your decision.

Respectfully,

Heather Wier Vaught

March 20, 2025

Dear:

I started on former Speaker Madigan's staff in early 2009 and I, to be frank, had really very little idea who he was. I grew up in Southern Illinois and had been out of state for college. When I came home, I wanted to work in state government and applied for then Speaker Madigan's staff. I really didn't know who he was, and was very, very removed from Chicago politics. I saw the Speaker in person maybe a few times in my first 3 years on staff, I would get a nod or a "hello," and smile. He was always polite. The representative I was working the most closely with at the time would talk to me about him, "I don't understand why people get so angry about him, he's genuinely the smartest person I ever met."

After 4 years working for the State, I moved to a position that worked for the political committees he chaired. I finally understood what that Representative meant. I was one of the people that worked to directly staff the former Speaker. I handled all his political finances, reporting, fundraisers, operations, Christmas cards lists and gifts. It only took a few months of working directly for him to realize how much that Representative was underselling it, he was not only one of the smartest individuals I had met, but he was he was kind, thoughtful, genuine and honest. In the years I worked for him, I don't ever remember him being anything but polite, I remember him encouraging offering opinions and mostly I remember the standard that was set, one that valued honesty and helping others.

I spent 4 years working in the political office in Springfield; during the years Gov. Rauner was around he would come out to the office frequently to make calls. It would often just be two or three staff total in the office with him. I remember before we knew it was going to be a regular occurrence, we didn't even have a coffee machine in the office, he never complained or asked anyone to go get him coffee, but did ask once if I would split my coffee with him. It was during those days I discovered that we had an overlapping love of cookies, and would often compare our favorite cookie locations in Springfield. After 4 years I moved from Springfield to Chicago and worked out of our Chicago office. I was only half a block from the Speaker's Law office, and our trading of cooking became a regular occurrence. On more than one occasion he would personally deliver cookies to my office from his favorite cookie spot. I would reciprocate by bringing cookies back to his law office.

However, it wasn't all cookies. The Speaker is one of the hardest working and most diligent individuals I have met. He was routine, meticulous and thorough. He was always prepared. Despite the immense workload and pressure, he never raised his voice to his staff. He approached everything with the same gentil manner. Always asked for things politely, gave clear deadlines and told us his expectations. It was easy to work hard for the Speaker because no matter how much he asked of you, you knew he was working harder. He surrounded himself with people that worked hard. The message was always I'm not going to ask someone to do something I'm not prepared to do myself, and that's put in hard work. I saw that firsthand. As the person who handedly the Speaker's political finances I got to see the level of detail put into making sure the committees had the money they needed to run efficiently. He personally called every donor over a certain amount to thank them for their contributions, in addition to the thank you letters they would all receive. Also, the level of detail he put into making sure the committee

was following the rules. He would make sure the committee had all the details it needed, so everything he spent money on came back with a note that included the date, topic of conversation and who he was meeting with that day if the political committee paid for the meal. That also translated to the ways he tried to help people. The political committees had access to text messaging software and the Speaker, and his ward office could not wait to use it for constituent services, it wasn't about votes it was about how do we help people. Proactive communications that covered items like trash collection, shoveling snow, and are there things you need, he always had an attitude of lets help people.

On a more personal note, the Speaker liked helping people. I had a very big health issue happen about a year into my time with the political committees that left me in the hospital for a few days and requiring ongoing treatment, I still remember him calling and saying "please take care of your self, this is a job, but there is nothing more important than your health." A few months went by and I was still having health issues and he would call and check to make sure I was going to the right doctors. I saw him do the same for other staffers.

In my years working for former Speaker Madigan, honesty was the rule. Rule and expectation are too loose a word to use about how engrained it was as a part of our office. It was about work, but it often creeped into other parts of our lives. I remember there was a bill that had passed the legislature and the he was banned from Springfield area communions by the Bishop of Springfield. We had a conversation about how he felt about it and I will never forget the sincerity of that answer. We talked about how he was raised, I told him about my parents and grandparents and their experiences. Similarly, after the state and democratic party had passed regulations around bullying and harassment training, I had sat with him to help him navigate the computer as he took his training. We had a long conversation about my experiences on campaign, and if I had been bullied or harassed by former candidates. We had a very honest conversation about what that had been like. However, what I remember most is that the expectation was to be honest with him, with each other on staff and if you are unsure of yourself either say that or ask a lawyer for help. No one was going to get upset for saying I don't know, or I need to double check, or I need to run that through the attorneys, but diligence and honesty were required. The equation was always simple, we want a democratic majority in the house and in the state. A democratic majority leads to policies we think will make the state better. To do that we all have to pull our weight and not cut corners. I never once saw the former Speaker cut a corner.

I ask that you please show mercy to Mike Madigan. He is a good man who has done many good things with his life.


Sincerely,


Emily Wurth